## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

WOODHULL FREEDOM FOUNDATION,    )
HUMAN RIGHTS WATCH, ERIC KOSZYK,    )
JESSE MALEY, a/k/a ALEX ANDREWS, and    )
THE INTERNET ARCHIVE,    )
    )
    )   Case No. 1:18-cv-1552
      Plaintiffs,    )
    )
    v.    )
    )
THE UNITED STATES OF AMERICA    )
and WILLIAM P. BARR, in his official    )
capacity as ATTORNEY GENERAL    )
OF THE UNITED STATES,    )
    )
      Defendants.    )
    )

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56, Plaintiffs Woodhull Freedom Foundation, Human Rights Watch, Eric Koszyk, Jesse Maley a/k/a Alex Andrews, and The Internet Archive, respectfully move the Court to enter summary judgment in their favor on their claims that the Allow States and Victims to Fight Online Sex Trafficking Act of 2017, Pub. L. No. 115-164, 132 Stat. 1253 (2018) ("FOSTA"), as codified at 18 U.S.C. §§ 1591(e), 1595(d)(4) & 2421A, and 47 U.S.C. § 230(e)(5), is unconstitutional under the First and Fifth Amendments and the Constitution's *Ex Post Facto* Clause. FOSTA is unconstitutionally vague and overbroad, is a content-based statute that cannot satisfy strict scrutiny, and lacks the necessary scienter requirements to be constitutional, and it explicitly is meant to have retroactive reach in both its criminal and civil applications.

Plaintiffs request a declaratory ruling that FOSTA is unconstitutional and a permanent injunction against its enforcement and application. There is a substantial controversy between Plaintiffs and the government regarding whether the FOSTA violates the First Amendment, and

as to whether it can be constitutionally enforced by federal and state officials by seeking criminal penalties for asserted violations, and by litigants seeking to impose civil liability, such that there is a real and immediate need warranting a declaration of unconstitutionality. *United Gov't Sec. Officers of Am., Local 52 v. Chertoff*, 587 F. Supp. 2d 209, 222 (D.D.C. 2008). Injunctive relief is proper because given FOSTA's unconstitutionality, Plaintiffs (and others subject to FOSTA) are suffering irreparable injury in the absence of an injunction, and both the balance of interests and public interest favor relief. *E.g.*, *Guffey v. Duff*, --- F. Supp. 3d ---, 2020 WL 2065274, at *9 (D.D.C. Apr. 29, 2020). *See also Mills v. D.C.*, 571 F.3d 1304, 1312 (D.C. Cir. 2009); *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511-12 (D.C. Cir. 2016); *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

In support of this Motion, Plaintiffs file the following accompanying documents: Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Summary Judgment, and Plaintiffs' Statement of Undisputed Material Facts and accompanying exhibits, including the Declarations of Kate D'Adamo, Dr. Jessica P. Ashooh, Dr. Alexandra Lutnick, Alexandra Frell Levy Yelderman, Jesse Maley, Brewster Kahle, Ricci Levy, Eric Koszyk, and Dinah PoKempner. Plaintiffs also rely on declarations by Ms. Levy and Dr. Kimberly Mehlman-Orozco, filed earlier in this case. ECF Nos. 5-2 & 5-9.

WHEREFORE, it is hereby respectfully requested that this Court grant summary judgment for Plaintiff's and enter an order enjoining FOSTA's enforcement and application.

DATED: August 31, 2020

JA064

Respectfully submitted,


_____/s/ Robert Corn-Revere_____
ROBERT CORN-REVERE
D.C. Bar No. 375415
RONALD G. LONDON
D.C. Bar No. 456284
**Davis Wright Tremaine LLP**
1301 K Street, NW, Suite 500 East
Washington, D.C. 20005
Telephone: (202) 973-4200
Facsimile: (202) 973-4499
Email: bobcornrevere@dwt.com
        ronnielondon@dwt.com


LAWRENCE G. WALTERS
Florida Bar No.: 0776599
*Pro Hac Vice*
**Walters Law Group**
195 W. Pine Ave.
Longwood, FL 32750-4104
Telephone: (407) 975-9150
Facsimile: (408) 774-6151
Email: Larry@FirstAmendment.com
        Paralegal@FirstAmendment.com


AARON MACKEY
D.C. Bar No. 1017004
DAVID GREENE
(admitted in California)
*Pro Hac Vice*
CORYNNE MCSHERRY
(admitted in California)
**Electronic Frontier Foundation**
815 Eddy Street
San Francisco, CA 94109
(415) 436-9333
Email:  amackey@eff.org
        davidg@eff.org


DAPHNE KELLER
Cal. Bar No. 226614
**Stanford Cyber Law Center**
616 Jane Stanford Way #E016
Stanford, CA 94305
(650) 725-0325
Email:  daphnek@stanford.edu


Attorneys for Plaintiffs

JA065

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

WOODHULL FREEDOM FOUNDATION,    )
HUMAN RIGHTS WATCH, ERIC KOSZYK,    )
JESSE MALEY, a/k/a ALEX ANDREWS, and    )
THE INTERNET ARCHIVE,    )
    )    Case No. 1:18-cv-1552
    Plaintiffs,    )
    )
    v.    )
    )
THE UNITED STATES OF AMERICA    )
and WILLIAM P. BARR, in his official    )
capacity as ATTORNEY GENERAL    )
OF THE UNITED STATES,    )
    )
    Defendants.    )

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 2

    A.  FOSTA's Specific Provisions ...................................................................... 2

    B.  FOSTA's Impact ........................................................................................ 4

ARGUMENT ................................................................................................................ 7

I.     FOSTA'S BROAD UNDEFINED PROHIBITIONS COMBINED WITH THE
      SELECTIVE MODIFICATION OF ONLINE INTERMEDIARY IMMUNITY IN
      SECTION 230 VIOLATE THE FIRST AMENDMENT .................................................... 7

    A.  The First Amendment Sharply Limits Restrictions on Intermediaries Because
        Such Measures Inevitably Lead to Overcensorship ...................................... 7

    B.  FOSTA Imposes Particular Burdens on Online Intermediaries ................. 10

II.    FOSTA VIOLATES THE FIRST AND FIFTH AMENDMENTS ................................ 12

    A.  FOSTA's Prohibitions are Imprecise, Excessively Broad, and Lack Necessary
        Scienter Requirements ............................................................................. 13

        1.    FOSTA is Unconstitutionally Vague ................................................ 13

        2.    FOSTA's Prohibitions are Unconstitutionally Overbroad ................. 18

        3.    FOSTA Lacks the Scienter the First Amendment Requires .............. 22

    B.  FOSTA Fails Strict Scrutiny ..................................................................... 26

III.   FOSTA IS AN UNCONSTITUTIONAL *EX POST FACTO* LAW ............................ 30

IV.   PLAINTIFFS ARE ENTITLED TO INJUNCTIVE AND DECLARATORY RELIEF . 32

    A.  Plaintiffs and All Other Internet Publishers and Users Have Suffered and Will
        Continue to Suffer Irreparable Harm ......................................................... 33

    B.  The Balance of Equities Favors Injunctive Relief ..................................... 35

    C.  An Injunction Would Serve the Public Interest ......................................... 37

JA0067

D.  Declaratory Relief is Warranted ................................................................................ 37

CONCLUSION ................................................................................................................... 38

JA0068

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Abuelhawa v. United States*,
   556 U.S. 816 (2009)....................................................................................15

*Amusement Devices Ass'n v. Ohio*,
   443 F. Supp. 1040 (S.D. Ohio 1977) ...............................................14, 16

*Ashcroft v. ACLU*,
   542 U.S. 656 (2004)...............................................................................27, 28

*Ashcroft v. Free Speech Coalition*,
   535 U.S. 234 (2002)............................................................................. *passim*

*Backpage.com v. Cooper*,
   939 F. Supp. 2d 805 (M.D. Tenn. 2013)........................................22, 23, 29

*Backpage.com v. Hoffman*,
   2013 WL 4502097 (D.N.J. 2013) ...........................................................22

*Backpage.com v. McKenna*,
   881 F. Supp. 2d 1262 (W.D. Wash. 2012)..............................................22

*Backpage.com, LLC v. Dart*,
   807 F.3d 229 (7th Cir. 2015) ...................................................................4

*Backpage.com, LLC v. Lynch*,
   216 F. Supp. 3d 96 (D.D.C. 2016)......................................................25, 30

*Baggett v. Bullitt*,
   377 U.S. 360 (1964)..........................................................................13, 14, 16

*Bantam Books, Inc. v. Sullivan*,
   372 U.S. 58 (1963)...................................................................................8, 9

*Barr v. Am. Ass'n of Political Consultants*,
   140 S. Ct. 2355 (2020)..............................................................................26

*Bartniki v. Vopper*,
   532 U.S. 514 (2001)...................................................................................23

*Batzel v. Smith*,
   333 F.3d 1018 (9th Cir. 2003) .................................................................10

JA0069

*Bd. of Airport Comm'rs of City of Los Angeles v. Jews for Jesus, Inc.*,
    482 U.S. 569 (1987) .......................................................................................... 14

*Boggs v. Bowron*,
    842 F. Supp. 542 (D.D.C. 1993), *aff'd*, 67 F.3d 972 (D.C. Cir. 1995) .................... 37

*Brandenburg v. Ohio*,
    395 U.S. 444 (1969) .......................................................................................... 19

*Brown v. Entm't Merchs. Ass'n*,
    564 U.S. 786 (2011) ......................................................................... 13, 27, 28, 29

*Center for Democracy & Technology v. Pappert*,
    337 F. Supp. 2d 606 (E.D. Pa. 2004) ......................................................... 9, 10, 29

*Cramp v. Bd. of Pub. Instruction*,
    368 U.S. 278 (1961) .......................................................................................... 16

*Cubby v. CompuServe, Inc.*,
    776 F. Supp. 135 (S.D.N.Y 1991) ....................................................................... 9

*Déjà vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cty.*,
    274 F.3d 377 (6th Cir. 2001) ............................................................................. 32

*Denver Area Educ. Telecomms. Consortium v. FCC*,
    518 U.S. 727 (1996) ........................................................................................ 8, 9

*Elonis v. United States*,
    135 S. Ct. 2001 (2015) ................................................................................ 22, 24

*Elrod v. Burns*,
    427 U.S. 347 (1976) .......................................................................................... 32

*Giboney v. Empire Storage & Ice Co.*,
    336 U.S. 490 (1949) .......................................................................................... 23

*Google, Inc. v. Hood*,
    822 F.3d 212 (5th Cir. 2016) ............................................................................. 10

*Google, Inc. v. Hood*,
    96 F. Supp. 3d 584 (S.D. Miss. 2015), *aff'd*, 822 F.3d 212 (5th Cir. 2016) ......... 17, 33, 37

*Gordon v. Holder*,
    721 F.3d 638 (D.C. Cir. 2013) ...................................................................... 33, 37

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972) .......................................................................................... 13

JA0070

*Guffey v. Duff*,
   2020 WL 2065274 (D.D.C. Apr. 29, 2020) ...................................7, 32

*Holder v. Humanitarian Law Project*,
   561 U.S. 1 (2010) ...............................................................................27

*J.B. v. G6 Hospitality, LLC*,
   2020 WL 4901196 (N.D. Cal. Aug. 20, 2020) ....................................6

*Jones v. Dirty World Entm't Recordings LLC*,
   755 F.3d 398 (6th Cir. 2014) .............................................................11

*Kingsley Int'l Pictures Corp. v. Regents of Univ. of N.Y.*,
   360 U.S. 684 (1959).............................................................................29

*Landgraf v. USI Film Prods.*,
   511 U.S. 244 (1994).............................................................................30

*Loveday v. FCC*,
   707 F.2d 1443 (D.C. Cir. 1983) .......................................................9, 10

*Members of City Council v. Taxpayers for Vincent*,
   466 U.S. 789 (1984).............................................................................18

*Midwest Video Corp. v. FCC*,
   571 F.2d 1025 (8th Cir. 1978) .............................................................8

*Mills v. D.C.*,
   571 F.3d 1304 (D.C. Cir. 2009)..........................................................32

*Mishkin v. New York*,
   383 U.S. 502 (1966).......................................................................22, 26

*N.Y. Times Co. v. Sullivan*,
   376 U.S. 254 (1964).........................................................................8, 29

*NAACP v. Button*,
   371 U.S. 415 (1963).......................................................................14, 19

*Ogden v. Saunders*,
   25 U.S. (12 Wheat.) 213 (1827).........................................................31

*Packingham v. North Carolina*,
   137 S. Ct. 1730 (2017).....................................................10, 26, 33, 34

*Peugh v. United States*,
   569 U.S. 530 (2003).............................................................................32

JA0071

*PHE, Inc. v. U.S. Dep't of Justice*,
 743 F. Supp. 15 (D.D.C. 1990) .......................................................37

*Pursuing America's Greatness v. FEC*,
 831 F.3d 500 (D.C. Cir. 2016) ..............................................32, 33, 37

*Reed v. Town of Gilbert*,
 576 U.S. 155 (2015)..........................................................26, 27

*Reno v. ACLU*,
 521 U.S. 844 (1997).............................................................. *passim*

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
 515 U.S. 819 (1995)...................................................................27

*Sable Commc'ns of Cal., Inc. v. FCC*,
 492 U.S. 115 (1989).....................................................................5

*Sandvig v. Sessions*,
 315 F. Supp. 3d 1 (D.D.C. 2018) ...............................................13

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*,
 502 U.S. 105 (1991)...................................................................27

*Smith v. California*,
 361 U.S. 147 (1959)...........................................................8, 9, 22

*Smith v. Goguen*,
 415 U.S. 566 (1974)...................................................................14

*Snyder v. Phelps*,
 580 F.3d 206 (4th Cir. 2009), *aff'd*, 562 U.S. 443 (2011) ...................29

*Speiser v. Randall*,
 357 U.S. 513 (1958)...................................................................26

*Stogner v. California*,
 539 U.S. 607 (2003)...................................................................31

*True the Vote, Inc. v. IRS*,
 831 F.3d 551 (D.C. Cir. 2016) .....................................................27

*United Gov't Sec. Officers of Am., Local 52 v. Chertoff*,
 587 F. Supp. 2d 209 (D.D.C. 2008) ........................................7, 33, 37

*United States v. Ali*,
 718 F.3d 929 (D.C. Cir. 2013) .....................................................26

JA0072

*United States v. Freeman*,
    761 F.2d 549 (9th Cir. 1985) .................................................................24

*United States v. Miller*,
    379 F.2d 483 (7th Cir. 1967) .................................................................16

*United States v. Miselis*,
    --- F.3d ---, 2020 WL 5015072 (4th Cir. Aug. 24, 2020) ....................15, 19, 23, 24

*United States v. Playboy Entm't Grp., Inc.*,
    529 U.S. 803 (2000)..........................................................................9, 27, 28, 30

*United States v. Reiner*,
    500 F.3d 10 (1st Cir. 2007) ..................................................................21

*United States v. Rundo*,
    No. 18-cr-00759-CJC (C.D. Cal. June 3, 2019)...................................19

*United States v. Seals*,
    2014 WL 3847916 (W.D. Ark. Aug. 5, 2014) .......................................21

*United States v. Stevens*,
    559 U.S. 460 (2010)..............................................................................18

*United States v. Williams*,
    553 U.S. 285 (2008)..............................................................14, 21, 23, 24

*United States v. X-Citement Video, Inc.*,
    513 U.S. 64 (1994)................................................................................22

*Universal Commc'n Sys., Inc. v. Lycos, Inc.*,
    478 F.3d 413 (1st Cir. 2007) ...........................................................10, 11

*Video Software Dealers Ass'n v. Webster*,
    968 F.2d 684 (8th Cir. 1992) ................................................................22

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)..................................................................................35

*Woodhull Freedom Found. v. United States*,
    334 F. Supp. 3d 185 (D.D.C. 2018), *rev'd on other grounds*,
    948 F.3d 363 (D.C. Cir. 2020) .............................................................21

*Woodhull Freedom Found. v United States*,
    948 F.3d 363 (D.C. Cir. 2020) ...................................................... *passim*

*Zeran v. America Online, Inc.*,
    129 F.3d 327(4th Cir. 1997) ...........................................................10, 11

JA0073

**Constitutional Provisions**

U.S. Const. amend. I ............................................................................ *passim*

U.S. Const. amend. V ........................................................................... 1, 2, 12

U.S. Const. art. I, § 9 ........................................................................... 30

U.S. Const. art. I, § 10 ......................................................................... 30

**Federal Statutes**

Allow States and Victims to Fight Online Sex Trafficking Act of 2017,
    Pub. L. No. 115-164, 132 Stat. 1253 (2018) ................................... *passim*

18 U.S.C. § 1591(a) ......................................................................... 3, 20, 25, 30

18 U.S.C. § 1591(b) ........................................................................... 32

18 U.S.C. § 1591(e) ........................................................................... 3, 14, 25

18 U.S.C. § 1595 ............................................................................... 38

18 U.S.C. § 1595(d) ........................................................................... 3, 28

18 U.S.C. § 1952 ............................................................................... 20

18 U.S.C. § 1952(a) ........................................................................... 21

18 U.S.C. § 1952(b) ........................................................................... 20

18 U.S.C. § 2101(a)(2) ....................................................................... 19

18 U.S.C. § 2202(b) ........................................................................... 19

18 U.S.C. § 2421A ............................................................................. *passim*

18 U.S.C. § 2421A(a) ......................................................................... 2, 13, 24, 28

18 U.S.C. § 2421A(b) ......................................................................... *passim*

18 U.S.C. § 2421A(c) ......................................................................... 3, 18, 28

18 U.S.C. § 2421A(d) ......................................................................... 3, 18, 28

47 U.S.C. § 230 ................................................................................. *passim*

47 U.S.C. § 230(c) ............................................................................. 11, 12

47 U.S.C. § 230(e) ............................................................................. *passim*

JA0074

47 U.S.C. § 230(f) ............................................................................................ 13

**State Statutes**

2019 Miss. Laws, Chapter 459 (S.B. 2305), § 1 ........................................... 32

Miss. Code § 97-3-54.1(1)(c) ......................................................................... 32

Nev. Rev. Stat. § 201.300 ............................................................................... 32

Tex. Penal Code § 43.031 ........................................................................ 17, 31

Tex. Penal Code § 43.041 ............................................................................... 31

**Other Authorities**

About FOSTA, CRAIGSLIST, https://www.craigslist.org/about/FOSTA ......................... 5

Brief of Amici Curiae Equality Now *et al.*, 2019 WL 1773391 (D.C. Cir. Apr. 22,
   2019) ..................................................................................................... 12, 18

Brief of the States of Texas *et al.*, 2019 WL 1773389 (D.C. Cir. Apr. 22, 2019) ......... 17

Congressional Research Service, *Sex Trafficking: An Overview of Federal
   Criminal Law*, June 25, 2015 .............................................................................. 26

Daphne Keller, "Empirical Evidence of 'Over-Removal' by Internet Companies
   under Intermediary Liability Laws," Stanford Ctr. for Internet & Soc'y,
   Oct. 12, 2015, http://cyberlaw.stanford.edu/blog/2015/10/empirical-evidence-
   over-removal-internet-companies-under-intermediary-liability-laws ..................... 11

*Doe v. Kik Interactive*,
   No. 0:20-cv-60702-AHS (S.D. Fla.) ...................................................................... 6

*Doe v. Rocket Science Grp. (Mailchimp)*,
   No. 1:19-cv-05393 (N.D. Ga.) ............................................................................... 6

Eric Goldman, *The Complicated Story of FOSTA and Section 230*,
   17 FIRST AMENDMENT L. REV. 279 (2019) ......................................................... 12

H.R. Rep. No. 115-572, pt. 1 ................................................................. 25, 26, 29

Jeff Kosseff, THE TWENTY-SIX WORDS THAT CREATED THE INTERNET 270 (2019) ............. 12

*M.L. v. Craigslist Inc.*,
   No. 3:19-cv-6153 BHS-TLF (W.D. Wash. Apr. 17, 2020) ........................................ 6

S. Rep. No. 115-199 (2018) ......................................................................... 12

JA0075

Tex. Sen. Bill 20 (2019)..................................................................................................31

The Federalist No. 44 (James Madison) ..........................................................................31

The Federalist No. 84 (Alexander Hamilton) ..................................................................31

x

## INTRODUCTION

The Allow States and Victims to Fight Online Sex Trafficking Act of 2017, Pub. L. No. 115-164, 132 Stat. 1253 (2018) ("FOSTA" or "the Act"), the most dramatic attempt to censor online speech since Congress first attempted to regulate the Internet through anti-indecency provisions in the Communications Decency Act of 1996 ("CDA"), violates the First and Fifth Amendments. FOSTA targets online speech by (1) creating a new federal offense for anyone who "owns, manages, or operates an interactive computer service" with the intent to "promote" or "facilitate" prostitution, (2) expanding potential liability for federal sex trafficking offenses by adding vague definitions and expanding the pool of enforcers, and (3) diluting the CDA's only pro-free speech provision—Section 230—by limiting federal immunity provided online inter-mediaries that host third-party speech. These new, entirely content-based prohibitions impose harsh criminal penalties and heavy civil liability for online intermediaries based on expansive and undefined terms regarding "promotion" or "facilitation" of "prostitution," *see Woodhull Freedom Found. v United States*, 948 F.3d 363, 372 (D.C. Cir. 2020), and lower thresholds of knowledge and intent. The government claims that the statute solely targets "sex traffickers," but "FOSTA's text does not limit its scope to 'bad actor websites,' or even to classified advertising." *Id.*

Since its April 2018 adoption, FOSTA has had a substantial chilling effect on protected speech, causing numerous online platforms to completely shut down or censor material protected by the First Amendment. This resulted in censorship of constitutionally protected, commercial and non-commercial speech that could be construed to "promote," "assist" or "facilitate" sex work, including constitutionally protected online advocacy and harm reduction efforts, like the speech of Plaintiffs Jesse Maley, Woodhull Freedom Foundation, and Human Rights Watch. It has abridged Internet speech indiscriminately, causing general-purpose online intermediaries to limit forums for speech, essentially silencing users such as Plaintiff Eric Koszyk, and greatly impeding

users like Woodhull.  Thus FOSTA, like the CDA before it, has "torch[ed] a large segment of the Internet community."  *Reno v. ACLU*, 521 U.S. 844, 882 (1997) (unanimously invalidating indecency prohibition on its face).  For these reasons, Plaintiffs ask this Court to declare FOSTA unconstitutional under the First and Fifth Amendments and to enjoin its enforcement.

## BACKGROUND

### A.    FOSTA's Specific Provisions

FOSTA changed the law in three ways:  (1) it created a new federal crime and civil claim, codified at 18 U.S.C. § 2421A, prohibiting use or attempted use of any facility of interstate commerce, including interactive computer services, to promote or facilitate prostitution; (2) it expanded the prohibition in 18 U.S.C. § 1591 on "participation in a venture" involving sex trafficking to include any action "knowingly assisting, supporting, or facilitating" a venture while recklessly disregarding its violation of the law; and (3) it amended 47 U.S.C. § 230 to allow state authorities to prosecute interactive computer services under state law if the underlying conduct would violate 18 U.S.C. § 2421A or § 1591, and to permit civil causes of action based on violations of § 1591.

Section 2421A makes it a felony for anyone to own, manage, or operate an interactive computer service using any facility or means of interstate commerce "with the intent to promote or facilitate the prostitution of another person."  18 U.S.C. § 2421A(a).  It also creates an "aggravated violation" when the underlying conduct "promotes or facilitates the prostitution of 5 or more persons," or if one "acts in reckless disregard" of the fact that his or her conduct "contributed to sex trafficking."  *Id*. § 2421A(b).  Anyone convicted of violating Section 2421A(a) can be fined, imprisoned for up to 10 years, or both; for "aggravated violations" imprisonment may be for up to 25 years.  *Id*. § 2421A(a)-(b).  Operators of interactive computer services can also face civil suits

JA0078

for violations of 2421A(b).  *Id*. § 2421A(c).  Sections 2421A(c) and (d) allow for, respectively, civil recovery of damages and attorneys' fees, and mandatory restitution for victims of the crime.

As the D.C. Circuit recognized, FOSTA does not define what it means to "promote" or "facilitate" prostitution, nor even what constitutes "prostitution," which is undefined in federal law.  *Woodhull Freedom Found*., 948 F.3d at 372.  Nor are the terms "promote," "facilitate," or "contribute to sex trafficking" defined for purposes of an aggravated offense under Section 2421A(b).  *Id*.  The court observed that "'promote' and 'facilitate,' when considered in isolation, are 'susceptible of multiple and wide-ranging meanings,'" and the statutory terms are not "limited by a string of adjacent verbs (such as advertises, distributes, or solicits) that would convey a 'trans-actional connotation' that might narrow the statute's reach."  *Id.*

FOSTA also expands the federal criminal trafficking law in 18 U.S.C. § 1591 by adding a definition for "participation in a venture" to mean "knowingly assisting or supporting, or facilitating a violation of" the sex trafficking law.  *See* 18 U.S.C. § 1591(e)(4).  However, where liability is based on benefitting financially or receiving anything of value from "a venture" under Section 1591(a)(2), FOSTA does not require a showing of specific intent, but only "knowing" or "reckless disregard" of whether or not trafficking has taken place.  Violations of Section 1591 are punishable by mandatory minimum sentences of ten or fifteen years, and fines of $250,000 for individuals, and $500,000 for organizations.  Additionally, FOSTA amends Section 1595 to provide that state attorneys general may bring civil actions *parens patriae* if there is reason to believe "an interest of the residents of that State has been or is threatened or adversely affected by any person who violates section 1591."  *See* 18 U.S.C. § 1595(d).

FOSTA reduced preexisting immunities for online intermediaries by amending 47 U.S.C. § 230(e) to eliminate immunity for:  "(A) any claim in a civil action [] under section 1595 of title

18 … if the conduct underlying the claim constitutes a violation of section 1591 …;" "(B) any charge in a criminal prosecution [] under State law if the conduct underlying … would constitute a violation of section 1591 …;" or "(C) any charge in a criminal prosecution [] under State law if the conduct underlying … would constitute a violation of section 2421A." *See* 47 U.S.C. § 230(e)(5). The amendments to Section 230, like all of FOSTA, became effective upon the date of enactment. However, these changes to the CDA's statutory immunities are *retroactive* in that they apply "regardless of whether the conduct alleged occurred, or is alleged to have occurred, before, on, or after … enactment." *See* FOSTA, Pub. L. No. 115-164, § 4(b).

### B.    FOSTA's Impact

FOSTA had precisely the wide censorial effect predicted during its consideration. Numerous online service providers that enabled interpersonal communication by users—including contacts with no connection to sexual activity—immediately removed content, eliminated entire sections of websites, or were shuttered altogether out of fear of state or federal prosecution, or ruinous civil liability. *See* Plaintiffs' Statement of Undisputed Material Facts ("SMF") ¶ 1. FOSTA caused censorship of online platforms that host classified ads (whether or not sexually-oriented) and platforms that host discussions of sex work, *id.*, even though most presumed speech about sex is legal and protected by the First Amendment. *Backpage.com, LLC v. Dart*, 807 F.3d 229, 234 (7th Cir. 2015) ("not all advertisements for sex are advertisements for illegal sex").

Some online service providers took these actions because they feared the new law would be interpreted to require monitoring the activities of third parties on their sites, which would be both impractical and financially ruinous. For example, just two days after the Senate passed H.R. 1865, online classified ad service Craigslist eliminated all personals ads, including non-sexual categories such as "Missed Connections" and "Strictly Platonic," stating: "Any tool or service can be misused. We can't take such risk without jeopardizing all our other services, so we are

JA0080

regretfully taking [the] personals offline."[1]  Google changed enforcement of its Google Play policy to forbid publishing "sexually explicit or pornographic images or videos," SMF ¶¶ 1, 22, even though any "[s]exual expression which is indecent but not obscene is protected by the First Amendment," and cannot be criminalized under FOSTA.  *See Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989).

For its part, social media platform Reddit banned user groups, called subreddits, that it feared "might be misconstrued as promoting or facilitating prostitution." SMF ¶¶ 1, 3.  Before FOSTA, Reddit would respond to potential terms-of-service compliance issues by warning their volunteer community moderators of the problem and working with them to address it.  Given FOSTA's vagueness and scope of liability of the new law, Reddit no longer does so, for fear that its actions could be misinterpreted as knowingly assisting, supporting, or facilitating the activity. It reluctantly shut down groups that it believes were valuable harm-reduction resources for vulnerable people, such as the r/escorts subreddit, a well-moderated community of approximately 8,000 subscribers, "with a focus on education, safety, and health for clients and providers alike."  *Id*. This group had specific rules forbidding providers from advertising their services, including a ban on posting links to external provider websites, profiles, and reviews.  It also forbade requests from potential clients to help find providers.  Despite these precautions, Reddit felt obligated to ban the group when FOSTA was passed, due to the potential risk of liability it presented under the new law.  *Id*.  Its loss removed an important discussion space for voluntary sex workers trying to stay safe.

---

[1]  *See* About FOSTA, CRAIGSLIST, https://www.craigslist.org/about/FOSTA (last visited Aug. 27, 2020).  Users now receive "404 Errors" if they try to access URLs where Craigslist's personals formerly appeared.

JA0081

As expected, civil litigants have quickly moved to take advantage of FOSTA.  In *J.B. v. G6 Hospitality*, for example, the plaintiff alleged, *inter alia*, that Craigslist conspired with sex traffickers between 2007 and 2010 by providing an "erotic services" and "adult services" section on its website, and argued that FOSTA had changed the law so as to allow her claims.  *See J.B. v. G6 Hospitality, LLC*, 2020 WL 4901196 (N.D. Cal. Aug. 20, 2020).  Craigslist successfully moved to dismiss, but only after months of expensive litigation, which may not be over should the plaintiff appeal.  *Id*.  And this lawsuit is far from unique.  *See, e.g.*, *M.L. v. Craigslist Inc.*, No. 3:19-cv-6153 BHS-TLF (W.D. Wash. Apr. 17, 2020) (citing FOSTA and alleging, *inter alia*, that Craigslist conspired with sex traffickers by providing an "erotic services" and "adult services" section on its website); *Doe v. Kik Interactive*, No. 0:20-cv-60702-AHS (S.D. Fla.) (citing FOSTA, alleging that provider of messaging application used in connection with sex trafficking conspired with the traffickers); and *Doe v. Rocket Science Grp. (Mailchimp)*, No. 1:19-cv-05393 (N.D. Ga.) (alleging Mailchimp facilitated trafficking by allowing an alleged sex trafficker to use its marketing services and technology).

And FOSTA continues to negatively affect the Plaintiffs.  As set forth in more detail below, for example, Eric Koszyk still can't use Craigslist to find customers for his therapeutic massage business and attempts at other methods of advertising, including his own website, have generated less than half his previous revenue; Jesse Maley is still prevented from improving or developing digital tools that sex workers could use to share health, safety, and other harm-reduction information—and now with the COVID-19 pandemic impeding in-person communication, has eschewed online alternatives; and due to adoption of restrictive content moderation policies by online intermediaries in response to FOSTA, Woodhull has been unable to promote and livestream its Sexual Freedom Summit as desired, and had to postpone or abandon some of its Summit

JA0082

programs, based on its fear of losing its established platform accounts, followers, and stored content.  *See infra* §§ IV.A-C.

## ARGUMENT

FOSTA violates well-established First Amendment principles pertaining to the constitutional rights to publish, post to, and access websites:  the law is unconstitutionally overbroad and vague, fails strict scrutiny, and lacks the proper scienter.  Additionally, FOSTA is an unconstitutional *ex post facto* law.  Summary judgment lies because there are no genuine issues as to any material fact and, as demonstrated below, Plaintiffs are entitled to judgment as a matter of law on FOSTA's constitutionality.  *E.g.*, *Guffey v. Duff*, 2020 WL 2065274, at *8 (D.D.C. Apr. 29, 2020) (quoting F.R.C.P. 56(a)).  Injunctive relief is warranted because Plaintiffs and others subject to FOSTA will suffer irreparable injury absent an injunction, and both the balance of interests and the public interest favor relief.  *Id.* at *9.  Declaratory relief is also proper due to the substantial controversy over whether FOSTA violates the First Amendment and the need for definitive statement in that regard, especially given its potential attempted application by those not before this Court.  *E.g.*, *United Gov't Sec. Officers of Am., Local 52 v. Chertoff*, 587 F. Supp. 2d 209, 222 (D.D.C. 2008).

## I.     FOSTA'S BROAD UNDEFINED PROHIBITIONS COMBINED WITH THE SELECTIVE MODIFICATION OF ONLINE INTERMEDIARY IMMUNITY IN SECTION 230 VIOLATE THE FIRST AMENDMENT

### A.  The First Amendment Sharply Limits Restrictions on Intermediaries Because Such Measures Inevitably Lead to Overcensorship

FOSTA violates fundamental First Amendment principles by imposing liability on online intermediaries without sufficient safeguards for protected speech.  By creating powerful incentives to eliminate whole platforms and broad categories of speech, it restricts not only the speech of the intermediaries themselves, including major platforms like Facebook or Google and smaller

JA0083

operators like Plaintiffs Jesse Maley and the Internet Archive, but of speakers who rely on those intermediaries, like Koszyk, Woodhull, and Human Rights Watch.

Well before the Internet, the Supreme Court repeatedly recognized that laws threatening to impose liability on those who provide a forum for the speech of others pose special threats to the rights of speakers and readers who depend on those services.  In *Smith v. California*, 361 U.S. 147 (1959), for example, the Court struck down a law holding booksellers strictly liable for obscene books on their shelves because the law would in effect compel self-censorship by the bookstore. The problem, the Court noted, was "[t]he bookseller's limitation in the amount of reading material with which he could familiarize himself, and his timidity in the face of his absolute criminal liability, thus would tend to restrict the public's access to forms of the printed word which the State could not constitutionally suppress directly."  *Id*. at 153-54.

For similar reasons, the Court rejected Rhode Island's bookseller liability laws in *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963), and later upheld cable programmers' First Amendment challenge to laws requiring cable operators to segregate and block patently offensive sexual content.  *Denver Area Educ. Telecomms. Consortium v. FCC*, 518 U.S. 727 (1996).  *See also N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 266 (1964) (holding that imposing liability on a newspaper for third-party advertisements "would discourage newspapers from carrying 'editorial advertisements' … and so might shut off an important outlet for the promulgation of information and ideas by persons who do not themselves have access to publishing facilities"); *Midwest Video Corp. v. FCC*, 571 F.2d 1025, 1056 (8th Cir. 1978) (striking FCC's requirement for cable operators to block programmers' unlawful speech, noting created "a corps of involuntary government surrogates, but without providing the procedural safeguards respecting 'prior restraint' required of the government").

8

JA0084

The concerns expressed in *Smith*, *Bantam Books*, and *Denver Area* are amplified in the Internet context due to the volume of speech passing through online intermediaries.  Thus, in *Center for Democracy & Technology v. Pappert*, 337 F. Supp. 2d 606, 649-50 (E.D. Pa. 2004), the court struck down a Pennsylvania statute requiring ISPs to block child pornography upon notice, which had led ISPs to block additional, lawful content as well.  The court reasoned that even though the law, "on its face, does not burden protected speech[,] … the action taken by private actors to comply with the Act has blocked a significant amount of speech protected by the First Amendment."  *Id.* at 652 (applying *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803 (2000)).  *See also Cubby v. CompuServe, Inc.*, 776 F. Supp. 135, 139 (S.D.N.Y 1991) (expressing concerns "deeply rooted in First Amendment" that intermediary not be treated as a publisher in defamation case).

Courts have been particularly wary of the "heckler's veto," whereby a law empowers others to censor speech by simply complaining to the intermediary about it.  *See Reno*, 521 U.S. at 880.  They recognize that intermediaries will often respond to a complaint by simply deleting the speech complained of or by eliminating the platform, rather than expend the resources to investigate the complaint's merits.  *Id.*  As the Supreme Court observed, the concern for censorship is magnified with respect to online intermediaries which may have to deal with thousands and thousands of complaints every day.  Regimes that require website operators to remove content based on such knowledge "confer broad powers of censorship, in the form of a 'heckler's veto,' upon any opponent of indecent speech."  *Id.*[2]

---

[2]  Even outside the Internet context, courts have noted how such a regime leads to censorship.  In *Loveday v. FCC*, 707 F.2d 1443 (D.C. Cir. 1983), the D.C. Circuit rejected a claim that broadcasters had a duty to investigate after receiving conflicting claims about a political ad's sponsorship.  Such a requirement would "invite abuse" in that "opponents of groups sponsoring political messages would have a ready means of harassing and perhaps silencing their adversaries

Given inevitable overcensorship, courts "must exercise extreme caution" and review with special scrutiny any law that purports to regulate speech on the "vast democratic forums of the Internet." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735-36 (2017) (quoting *Reno*, 521 U.S. at 868). Because of the scale of speech burdened by clumsy lawmaking, courts are especially ready to "presume that governmental regulation of the content of speech is more likely to interfere with the free exchange of ideas than to encourage it." *Reno*, 521 U.S. at 885. *See, e.g.*, *Pappert*, 337 F. Supp. 2d at 655 (striking down law where "[m]ore than 1,190,000 innocent web sites were blocked in an effort to block less than 400 child pornography web sites").

### B.  FOSTA Imposes Particular Burdens on Online Intermediaries

Before FOSTA, federal law was specifically designed to reinforce First Amendment protections for online intermediaries so as to protect freedom of speech for Internet users. Congress recognized that Internet speech would be stifled if online intermediaries faced civil liability risks or state law prosecutions for speech posted by third parties. Accordingly, it adopted CDA Section 230 to promote free online expression by incorporating First Amendment values, freeing intermediaries from threats of liability for hosting third-party speech, and encouraging websites to make editorial judgments without risking liability.[3]

---

by making charges, however baseless." Targeted broadcasters in turn would likely seek to "avoid carrying ad[s] of the type involved here" rather than incur the expense and risk of assessing ads under an unclear legal standard with minimal ability to gather evidence. *Id.* at 1457-58.

[3]  *See Google, Inc. v. Hood*, 822 F.3d 212, 220 (5th Cir. 2016) ("First Amendment values … drive the CDA"); *Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 418-19 (1st Cir. 2007) (Section 230 was adopted to avoid the "obvious chilling effect" of intermediary liability); *Batzel v. Smith*, 333 F.3d 1018, 1027-29 (9th Cir. 2003) (Section 230 was added to the CDA "to further First Amendment and e-commerce interests on the Internet while also promoting the protection of minors"); *Zeran v. America Online, Inc.*, 129 F.3d 327, 331(4th Cir. 1997) ("Congress considered the weight of the speech interests implicated and chose to immunize service providers to avoid any such restrictive effect.").

JA0086

Section 230 was specifically designed to mitigate the special risks facing online inter-mediaries. *Lycos, Inc.*, 478 F.3d at 418-19 (explaining that online intermediaries are especially vulnerable to threats of liability "given the volume of material communicated ..., the difficulty of separating lawful from unlawful speech, and the relative lack of incentives to protect lawful speech"). In particular, the CDA's immunities were an effort to avoid the "heckler's veto" in the online environment. *Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 407-09 (6th Cir. 2014). As the Fourth Circuit explained in *Zeran*, the seminal case interpreting 47 U.S.C. § 230, service providers' inability to screen each of the millions of postings they may host requires them either to make "an on-the-spot editorial decision whether to risk liability by allowing the continued publication," or else yield to the "natural incentive simply to remove messages upon notification, whether the contents were [unlawful] or not[.]" 129 F.3d at 333. Thus, Section 230(c) was adopted to implement First Amendment values and to avoid this "moderator's dilemma."[4]

FOSTA took the law sharply in the opposite direction, targeting anyone who "owns, manages, or operates an interactive computer service" with broad and ambiguous speech prohibi-tions, increasing the number of actors who could seek to impose such liability, and whittling away the immunities previously provided by Section 230. At the same time, FOSTA leaves unchanged immunity under Section 230(c)(2), which immunizes only "good faith" actions taken to *restrict* speech in various categories "whether or not protected by the First Amendment." FOSTA's

---

[4] Empirical research into the Digital Millennium Copyright Act ("DMCA"), which creates notice liability for platforms in copyright cases, supports the *Zeran* court's concern. Platforms receive literally millions of false accusations, and often remove lawful speech—despite the DMCA's inclusion of penalties and procedures, lacking in FOSTA, to reduce erroneous removals. Daphne Keller, "Empirical Evidence of 'Over-Removal' by Internet Companies under Inter-mediary Liability Laws," Stanford Ctr. for Internet & Soc'y, Oct. 12, 2015, http://cyber-law.stanford.edu/blog/2015/10/empirical-evidence-over-removal-internet-companies-under-intermediary-liability-laws.

JA0087

congressional sponsors, and those who advocate its enforcement, conflate the different immunities provided by Section 230(c)(1) and (c)(2) and interpret FOSTA as preserving immunity only for intermediaries' moderation decisions made in "good faith."[5]  This heightens the extent to which online platforms must err on the side of censorship.

As a consequence, "FOSTA effectively resurrects a dilemma Section 230 had been designed to eliminate."  Eric Goldman, *The Complicated Story of FOSTA and Section 230*, 17 FIRST AMENDMENT L. REV. 279, 288 (2019).  The predictable outcome, as discussed above, is that most large platforms began to over-censor to avoid potential liability and many smaller sites simply shut down.  *Id*. at 288-89.  FOSTA's impact was immediate because it confronted "well-intentioned platforms with the choice of censoring legitimate speech or risking lawsuits and criminal prosecution," forcing them to "err on the side of caution."  Jeff Kosseff, THE TWENTY-SIX WORDS THAT CREATED THE INTERNET 270-72 (2019).  And users, including Plaintiffs here, suffered the consequences.  *See supra* 4-7; *infra* §§ IV.A-C.

## II.    FOSTA VIOLATES THE FIRST AND FIFTH AMENDMENTS

Beyond the particular problems of intermediaries, any law that purports to regulate speech across "the entire universe of cyberspace" risks suppressing not merely a large amount of speech, but speech that is unfathomably diverse, constantly expanding, and globally interconnected.  *Reno*,

---

[5]  For example, the Senate Report discussed the immunities provided by Section 230(c)(1) and 230(c)(2), and observed that interactive computer service providers "would not have their good faith efforts to restrict access to objectionable content used against them" because the legislation "would not abrogate section 230(c)(2)(A)."  S. Rep. No. 115-199, at 4 (2018).  Amici who filed in support of FOSTA in the D.C. Circuit argued the law "discourages misconduct by internet service providers by exposing them to additional liability," and extends immunity only to "actors who can demonstrate that they undertook a good-faith effort to prevent their platforms from being utilized for sex trafficking."  Brief of Amici Curiae Equality Now *et al.* ("*Equality Now Amici*"), 2019 WL 1773391, at *15-16, *Woodhull Freedom Found. v. United States*, No. 18-5298 (D.C. Cir. Apr. 22, 2019).

521 U.S. at 868.[6]  Accordingly, the "special attributes of Internet communication" require robust application of the First Amendment doctrines of overbreadth and vagueness.  *Id*. at 863 (citation omitted).  As a content-based speech restriction, it is particularly vital that it satisfy strict scrutiny and rigorous *mens rea* requirements.  The principle that the "Government may not suppress lawful speech as the means to suppress unlawful speech," *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 255 (2002), has special application on the Internet.

### A. FOSTA's Prohibitions are Imprecise, Excessively Broad, and Lack Necessary Scienter Requirements

#### 1. FOSTA is Unconstitutionally Vague

The Supreme Court has repeatedly recognized that although vague laws generally offend due process, an imprecise law that regulates expression "raises special First Amendment concerns because of its obvious chilling effect on free speech." *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 807 (2011) (quoting *Reno*, 521 U.S. at 871-72); *see also Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  Vague statutes that affect "sensitive areas of basic First Amendment freedoms" will "inevitably lead citizens to 'steer far wider of the unlawful zone' … than if the boundaries of the forbidden areas were clearly marked." *Id*. at 109 (quoting *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964)).  The vagueness doctrine thus demands a greater degree of specificity "[w]here a statute's literal scope … is capable of reaching expression sheltered by the First

---

[6]  Regulating the Internet inherently has First Amendment implications, *Sandvig v. Sessions*, 315 F. Supp. 3d 1, 12-13 (D.D.C. 2018) (quoting *Reno*, 521 U.S. at 870), and FOSTA is clearly a regulation specifically targeting online speech.  Section 2421A applies only to one who "owns, manages, or operates an interactive computer service, as such term is defined in … 47 U.S.C. 230(f)," 18 U.S.C. § 2421A(a), (b), and FOSTA amends 47 U.S.C. § 230, which, as explained by Congress, uses the same language.  If FOSTA had been enacted pre-Internet and imposed penalties on anyone who "owns, manages, or operates [a printing press] or conspires or attempts to do so, with the intent to promote or facilitate the prostitution of another person," no one would doubt it was a regulation of the press and subject to strict First Amendment limits.

JA0089

Amendment." *Smith v. Goguen*, 415 U.S. 566, 573 (1974).  And where penal statutes are involved, "[p]recision of regulation must be the touchstone in an area so closely touching our most precious freedoms." *NAACP v. Button*, 371 U.S. 415, 438 (1963).[7]

FOSTA's restrictions fall well short of that required precision.  The law imposes criminal penalties based entirely on speaking or publishing online with "intent" to "promote" or "facilitate" the prohibited offenses, but does not define those terms.[8]  As the D.C. Circuit held, "FOSTA does not define 'promote' or 'facilitate,' nor does it specify what constitutes 'prostitution,' a term undefined by federal law."  What is worse, these terms are not "limited by a string of adjacent verbs (such as advertises, distributes, or solicits) that would convey 'a transactional connotation' that might narrow the statute's reach."  *Woodhull Freedom Found.*, 948 F.3d at 372 (quoting *United States v. Williams*, 553 U.S. 285, 294 (2008)).  The statutory terms "are susceptible of multiple and wide-ranging meanings," and lack companion terms to narrow their reach to include only unprotected speech.  *Williams*, 553 U.S. at 294-95.  Likewise, the operative verbs in Section 1591(e)(4)—assisting, supporting, and facilitating—are not presented in a context that narrows their meanings to avoid broad application to speech protected by the First Amendment.

---

[7]  Questions involving overbreadth and vagueness in laws that regulate speech necessarily are related.  However, a restriction can be unconstitutionally overbroad without being vague.  *E.g.*, *Bd. of Airport Comm'rs of City of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 570, 577 (1987) (resolution banning all "First Amendment activities" at Los Angeles International Airport is overbroad).  At the same time, vague restrictions on speech are inherently overbroad, because a nebulous law really imposes "no rule or standard at all."  *Baggett*, 377 U.S. at 374.  *Reno*, 521 U.S. at 864 (vagueness is relevant to the First Amendment overbreadth inquiry).

[8]  FOSTA's inclusion of an "intent" standard does nothing to cure the law's vagueness where the operative terms "promote" or "facilitate" are ambiguous and undefined.  *Amusement Devices Ass'n v. Ohio*, 443 F. Supp. 1040, 1051 (S.D. Ohio 1977) ("[T]he Supreme Court has never to our knowledge held that the imposition of a scienter element upon a statute necessarily renders the statute's prohibitions sufficiently precise to withstand a vagueness challenge.").  In any event, the law's scienter elements are defective, as explained *infra* § II.A.3.

14

In this regard, the only clearly discernible rule is that FOSTA broadened the reach of existing law.  Congress impermissibly sought to impose liability on a wide range of non-trafficking speech by asserting that sex trafficking and prostitution are "inextricably linked" and purposefully adopting expansive language.  As the D.C. Circuit explained,

> [t]he common meaning of facilitate is "'to make easier'" or "less difficult," or "to assist or aid."  *United States v. Rivera*, 775 F.2d 1559, 1562 (11th Cir. 1985) (quoting *United States v. Phillips*, 664 F.2d 971, 1032 (5th Cir. 1981)); *see also* Black's Law Dictionary (11th ed. 2019) ("To make the occurrence of (something) easier; to render less difficult."); *cf. United States v. Bennett*, 1996 WL 477048, at *5 (9th Cir. Aug. 21, 1996).

*Woodhull Freedom Found.*, 948 F.3d at 372.  *See also Abuelhawa v. United States*, 556 U.S. 816, 819 (2009) (acknowledging that the common definition of "facilitate" includes "the act of making it easier for another person to commit a crime") (quoting BLACK'S LAW DICTIONARY 627 (8th ed. 2004)).[9]

Notably, "the verbs 'promote' and 'facilitate' are disjunctive."  *Woodhull Freedom Found.*, 948 F.3d at 372.  Thus, FOSTA can apply to any act that would cause the unlawful activity to be accomplished or to assist in the unlawful activity in any way, even in the absence of "promoting" it, that is, "advancing or actively supporting it."  *See also infra* 19-20.  The Act creates further ambiguity by increasing punishment for those who act "in reckless disregard … that … conduct contributed to sex trafficking," without defining how one "contributes to sex trafficking."  18 U.S.C. § 2421A(b)(2).  The vagueness of "contributed to sex trafficking" is compounded by

---

[9]  The D.C. Circuit acknowledged that one possible reading of FOSTA could limit its scope, based on the background law of aiding and abetting.  *Woodhull Freedom Found.*, 948 F.3d at 372.  However, it also observed that the operative terms in FOSTA are *not* "limited by a string of adjacent verbs (such as advertises, distributes, or solicits) that would convey 'a transactional connotation' that might narrow the statute's reach."  *Id*.  *See, e.g.*, *United States v. Miselis*, --- F.3d ---, 2020 WL 5015072, at *11 (4th Cir. Aug. 24, 2020) (holding that statutory terms "promote" and "encourage" in Anti-Riot Act are facially invalid because they reach protected speech and are not susceptible to a narrowing interpretation).

JA0091

Congress's belief that sex trafficking and consensual sex work are "inherently linked," thus raising the probability that it considers anything that "contributes to" sex work, whatever that means, to also "inherently" "contribute to sex trafficking." Even under normal due process standards, an intent to "facilitate" criminal activity can be unconstitutionally vague.[10]

It is notable that other federal statutes with terms like "promote" or "facilitate" have been interpreted fairly boundlessly (although not in the First Amendment context), with "facilitate," for example, meaning simply "to make easy or less difficult." *E.g.*, *United States v. Miller*, 379 F.2d 483, 485-86 (7th Cir. 1967) (interpreting provisions of Travel Act). Under these vague parameters, if applied to a speech regulation, any online communication that might be considered encouraging to sex workers, or that provides services or seeks to minimize harm in a way that makes sex work easier and safer for sex workers, could be swept up in prosecutions or civil claims. Or, as the Court put it in *Reno*, no one could say with confidence that such speech would avoid legal sanctions. 521 U.S. at 871.

The operative terms of FOSTA impose a far more amorphous burden on protected speech than the terms the Supreme Court held unconstitutionally vague in *Reno*: "obscene or indecent" and "patently offensive." *Reno*, 521 U.S. at 858-59, 871-79. And as the Court observed in *Baggett*, the Constitution does not permit statutory language regulating speech that can be interpreted "to require the forswearing of an undefined variety of 'guiltless knowing behavior.'" 377 U.S. at 366-68 (striking down a statute requiring teachers to sign oaths affirming they did not "advise, teach, abet, or advocate" overthrow of government). *See also Cramp v. Bd. of Pub. Instruction*, 368 U.S.

---

[10]   *E.g.*, *Amusement Devices Ass'n*, 443 F. Supp. at 1051 (invalidating state law prohibiting provision of legal services to criminal syndicate with a purpose of "establishing or maintaining" the syndicate or "facilitating any of its activities" because the language "fails to specify with reasonable clarity which kind or kinds of conduct it prohibits").

278, 281 (1961) (invalidating Florida law that required public employees to swear they never lent "aid, support, advice, counsel or influence to the Communist Party").

Moreover, the threats that ordinarily accompany vagueness are exponentially greater here, because FOSTA vastly multiplies the number of people who can enforce the law. Even if a party were confident that DOJ would not find that its speech "facilitates" prostitution, it would ignore reality—as well as the history of Internet censorship—to disregard how FOSTA's vague mandate will be used by prosecutors and private litigants in all 50 states to censor speech and threaten lifestyle choices with which they disagree. In fact, these efforts are already underway. *See supra* 6; Tex. Penal Code § 43.031(a) (creating a state criminal law based on FOSTA's 18 U.S.C. § 2421A). Amicus briefs submitted in the D.C. Circuit appeal in this case show this is far from just speculation. Law enforcement officials from twenty-one states admitted that because, in their view, "federal law no longer can be said to provide legal protection for websites that unlawfully facilitate sex trafficking" states "may now pursue state-law prosecutions based on conduct that would also violate FOSTA," and Attorneys General may now pursue FOSTA's new civil remedy. Brief of the States of Texas *et al.*, 2019 WL 1773389, at *9-10 (D.C. Cir. Apr. 22, 2019).[11]

Private parties, for their part, foreshadowed plans to use FOSTA as a heckler's veto. They contended FOSTA "discourages misconduct by internet service providers by exposing them to additional liability," and add that Section 230 now extends immunity only to "those actors who can demonstrate that they undertook a good-faith effort to prevent their platforms from being

---

[11]   Notably, certain signatories to the states' brief have a history of interpreting their authority to regulate online speech very broadly while disregarding First Amendment limits. *See, e.g.*, *Google, Inc. v. Hood*, 96 F. Supp. 3d 584, 593 (S.D. Miss. 2015) (Mississippi AG threatened to prosecute Google after demanding it "take down entire websites that possibly contain illegal or dangerous content and, in his opinion, facilitate illegal activity," including human trafficking), *vacated on other grounds*, 822 F.3d 212 (5th Cir. 2016).

JA0093

utilized for sex trafficking." *See Equality Now Amici*, 2019 WL 1773391, at *15-16. They argued

that this would alter the incentives of online platforms to "encourage monitoring" of third-party

content, and they offer to provide "education" to "encourage[] web platforms … to accept

accountability for [] trafficking that they facilitate." *Id*. at *16, *20. Under FOSTA, such "en-

couragement" comes with an implied "or else," which is the very definition of the heckler's veto.

*See Reno*, 521 U.S. at 880 (law "would confer broad powers of censorship" on private parties).[12]

These plans are now playing out in extant litigation. *See supra* 6. Even the prospect of having to

defend a meritless lawsuit brought by a state attorney general or private litigant creates a powerful

disincentive to speak anywhere close to FOSTA's blurry lines.

### 2. FOSTA's Prohibitions are Unconstitutionally Overbroad

FOSTA is also facially unconstitutional because its plain terms restrict a substantial amount

of protected speech. The Constitution "gives significant protection from overbroad laws that chill

speech within the First Amendment's vast and privileged sphere," *Free Speech Coal.*, 535 U.S. at

244, and the overbreadth doctrine is particularly vital when laws target online speech. *Reno*, 521

U.S. at 863. A law "may be invalidated as overbroad if 'a substantial number of its applications

are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *United States*

*v. Stevens*, 559 U.S. 460, 473 (2010) (citation omitted). *See Free Speech Coal.*, 535 U.S. at 244

(a law is "unconstitutional on its face if it prohibits a substantial amount of protected expression").

Likewise, a law that targets speech is facially unconstitutional if there is a "likelihood that the

statute's very existence will inhibit free expression" by "inhibiting the speech of third parties who

are not before the Court." *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 799-

---

[12]  Notably in this regard, Sections 2421A(c)-(d) offer a bounty for, respectively, civil
recovery and attorney's fees and mandatory restitution.

JA0094

800 (1984).  "Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity."  *NAACP*, 371 U.S. at 433.

The Fourth Circuit applied these overbreadth principles recently to strike down terms of the Anti-Riot Act, 18 U.S.C. §§ 2101(a)(2), 2202(b), that prohibit speech tending to "encourage" or "promote" a riot, as well as speech "urging" others to riot or that "involv[e]" mere advocacy of violence.  *Miselis*, 2020 WL 5015072, at *11-13.  The court upheld only those aspects of the Anti-Riot Act that specifically addressed *conduct* that amounted to participation in illegal activity (*e.g.*, to "organize" a riot) or that involved unprotected speech subject to a precise legal definition (*e.g.*, to "incite" a riot).  *Id*. at *10-11 (upholding incitement restriction under *Brandenburg v. Ohio*, 395 U.S. 444 (1969) (*per curiam*)).  But it held the verbs "encourage" or "promote" "fail[ed] to bear the requisite relation between speech and lawlessness," *id*. at *10, because such language "sweeps up a substantial amount of speech that retains the status of protected advocacy."  *Id*. at *5.  The "central overbreadth question," the court explained, is "whether any of the purposes included in the statute's specific-intent element implicate protected advocacy."  If so, "those purposes can't form the basis of an attempt to engage in unlawful speech."  *Id*. at *10.[13]

The same overbreadth problem plagues FOSTA.  Under its plain terms, anything on any online platform, commercial or non-commercial alike, that can be said to "promote" or "facilitate" prostitution or trafficking creates a risk of criminal prosecution or ruinous civil liability.  Websites that support sex workers by providing health-related information or safety tips could be viewed as promoting or facilitating prostitution, *see* SMF Ex. E ¶¶ 30-31, as could those that "facilitate" it by advocating decriminalization.  SMF Ex. I ¶¶ 8-9.  Merely indicating online, in anything other

---

[13]   *See also United States v. Rundo*, No. 18-cr-00759-CJC (C.D. Cal. June 3, 2019) (order dismissing indictments under the Anti-Riot Act because its terms are facially overbroad and reach protected speech).

19

than a negative light, that a person is a sex worker—thus "promoting the[ir] prostitution"—could trigger similar ruinous liability.  Additionally, websites that enable interpersonal or intimate connections, such as "personals" or "dating" information, face obvious risks.[14]  As set forth below, this overbreadth is not hypothetical.  Intermediaries have predictably, inevitably, and understandably responded to FOSTA by censoring wide swaths of protected speech, to the detriment of Plaintiffs here and the general public.  *See infra* §§ IV.A-C.

Contrary to this Court's preliminary assessment, the law's overbreadth cannot be cured by referring to the Travel Act.  First, unlike the Travel Act, FOSTA applies *exclusively* to (online) speech.  Conversely, the Travel Act's prohibitions are focused on non-speech *conduct*, applying to "whoever travels in interstate or foreign commerce or uses … any facility in interstate or foreign commerce."  18 U.S.C. § 1952.

Second, the Travel Act applies only when the requisite intent to violate specific laws exists, *id*. § 1952(b) (defining "unlawful activity" as a violation of specific state or U.S. laws).  FOSTA, by contrast, makes it illegal simply "to promote or facilitate the prostitution of another person," without incorporating any specific state or federal law.  And its affirmative defense for local legality does not ameliorate this—the fact that it is an *affirmative defense* proves illegality is *not* part of the prosecution's case.  *See Free Speech Coal.*, 535 U.S. at 255-56 (rejecting government reliance on statutory affirmative defense which left substantial amount of speech unprotected).

Third, while the terms "facilitate" and "promotion" appear in both laws, the Travel Act directly includes only one term used in FOSTA:  "promote."  The term "facilitate" is used only as

---

[14]   Other FOSTA provisions create overbreadth problems as well.  Section 1591 as expanded by FOSTA prohibits not only specific acts of traffickers, but those of anyone who "participates in a venture," which broadly reaches anyone who "benefits" either financially, or by receiving "anything of value" from their participation, and requires only "reckless disregard" to make out a violation.  18 U.S.C. § 1591(a)(2).

integrally connected to promotion, *i.e.*, to "facilitate the promotion of."  18 U.S.C. § 1952(a)(3). Moreover, in the Travel Act these terms are constrained by a string of verbs ("promote, manage, establish, carry on, or facilitate the promotion, management, or establishing, or carrying on, of any unlawful activity") connoting active participation in crime.  *See Williams*, 553 U.S. at 294.  In FOSTA, however, "promote" and "facilitate" are used in the disjunctive and can apply to any speech that could make prostitution "easier." *See supra* 15-16.[15]

The Travel Act prosecutions to which this Court looked previously[16] only underscore the extent to which the Travel Act is focused on *conduct*, and why FOSTA's speech restrictions are overbroad.  *United States v. Reiner*, 500 F.3d 10, 13 (1st Cir. 2007), was a Travel Act prosecution where the defendant was convicted because he made all personnel decisions and handled the business's financial aspects, while *United States v. Seals*, 2014 WL 3847916, at *9 (W.D. Ark. Aug. 5, 2014), involved a defendant who hired prostitutes and handled the business's finances. These cases may illustrate what it means to "promote, manage, establish, carry on, or facilitate the promotion, management, establishing, or carrying on, of any unlawful activity" in violation of specified state laws (under 18 U.S.C. § 1952(a)), but say nothing about how a law prohibiting Internet speech that may "facilitate" prostitution could satisfy constitutional standards.

Finally, FOSTA is also unconstitutionally overbroad to the extent it seeks to revitalize prior efforts to restrict online intermediaries.  In past years, various states had passed laws designed to close down online classified ad services based on claims that ad sections for "adult" services or

---

[15]   In any event, the Supreme Court has recognized that in the First Amendment context, simply borrowing language from one law does not necessarily cure vagueness created when the terms are planted into a new statute.  *Reno*, 521 U.S. at 873-74 (rejecting government's argument to the contrary both factually and in its reasoning).

[16]   *See Woodhull Freedom Found. v. United States*, 334 F. Supp. 3d 185, 200 (D.D.C. 2018), *rev'd on other grounds*, 948 F.3d 363 (D.C. Cir. 2020).

21

"escorts" were synonymous with prostitution, but these laws were uniformly struck down. *Backpage.com v. McKenna*, 881 F. Supp. 2d 1262 (W.D. Wash. 2012); *Backpage.com v. Cooper*, 939 F. Supp. 2d 805 (M.D. Tenn. 2013); *Backpage.com v. Hoffman*, 2013 WL 4502097 (D.N.J. 2013). Courts held that each of those laws was preempted by Section 230—which was one factor that motivated Congress to adopt FOSTA—but those courts also held those laws violated the First Amendment because they were vague, overbroad, and lacked sufficient *scienter* requirements. *McKenna*, 881 F. Supp. 2d at 1278-81; *Cooper*, 939 F. Supp. 2d at 828-36; *Hoffman*, 2013 WL 4502097 at *7-11. As discussed herein, FOSTA suffers from the same constitutional infirmities, but is overbroad for an even more basic reason: "FOSTA's text does not limit its scope to 'bad-actor websites,' or even to classified advertising." *Woodhull Freedom Found.*, 948 F.3d at 373 (citation omitted).

### 3.  FOSTA Lacks the Scienter the First Amendment Requires

FOSTA's vagueness and overbreadth are further underscored by its failure to prescribe constitutionally sufficient *mens rea* requirements. The Supreme Court has long held the First Amendment bars the State from imposing liability for distributing expressive materials without proof of scienter. *Smith*, 361 U.S. at 153-54; *Mishkin v. New York*, 383 U.S. 502, 511 (1966) ("The Constitution requires proof of scienter to avoid the hazard of self-censorship of constitutionally protected material ...."). [17] This knowledge and intent requirement is particularly vital for any restrictions targeting online speech, because "websites … will bear an impossible burden to review

---

[17]  *See also United States v. X-Citement Video, Inc.*, 513 U.S. 64, 78 (1994) ("[A] statute completely bereft of a scienter requirement as to the age of the performers would raise serious constitutional doubts."); *Video Software Dealers Ass'n v. Webster*, 968 F.2d 684, 690 (8th Cir. 1992) ("Statutes that impose criminal responsibility for dissemination of unprotected speech must contain a knowledge requirement."); *Elonis v. United States*, 135 S. Ct. 2001, 2009 (2015) ("[W]rongdoing must be conscious to be criminal.") (citation omitted).

JA0098

all of their millions of postings or, more likely, shut down their adult services section entirely." *Cooper*, 939 F. Supp. 2d at 830.

In a case like this, where the government seeks to prohibit speech that it alleges promotes criminal acts *by others*, a showing of specific intent is required:  the government must  prove <u>both</u> that (1) a defendant had knowledge of specific content that is integrally related to a particular crime *and* (2) specifically intended to bring about the illegal result.  *Miselis*, 2020 WL 5015072, at *10 ("the government must at a minimum prove that … the defendant acted with specific intent to engage in unprotected speech or conduct").  For speech to fall into the First Amendment exception for "speech integral to criminal conduct," the government must show the targeted speech is for the "sole immediate purpose" of furthering a specific crime.  *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498-502 (1949).

Importantly, an intermediary's mere knowledge that a third party's speech relates in some way to criminal conduct does not overcome First Amendment protection on the theory it facilitates that conduct.  *Bartniki v. Vopper*, 532 U.S. 514, 529-30 (2001).  And to satisfy the "intent" standard, it is not enough to suggest that speech the government seeks to prohibit "encourages" another person's criminal behavior.  *Free Speech Coal.*, 535 U.S. at 253-54 ("The mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it.").  Nor is it sufficient to claim speech "promotes" criminal behavior.  For speech to satisfy the criminal intent requirement, it must in some way be participatory, or as the Supreme Court put it, "transactional."  *Williams*, 553 U.S. at 294.  *See also id.* at 300 ("It refers to the recommendation of a particular piece of purported child pornography *with the intent of initiating a transfer*.") (emphasis added).[18]  *See United States*

---

[18]   A statutory proscription fails to target criminal intent where it is broad enough to include mere advocacy "such as the statement 'I believe that child pornography should be legal' or even 'I encourage you to obtain child pornography.'"  *Williams*, 553 U.S. at 299-300.

JA0099

*v. Freeman*, 761 F.2d 549, 551-52 (9th Cir. 1985) (reversing convictions for 12 counts for counseling tax evasion but affirming two where defendant "not only counseled *but also assisted* in the filing of false returns") (emphasis added).

FOSTA's *mens rea* terms do not speak to these requirements and are thus facially deficient. Section 2421A lacks any specific knowledge element, and although it includes an "intent" requirement, it is not limited to speech that is integrally related to, or supportive of, criminal activity.[19] As discussed above, the operative "terms 'promote' and 'facilitate' … 'are susceptible of multiple and wide-ranging meanings,'" which are commonly understood as "'to make easier' or less difficult, or to assist or aid," and are not linked to a specific crime, and thus do not necessarily identify criminal activity. *See Woodhull Freedom Found.*, 948 F.3d at 372. This means a prosecution under the law could be based on legally protected speech, such as political advocacy, education or harm reduction.[20]

Further, FOSTA's "aggravated" offense imposes liability based on "reckless disregard" of the fact that speech "contributed to sex trafficking." 18 U.S.C. § 2421A(b)(2). Instead of requiring specific knowledge, this provision imposes liability based on generalized knowledge that online speech may be construed to "promote or facilitate" prostitution or to "contribute to sex trafficking." *See Elonis*, 135 S. Ct. at 2009 (defendant "must 'know the facts that make his conduct fit the

---

[19]   The Fourth Circuit recently addressed this same problem in the Anti-Riot Act, noting that where a statute's intent element implicates protected expression, it "can't form the basis of an attempt to engage in unlawful speech." *Miselis*, 2020 WL 5015072, at *10.

[20]   This deficiency is not cured by Section 2421A's focus on an intent to facilitate "the prostitution of another person." 18 U.S.C. § 2421A(a). The supposed crime is the "facilitation," which can include education, advocacy, safety information, or mere encouragement, and First Amendment protection is not lost if such information is provided directly to one person as opposed to many. In any event, the phrase "prostitution of another person" does not render the facilitation "transactional," as did the string of verbs analyzed in *Williams*.

JA0100

definition of the offense, even if he does not know that those facts give rise to a crime'") (citation omitted).

Finally, FOSTA's adoption renders the *mens rea* requirements of Section 1591 confusing and conflicting; the only thing that is clear is that Congress changed the law to reduce the required level of scienter for "participation in a venture" that may include sex trafficking.  Except where "the act constituting the violation … is advertising," knowledge may be established based on a showing of "reckless disregard."  18 U.S.C. §§ 1591(a)(2), (e)(4).  Under FOSTA, advertising is actually treated *more favorably* than other prohibited acts, whereas liability for other activities, including non-advertising speech that assists, facilitates, or supports a venture involved in sex trafficking, requires an undetermined *mens rea*, no more than a reckless disregard.  18 U.S.C. § 1591(e).

The statutory language is convoluted, but the touchstone for understanding FOSTA is that Congress amended Section 1591 to broaden the meaning of "participation in a venture" specifically to undo the stricter *mens rea* standard articulated in *Backpage.com, LLC v. Lynch*, 216 F. Supp. 3d 96 (D.D.C. 2016).  The House Report on the legislation explained that the purpose of this change was to create a workaround to the specific knowledge requirement for advertising in the prior version of Section 1591.  It noted Section 1591's previous knowledge requirement was difficult to prove because "online advertisements rarely, if ever, indicate that sex trafficking is involved."  H.R. Rep. No. 115-572, pt. 1, at 5.  The Report added that "federal prosecutors usually cannot demonstrate beyond a reasonable doubt that the website operators knew the ad[s] involved sex trafficking."  The Government confirmed this point in the law's "signing statement," which explains that FOSTA was adopted because, under prior law, prosecutors were "limited by the high

evidentiary standard needed to bring federal criminal charges." *See* Letter from Prim F. Escalona to Mick Mulvaney, Director, Office of Management and Budget. ECF 15-1.

But the bar FOSTA lowered served a crucial constitutional purpose. Under the new lax and confusing *mens rea* requirements, online platforms have no clear way to avoid liability without monitoring and over-censoring users' posts.[21] Platforms lacking resources to effectively monitor user-generated content face enormous risks if they continue to operate. The predictable result of this law has been "self-censorship of constitutionally protected material" on a massive scale, *Mishkin*, 383 U.S. at 511, such as where Craigslist eliminated its entire personals section and Reddit banned certain subreddits. *See supra* 4-5. Such mainstream, general-purpose websites, of the sort that the Supreme Court viewed as indispensable in *Packingham*, 137 S. Ct. at 1735-36, have restricted themselves in an effort to "steer far wide[] of the unlawful zone." *Speiser v. Randall*, 357 U.S. 513, 526 (1958).

## B. FOSTA Fails Strict Scrutiny

Strict scrutiny applies to FOSTA because it imposes content-based restrictions on speech. As a general matter, "the First Amendment means that government … has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Barr v. Am. Ass'n of Political Consultants*, 140 S. Ct. 2355, 2346 (2020) (citation and internal quotation marks omitted). "[R]egulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163

---

[21]  H.R. Rep. No. 115-572, pt. 1, at 9 (unlawful intent will not be present "where the material appears despite the operator's good faith efforts to moderate, remove, or restrict such material from appearing on or through the facility"). Civil liability creates even greater pressure to actively police users' speech, as a defendant may be liable under a reckless disregard standard if it does not "seek out the facts that would be reasonable and prudent under the circumstances." Congressional Research Service, *Sex Trafficking: An Overview of Federal Criminal Law*, June 25, 2015, at 6 (quoting *United States v. Ali*, 718 F.3d 929, 936 (D.C. Cir. 2013)).

JA0102

(2015).  Such content-based restrictions of speech, "enforced by severe criminal penalties, have the constant potential to be a repressive force in the lives and thoughts of a free people." *Ashcroft v. ACLU*, 542 U.S. 656, 660 (2004).  The First Amendment "demands" that such restrictions "be presumed invalid, and that the Government bear the burden of showing their constitutionality." *Id.* (internal citation omitted).  Under strict scrutiny, "[i]t is rare that a regulation restricting speech because of its content will ever be permissible." *Brown*, 564 U.S. at 799 (quoting *Playboy Entm't Grp.*, 529 U.S. at 818).

FOSTA criminalizes particular subject matter:  speech that "promote[s]" or "facilitate[s]" the prostitution of another person.  18 U.S.C. § 2421A.  Section 2421A thus targets speech based on its "message" and "function." *Reed*, 576 U.S. at 163-64. *See also Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991) (statute restricting speech about crime is content-based).  Section 2421A "focuses *only* on the content of the speech …. This is the essence of content-based regulation." *Playboy Entm't Grp.*, 529 U.S. at 811-12 (internal citation omitted).

Section 2421A also allows the government to discriminate against certain viewpoints, which is an even more "blatant" and "egregious form of content discrimination." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995); *True the Vote, Inc. v. IRS*, 831 F.3d 551, 560 (D.C. Cir. 2016).  By criminalizing speech that promotes or facilitates prostitution, the law's sweep includes speech such as harm-reduction education aimed at sex workers, and advocacy intended to bring about decriminalization of sex work.  Speech condemning prostitution or seeking to perpetuate criminalization faces no such prohibition. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 7 (2010) (statute prohibiting "material support" of terrorist organizations meant "any contribution" that "facilitate[d]" their criminal conduct); *id.* at 36 (statute applied even

27

where providers of support meant to "*promote* only the groups' nonviolent ends") (emphasis added).

To satisfy strict scrutiny, the government must prove the law is "narrowly tailored to promote a compelling Government interest," and that no "less restrictive alternative would serve [its] purpose." *Playboy Entm't Grp.*, 529 U.S. at 813; *Brown*, 564 U.S. at 799. This means it may limit speech "no further than necessary to achieve the goal," to "ensure that legitimate speech is not chilled or punished." *Ashcroft*, 542 U.S. at 666. The government has the burden to show any speech restriction directly advances its asserted interest. *Reno*, 521 U.S. at 874.

This burden is particularly heavy where, as here, Congress has adopted "nuclear option" penalties to ensure compliance. *See Free Speech Coal.*, 535 U.S. at 244 ("a law imposing criminal penalties on protected speech is a stark example of speech suppression" and "a textbook example of why we permit facial challenges to statutes that burden expression"). In *Reno*, the Supreme Court noted that violations of the CDA could be punished by up to two years in prison and concluded "the severity of criminal sanctions may well cause speakers to remain silent rather than communicate even arguably unlawful words, ideas, and images." *Reno*, 521 U.S. at 872. But where the threat of such sanctions under the CDA were undeniably chilling, FOSTA imposes a deep freeze: violations of Section 2421A are subject to 10 years in prison, while aggravated violations carry a sentence of up to 25 years. 18 U.S.C. § 2421A(a)-(b). While the CDA raised possible enforcement by federal prosecutors, FOSTA authorizes criminal enforcement by federal authorities, 50 state attorneys general, *and* hundreds of local prosecutors. 18 U.S.C. § 2421A(a); 47 U.S.C. § 230(e)(5); 18 U.S.C. § 1595(d).[22]

---

[22]   In addition, FOSTA authorizes civil damages, strips away existing statutory immunities from civil liability in state and federal courts, and imposes mandatory restitution "in addition to any other civil or criminal penalties." 18 U.S.C. § 2421A(c)-(d); 47 U.S.C. § 230(e)(5). As with

JA0104

The government cannot meet that heavy burden.  FOSTA is overinclusive:  it restricts sub-stantially more speech than necessary to further the government's interest.  *See Brown*, 564 U.S. at 805 (holding that a law is not narrowly tailored if it is either overinclusive or underinclusive).  Even granting that there is a compelling interest in preventing sex trafficking, "[t]he prospect of crime … by itself does not justify laws suppressing protected speech."  *Free Speech Coal.*, 535 U.S. at 244-45; *see also Kingsley Int'l Pictures Corp. v. Regents of Univ. of N.Y.*, 360 U.S. 684, 689 (1959).  Section 2421A reaches beyond prostitution and sex trafficking, criminalizing speech intended to promote sex workers' rights and safety, including advocacy and education that may "facilitate" prostitution.  Congress's belief that such speech about sex work can be equated with sex trafficking illustrates the law's lack of tailoring.  *See supra* 12.

Moreover, the law is overinclusive to the extent that the Court accepts the government's position that FOSTA was enacted specifically to target classified advertising sites.  H.R. Rep. No. 115-572, pt. 1, at 3-6.  Far from targeting this limited category, FOSTA applies to *every* online service provider and not just "bad actor websites" or even classified advertising.  *Woodhull Free-dom Found.*, 948 F.3d at 372.  This is the opposite of narrow tailoring.  *Cf. Pappert*, 337 F. Supp. 2d at 655 (holding that law imposing liability on ISPs for online speech fails both strict and intermediate scrutiny).  With FOSTA, Congress used "a butcher knife on a problem that requires a scalpel to fix."  *Cooper*, 939 F. Supp. 2d at 813.

Lastly, FOSTA fails strict scrutiny because there are less speech-restrictive alternatives that would effectively further the government's stated interest in eliminating sex trafficking.  "When a plausible, less restrictive alternative is offered to a content-based speech restriction, it is

---

criminal penalties, the prospect of significant civil liability based on the exercise of free speech is circumscribed by the First Amendment.  *Snyder v. Phelps*, 580 F.3d 206, 217-18 (4th Cir. 2009), *aff'd*, 562 U.S. 443 (2011); *N.Y. Times Co. v. Sullivan*, 376 U.S. at 264-65.

the Government's obligation to prove that [it] will be ineffective to achieve its goals." *Playboy Entm't Grp.*, 529 U.S. at 816.  Some of these alternatives already exist in federal law; prior to FOSTA's enactment, it was already a crime to "advertise[]" sex trafficking (on the Internet or elsewhere) and to "benefit[] financially" from a venture involving such ads.  18 U.S.C. § 1591(a)(1), (2).  Such laws, subject to First Amendment limits and when enforced pursuant to constitutionally required *mens rea* requirements, constitute less restrictive ways to address the government's interest. *Backpage.com, LLC v. Lynch*, 216 F. Supp. 3d at 108-09; *Playboy Entm't Grp.*, 529 U.S. at 816-26 (holding that enforcing existing law was an available least restrictive alternative).  As the government admitted on Rule 12 briefing, "before FOSTA was enacted, websites could have been prosecuted in federal court for those same or substantially similar crimes." ECF 16, at 19.  By targeting intermediaries for publishing a broad range of user speech, instead of punishing the sex traffickers themselves, FOSTA actually adopts the *most speech restrictive* alternative.

## III.    FOSTA IS AN UNCONSTITUTIONAL *EX POST FACTO* LAW

FOSTA enables enforcement "regardless of whether the conduct alleged occurred, or is alleged to have occurred, before, on, or after such date of enactment."  FOSTA § 4(b).  This provision implements changes to 47 U.S.C. § 230(e), which authorizes (1) civil claims that are predicated on violations of criminal law in 18 U.S.C. § 1591; (2) criminal prosecutions under state law where the underlying conduct violates Section 1591; and (3) criminal prosecutions under state law where the underlying conduct violates newly adopted prohibitions in 18 U.S.C. § 2421A.

Thus, on its face, FOSTA violates the Constitution's command that "[n]o … *ex post facto* Law shall be passed."  U.S. Const. art. I, § 9. *See also* U.S. Const. art. I, § 10 (barring states from adopting *ex post facto* laws).  "[T]he presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic." *Landgraf*

JA0106

*v. USI Film Prods.*, 511 U.S. 244, 265 (1994).[23]  The Supreme Court has thus long recognized retroactive legislation as "oppressive, unjust, and tyrannical," and therefore "condemned by the universal sentence of civilized man." *Ogden v. Saunders*, 25 U.S. (12 Wheat.) 213, 266 (1827).

FOSTA violates these principles in at least two ways.

First, FOSTA added 47 U.S.C. § 230(e)(5)(C), which removed the statute's immunity from state criminal prosecutions and creates new, retroactive liability under state criminal laws modeled after 18 U.S.C. § 2421A.  This creates new state criminal liability for past conduct that Section 230 previously immunized.  Doing so violates the *Ex Post Facto* Clause.  *See Stogner v. California*, 539 U.S. 607 (2003) (holding California statute unconstitutional because its extension of the statute of limitations for certain crimes permitted previously time-barred criminal prosecutions).  Texas responded to Congress' signal and in 2019 enacted a law modeled after Section 2421A.[24]  Under FOSTA, a party now faces new criminal liability under this Texas law for any conduct that occurred prior to FOSTA's passage—conduct that previously would have been immunized from state criminal prosecution under Section 230.

Second, although Section 230 has always excepted criminal prosecution under federal law, FOSTA's addition of 47 U.S.C. § 230(e)(5)(B) results in higher penalties for individuals prosecuted under state laws than would be possible under federal law.  At least two states have greater

---

[23]   The Constitution's Framers were keenly aware of the dangers posed by such laws.  *See* The Federalist No. 44 (James Madison) ("ex-post-facto laws … are contrary to the first principles of the social compact, and to every principle of sound legislation"); The Federalist No. 84 (Alexander Hamilton) ("the prohibition of ex-post-facto laws … are perhaps greater securities to liberty and republicanism" than any other constitutional principles).

[24]   *See* Tex. Sen. Bill 20 (2019), *codified at* Tex. Penal Code §§ 43.031, 43.041 (incorporating Section 2421A's elements into a new criminal law, *e.g.*, § 43.031(a): "A person commits an offense if the person owns, manages, or operates an interactive computer service … with the intent to promote the prostitution of another person or facilitate another person to engage in prostitution.").  https://capitol.texas.gov/BillLookup/BillStages.aspx?LegSess=86R&Bill=SB20.

31

penalties for sex trafficking than federal law.  Mississippi's legislature amended its criminal anti-trafficking statute in 2019 to increase the mandatory minimum for trafficking a minor beyond the mandatory minimum proscribed by 18 U.S.C. § 1591(b).  *Compare* 2019 Miss. Laws, Ch. 459, (S.B. 2305), § 1 (amending Miss. Code § 97-3-54.1(1)(c) to increase mandatory minimum for trafficking a minor from 5 years to 20 years) *with* 18 U.S.C. § 1591(b) (mandatory minimums of 15 years for trafficking a minor under age 14, and 10 years for trafficking a minor over age 14).  Nevada's anti-trafficking statute creates a mandatory minimum of life in prison where the victim is a minor—a more punitive penalty than Section 1591(b).  *See* Nev. Rev. Stat. § 201.300.

Thus, parties face even greater punishment under Mississippi and Nevada law for conduct that occurred prior to FOSTA's enactment.  This is unconstitutional.  *See Peugh v. United States*, 569 U.S. 530 (2003) (finding *ex post facto* violation because new sentencing guidelines promulgated after the crime increased the punishment).

## IV.    PLAINTIFFS ARE ENTITLED TO INJUNCTIVE AND DECLARATORY RELIEF

Injunctive relief is proper because FOSTA is unconstitutional for the reasons set forth above, Plaintiffs (and others subject to FOSTA) will suffer irreparable injury absent an injunction, and both the balance of equities and public interest favor relief.  *E.g.*, *Guffey*, 2020 WL 2065274, at *9.  It is settled law that "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Mills v. D.C.*, 571 F.3d 1304, 1312 (D.C. Cir. 2009); *see also Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016).  The balance of equities favors Plaintiffs given these constitutional harms, as "no substantial harm to others can be said to inhere" in allowing violations of constitutional rights to continue.  *Déjà vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cty.*, 274 F.3d 377, 400 (6th Cir. 2001).  If anything, the harm suffered by speakers engaged in constitutionally protected expression like Plaintiffs, coupled with the public interest in preserving

a free and open internet, *see Google, Inc. v. Hood*, 96 F. Supp. 3d at 601, weigh strongly in favor

of enjoining FOSTA.  *See Packingham*, 137 S. Ct. at 1735-36. Allowing unconstitutional laws to

stand "is always contrary to the public interest," which lies in "protecting First Amendment rights."

*Pursuing America's Greatness*, 831 F.3d at 511-12 (quoting *Gordon v. Holder*, 721 F.3d 638, 653

(D.C. Cir. 2013)).

Declaratory relief is also proper. There is a substantial controversy between Plaintiffs and

the government regarding whether the FOSTA violates the First Amendment, and as to whether it

can be constitutionally enforced by federal and state officials by seeking criminal penalties for

asserted violations, and by litigants seeking to impose civil liability.  Consequently, there is a real

and immediate need warranting a declaration of unconstitutionality.  *E.g.*, *United Gov't Sec.

Officers of Am., Local 52*, 587 F. Supp. 2d at 222.

### A.  Plaintiffs and All Other Internet Publishers and Users Have Suffered and Will Continue to Suffer Irreparable Harm

Plaintiffs have already had their protected speech curtailed or silenced due to FOSTA's

chilling effect, and self-censored their expression, causing a significant loss of First Amendment

rights.  The same is true for other websites, and the members of the public who use them.

That loss of freedom has caused significant practical harm.  Since FOSTA was signed into

law, Plaintiff Eric Koszyk, a licensed massage therapist who had found clients primarily through

ads placed on Craigslist's Therapeutic Services section, completely lost access to that platform

due to its reaction to FOSTA.  "Mr. Koszyk's massage business reported less than half the revenue

it generated in the year before FOSTA, a change he attributes to an inability to advertise on

Craigslist."  SMF ¶ 11.  In the two years since then, Mr. Koszyk has tried to use a variety of other

online advertising services, but none of them—on their own or combined—offers Mr. Koszyk the

same reach and ability to connect with customers as Craigslist did.  *Id.* ¶¶ 8, 12-13.

JA0109

Mr. Koszyk's circumstance also highlights the harm suffered by others not presently before the Court.  SMF ¶¶ 3, 5.  Users have seen their First Amendment rights undermined by removal of content, shuttering of services, and changes in policies outlined above by numerous online services.  This is especially true of websites and interactive computer services that enable inter-personal contact by users such as those for personal ads, dating services, and similar platforms, *id*., which facilitate the "unlimited … communication of all kinds" that the Supreme Court has deemed vital.  *Packingham*, 137 S. Ct. at 1735-36 (citation omitted).

Plaintiff Woodhull, a tax-exempt education, advocacy and lobbying organization, has experienced adverse impacts from FOSTA on its mission, annual Summit, publications, and advocacy efforts.  SMF ¶¶ 19-20.  Most recently, Woodhull has been forced to conduct its advocacy efforts and Summit online, due to COVID-19, causing it to become even more reliant on large, online platform providers such as Facebook, YouTube, Zoom and Streamyard.  Due to the adoption of restrictive content moderation policies in response to FOSTA, Woodhull has been impeded in being able to promote itself and its events and to livestream content via these services. *Id*. ¶¶ 21-22.  This has included Facebook's post-FOSTA rejection of ads of the type that the web-site allowed prior to the passage of FOSTA.  *Id*. ¶ 22 & Ex. 1.  And though Woodhull considered launching its own online platform to conduct the Summit, it concluded the risks of civil and criminal liability under FOSTA were too great, causing it to postpone or abandon some of its Summit programs.  *Id*. ¶¶ 24-25.

FOSTA continues to thwart the efforts of Plaintiff Jesse Maley, a long-time proponent of sex worker rights (under the name "Alex Andrews"), to use, improve or develop digital tools that sex workers could use to share health, safety, and other harm-reduction information.  SMF ¶¶ 15-17.  Central to these efforts is the Rate That Rescue website, a free, community effort to share

34

information about all types of entities that provide services sex workers use, including those that do not focus on sex workers but products or services they use, such as Twitter, Wix, or PayPal. Due to the nature of Rate That Rescue and that it hosts content created by both organizations and the sex worker community, it could face claims of direct liability under Section 2421A's ban on owning, managing, or operating a website with the intent to promote or facilitate prostitution, and the site's heavy reliance on Section 230 immunity raises the specter that it now it faces potentially ruinous liability.  These effects are magnified because the site produces no revenue, is volunteer-operated, and cannot actively or comprehensively review, edit, or moderate user-generated content.  *Id.* ¶ 16.  FOSTA has also foreclosed an effort to purchase a smartphone application and website designed to increase sex worker safety.  *Id.* ¶ 17.  Most recently, Ms. Maley found herself unable rely on digital communications or other online tools to share information with sex workers amid the ongoing COVID-19 pandemic in her efforts to share accurate, timely information about public health and community organizations' services.  *Id.* ¶ 18.

This erosion of Plaintiffs' practical access to the tools of free expression, and the self-censoring conduct of non-parties, constitute irreparable harm.  They also reflect the real consequences of creating new civil and especially criminal liability risks.  If the Supreme Court agreed in *Reno* that a threat of two years in prison under the CDA justified the district court's entry of a preliminary injunction, *see* 521 U.S. at 862, 885; *see also id.* at 872, the prospect of ten years in prison, ratcheting up to as many as 25 under FOSTA, certainly warrants injunctive relief here.

### B.  The Balance of Equities Favors Injunctive Relief

Given that Plaintiffs have demonstrated irreparable injury, the balance of equities clearly tips in Plaintiffs' favor.  *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Any harm the government might cite pales compared to the loss of First Amendment freedoms

JA0111

Plaintiffs and others have suffered, particularly given that all laws that already criminalize the conduct of traffickers will continue to apply.[25]

Further, although FOSTA is premised on preventing sex trafficking and helping ameliorate harm that may be involved in sex work, it is having a decidedly opposite impact. As explained above, organizations like Woodhull and websites like Rate That Rescue, seek to provide information, education, and strategies geared to the safety and well-being of their constituencies. Yet FOSTA has forced them to curtail those efforts. *See supra* 34-35. The same is true of online services and forums such as Reddit or VerifyHim.com, which have limited or eliminated opportunities for users to communicate in these areas. SMF ¶¶ 1, 3.

Moreover, by eliminating online forums for sex workers, FOSTA is having a devastating impact of sex workers' health and safety. Studies attribute these harms and others to the loss of online services described above that sex workers previously used to advertise, screen clients, and share safety information. *Id.* ¶¶ 3-4. These findings echo economic research establishing a link between the presence of adult services advertisements on Craigslist and a decrease in violence against women. http://gregoryjdeangelo.com/workingpapers/Craigslist5.0.pdf. At the same time, experts have observed that there is no evidence FOSTA will, in fact, curtail sex trafficking, and censorship of online content is a questionable approach—at best—to combatting it. SMF ¶ 2. To the contrary, there is evidence that it actually hinders anti-trafficking efforts. *Id.* ¶¶ 4-5. It has also been observed, and studies have shown, that it hinders law enforcement in targeting trafficking. *Id.* ¶ 5. Where law enforcement could once turn to a small number of concentrated, open-access websites in the U.S. to catalyze arrests and rescues, FOSTA caused commercial sex

---

[25]  The government has already argued in this case that anything reached by FOSTA could be prosecuted under existing law. Defs.' Opp. to Mot. for Prelim. Inj. (ECF 15), at 18-19.

JA0112

ads to disperse to hundreds of platforms, leaving trafficking even more hidden from law enforcement. *Id*.

### C.  An Injunction Would Serve the Public Interest

An injunction is particularly warranted because "it is in the public interest to uphold a constitutionally guaranteed right." *PHE, Inc. v. U.S. Dep't of Justice*, 743 F. Supp. 15, 26 (D.D.C. 1990) (citation omitted).  As the D.C. Circuit has stressed, allowing unconstitutional government action to stand "is always contrary to the public interest," which lies in "protecting First Amendment rights." *Pursuing America's Greatness*, 831 F.3d at 511-12 (quoting *Gordon*, 721 F.3d at 653).  Further, the public "has a strong interest in having largely-unfettered access to Internet mediums for the purpose of publishing and viewing content and information," consistent with the exercise of First Amendment rights.  *Google, Inc. v. Hood*, 96 F. Supp. 3d at 601.  For the same reasons that FOSTA's counter-productivity undermines the government's interest, *see supra* 36-37, it is likewise in the public interest to allow those like Plaintiffs, the platforms that they offer and/or use, and those who would speak through them to continue to do so without the incursion on First Amendment rights that FOSTA imposes.

### D.  Declaratory Relief is Warranted

Many of the same considerations favor injunctive relief support granting the declaratory relief Plaintiffs seek.  *Boggs v. Bowron*, 842 F. Supp. 542, 547 (D.D.C. 1993) (actions for declaratory relief are a common method for challenging federal statutes that threaten First Amendment rights), *aff'd*, 67 F.3d 972 (D.C. Cir. 1995).  Declaratory relief is proper because there is a substantial controversy between the parties, and a definitive statement regarding FOSTA's constitutionality will resolve it.  *See supra* 33 (citing *United Gov't Sec. Officers of Am., Local 52*, 587 F. Supp. 2d at 222).

JA0113

**CONCLUSION**

For the reasons above, Plaintiffs respectfully request that the Court grant summary judgment in their favor, declare FOSTA unconstitutional on the grounds set forth herein, and enjoin enforcement 18 U.S.C. § 2421A and the amendments to 18 U.S.C. §§ 1591 and 1595 and 47 U.S.C. § 230 enacted by FOSTA.


DATED:  August 31, 2020


                                          Respectfully submitted,


                                          _____/s/ Robert Corn-Revere_____
                                          ROBERT CORN-REVERE
                                          D.C. Bar No. 375415
                                          RONALD G. LONDON
                                          D.C. Bar No. 456284
                                          **Davis Wright Tremaine LLP**
                                          1301 K Street, NW, Suite 500 East
                                          Washington, D.C. 20005
                                          Telephone: (202) 973-4200
                                          Facsimile: (202) 973-4499
                                          Email: bobcornrevere@dwt.com
                                                  ronnielondon@dwt.com

                                          LAWRENCE G. WALTERS
                                          Florida Bar No.: 0776599
                                          *Pro Hac Vice*
                                          **Walters Law Group**
                                          195 W. Pine Ave.
                                          Longwood, FL 32750-4104
                                          Telephone: (407) 975-9150
                                          Facsimile: (408) 774-6151
                                          Email: Larry@FirstAmendment.com
                                                  Paralegal@FirstAmendment.com

JA0114

AARON MACKEY
D.C. Bar No. 1017004
DAVID GREENE
(admitted in California)
*Pro Hac Vice*
CORYNNE MCSHERRY
(admitted in California)
**Electronic Frontier Foundation**
815 Eddy Street
San Francisco, CA 94109
(415) 436-9333
Email:  amackey@eff.org
            davidg@eff.org

DAPHNE KELLER
Cal. Bar No. 226614
**Stanford Cyber Law Center**
616 Jane Stanford Way #E016
Stanford, CA 94305
(650) 725-0325
Email:  daphnek@stanford.edu

Attorneys for Plaintiffs

JA0115

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

WOODHULL FREEDOM FOUNDATION,    )
HUMAN RIGHTS WATCH, ERIC KOSZYK,    )
JESSE MALEY, a/k/a ALEX ANDREWS, and    )
THE INTERNET ARCHIVE,    )
                                         )    Case No. 1:18-cv-1552
         Plaintiffs,    )
                                         )
      v.    )
                                         )
THE UNITED STATES OF AMERICA    )
and WILLIAM P. BARR, in his official    )
capacity as ATTORNEY GENERAL    )
OF THE UNITED STATES,    )
                                         )
         Defendants.    )
                                         )

### PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS

Plaintiffs, Woodhull Freedom Foundation, Human Rights Watch, Eric Koszyk, Jesse Maley a/k/a Alex Andrews, and The Internet Archive, file this Statement of Undisputed Material Facts pursuant to Fed. R. Civ. P. 56(c) and Local Rule 7(h).

1.      In reaction to the Allow States and Victims to Fight Online Sex Trafficking Act of 2017, Pub. L. No. 115-164, 132 Stat. 1253 (2018) ("FOSTA"), online service providers that enabled interpersonal communication by users – including many lacking a connection to sexual material – removed content, eliminated entire sections of websites, or were shuttered altogether. Declaration of Kate D'Adamo ("D'Adamo Decl.") ¶¶ 9-13 (attached as Ex. A); Declaration of Dr. Jessica P. Ashooh ("Ashooh Decl.") ¶¶ 2-3, 5-7 (attached as Ex. B); About FOSTA, Craigslist, https://www.craigslist.org/about/FOSTA.

2.      Experts have observed there is no rigorous quantitative data to suggest FOSTA has had or will have a significant impact in reducing the prevalence of sex trafficking, nor any criminological theory to support the hypothesis that FOSTA will have a significant impact in

reducing the prevalence of sex trafficking.  Declaration of Dr. Kimberly Mehlman-Orozco in

Supp. of Mot. for Prelim. Inj. ("Mehlman-Orozco PI Decl.") (ECF No. 5-9) ¶¶ 21, 23.

     3.    Experts and observers have reported that FOSTA has had an adverse effect on

online services relevant to sex workers, on the ability of sex workers who relied upon them to

stay safe and to share information, and on harm-reduction tactics in which sex workers

previously engaged.   D'Adamo Decl. ¶¶ 17-19; Ashooh Decl. ¶¶ 6-7; Declaration of Dr.

Alexandra Lutnick ("Lutnick Decl.") ¶¶ 11-13, 15 (attached as Ex. C); Declaration of Alexandra

Frell Levy Yelderman ("Yelderman Decl.") ¶ 7 (attached as Ex. D); "The Loss of Sex Work

Friendly Resources," https://hackinghustling.org/online-platforms-sex-worker-discrimination.

     4.    A study by an organization that provides housing to those who need it, including

individuals described as victims of sex trafficking, reported that FOSTA led to an increase in

violence against sex workers and made it more difficult for law enforcement to pursue

trafficking.  D'Adamo Decl. ¶ 23; *Research Brief After FOSTA-SESTA*, The Samaritan Women's

Institute  for  Shelter  Care  (2018)  at  4-6,  https://thesamaritanwomen.org/wp-content/up-

loads/2020/02/After-SESTA-FOSTA.pdf.

     5.    Experts and other observers have noted FOSTA's detrimental impact on the

ability of law enforcement to pursue sex trafficking crimes.  Mehlman-Orozco PI Decl. ¶¶ 16,

24-25, 28, 31; D'Adamo Decl. ¶ 24; Yelderman Decl. ¶ 6; Lutnick Decl. ¶¶ 16-19.

     6.    The Plaintiffs in this case who operate online platforms or services depend upon

immunity provided by 18 U.SC. § 230 to host third-party content.  Declaration of Jesse Maley

("Maley Decl.") ¶¶ 25-26 (attached as Ex. E); Declaration of Ricci Levy in Support of Mot. for

Prelim. Inj. ("Levy PI Decl.") (ECF No. 5-2) ¶ 43; Declaration of Brewster Kahle ¶ 15 (attached

as Ex. F).

JA0117

7.      The Plaintiffs have had their speech chilled and/or have self-censored as a direct result of FOSTA's enactment.  Maley Decl. ¶¶ 32-34, 37-38, 40, 43-48; Declaration of Ricci Levy in Supp. of Mot. for Summ. J. ("Levy SJ Decl.") ¶¶ 16, 21-23, 27 (attached as Ex. G); Levy PI Decl. ¶¶ 32-34.

8.      Plaintiffs who had used online platforms that hosted Plaintiffs' content lost the ability in the wake of FOSTA to use those platforms, either in full, Declaration of Eric Koszyk ("Koszyk Decl.") ¶¶ 1-2, 7-9, 11-13, 20 (attached as Ex. H), or in part.  Levy SJ Decl. ¶¶ 10-15, 17, 21, 24 & Ex. 1.

9.      Plaintiffs who lost access to online platforms in the wake of FOSTA have been unable to find adequate substitutes, Koszyk Decl. ¶ 24, as were other users of those platforms. *Id.*; Levy PI Decl. ¶ 29.

10.      Plaintiff Eric Koszyk, owner and sole proprietor of Soothing Spirit Massage and a licensed massage therapist since 2006, used Craigslist prior to the enactment of FOSTA as the primary way of finding massage clients.  Koszyk Decl. ¶¶ 1, 7, 8.

11.      On Friday, April 6, 2018, in the wake of Congress' passage of FOSTA, Koszyk learned Craigslist had removed his most recent ad for Soothing Spirit and had shut down its Therapeutic Services section.  *Id.* ¶ 20.

12.      Since FOSTA's enactment, Koszyk has been unable to advertise his therapeutic massage business on Craigslist, and thus has been prevented from reaching the same audience of potential customers as prior to the law's passage.  *Id.* ¶ 2.

13.      Koszyk has not learned of any other website that would allow him to post similar ads and to reach a similar sized audience as he did using Craigslist.  Nor has Koszyk been able to use any combination of multiple advertising websites to reach potential customers.  *Id.* ¶ 24.

JA0118

14.     It is Koszyk's understanding that Craigslist publicly committed to reinstate the sections it removed as a result of FOSTA if the law changes, and if it does so as to therapeutic services, Koszyk intends to immediately resume posting on Craigslist.  *Id.* ¶ 3.

15.     Plaintiff Jesse Maley, who in working as a community organizer and advocate for sex workers—including as co-founder, director, employee, or volunteer for organizations that directly service sex workers and advocate on broader issues impacting them—identifies herself as Alex Andrews, is a member of the board of directors of the Sex Workers Outreach Project USA ("SWOP USA"), a national social justice network dedicated to the fundamental human rights of people involved in the sex trade and their communities.  Maley Decl. ¶¶ 2-3.

16.     Maley helped create Rate That Rescue (www.ratethatrescue.org), an online resource for sex workers to learn more about organizations that provide services to them, operating as a sex worker-led, public, free website that seeks to help share information about both the organizations they can rely on, and those they should avoid, including through posts by third parties and organizations.  *Id.* ¶¶ 13-19.  The site has expanded to include reviews of all types of services that sex workers and the broader public use, including Twitter, Wix, and PayPal.  *Id.* ¶ 24.  The site generates no revenue, is run by volunteers, and is unable to actively or comprehensively review, edit, or moderate user-generated content.  *Id.* ¶ 26.

17.     Maley helped lead SWOP USA efforts to purchase an in-development mobile app and website dedicated to increasing sex worker safety, whose features would include allowing sex workers to report violence, harassment, and other harmful behavior against them via the app; maintaining a database of the reports that other sex workers could query; and sending notifications to others near the location of the sex worker who reported the incident.  *Id.* ¶¶ 34-

36.  More than two years after FOSTA's passage, SWOP USA did not purchase the app due to the change in law, and has no plans to develop any similar service in the future.  *Id.* ¶¶ 37, 42.

18.    Maley's work has encompassed in-person, direct service to sex workers, including communicating health and safety information and directing them to services in their community. Though it would be easier to convey this information timely and accurately if Maley could engage in more digital outreach to her constituency, especially during the public health crisis as a result of the novel Coronavirus (which only heightens needs for this type of information), Maley has refrained from creating any tool or online service to provide that outreach due to concerns about FOSTA.  *Id.* ¶¶ 43-48.

19.    Woodhull Freedom Foundation ("Woodhull") uses various online technologies to conduct business and organize events, such as Google Docs, Formidable form generator, and online databases and cloud storage, as well as social media like Facebook, Twitter, Instagram, Hootsuite (for post-scheduling) and Bitly (for link-shortening) to promote the organization and its events.  Woodhull also uses online ticketing to register attendees for events, a mobile event app called YAPP, and Youtube.com to store and publish workshop presenter videos, which include information about presenters.  Levy PI Decl. ¶¶ 10-15.

20.    Woodhull's signature event, a multi-day Sexual Freedom Summit ("Summit") held annually in Washington, DC that engages educators, therapists, legal and medical professionals, and advocacy leaders to strategize, share information, and work collaboratively to protect the rights to information, health, and pleasure, has come to include a "sex worker" track involving workshops devoted to issues impacting sex workers, including but not limited to harm reduction, disability, age, health, and personal safety.  *Id.* ¶¶ 7, 16-20, 22.

JA0120

21.     Woodhull promotes the Summit on its own website, and promotes most, if not all, of the workshops on social media like Facebook, Instagram, and Twitter, with posts that link to presenters' workshops and biographies.  *Id.* ¶¶ 23-24.  On FOSTA's passage, Woodhull ceased online promotion of the 2018 Summit's sex work track, blocked all information associated with its workshops from the Summit website, and restrained publication of workshop titles, biographies and contact information, restoring the material only after joining a legal challenge to FOSTA.  *Id.* ¶¶ 32-34.

22.     Woodhull currently uses Facebook to livestream video of Summit programs, Facebook and YouTube to archive the videos, and Zoom or Streamyard to connect panel partici-pants via videoconference.  In 2020, due to the COVID-19 pandemic, Woodhull has had to present the Summit and its workshops exclusively online.  Levy SJ Decl. ¶ 9.  Woodhull found promoting the Summit on platforms such as Facebook and YouTube difficult due to content moderation policies imposed on them since FOSTA's enactment.  *Id.* ¶¶ 10-11, 17.  Attempts to advertise the 2020 Summit repeatedly have been rejected by Facebook, even though Woodhull had posted similar Facebook ads for sexually-oriented Summit programs which were not rejected prior to passage of FOSTA.  Woodhull expects Facebook will likewise reject similar future attempts by Woodhull to promote the Summit, potentially risking permanent termination of its account and loss of over 7,800 followers.  *Id.* ¶¶ 13-15 & Ex. 1.  As a result, Woodhull has censored its Facebook ads which has hampered its ability to promote the Summit.  *Id.* ¶ 16.

23.     Similarly, fearing termination of its YouTube channel with over 11 years' worth of archived videos, Woodhull has chosen not to "livestream" its Summit programs on YouTube in 2020 due to the platform's broad post-FOSTA restrictions.  Specifically, Woodhull concluded

JA0121

that livestreaming its content would call more attention to the archived materials and potentially risk termination of its channel by YouTube.  *Id*. ¶ 21.

24.     Woodhull has postponed or abandoned Summit programs in 2020 relating to human sexuality, sex work, and/or prostitution due to concerns over removal of the material or termination of its accounts by Facebook, YouTube, Zoom, and/or Streamyard.  *Id*. ¶ 22.

25.     Though Woodhull originally intended to develop and launch its own online video sharing platform to conduct its virtual Summit in 2020, after evaluation of the legal risks—and in particular FOSTA's broad prohibitions on operating a computer service that could be alleged to promote or facilitate prostitution, the various civil claims brought against online platforms under FOSTA, and the pending criminal prosecution against cityxguide.com based on alleged violation of 18 U.S.C. § 2421A as added by FOSTA—Woodhull's Board of Directors voted not to proceed due to fears of criminal prosecution or civil liability under FOSTA.  *Id*. ¶¶ 23-24.

26.     The Internet Archive seeks to prevent Internet and other "born-digital" material from disappearing by offering permanent access for researchers, historians, scholars, people with disabilities, and the general public to historical collections that exist in digital format, consisting of texts, audio, moving images, and software, as well as archived web pages.  Kahle Decl. ¶¶ 4-5. In doing so, it collects and displays web materials on behalf of the Library of Congress, the National Archives, most state archives and libraries, and universities and other countries.  *Id*. ¶ 6.

27.     The Internet Archive regularly gathers "snapshots"—accessible copies—of content on the World Wide Web through "crawling" and indexing processes, currently crawling and archiving more than 80 million web pages per day.  *Id*. ¶ 7.  It also scans and digitizes over one thousand books a day on behalf of libraries, museums, and authors, *id*. ¶ 10, and the general public uploads over 2,000 items per day.  *Id*. ¶ 13.

JA0122

28.     The Internet Archive currently maintains over 330 billion web pages archived from 1996 to (nearly) the present from web sites around the world, including archives of third-party content posted to web sites like craigslist.org.  The vast majority of the material in the Internet Archive's collection is authored by third parties.  *Id*. ¶¶ 4, 8.  It circulates over 17 million texts, 5 million audio items, and 4 million video items that are downloaded by tens of millions of users each month.  *Id*. ¶ 12.  Currently, the Internet Archive has over 1.4 million unique users per day across all of its services and adds over 100,000 registered users per month.  *Id*. ¶ 11.

29.     While the Internet Archive does at times remove content, it has no practical ability to evaluate the legality of any significant portion of the third-party content it archives and makes available.  *Id*. ¶ 14.

30.     Human Rights Watch, Inc. ("HRW"), a 501(c)(3) tax-exempt organization that monitors human rights conditions worldwide and advocates for cessation and remediation of violations, including as pertain to rights of sex workers, has since 2013 urged decriminalization of sex work.  Declaration of Dinah PoKempner ¶ 2 (attached as Ex. I).  Each year, HRW produces and publishes many hundreds of reports, press releases, videos, podcasts and other online documents on its website and social media accounts, including research and advocacy on behalf of the rights of sex workers and the decriminalization of sex work, and relies heavily on individuals spreading its reporting and advocacy through social media platforms and websites that host, disseminate, or allow users to post HRW's reports and advocacy materials.  *Id*. ¶¶ 5, 9.

JA0123

DATED:  August 31, 2020

Respectfully submitted,


_____/s/ Robert Corn-Revere_____
ROBERT CORN-REVERE
D.C. Bar No. 375415
RONALD G. LONDON
D.C. Bar No. 456284
**Davis Wright Tremaine LLP**
1301 K Street, NW, Suite 500 East
Washington, D.C. 20005
Telephone: (202) 973-4200
Facsimile: (202) 973-4499
Email: bobcornrevere@dwt.com
      ronnielondon@dwt.com

LAWRENCE G. WALTERS
Florida Bar No.: 0776599
*Pro Hac Vice*
**Walters Law Group**
195 W. Pine Ave.
Longwood, FL 32750-4104
Telephone: (407) 975-9150
Facsimile: (408) 774-6151
Email: Larry@FirstAmendment.com
      Paralegal@FirstAmendment.com


AARON MACKEY
D.C. Bar No. 1017004
DAVID GREENE
(admitted in California)
*Pro Hac Vice*
CORYNNE MCSHERRY
(admitted in California)
**Electronic Frontier Foundation**
815 Eddy Street
San Francisco, CA 94109
(415) 436-9333
Email:  amackey@eff.org
      davidg@eff.org

DAPHNE KELLER
Cal. Bar No. 226614
**Stanford Cyber Law Center**
616 Jane Stanford Way #E016
Stanford, CA 94305
(650) 725-0325
Email:  daphnek@stanford.edu

Attorneys for Plaintiffs

JA0124

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| WOODHULL FREEDOM FOUNDATION, HUMAN RIGHTS WATCH, ERIC KOSZYK, JESSE MALEY a/k/a ALEX ANDREWS, and THE INTERNET ARCHIVE, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OF AMERICA and JEFFERSON B. SESSIONS, in his Official Capacity as ATTORNEY GENERAL OF THE UNITED STATES, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )     Case No. 18-cv-01552 (RJL) |

**DECLARATION OF KATE D'ADAMO**

Pursuant to 28 U.S.C. § 1746, I, KATE D'ADAMO, hereby declare as follows:

1.    The facts contained in the following affidavit are known to me of my own personal knowledge, and if called upon to testify, I could and would competently do so. I am a sex worker rights advocate who for more than 12 years has focused on economic justice, anti-policing and incarceration and public health issues related to sex work. I received a bachelor of arts degree in political science in 2006 from California Polytechnic State University, San Luis Obispo and a master's degree in international affairs in 2012 from The New School University.

2.    The Allow Victims to Fight Online Sex Trafficking Act ("FOSTA") has resulted in the loss of online platforms and other digital services that sex workers rely upon to stay safe

JA0126

and share information. As discussed below, sex workers have been harmed by the loss of these services.

**History of Sex Worker Advocacy**

3.       I am a partner at Reframe Health and Justice, a consulting collective which works on issues related to harm reduction and criminal-legal reform, especially in forms which predominantly impact women and femmes. My previous work includes serving as the National Policy Advocate at the Sex Workers Project at the Urban Justice Center. In that position, I focused on laws, policies and advocacy surrounding individuals who trade sex, including the criminalization of sex work, anti-trafficking policies, and HIV-specific laws.

4.       Prior to joining the Sex Workers Project, I was a community organizer and advocate with the Sex Workers Outreach Project and Sex Workers Action New York. In this role, I developed programming to promote community building, provided peer support and advanced political advocacy to support the rights and well-being of people engaged in the sex trade both on and off the job.

5.       I have has also participated in coalitions such as the Human Rights for All campaign, which sought to incorporate sex worker rights within the Universal Periodic Review, and was a founding member of the Persist Health Project, a community-based health program for people who trade sex.

6.       As part of my advocacy for sex workers' rights, I worked with a broader coalition to oppose the Allow State and Victims to Fight Online Sex Trafficking Act (H.R. 1865) ("FOSTA") and the Stop Enabling Sex Traffickers Act (S. 1693) ("SESTA") as they moved through Congress. I previously served as a member of the board of directors of Plaintiff Woodhull Freedom Foundation.

JA0127

**Creation of Survivors Against SESTA website**

7.      Along with a coalition of other sex worker advocates, sex workers, and their allies, I helped create the website Survivors Against SESTA, www.survivorsagainstsesta.org. The coalition who created Survivors Against SESTA were concerned about the impact the law would have on sex workers and the websites and other online services they rely upon to stay safe. The website was created to support sex workers, to disseminate information about the bill and potential advocacy that individuals could engage in, and to gather and post information about sex workers' legal rights and how they can work safely.

8.      The organizers of Survivors Against SESTA also held multiple calls with members of the sex worker community throughout the United States to disseminate the information we had collected. Additionally, advocates, both in association with Survivors Against SESTA and independently, organized know your rights trainings and community meet-ups in multiple cities with the goal of sharing information about the then-pending legislation and connecting organizers with people who would affected by the law.

9.      The organizers of Survivors Against SESTA arranged the first national sex worker lobby day on June 1. Dozens of sex workers and their allies traveled to Washington, D.C. to meet with their representatives' offices. At the same time, advocates in cities throughout the country hosted events to help with education and outreach for sex workers' rights. On June 2, sex workers and their allies arranged rallies and marches in 15 cities across the country.

10.      Survivors Against SESTA also decided to document some of the impact of the legislation. Even before FOSTA became law, the creators of Survivors Against SESTA and the broader community advocating on behalf of sex workers began noticing that certain websites and online services used by sex workers were changing their policies, removing certain services, or

3

JA0128

shutting down completely. It appeared to us as though many were doing so out of fear and

uncertainty regarding their potential liability under SESTA. In June 2018, the organizers

announced that we were sunsetting the campaign and website.

**FOSTA's Impact on Services Used by Sex Workers**

11.     During the period that Survivors Against SESTA was active, it served as a central

location to document FOSTA's impact on the online services' reactions to the law. These

changes included:

12.     The online classified ads website Craigslist, www.craigslist.com, shut down its

personals section on March 23, publicly attributing the closure to the Senate's passage of

FOSTA. In a post on its website, Craigslist wrote:

> US Congress just passed HR 1865, "FOSTA", seeking to subject websites to
> criminal and civil liability when third parties (users) misuse online personals
> unlawfully.
>
> Any tool or service can be misused. We can't take such risk without jeopardizing
> all our other services, so we are regretfully taking craigslist personals offline.
> Hopefully we can bring them back some day.
>
> To the millions of spouses, partners, and couples who met through craigslist, we
> wish you every happiness!

*See* https://www.craigslist.org/about/FOSTA. A true and correct copy is attached as Exhibit 1.

13.     Around the same time, Reddit published an announcement that specifically

banned "Paid services involving physical sexual contact." *See*

https://www.reddit.com/r/announcements/comments/863xcj/new_addition_to_sitewide_rules_re

garding_the_use/.  A true and correct copy is attached as Exhibit 2.

14.     Reddit also began to remove several "subreddits" relating to sex, including:

r/Escorts, r/MaleEscorts, r/Hookers, and r/SugarDaddy. Elizabeth Nolan Brown, "Hours After

FOSTA Passes, Reddit Bans 'Escorts' and 'SugarDaddy' Communities," REASON (March 22,

JA0129

2018 10:35 am), https://reason.com/blog/2018/03/22/reddit-bans-escort-subreddits. A true and

correct copy is attached as Exhibit 3.  The moderator of the r/sexworkers subreddit—which is

described as "a community forum for sex workers, clients, and even those unaffiliated with the

industry to come together and ask questions and share resources"—received a warning that the

subreddit could be shut down if administrators felt that it infringed on Reddit's new policy. Tina

Horn, "How a New Senate Bill Will Screw Over Sex Workers," ROLLINGSTONE (March 23,

2018), https://www.rollingstone.com/politics/features/controversial-anti-sex-trafficking-bill-

screw-over-sex-workers-w518323. A true and correct copy is attached as Exhibit 4.

15.     Additionally, VerifyHim. a tool that helps sex workers avoid abusive clients and

describes itself as "the biggest dating blacklist database on earth," said at the around same time

that it was "working to change the direction of the site." Nitasha Tiku, "Craigslist Shuts Personal

Ads For Fear of New Internet Law," Wired (March 23, 2018),

https://www.wired.com/story/craigslist-shuts-personal-ads-for-fear-of-new-internet-law/. A true

and correct copy is attached as Exhibit 5.

16.     In the days immediately before and after FOSTA became law, several other

online platforms, websites and services either changed their behavior or shut down entirely.

Some examples include:

- The Google Play Store Google Play updated its policy to ban explicit content such

  as "promotional images of sex toys" and "apps that promote escort services."

  https://play.google.com/about/restricted-content/inappropriate-content/sexually-

  explicit-content/. Google also began deleting explicit content that users uploaded

  to its Google Drive service and also appeared to lock out users from the service.

  Samantha Cole, "Sex workers are reporting that their Google Drive files are

JA0130

mysteriously locked or vanishing," Motherboard (March 21, 2018),

https://motherboard.vice.com/en_us/article/9kgwnp/porn-on-google-drive-error.

A true and correct copy is attached as Exhibit 6.

- Eventbrite, the online ticketing and event service, updated its policies to prohibit

  events that would "constitute or promote . . . explicit sexual activity or

  pornography."

  https://www.eventbrite.com/support/articles/en_US/Troubleshooting/community-

  guidelines.

- The "adult-ad forum" CityVibe.com disappeared two days after the President

  signed FOSTA. Elizabeth Nolan Brown, "The New Law That Killed Craigslist's

  Personals Could End the Web As We've Known It," THE DAILY BEAST (Mar. 23,

  2018), https://www.thedailybeast.com/the-new-law-that-killed-craigslists-

  personals-could-end-the-web-as-weve-known-it. A true and correct copy is

  attached as Exhibit 7.

- Pounced.org, a personals website serving the "furry" community, shut down,

  explaining that as a free site staffed by volunteers, it could not manage the news

  burden created by potential liability under section 2412A if it did not have the

  protection of section 230:

  "FOSTA changes that in a way that makes sites operated by small
  organizations like pounced.org much riskier to operate. FOSTA essentially
  says that if we facilitate the prostitution of another person we're liable. If
  you read FOSTA carefully the bill says "or facilitate" - the problem is that
  "or facilitate" is ill-defined.

  . . .

  "We don't promote prostitution or sex trafficking. We're a personals site for
  the furry community, our goal was to allow members of our community to

JA0131

have a personals site dedicated solely to the community, and we've tried to serve our community well.

"The problem is, with limited resources and a small volunteer staff, our risk for operating the site has now significantly increased. Now if someone posts an ad looking to exchange sex for something to pounced.org, and we don't catch it, is that facilitating prostitution? Is it enough to simply re-train our volunteer staff and update our terms of service?

"Do we try to filter advertisements and forum posts? Do we ask our volunteer staff to take on the burden of reviewing all personal ads to insure we're in compliance - and what if they miss one? If we try to implement filtering will it be anything other than intrusive and ineffective, given the resources of a small organization like ours?

"And we must now account for the fact that our liability to operate a service such as pounced.org has unequivocally increased, especially given that FOSTA explicitly makes this a criminal liability.

"We now can be held accountable for the actions of others using our service.

. . .

"In many ways this bill targets small sites like ours directly, it favors organizations with the resources to invest in filtering technology, paid staff and legal support staff. It is less of an impediment for big organizations, while doing significant harm to small organizations like ours, which service niche communities like ours. Our larger competitors are not likely to find a large market in servicing the furry community, and so our community will suffer."

Archived at https://web.archive.org/web/20180503181331/http://pounced.org/why.html. A true and correct copy is attached as Exhibit 8.

- The adult live streaming website MyFreeCams changed its policies to specifically ban its performers and its users from engaging in any transactions, including offering to meet up in person in exchange for anything of value.

  https://wiki.myfreecams.com/wiki/Rules_and_Guidelines.

- First Choice Pay, an online payment processer and platform used by online adult livestreaming performers, stopped receiving or processing payments shortly after passage of FOSTA. https://firstchoicepay.custhelp.com/.

JA0132

- A number of other adult websites, such as www.myscarlettbook.com,
  www.escortdesign.com/, and www.getluckyhere.com, shut down.

**FOSTA Long-Term Impact on Sex Workers**

17.     FOSTA's impact on online services and the sex workers who relied upon them
have directly harmed their ability to stay safe, share information, and build community. Some of
those documented harms are discussed below.

18.     A 2020 community study on FOSTA's effects states:

> this law is contributing to the poverty that makes an individual more
> susceptible to labor exploitation and trafficking. By censoring the way that
> sex workers communicate with each other online, this law is also
> responsible for the dissolution of harm reduction tactics that allow workers
> to educate each other by sharing experiences with violent clients,
> exploitative management, and labor exploitation.

Daniel Blunt and Ariel Wolff, *Erased: The Impact of FOSTA-SESTA & the Removal of
Backpage* (2020), 18 (*"Erased"*), https://hackinghustling.org/erased-the-impact-of-fosta-
sesta-2020/. A true and correct copy is attached as Exhibit 9.

19.     Other findings of *Erased* include:

- "There is no evidence that FOSTA-SESTA has done anything to prevent sexual
  labor exploitation. Our research shows that this law has actually put people in
  more precarious financial situations that actually make individuals more
  vulnerable to trafficking, as well as de-creasing access to previously established
  channels of communication used to protect sex workers against violence." *Erased*
  at 35.

- "FOSTA-SESTA has reduced the number of sites that sex workers use to find
  clients, community and share harm reduction working tips." *Erased* at 19.

JA0133

- "Our research suggests that individuals who work online experienced a greater increase of violence than those who were already working on the streets after the removal of Backpage and the passage of FOSTA-SESTA." *Erased* at 23.

- "The Internet provided a space for sex workers to share resources, build community, and advertise their services. Sex workers who use social media to connect with community or share harm-reduction working tools may now find themselves isolated from their trusted networks and unable to find community members through regular searches." *Erased* at 25.

20.     A 2018 survey by a coalition of sex workers in Rhode Island—Call Off Your Old Tired Ethics ("COYOTE")—found that sex workers had lost income and tools to stay safe as a result of FOSTA. COYOTE-Rhode Island, *After FOSTA, It's Like Hunger Games on Sex Workers* (May 22, 2018), http://coyoteri.org/wp/after-fosta-its-like-hunger-games-on-sex-workers/. A true and correct copy is attached as Exhibit 10. A presentation analyzing the survey's results details how 60 percent of respondents said that had engaged in less safe work since FOSTA's passage and that there was a 28 percent drop in sex workers ability to screen clients, largely because online services workers previously relied upon had shut down or prohibited sex workers from using them. http://www.swop-seattle.org/wp-content/uploads/2018/11/COYOTE-Survey-Results-2018.pdf. A true and correct copy is attached as Exhibit 11.

21.     News reports also described how FOSTA increased danger for sex workers because online services they previously used were no longer available. April Glaser, *There Is No New Backpage* (Feb. 13, 2019), https://slate.com/technology/2019/02/backpage-sex-workers-fosta-sesta-switter-tryst-trafficking.html. A true and correct copy is attached as Exhibit 12.

9

22.    FOSTA's removal of online spaces that sex workers used runs counter to research that demonstrated that the presence of Craigslist in a community increased safety. Scott Cunningham et al., *Craigslist Reduced Violence Against Women*, http://scunning.com/craigslist110.pdf. A true and correct copy is attached as Exhibit 13.

23.    Another study by an organization that provides housing to those who need it, including individuals they describe as victims of sex trafficking, reported that FOSTA led to an increase violence against sex workers and has made it more difficult for law enforcement to pursue trafficking investigations. *Research Brief After FOSTA-SESTA*, The Samaritan Women's Institute for Shelter Care (2018) at 4-6 ("Research Brief"), https://thesamaritanwomen.org/wp-content/uploads/2020/02/After-SESTA-FOSTA.pdf.

24.    The Research Brief states that its purpose "was to assess whether the FOSTA-SESTA legislation had/is having an impact on shelter agencies' referrals or operations." Responses to the survey included:

- "SESTA has done absolutely nothing to improve anything in [our city]. In fact, it has definitely made things worse. Street-level activity is up. Gang involvement in prostitution is up. Website [sic] are still active. There has been absolutely no improvement or change."

- "Clients on the whole experiencing more violent assaults since no longer able to use online platforms to advertise and screen johns."

- "The women we interact with are frustrated by the changes and feel it makes their jobs more dangerous."

10

JA0135

- "Our partners in law enforcement had to abandon several pending investigations and have had a much more difficult time finding/locating missing youth and/or being able to coordinate undercover sting operations."

25.    I declare under penalty of perjury of the laws of the State of Maryland that the foregoing is true and correct to the best of my knowledge and belief.

Executed on this 28th day of August 2020 at Baltimore, Maryland.

Kate D'Adamo

JA0136

# Exhibit 1

JA0137

Case 1:18-cv-01552-RJL   Document 34-4   Filed 08/31/20   Page 2 of 182
USCA Case #22-5105      Document #1962386      Filed: 09/06/2022      Page 76 of 173

 about > FOSTA

US Congress recently passed HR 1865, "FOSTA", seeking to subject websites to criminal and civil liability when third parties (users) misuse online personals unlawfully.

Any tool or service can be misused. We can't take such risk without jeopardizing all our other services, so we have regretfully taken craigslist personals offline. Hopefully we can bring them back some day.

To the millions of spouses, partners, and couples who met through craigslist, we wish you every happiness!

JA0138

# Exhibit 2

JA0139

New addition to site-wide rules regarding the use of Reddit to conduc... https://www.reddit.com/r/announcements/comments/863xcj/new_add...

Case 1:18-cv-01552-RJL   Document 34-4   Filed 08/31/20   Page 4 of 182
USCA Case #22-5105      Document #1962386      Filed: 09/06/2022      Page 78 of 173



Posted by u/Reddit-Policy 🔴 2 years ago 🗄️ 🏠 Ⓢ

**0**

## New addition to site-wide rules regarding the use of Reddit to conduct transactions

Hello All—

We want to let you know that we have made a new addition to our content policy forbidding transactions for certain goods and services. As of today, users may not use Reddit to solicit or facilitate any transaction or gift involving certain goods and services, including:

- Firearms, ammunition, or explosives;
- Drugs, including alcohol and tobacco, or any controlled substances (except advertisements placed in accordance with our advertising policy);
- Paid services involving physical sexual contact;
- Stolen goods;
- Personal information;
- Falsified official documents or currency

When considering a gift or transaction of goods or services not prohibited by this policy, keep in mind that **Reddit is not intended to be used as a marketplace and takes no responsibility for any transactions individual users might decide to undertake in spite of this**. Always remember: you are dealing with strangers on the internet.

EDIT: Thanks for the questions everyone. We're signing off for now but may drop back in later. We know this represents a change and we're going to do our best to help folks understand what this means. You can always feel free to send any specific questions to the admins here.

34% Upvoted

🗨️ **13.0k Comments**   ↗ Share   🔖 Save   ⊘ Hide   🚩 Report

JA0140

Exhibit 3

JA0141

[reason.com](reason.com)

# Hours After FOSTA Passes, Reddit Bans 'Escorts' and 'SugarDaddy' Communities

*Elizabeth Nolan Brown*

5-6 minutes



**This community has been banned**

This subreddit was banned due to a violation of our content policy
Banned 7 hours ago.

BACK TO REDDIT

screenshot/Reddit

Sometime around 2 a.m. last night, Reddit banned several long-running sex worker forums from the platform. The move comes just hours after the <u>Senate passed a bill making digital facilitation of prostitution a federal crime</u>. Under the new law, social media sites and other hubs of user-generated content can be held criminally liable.

JA0142

Case 1:18-cv-01552-RJL    Document 34-4    Filed 08/31/20    Page 7 of 182
USCA Case #22-5105    Document #1962386    Filed: 09/06/2022    Page 81 of 173

For months, sex workers have warned that the passage of "SESTA" or "FOSTA"—two similarly bad bills that were competing for dominance; FOSTA passed yesterday—would mark the end of all online forums for communication with clients, lawyers, or each other. To sex workers like Liara Roux, Louise Partridge, and Jiz Lee, Reddit's takedown of these subreddits confirmed their fears about the new legislation.

Even if individuals aren't targeted by law enforcement for placing ads, and even if individual cases brought by state prosecutors are struck down as unconstitutional, a lot of platforms will preemptively ban anything remotely related to sex work rather than risk it.

So far, four subreddits related to sex have banned: Escorts, Male Escorts, Hookers, and SugarDaddy. None were what could accurately be described as *advertising* forums, though (to varying degrees) they may have helped connect some people who wound up in "mutually beneficial relationships." The escort forums were largely used by sex workers to communicate with one another, according to Partridge. Meanwhile, the "hooker" subreddit "was mostly men being disgusting," according to Roux, "but also was a place that sometimes had people answering educational questions in good faith."

If you visit the Reddit "Hooker" community now, you'll see a notice that "this subreddit was banned due to a violation of our content policy." The "Escorts" and "Male Escots" pages provides a little more detail: "This subreddit was banned due to a violation of our content policy, specifically, a violation of

JA0143

Reddit's policy against transactions involving prohibited goods or services."

Reddit yesterday announced changes to its content policy, now forbidding "transactions for certain goods and services," including "firearms, ammunition, or explosives" and "paid services involving physical sexual contact." While some of the prohibited exchanges are illegal, many are not.

Yet they run close enough up against exchanges that *could* be illegal that it's hard for a third-party like Reddit to differentiate. And the same goes for forums where sex workers post educational content, news, safety and legal advice. Without broad Section 230 protections, Reddit could be in serious financial and legal trouble if they make the wrong call.

Some have suggested that the new content policy, not FOSTA, is to blame for the shutdown of the sex-related subreddits. But FOSTA may also help explain Reddit's new content policy overall. (Reddit did not respond to my request for comment Thursday morning.)

FOSTA seriously chips away at Section 230, the federal provision that protects web publishers from being treated as the speaker of user-generated content. Proponents of FOSTA have insisted this is just a renovation of Section 230, not a demolition. But as Sen. Ron Wyden (D-Ore.)—who coauthored the Section 230 language in the '90s—noted yesterday, once you carve out a loophole for one bad thing (in this case, the change is allegedly meant to stop sex trafficking), it's easy for legislators

JA0144

Case 1:18-cv-01552-RJL   Document 34-4   Filed 08/31/20   Page 9 of 182
USCA Case #22-5105      Document #1962386      Filed: 09/06/2022      Page 83 of 173

and courts to carve out loopholes and justifications for everything.

After all, murder is pretty bad. And everyone's pretty jazzed up about the "opioid epidemic" right now. Guns, too. Do you think Congress can resist asking if websites that facilitate these crimes shouldn't be just as liable as those that broker sex?

But as Wyden also pointed out yesterday, this strategy doesn't mean that more sex traffickers—or murderers, illegal arms dealers, etc.—will be caught and punished (and perhaps less overall, for a vareity of reasons). It just means treating websites like the criminals instead—which would make the government a lot of money, but do nothing for safety or justice.

"Section 230 was never about protecting incumbents," Wyden told his colleagues from the Senate floor Wednesday. Yet "despite the fact that section 230 undergirds the framework of the internet as we know it today, there's a signifficant effort to take it down and collapse it." The result will be "an enourmous chilling effect on speech in America," Wyden warned.

Looks like we're already seeing the effects.

JA0145

# Exhibit 4

JA0146

rollingstone.com

# How a New Senate Bill Will Screw Over Sex Workers

*Tina Horn*

10-13 minutes

---

March 23, 2018 9:33PM ET

## Although designed to protect them, the controversial anti-sex trafficking bill could harm consensual sex workers



JA0147

Case 1:18-cv-01552-RJL    Document 34-4    Filed 08/31/20    Page 12 of 182
USCA Case #22-5105     Document #1962386     Filed: 09/06/2022     Page 86 of 173

SESTA has been touted as a provision whose purpose is protecting children and girls from serial rape.

Andreas Arnold/picture-alliance/dpa/AP Images

On Wednesday, the Senate passed the Stop Enabling Sex-Trafficking Act by a bipartisan consensus of 97-2. SESTA amends Section 230 of the 1996 Communications Decency Act, a federal provision which protects online publishers – from Facebook to *The Erotic Review* – from being held liable for third-party user posts on their sites.

This development comes nearly a month after the House of Representatives passed the Allow States and Victims to Fight Online Sex Trafficking Act or FOSTA at a vote of 388-25, making posting or hosting online prostitution ads a federal crime.

After receiving this overwhelming Congressional approval, FOSTA-SESTA is now headed to President Trump's desk. Last month, Trump tweeted that he vowed to fight the "epidemic" of human trafficking, so it is expected that he will sign it into law.

Bolstered in part by a PSA featuring celebrities – including Amy Schumer and Seth Meyers – SESTA has been touted as a provision whose purpose is protecting children and girls from serial rape. Its authors and supporters have framed Section 230 as a loophole which allows websites to profit from forums which "knowingly assist, facilitate, or support sex trafficking."

JA0148

Case 1:18-cv-01552-RJL    Document 34-4    Filed 08/31/20    Page 13 of 182
USCA Case #22-5105      Document #1962386      Filed: 09/06/2022      Page 87 of 173

If SESTA becomes law, victims of human trafficking will be able to sue the websites their abusers may have used to communicate with one another. The implications reach beyond justice for survivors, however, as consensual sex workers may be charged with facilitating prostitution if they use an online forum to exchange safety information such as bad date lists. The threat of prosecution has already led such forums to simply shut down rather than face potential legal liability. When sex workers don't have access to digital resources – such as Craigslist, Backpage, Rentboy or MyRedBook – they often engage in high-risker street work.

"I fear this legislation will *not* stop human trafficking," says Nat

JA0149

Case 1:18-cv-01552-RJL   Document 34-4   Filed 08/31/20   Page 14 of 182
USCA Case #22-5105        Document #1962386        Filed: 09/06/2022      Page 88 of 173

Paul, a new appointee to the U.S. Advisory Council on Trafficking. Paul is a former sex worker and trafficking survivor, which she emphasizes are two different things. Like any other kind of abuse, trafficking thrives when victims can be isolated. Without free Internet forums, sex workers of all kinds will lose access to resources that can help them to both survive and thrive.

"The system should work to better understand human trafficking as a whole, instead of sensationalizing end-demand myths of girls stolen and exploited," says Paul.

Many grassroots organizations run by current and former sex workers have been voicing dissent against FOSTA and SESTA for months. They've clarified that sex workers choose to trade companionship, entertainment, fetish play, and other services to fellow adults, while those who are victims of trafficking are forced into providing such services against their will. The hashtag campaigns #LetUsSurvive and #SurvivorsAgainstSESTA have illustrated that many consensual sex workers believe they will be harmed by this bill that is supposedly designed to protect them.

The national ACLU is among the organizations who have publicly voiced their opposition to FOSTA-SESTA. In a statement sent to the Senate Commerce committee last November, they argued: "Online providers cannot and should not be subjected to criminal liability merely for facilitating the speech of others – even if elements of those communications are distasteful or even unlawful." The organization added that

JA0150

such liability will actually make it more difficult to expose criminal activity.

"This legislation will drive demand into the street corners, the back alleys," explains Paul. "It will stifle meaningful discussions on education and safety, perpetuating the very problems they hoped to resolve."

Elliot Harmon, an activist with the Electronic Frontier Foundation a nonprofit organization that defends digital civil liberties, is concerned that online platforms are going to swiftly adopt automated filtering technologies.

"When platforms over-censor their users, marginalized communities are often silenced disproportionately," he points out.

While it is unclear if and when the bill will be made into law, it took less than 24 hours for some of its critics' fears to become reality.

Late Wednesday night, Reddit administrators banned the subreddits Escorts, Male Escorts, Hookers and SugarDaddy.

Alex Empire, who is the moderator of a subreddit called Sexworkers, received a messaged from reddit administrator zippylooda warning her that "any post that could facilitate the connection of sex sellers and sex buyers would be a violation" of the update to reddit's content policy.

Empire describes /r/sexworkers as "a community forum for sex workers, clients, and even those unaffiliated with the industry to

Case 1:18-cv-01552-RJL    Document 34-4    Filed 08/31/20    Page 16 of 182
USCA Case #22-5105        Document #1962386        Filed: 09/06/2022    Page 90 of 173

come together and ask questions and share resources." She is attempting to follow the admin guidelines to bring the subreddit into compliance.

"I fear that by the time FOSTA is signed into law all of our resources will be gone," she says.

By Thursday morning, Cityvibe, an adult dating website which offered listings for "escort videos, BDSM, massage, and more," had shuttered. Models who had paid for ads on the site took to social media, [expressing](#) outrage that their money had not been refunded.

On Friday, the entire "Personals" section of Craigslist, including the iconic "Missed Connections" column, was replaced by a [message](#) from the company, explaining that the risk of offering this tool would "jeopardize" all of their services.

Their statement concluded: "To the millions of spouses, partners, and couples who met through craigslist, we wish you every happiness!"

Sex workers and the peer-led organizations that serve them are preparing for the worst. [Red Light Legal](#), which offers legal representation to anyone in the sex trades, is hosting an online know your rights workshop for creating arrest plans. Various informal groups are holding in person meetings to discuss safe ways to continue conducting business, as well as how to support the most marginalized among them.

Red, a community organizer with the Chicago-based organization Support Ho(s)e, anticipates that community

JA0152

Case 1:18-cv-01552-RJL    Document 34-4    Filed 08/31/20    Page 17 of 182
USCA Case #22-5105      Document #1962386      Filed: 09/06/2022    Page 91 of 173

creativity will tested. "People will find ways to build new, or dust off old, methods of communication and outreach," they say. "I hope we can demonstrate that the best way to support survivors is by giving them access to safer housing, cash benefits, food stamps, visas, living-wage work, and life/gender affirming medical care immediately without red-tape."

Overall, the sex work community is devastated that this bill will take community resources away from consensual workers while doing demonstrably little to abolish trafficking or offer care to those who have been trafficked.

"Congress fucked up big time and is placing lives in harm because of ill informed best intentions," says Paul.



PMC

© 2020 Penske Media Corporation

**Verify it's you**

To help keep your account secure, please log-in again.

**Please log in**

You are no longer onsite at your organization. Please log in. For assistance, contact your corporate administrator.

JA0153

# Exhibit 5

JA0154

Craigslist Shuts Personal Ads for Fear of New Internet Law          about:reader?url=https://www.wired.com/story/craigslist-shuts-perso...

Case 1:18-cv-01552-RJL   Document 34-4   Filed 08/31/20   Page 19 of 182
USCA Case #22-5105      Document #1962386      Filed: 09/06/2022      Page 93 of 173

wired.com

# Craigslist Shuts Personal Ads for Fear of New Internet Law

*Nitasha Tiku*

6-7 minutes

Online classified site Craigslist abruptly shut its personals section just days after Congress approved a bill expanding the criminal and civil liability of website operators over user-generated content. President Trump is expected to soon sign the measure into law.

In an attempt to curb sex trafficking, the Allow States and Victims to Fight Online Sex Trafficking Act (FOSTA) amends a bedrock law — Section 230 of the Communications Decency Act — that helped the internet flourish by shielding websites from liability for outside content.

Reddit also shuttered sections of its website as part of a policy update that prohibited "paid services involving physical sexual contact," but the company did not specifically call out FOSTA. Reddit's policy change appears to have affected the sections Escorts, Male Escorts, Hookers, and SugarDaddy.

Those moves, and others by less popular sites, appeared to

JA0155

Craigslist Shuts Personal Ads for Fear of New Internet Law        about:reader?url=https://www.wired.com/story/craigslist-shuts-perso...

validate the concerns of the bill's opponents, who said the measure would prompt some site operators to ban or remove content to avoid running afoul of the new law. The measure weakens the "Good Samaritan" clause in Section 230 that protected internet companies trying their best to moderate illegal sex trafficking on their platforms. Legislators amended that clause after a judge in California dismissed criminal charges against Backpage.com over online ads featuring underage girls because, the judge said, the website and its CEO were shielded by Section 230.

Liara Roux, a sex worker, political organizer, and adult-media producer and director, says a handful of other sites shut advertising forums, including The Erotic Review and CityVibe, hours after FOSTA passed. "[E]verything we've been warning people about for a year has been proven true within 24 hours, before it's even signed into law," Roux said in an email to WIRED.

VerifyHim, a tool that helps sex workers avoid abusive clients and describes itself as "the biggest dating blacklist database on earth," also said Thursday that it is "working to change the direction of the site." Kate D'Adamo, a partner with the consulting firm Reframe Health and Justice, says VerifyHim has been a particularly vital safety and screening mechanism for sex workers.

Roux says these recent closures come on the heels of other efforts by tech companies that began in 2017, to ban or shadow ban sex workers from their platforms. "Not one of these sites,

JA0156

Case 1:18-cv-01552-RJL   Document 34-4   Filed 08/31/20   Page 21 of 182
USCA Case #22-5105      Document #1962386       Filed: 09/06/2022     Page 95 of 173

including the big social media companies acting in knee jerk ways, wants this. … The people who run safety resources are scared, scared for themselves and scared for their friends," she said.

In an announcement Thursday, Craigslist said, "Any tool or service can be misused. We can't take such risk without jeopardizing all our other services, so we are regretfully taking craigslist personals offline. Hopefully we can bring them back some day." Craigslist did not respond to questions from WIRED.

Senator Richard Blumenthal (D-Connecticut), a cosponsor of the bill, derided Craigslist's announcement. "If Craigslist is really telling us that they can't run a page on their website without knowingly facilitating sex trafficking, that would certainly be a damning admission," he said in a statement. [1]

In a statement, a spokesperson for Reddit said the site added a section to its content policy "forbidding transactions for certain classes of goods and services. Moving forward, we are prohibiting transactions that are either illicit or strictly controlled. Communities focused on such transactions and users who attempt to conduct them will be banned from the site."

Reddit declined to say whether its policy change was related to FOSTA, but the company signed a letter to members of Congress earlier this month protesting the bill. The letter was organized by Engine, a nonprofit representing tech startups, and was also signed by Automattic (the company that owns Wordpress), Patreon, Cloudflare, Twitter, Match Group (the

Craigslist Shuts Personal Ads for Fear of New Internet Law          about:reader?url=https://www.wired.com/story/craigslist-shuts-perso...

company that owns Tinder, OkCupid, and Match.com),
Pinterest, Wikimedia Foundation, Github, Medium, and Yelp.

The tech industry was initially united against this legislative
effort, but the Internet Association, a trade group representing
major tech firms, reversed its position under pressure from
Facebook, which was facing additional regulatory pressure from
the Russia investigation, WIRED reported in December. Reddit
is also a member of Internet Association, as is Google, which
lobbied heavily against earlier versions of the legislation.

Evan Engstrom, executive director of Engine, said he expected
this response given the ambiguity of the bill, especially for
websites "that have large user bases commenting on a range of
topics."

"This isn't at all a publicity thing. This is just a reality of how you
have to do business when there's potential criminal liability for
content that you may not necessarily see," says Engstrom. He
expressed hope Congress would amend the new law to remove
some of the ambiguity.

D'Adamo says she plans to reach out to members of Congress
and nonprofits that advocated for the bill. "They were pretty
explicit that sex workers and the community was wrong, and
within 48 hours, we have already started facing the collateral
consequences that everyone knew was coming.

"If this was about ending violence, then I want to know what
their commitment is for violence against people who trade sex,"
D'Adamo says.

JA0158

Craigslist Shuts Personal Ads for Fear of New Internet Law about:reader?url=https://www.wired.com/story/craigslist-shuts-perso...

Case 1:18-cv-01552-RJL Document 34-4 Filed 08/31/20 Page 23 of 182
USCA Case #22-5105 Document #1962386 Filed: 09/06/2022 Page 97 of 173

**[1] UPDATE, 6:20PM:** This article was updated to include a statement from Senator Richard Blumenthal.

Internet Law

- Congress approved the new law to curb sex trafficking, but opponents warned that it would dampen online speech.

- A Senate cosponsor argued in support of the bill in this article.

- Legislative maneuvering over the bill began in earnest when a tech trade group opened the door to amending the Communications Decency Act.

JA0159

Exhibit 6

## MOTHERBOARD
**TECH BY VICE**

# Sex Workers Say Porn on Google Drive Is Suddenly Disappearing

Sex workers are reporting that their Google Drive files are mysteriously locked or vanishing.

 By [Samantha Cole](#)

March 21, 2018, 12:07pm



Porn performer <u>Avey Moon</u> was trying to send the lucky winner of her Chaturbate contest his prize—one of her videos, titled "POV Blowjob"—through her Google Drive account. But it wouldn't send, and Google wasn't telling her why.

would feel like he got ripped off and never come back again or worse, he could actually file a complaint with Chaturbate about me and they can take money from me."

She's not alone. Six porn performers I talked to and more on social media said that they suddenly can't download adult content they keep on Google Drive. They also said they can't share that content with other accounts or send to clients. In some cases, the adult content is disappearing from Drive without warning or explanation. The porn performers I talked to started sounding the alarm on Twitter last week. They said that Google Drive no longer seemed sex-trade friendly, detailing error messages and sharing cloud storage alternatives with each other.

When I asked about sexual content being blocked on Drive, a spokesperson for Google directed me to the Drive policy page—specifically the section on sexually explicit material, which says, "Do not publish sexually explicit or pornographic images or videos.... Additionally, we do not allow content that drives traffic to commercial pornography." Writing about porn and sex is permitted, the policy states, as long as it's not accompanied by sexually explicit images or videos. According to Google, Drive uses a combination of automated systems and manual review to decide what's in violation.

## "It's very oppressive. And it's making my job hellish."

"I heard randomly that someone got one piece of their adult content flagged, that was stored on Google Drive," adult performer Melody Kush told me in Twitter direct messages. She's been using Google Drive for most of the last five and a half years she's worked as a performer full-time, but started using it more heavily for

8/27/2020  Porn on Google Drive is Disappearing + United States Edition

Case 1:18-cv-01552-RJL  Document 34-4  Filed 08/31/20  Page 27 of 182
USCA Case #22-5105    Document #1962386      Filed: 09/06/2022    Page 101 of 173
+ UNITED STATES EDITION

received an error message, saying that the item may violate Google's Terms of Service, with a link to request a review.

The video title contained the phrase "cum show," which Kush suspected triggered the system.

But unlike Kush and Moon, others have gotten this error on videos even when the title isn't explicit. "It's just the content, which is the strange part," adult performer Lilly Stone told me in a Twitter direct message. Her Drive account contains mostly adult content, but her images aren't affected by this error—only videos, some of which have begun to disappear without warning or explanation.

**_Read more: Google Docs Is Randomly Flagging Files for Violating its Terms of Service_**

"It seems like all of our videos in Google Drive are getting flagged by some sort of automated system," Stone said. "We're not even really getting notified of it, the only way we really found out was one of our customers told us he couldn't view or download the video we sent him."

Stone's files aren't removed from Drive, but when she tries to play the video or download it, she said Google gives her an error message: "Whoops! There was a problem playing this video" with an option to download the item, but the download link doesn't work.

Some sex workers are wondering if this has something to do with the impending vote on the SESTA-FOSTA bill, which is on the Senate floor for debate this week. Performer Hailey Heartless told me that she's not sure if it's a "blitz" that Google is doing, or if it's just something many sex workers noticed at once, and got the



It could also be that Google is simply, suddenly, deciding to enforce its Terms of Service. The fact remains that Google Drive is either glitching out and impacting people's livelihoods, or suddenly enforcing its Terms of Service without warning. Adult performer <u>Ramona Flour</u> told me in an email that she's been using a paid version of Drive with 1 TB of storage, which costs $9.99 a month, for five years, but she just started getting error messages last week.

"It's very oppressive. And it's making my job hellish," Moon told me. "I'm still stressing about finding a way around this. I don't believe that Google should be allowed to dictate what you and another consenting adult send to each other through email."

---

**TAGGED:** <u>PORN</u>, <u>TECH</u>, <u>MOTHERBOARD</u>, <u>SEX WORK</u>, <u>GOOGLE</u>, <u>DRIVE</u>, <u>ERROR</u>, <u>PORN PERFORMERS</u>

# Exhibit 7

JA0165

The New Law That Killed Craigslist's Personals Could End the We...        about:reader?url=https://www.thedailybeast.com/the-new-law-that-ki...

Case 1:18-cv-01552-RJL    Document 34-4    Filed 08/31/20    Page 30 of 182
USCA Case #22-5105        Document #1962386        Filed: 09/06/2022        Page 104 of 173

thedailybeast.com

# The New Law That Killed Craigslist's Personals Could End the Web As We've Known It

*Elizabeth Nolan BrownUpdated Mar. 24, 2018 9:37AM ET / Published Mar. 23, 2018 11:14PM ET*

8-11 minutes

For countless folks who came of age in the 00s, finding a partner via the Craigslist personals section was a rite of passage. I remember pouring over the ads with friends, amazed at the sheer variety of sexual and romantic asks and desires out there, the strange and tantalizing mix of anonymity and eros and possibility. I brokered my best ongoing "casual encounter" through the Craigslist personals. I know others who met long-term partners and even spouses that way.

But as of Friday, the Craigslist personals section is no more. Consider it one of the first—but certainly not the last—casualties of new legislation passed by the Senate this week 97-2.

The bill, euphemistically known as the "Fight Online Sex Trafficking Act," or FOSTA, was passed by the House of Representatives in late February. It's been largely portrayed by the media and those in Congress as an "anti-sex trafficking"

JA0166

USCA Case #22-5105    Document #1962386    Filed: 09/06/2022    Page 105 of 173

measure. But while doing nothing to realistically fight sex trafficking, it manages to muck up all sorts of other serious things.

FOSTA will "subject websites to criminal and civil liability when third parties (users) misuse online personals unlawfully," Craigslist explains in the brief notice that now appears in place of potential partners if you try to go to a personals listing .

Under current law, the site can't be held legally liable if someone uses veiled terms to solicit commercial sex—aka prostitution—through the Craigslist personals. But FOSTA will change that, opening up Craigslist (and every other digital platform) to serious legal and financial jeopardy should it accidently "promote" or "facilitate" prostitution.

Prostitution, mind you, is not sex trafficking, which has a distinct meaning both colloquially and under the law. In the simplest terms, prostitution involves consent and sex trafficking does not.

"Any tool or service can be misused," Craigslist said a statement. "We can't take such risk without jeopardizing all our other services, so we are regretfully taking craigslist personals offline. Hopefully we can bring them back some day. To the millions of spouses, partners, and couples who met through craigslist, we wish you every happiness!"

Craigslist isn't the only one making changes since FOSTA's passage. On Friday, the adult-ad forum CityVibes disappeared. And on Thursday, Reddit banned several sex-related subreddits, including r/Escorts, r/MaleEscorts, and

JA0167

Case 1:18-cv-01552-RJL   Document 34-4   Filed 08/31/20   Page 32 of 182
USCA Case #22-5105    Document #1962386    Filed: 09/06/2022    Page 106 of 173

r/SugarDaddy.

Reddit said the purge was enforcing its new content policy, which bans "transactions for certain goods and services," including "paid services involving physical sexual contact." But frequenters of these subreddits say they were forums for sex-work news, tips, questions, and camaraderie, not places where sex workers advertised their services.

This failure to distinguish between ads for prostitution and any discussion of prostitution is part of what has sex workers (and free-speech advocates) so worried. Sex worker blogs could be shut down, and they could find their social-media accounts suspended simply for being honest about their work.

This is because the core of FOSTA makes it a federal crime to "promote or facilitate the prostitution of another person," punishable by up to 10 years in prison, plus fines. For promoting the prostitution of five or more people, the penalty is 25 years, and the same if promoting someone's prostitution "contributed to sex trafficking."

Sex workers don't have to worry about being punished for posting their own ads, but they could run afoul of the law if working in pairs or helping a colleague place an ad.

**Related in Politics**

The primary target are websites, apps, messageboards, and other digital publishers, which have deeper pockets. To reach them, Congress had to carve a hole in Section 230, which has

JA0168

USCA Case #22-5105    Document #1962386    Filed: 09/06/2022    Page 107 of 173

Case 1:18-cv-01552-RJL   Document 34-4   Filed 08/31/20   Page 33 of 182

governed the internet for 22 years. It protects web platforms from being sued in civil court or criminally charged by state prosecutors for third-party (i.e., user-posted) content. (It doesn't apply for federal crimes.)

Section 230 says that unless they create the content in whole or part, these platforms shall not be treated as the speaker of such content, and good-faith efforts at content moderation (like banning ads that explicitly mention illegal acts or auto-filtering out content that contains prohibited words) do not change this. Under FOSTA, this won't apply when paid sex is concerned. That's why sites are scrambling right now to prohibit any content that could get them held liable.

It's probably too late, or at least would be if legislators get their way. FOSTA "shall apply regardless of whether the conduct alleged occurred… before, on, or after such date of enactment." This is what's known as an ex post facto law, and it's explicitly forbidden by the U.S. Constitution.

No less than the U.S. Department of Justice has urged against passing FOSTA, calling it unconstitutional and saying that it would make prosecuting sex traffickers harder. "You're heading in the wrong direction if you [pass a bill] that would raise the burden of proof in cases against sex traffickers," said Oregon Sen. Ron Wyden Wednesday from the Senate floor.

Wyden—who co-authored Section 230—was the only Democrat to vote against the bill, and Kentucky Sen. Rand Paul the only Republican. An amendment to FOSTA proposed by Wyden

JA0169

USCA Case #22-5105    Document #1962386    Filed: 09/06/2022    Page 108 of 173

would have clarified that websites can try to filter out illegal content without increasing their liability, but it was overwhelmingly defeated.

Wyden stressed that FOSTA is not a matter of substituting some free-speech rights for a better ability to stop sex trafficking. Rather, it's imposing serious burdens while at best doing nothing for trafficking victims and quite likely making their lives worse.

For one thing, it incentivizes law enforcement to go after third parties rather than stop traffickers or rescue victims. It also takes away an important tool for finding trafficking victims—the open internet. This new paradigm creates huge incentives for cops and prosecutors to go  after websites and apps rather than actual criminals—ensuring thatreal victims, and public safety, will suffer along with open expression. Online ads have allowed an untold number of victims to be identified and found. What's more, the digital trail of ads, emails, and texts can provide evidence that makes catching and prosecuting the perpetrators easier. Law enforcement loses this when traffickers switch to private, encrypted, or dark web forums.

Many sex-trafficking survivors and victims groups vocally opposed FOSTA, saying it fails to address the things they really need (like housing and job assistance) and will make saving future victims harder. Plus, even those being forced or coerced into prostitution benefit from things like screening out violent clients and not having to walk the streets.

JA0170

The bottom line is that FOSTA "is not going to prevent sex trafficking [and] it's not going to stop young people from becoming victims," Wyden said. What it will do is create "an enormous chilling effect on speech in America," as sites move to squelch anything remotely related to a liability and "powerful political" forces weaponize it against minority voices.

We're already starting to see the chill, even though FOSTA hasn't even been signed into law yet. And it goes beyond speech related to sex. For instance, Reddit's sex-work subreddit bans were accompanied by bans of forums for gun talk and trading gaming logins, among others.

While Reddit would still have Section 230 protection should any illegal conduct arise from these forums, it's hard to say how long that will last now that's Congress has decided to start making exceptions.

After all, how can we say that Craigslist should be prosecuted if its ads broker prostitution but not a gun sale that leads to the next school shooting? How can we say that social media is criminally liable if a "john" meets a 17-year-old girl there, but not if two terrorists hook up and hatch out plans through their DMs? Or what about the next time hackers post illegally obtained state secrets (or nudes) on some remote corner of some social forum?

Sex trafficking is horrific. But so are a lot of other crimes. And under FOSTA, our law effectively says that both sex trafficking and paid sex between two consenting adults are more grave

JA0171

USCA Case #22-5105      Document #1962386      Filed: 09/06/2022      Page 110 of 173
Case 1:18-cv-01552-RJL    Document 34-4    Filed 08/31/20    Page 36 of 182

offenses that rape, child molestation, mass murder, or anything else. What kind of logic is that?

The answer to this conundrum is that the creators of Section 230 were onto something. Because once we decide something like prostitution is so bad that it overrides it, what won't warrant an exception? And once we start treating technology as the guilty party in any badness it brokers, we will wind up with tech overlords terrified to let us speak about anything controversial at all.

JA0172

Exhibit 8

What happened to pounced.org          https://web.archive.org/web/20180503181314/http://pounced.org/wh...

Case 1:18-cv-01552-RJL   Document 34-4   Filed 08/31/20   Page 38 of 182
USCA Case #22-5105      Document #1962386      Filed: 09/06/2022      Page 112 of 173

| http://pounced.org/why.html | Go |    APR  MAY  JUN        |

4 captures
1 May 2018 – 20 May 2018                           2017  2018  2019    ▼ About this capture

# What happened to pounced.org?

Pouncad was a furry personals site which operates a free service on behalf of the community. We are staffed by volunteers and cover our own costs as a benefit to the community. On April 11th, 2018 President Trump signed into law FOSTA, which attempts to make Internet sites such as pounced.org liable for the way users use the site in an effort to address sex trafficking and prostitution.

FOSTA increases our liability significantly and chips away at one of the primary reasons we as a small organization can provide services to the community - the protection that had previously been offered to us by Section 230 of the Communications Decency act:

> **"No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider"**

We didn't have to worry about what our users said using our platform, as we weren't liable for what they said.

FOSTA changes that in a way that makes sites operated by small organizations like pounced.org much riskier to operate. FOSTA essentially says that if we facilitate the prostitution of another person we're liable. If you read FOSTA carefully the bill says "or facilitate" - the problem is that "or facilitate" is ill-defined.

> **"(Sec. 3) The bill amends the federal criminal code to add a new section that imposes penalties-a fine, a prison term of up to 10 years, or both-on a person who, using a facility or means of interstate or foreign commerce, owns, manages, or operates an interactive computer service (or attempts or conspires to do so) to promote or facilitate the prostitution of another person."**

We don't promote prostitution or sex trafficking. We're a personals site for the furry community, our goal was to allow members of our community to have a personals site dedicated solely to the community, and we've tried to serve our community well.

The problem is, with limited resources and a small volunteer staff, our risk for operating the site has now significantly increased. Now if someone posts an ad looking to exchange sex for something to pounced.org, and we don't catch it, is that facilitating prostitution? Is it enough to simply re-train our volunteer staff and update our terms of service?

Do we try to filter advertisements and forum posts? Do we ask our volunteer staff to take on the burden of reviewing all personal ads to insure we're in compliance - and what if they miss one? If we try to implement filtering will it be anything other than intrusive and ineffective, given the resources of a small organization like ours?

And we must now account for the fact that our liability to operate a service such as pounced.org has unequivocally increased, especially given that FOSTA explicitly makes this a criminal liability.

We now can be held accountable for the actions of others using our service. This bill is poor a trade off, it makes all service operators bear increased liability for the actions of their users or act as censors to their speech in exchange for targeting a few malicious services.

As an organization that operates a free service, is this trade off worth the reward of providing our services to the community?

We were able to offer pounced.org as a free service to the community because the liability to us was manageable and we could manage our cost effectively. We didn't frequently have to pay for lawyers, and we ate this cost when we did.

Would you be willing to try to accomplish the same if it meant you could be criminally liable for the actions of others who use a service you offered for free?

In many ways this bill targets small sites like ours directly, it favors organizations with the resources to invest in filtering technology, paid staff and legal support staff. It is less of an impediment for big organizations, while doing significant harm to small organizations like ours, which service niche communities like ours. Our larger competitors are not likely to find a large market in servicing the furry community, and so our community will suffer.

JA0174

What happened to pounced.org  https://web.archive.org/web/20180503181331/http://pounced.org/wh...

Case 1:18-cv-01552-RJL   Document 34-4   Filed 08/31/20   Page 39 of 182
USCA Case #22-5105    Document #1962386    Filed: 09/06/2022    Page 113 of 173



## Why did we decide to cease operations?

We enjoyed operating pounced.org and serving the community, but ultimately operating without the full protection of the CDA, really is challenging for a small organization which was trying to offer a quality service for a small community for free. Essentially after having spent a lot of time deeply considering our options, life is too short to worry about what other people are saying using our site on the internet. It's unfortunate that the United States government decided to pass a bill which harms the voice of our community, which is why we must all be vigilant and protect our freedom of speech and take an active role in our government.

## Once pounced.org shutdowns permanently what will happen to my data?

We have always tried to operate with a community first perspective. We will find some way to make your data available to you for a period of time, after which all member data will be destroyed. We will not sell your data or re-purpose it outside the context of operating pounced.org.

## Thank you for all the kind words and support!

It brings us much happiness to know that we were able to serve our community for so many years.

Terms of service | Contact | Twitter | Resources

Exhibit 9

# Erased

## The Impact of
## FOSTA-SESTA
& the Removal of Backpage



A community report by:
Danielle Blunt and Ariel Wolf of **Hacking//Hustling**
Advised by Naomi Lauren of **Whose Corner Is It Anyway**

JA0177

**Abstract:** A few days after Backpage was shut down by federal authorities, Public Law 115-164, better known as FOSTA-SESTA, became US law in 2017. The stated goal of this law was to reduce human trafficking by amending section 230 of the Communications Decency Act. What the law has actually done is put increased pressure on Internet platforms to censor their users. While the law has been lauded by its supporters, the communities that it directly impacts claim that it has increased their exposure to violence and left those who rely on sex work as their primary form of income without many of the tools they had used to keep themselves safe. In this sex worker-led study, Hacking//Hustling used a participatory action research model to gather quantitative and qualitative data regarding the impact of the removal of Backpage and the passage of FOSTA-SESTA on two groups of sex workers: those who work online, and primarily street-based sex workers who have limited access to technology. The results of our online survey (98 participants) and street-based survey (38 participants) indicate that the removal of Backpage and FOSTA-SESTA have had detrimental effects on online workers' financial stability, safety, access to community, and health outcomes.

**Key Words:** Trafficking, Sex Work, Prostitution, FOSTA-SESTA, Tech, Sex Trafficking, CDA 230, Internet, Content Moderation, Gig Economy, Public Health, Platform Policing

**This report was written by Danielle Blunt and Ariel Wolf of Hacking//Hustling with advisement by Naomi Lauren of Whose Corner Is It Anyway.**

Much love, appreciation, and care to our sex working/trading community for sharing your insights and analysis, your organizing and survival strategies. We are grateful to everyone who took the time to complete this survey and to our graphic designer, Livia Foldes, who volunteered her labor and genius. This report was made possible with funding from our direct labor in the sex trades.

**Hacking//Hustling** is a collective of sex workers and allies working at the intersection of technology and social justice. It is a space for digital rights advocates, journalists, and allied communities to learn from sex workers and better understand the developing effects of "FOSTA-SESTA" on internet freedom for all. This organization was formed with the belief that sex workers are the experts of their own experience, and that an internet that is safer for sex workers is an internet that is safer for everyone.

**Whose Corner Is It Anyway** is a Western MA mutual aid, harm reduction, political education, and organizing group led by stimulant- and opioid-using low-income, survival, or street-based sex workers.

**Danielle Blunt** (she/her) is a NYC-based Dominatrix, a full-spectrum doula, and chronically-ill sex worker rights activist. She recently received her Masters of Public Health. Her research investigates the intersection of public health, sex work, and equitable access to technology in marginalized communities. She enjoys watching her community thrive and making men cry. DanielleBlunt@protonmail.ch

**Ariel Wolf** (she/her) is a writer, researcher, and former sex worker from New York City. She previously served as the community organizer for the Red Umbrella Project, a nonprofit organization that amplified the voices of those in the sex trades, and as a research assistant for the Center for Court Innovation, where she has worked on studies on sex work, human trafficking, gun violence, and procedural justice. Her first solo academic paper entitled "Stigma in the Sex Trades" was published earlier this year in the Journal of Sexuality and Relationship Therapy. ArielHWolf@gmail.com

**Naomi Lauren** (she/her) is a long time stripper and an organizer with Whose Corner Is It Anyway.

# Contents

## Introduction and Literature Review    1

Sex Work and Labor Trafficking    1

FOSTA-SESTA and Platform Policing    4

## Methodology    5

## Key Findings    7

Survey Demographics    7

FOSTA-SESTA in Sex Workers' Own Words    9

Trafficking in Sex Workers' Own Words    13

Trafficking Statistics    15

Barriers to Other Forms of Labor    16

Effects of FOSTA-SESTA    18

    Digital Security and Harm Reduction    20

    Police Interactions    23

    Community    25

    Financial Technology    29

    Shadowbanning    31

## Discussion and Recommendations    33

Limitations    34

Recommendations and Relevancy    35

Platform Suggestions    36

    More User Choice    37

    Sex Worker Inclusion    38

Policy Recommendations    38

Further Research    40

## Conclusion    42

JA0180

# Introduction and Literature Review

## Sex Work and Labor Trafficking

We begin from this premise: under capitalism, all labor is vulnerable to hyper-exploitation. The risk of exploitation is increased in criminalized economies that lack labor protections, such as sex work. Many individuals who have traded sex live at the intersection of marginalized identities and may have limited access to other sources of income or employment due to stigma, discrimination, and lack of social support.[1] In this way, sex workers face a similar risk of exploitation, as do undocumented laborers who perform domestic and agricultural work.

1    (White Hughto, Reisner, and Pachankis 2015)

> "Sex work" is a broad term used to describe exchanges of sex or sexual activity. Sex work is also used as a non-stigmatizing term for "prostitution," but in this report we use the term in its broader meaning. Using the term "sex work" reinforces the idea that sex work is work and allows for greater discussion of labor rights and conditions. Not every person in the sex trade defines themselves as a sex worker or their sexual exchange as work. Some may not regard what they do as labor at all, but simply a means to get what they need. Others may be operating within legal working conditions, such as pornography or exotic dancing, and wish to avoid the negative associations with illegal or informal forms of sex work. In addition to the exchange of money for sexual services, a person may exchange sex or sexual activity, or things they need or want, such as food, housing, hormones, drugs, gifts, or other resources. "Survival sex" is a term used by many non-profit organizations and researchers to describe trading of sex for survival needs.
>
> — *Meaningful Work: Transgender Experiences in the Sex Trades*

The United States government has attempted to protect individuals from sexual exploitation through anti-trafficking legislation. In the United States, the Federal Victims of Trafficking and Violence Protection Act (TVPA) of 2000 defines trafficking as "the recruitment, harboring, transportation,

provision, or obtaining of a person for the purpose of a commercial sex act."[2] The TVPA does distinguish this from "severe forms of sex trafficking" by stating that it is "(A) sex trafficking in which a commercial sex act is induced by force, fraud, or coercion, or in which the person induced to perform such act has not attained 18 years of age; or

(B) the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery."[3] Under these two definitions, any and all persons who trade sex for money may be considered "trafficked," irrespective of the circumstances under which they engage in this work. In addition, any individual under the age of 18 who is involved in commercial sexual activity is defined as a victim of sex trafficking,[4] regardless of how the individual defines their experience. Many individuals who have histories of trading sex as a minor do so to acquire needed resources and to escape abusive living situations, facing no explicit external force, fraud, or coercion, other than the need to survive.[5] LGBTQ youth, who often face housing insecurity due to familial rejection, are seven times more likely to have experiences of trading sex for a place to stay than their heterosexual counterparts.[6] These individuals are labeled trafficking victims by the state and processed through the criminal justice systems or family court systems under the "safe-harbor" laws.[7] The singular focus of the anti-trafficking lobby on sex trafficking has been criticized for ignoring the complex forms of labor trafficking that occur in other labor sectors that outnumber cases of sex trafficking.[8] The fact that those experiencing labor trafficking in any industry are also more vunerable to sexual abuse, with no legal recourse, is also highly overlooked.[9]

Many sex workers have argued that, in practice, the impact of anti-trafficking laws is opposite to their stated intent (protecting vulnerable populations). Anti-trafficking rhetoric and policing tactics disproportionately affect migrants, the insecurely employed, trans women, and women of color. In Brooklyn, 89% of the arrests for loitering for the purposes of prostitution were of women of color, many of them trans women who were then processed in the Human Trafficking Intervention Courts (HTICs).[10] Sex workers who cross borders for employment are also at high risk for being arrested and labeled either traffickers[11] or victims of trafficking.

2   TVPA 2000, Sec. 103(8).

3   (Chapman-Schmidt 2019)

4   (Child Welfare Information Gateway. 2016)

5   (World Health Organization. 2015)

6   (Dank 2015)

7   **Safe Harbor Laws** is a provision of a statue that a specific action does not violate a rule or law. For example under Safe-Harbor laws prevent a young person trading sex for being arrested for prostitution and directs youth who trade sex to 'non-punitive' social services.

8   (Wolf 2019)

9   (Global Freedom Center n.d.)

10   (White et al. 2017)

11   (M. Smith and Mac 2018)

These arrests and legal proceedings disrupt these workers' ability to earn a living and thus lead to increased, rather than decreased, vulnerability.[12] There is a significant body of research that illustrates the harm caused by the policing of sex work on the street.[13] In addition, anti-trafficking laws criminalize the very people whom sex workers depend on for safety an support. When a partner or family member provides housing, transportation, safe calls, or financial support to someone trading sex, this person under current legal definitions can be considered a trafficker. At the same time, many people in the sex trade report on complexities of experience regarding exploitation, force, and coercion that are not adequately addressed in the federal definition of trafficking.[14] By defining all sex workers as victims of a criminal network, rather than as individuals attempting to survive under capitalism, the state claims power to intervene, surveil, and control rather than address the root causes of trafficking: poverty and vulnerability.

For sex workers, one of the many benefits of a decriminalized market place is the ability to negotiate with clients. Due to fear of law enforcement, street based sex workers often have less then five minutes to discuss what services they offer, what the prices for those services are, set boundries and vet potential clients.[15] An Internet-based model has allowed workers to be more forthright in their advertising, negotiate costs and services prior to meeting and establish boundaries. Still, online sex workers are hesitant to speak directly about the services they offer because of fear of stings by undercover police. Without the ability to speak freely and clearly about what servicies they are willing to provide, many sex workers reported that they risk miscommunication with clients that could lead to violence or lack of payment.

Sex workers who oppose this legislation also point out that it collapses a range of experiences within the sex trade into a monolithic vision of sex work as inherently exploitative. In American legal discourse, "sex trafficking" is often conflated with all forms of sex work.[16] Sex trafficking is singled out from other exploitative labor practices; despite trafficking occuring in all labor sectors, media coverage of trafficking focusing disproportionately on the sex industry.[17] These discources reinforce the stigmatization of sex work and erase sex workers' lived experiences. In reality, individuals' motivations for trading sex exist within a complicted landscape of choice, circumstance, and coercion. However, in the mainstream media and legal system, the lives of those who trade sex are often reduced to a binary: victim or criminal. This study aims to explore beyond this binary and acknowledge how individuals

12   (M. Smith and Mac 2018)

13   (Platt et al. 2018)

14   (M. Smith and Mac 2018)

15   (Krüsi et al. 2012)

16   (Chapman-Schmidt 2019)

17   (Ashley 2015)

identify their experiences within the sex trades as subject to variation and change over time. Many of those who may meet the federal definition of human trafficking may choose not to define those experiences as such. By allowing our participants to present their own definitions of trafficking and to use their own words to describe their work in the sex trades, we hope to present data that more acurately reflect these nuances.

# FOSTA-SESTA and Platform Policing

Public Law 115-164, better known as FOSTA-SESTA, became US law in 2017. These bills were signed into law days after the federal authorities shut down Backpage, a popular website used by sex workers to connect with clients. Despite the bills being signed into law after Backpage was shut down, and at the time of this report's publication no one has ever been charged under this new law,  supporters of the bills said that the removal of Backpage would not have been possible without FOSTA-SESTA. The stated goal of this law was to reduce human trafficking by amending section 230 of the Communications Decency Act. What the law has actually done is put increased pressure on Internet platforms to censor their users for fear of civil and criminal liability. While the law has been lauded by its supporters, the communities that it directly impacts claim that it has increased their exposure to violence and left those who rely on sex work as their primary form of income without many of the tools they use to keep themselves safe.

This study examines the impact of this new legislation, the removal of Backpage and the myriad of ways that sex workers are denied acceess to technologies on two different, though sometimes overlapping, populations of sex workers: those who work online and a group of primarily street-based sex workers who have limited access to technology.

With the advent of the Internet and websites like Craigslist and Backpage, sex workers were able to gain more control over their work environment and avoid some of the dangers of outdoor and street-based work, such as violence and homocide by clients, police violence, and being forced to have sex in exchange for not being arrested. When Craigslist Erotic Services opened, a 17% reduction in all female homicide was reported in the following years.[18] Intimate partner violence is one of the most common forms of violence that threatens the health and safety of women. The internet can be a powerful tool for vulnerable populations

18  (Cunningham, DeAngelo, and Tripp 2017)

to gain autonomy, financial security, and safety. For sex workers specifically, online platforms can allow them to advertise independently, screen clients more thoroughly, and build community with other sex workers.[19, 20]

Unfortunately, recent legislation took away these invaluable tools by putting pressure on social media platforms to censor their users and bar sex workers from online spaces. The movements of sex workers are surveilled, policed, and restricted through both traditional law enforcement and online-platform policing. This policing is done in the streets,[21, 22, 23, 24] through police using the carrying of condoms as evidence of prostitution;[25, 26] it is done indoors, through brothel-keeping laws;[27] it is done through data collection, through gang databases[28] and predictive policing;[29, 30] and more recently, it is done online through banishment from advertising and social media.

On March 21st, 2018, FOSTA-SESTA passed the Senate (97-2). President Trump signed FOSTA-SESTA into law on April 11th. FOSTA-SESTA was sold as "anti-human trafficking" legislation by lawmakers. However, what this legislation actually does is give online platforms the power and incentive to censor their users for fear of "facilitating" sex work, thereby pushing sex workers off reliable and trusted platforms and into less safe working environments. Street policing (including racist, sexist, and transphobic policing tactics) intended to "clean up the streets" pushed sex workers online, and now with legislation such as FOSTA-SESTA, this policing is extended to online platforms, effectively, squeezing workers from both sides. Faced with this policing and social stigma, sex workers' own fears and self-censorship act as another form of policing within the community.

FOSTA-SESTA's passage was followed with an immediate chilling effect,[31] as platforms shuttered in anticipation of bankrupting lawsuits and possible criminal charges. Platforms used by mainstream audiences—like Reddit and Craigslist—deleted content before the law had even been signed.[32] As a result, the already-marginalized communities who use the web to find work and build community around sex work were suddenly locked out.

# Methodology

This report consists of participatory action-based, sex worker-led research and data collected through two peer-led organizations: Hacking//Hustling and Whose Corner is it Anyway. Eighteen months after FOSTA-SESTA was

19  (Campbell and Sanders 2018); (Internet Governeece Forum 2019)

20  (M. Smith 2018)

21  (Sei Young Pyo, 2016)

22  (Ritchie n.d.)

23  (Grant n.d.)

24  ("#NoLoitering JustLiving" n.d.)

25  (Wurth et al. 2013)

26  (Grant 2014)

27  (ProCon.org n.d.)

28  (Gullapalli, 2019)

29  ( LAPD Stop Spying Coalition 2013)

30  (Stop 2013)

31  **Chilling effect** is a term in law and communication that describes a situation where speech or conduct is suppressed by fear of penalization at the interests of an individual or group. It can affect one's free speech. (USLegal.com)

32  (*Wired* 2018)

signed into law, Hacking//Hustling conducted research through online surveys on how this legislation and the removal of Backpage were impacting marginalized communities' access to financial security, harm reduction working tools, and optimal health outcomes.

Hacking//Hustling began by gathering data on how people who trade sex utilize technology to stay connected to their communities. Hacking//Hustling created an online survey designed to gather both quantitative and qualitative data and distributed it via DecrimNY (a coalition of over 30+ organizations that work with the sex worker communities in New York City) and the broader online community of sex workers on Twitter. The survey was accessible and shared for a month. We received 98 responses from this initial outreach-based research effort. As this round of data collection was conducted via an online survey, the results reflect the experiences of sex workers who still have access to the internet (including social media platforms like Twitter). We then partnered with Whose Corner is it Anyway,[33] an organization in Western Massachusetts of drug-using, low-income, survival-based, and/or street-based sex workers that provides mutual aid, harm reduction, and political education to its members. WCIIA assisted us in adapting the survey into a verbal interview format for sex workers who face significant barriers to accessing online or digital technology, in order to gain insight into how their lives are affected by surveillance and technology on the streets. One month after our initial online data collection, we conducted interviews with 38 members of WCIIA, four of which were conducted in Spanish.

[33] Henceforth referred to as "WCIIA."

As it is difficult to tell what are the effects of the removal of Backpage, implementation of FOSTA-SESTA, the anticpation of its passage, or each platforms preexisting policies around sex worker content, the questions were framed as and are presented as "before/after April 2018" to reflect the changes in internet infastructure after the removal of Backpage and passage of FOSTA-SESTA.

# Key Findings

## Survey Demographics

Of 98 internet-based workers

**Gender***

**Sexual Orientation**

* It is worth noting that for online participants, some may have chosen to identify only as trans, and some trans women may choose to identify only as female.

** Includes mixed race participants

**Age**

**Location**

**Housing**

**Ethnicity**

## Survey Demographics

From Whose Corner is it Anyway

Sample size of 41

12% of surveys were completed in Spanish

Gender

Sexual Orientation

**Age**

**Ethnicity**

**Housing**





# FOSTA-SESTA in Sex Workers' Own Words

The vagueness of the language and intent of FOSTA-SESTA adds to fear and the perception of violence, as well as an actual increase in exposure to physical violence. The fear surrounding FOSTA-SESTA is compounded by the obfuscation of the processes that online platforms use to discriminate against sex workers that may or may not be directly related to this law. General technological illiteracy and the opaque practices of platforms facilitate the spread of misinformation, feelings of paranoia, and lack of control in the sex working community. The fear and lack of adequate legal guides and resources surrounding FOSTA-SESTA has led to a chilling effect in the community as sex workers who work online have had to reassess their business models and still make ends meet.

It is important to gain an understanding of how sex workers interpret and understand this law. We asked sex workers to define, in their own words, how they understood FOSTA-SESTA.

The main patterns observed in how online sex workers defined FOSTA-SESTA was that they reported finding it to be an overbearing, paternalistic law that does nothing to actually fight sex trafficking—but instead would be used to censor sex worker presence online and create more dangerous situations. Many respondents suggested that this law represents a

**Many respondents suggested that this law represents a moralistic fight against sex work in general.**

moralistic fight against sex work in general, regardless of whether or not labor trafficking is involved. Many respondents saw this as an extension of the prohibitionist anti-trafficking movement's attempt to eradicate all forms of the sex industry with no regard for the safety of people in the sex trades.

When asked to define FOSTA/SESTA, online participants' responses centered on three primary themes (some quotes have been edited for clarity):

## 1) It removes key safety measures used by sex workers

**"** A bill that is aimed to stop sex trafficking but is making the sex work industry more dangerous.

**"** It's a law that is censoring sex workers and is making it difficult for us to conduct business with clients. It criminalizes sex workers even further.

**"** Making online platforms used by sex workers responsible for "sex trafficking" that happens on their site, leading to the shutting down of important online sites used for safety and information.

**"** A bunch of whorephobic bullshit law stuff making sex work even scarier.

**"** Removal of section 230 from the Internet and a death sentence for me.

## 2) Its aim is to create moral panic and perpetuate whorephobia

**"** An anti-sex trafficking bill that doesn't actually work, and was designed to hurt sex workers.

**"** The government controlling what women do with their bodies in a failed attempt to clean up the Internet by fearmongering.

**"** Overreaching whorephobia and misguided fearmongering.

> **Whorephobia** is the fear or hatred of sex workers that often leads to discrimination, stigma and violence. It is a term that was coined by sex worker rights activists.
>
> —USLegal.com

❝ It was written to remind whores that our lives are dispensable, we are not protected, our work is unseen and irrelevant, to destabilize our ability to live with any degree of agency, to flaunt the murders and negligent deaths of our loved ones as a daily reminder that the world does not mind at all watching us die and forgetting our names.

❝ A complete bullshit mountain.

## 3) It doesn't actually help to prosecute real traffickers or keep people safe

❝ It's supposed to be a bill that helps end sex trafficking. What it really does is harm sex workers, and victims of sex trafficking... This law makes it much harder to even find [traffickers] as it's pushed them underground to the dark web.

❝ ...Claims to be about reducing child sex trafficking by making advertising my services much more challenging. This law actually does the opposite and just drives all sex work underground, where it's more difficult to find traffickers. It's interesting to note that Jeffrey Epstein didn't use a website to traffic young women and neither do the pimps I have met in my 17 years as a sex worker.

❝ A poor attempt to appear to be concerned about issues of human trafficking.

❝ **Holding websites liable for users' speech involving anything sexually related which in turn specifically targets sex workers and not the victims of human trafficking.**

❝ **[It's] supposed to stop sex "trafficking" but willing sex workers are lumped into that definition.**

❝ **The purpose is supposed to stop sex trafficking but it's destroying rights of sex workers.**

❝ **It's a bill meant to punish human traffickers but mainly punishes consensual adult sex workers because laymen and law enforcement interpreting it are ignorant sadists.**

The overwhelming majority of WCIIA respondents did not demonstrate an understanding of what FOSTA-SESTA is, or any direct impact it had on their work or safety. Sex workers who work online however, did have a strong understanding of not only the parameters of the law, but how it affects their lives and livelihoods. WCIIA workers who were interviewed expressed that they were already dealing with traditional law enforcement-based criminalization and didn't experience as direct an effect of a law regulating digital platforms.

# Trafficking in Sex Workers' Own Words

**" Trafficking takes many forms. It's not always some-
one being kidnapped and tied to a bed like a lot of
people think. I was actually trafficked. It was an
emotionally abusive situation where my only worth
came from how much money I made. He found all
of my clients and set up my appointments. I had no
control and was not able to leave because he had
control of all the money. It took me 3 years to escape.
—Online respondent**

We also asked sex workers to define *trafficking* in their own words and
where their experiences might have met or strayed from the legal definition
of trafficking. A large majority of online respondents described trafficking as
an act of "forced labor" where one party controlled another through violence
or threats. In addition to "force," respondents included these commonalities
they understood to be a part of labor trafficking: the taking of some, or all
of one's money earned through sexual services, as well as transportation
over state lines, underage sex work in any form, and kidnapping. Many online
respondents noted that trafficking goes beyond the bounds of the sex indus-
try and includes other forms of labor trafficking that are not mentioned or
addressed within FOSTA-SESTA.

The most common theme from online respondents to this question was the
lack of consent present in trafficking situations. Previous community re-
search has noted that for some, economic hardship can be seen as a mo-
tivating factor in participation within the sex trades, constituting a type of
force by capitalism.[34] This idea of financial desperation as a coercive force
complicates the discussion around free will and coercion, but has never met
any legal definition for trafficking resulting in leniency from prosecution.

34 (Wolf 2019)

Of the respondents from the WCIIA group, most defined trafficking in similar
ways: primarily by the act of being forced into selling sexual services or per-
forming that service while "someone else took all or most of the profit from
it." Other common themes mentioned were: kidnapping, forced labor, and
financial abuse, as well as drug trafficking.

❝ Trafficking was a word that I never heard when I first got into the business in 2002, back then it was called pimping. In my opinion, the terminology changed to conjure up images of white women being forced into sex work. Pimping is mostly associated with African-Americans and if I know anything to be true, it's that America is a deeply racist country that doesn't value black women as much as it should.

❝ Nonconsensual work regardless of field.

❝ Bringing someone into another country. Usually servitude is implied, but more often it's field, domestic, or sweatshop, less often sexual.

❝ A too-wide term that don't say much about anything.

❝ I think it's an ambiguous term. There is abusive management in every industry.

❝ Forcing someone to perform sexual services where you keep the financial gain. Where the person does not have a choice, or is performing acts under duress or can't consent due to age, or intoxication.

❝ Promise work for people, take them away from family and friends and then not deliver the work that was promised (different conditions, payment and/or type of work).

❝ Humans who are transported from one place to another against their will for work and/or sex. Sex trafficking is rare, more human trafficking happens when there is a need for farm hands or needing low-paid workers.

# Trafficking Statistics

|  | Online Group (N=98) | WCIIA (N=36) |
|---|---|---|
| Has been trafficked by their own definition | 10.2% (N=10) | 22.8% (N=8) |
| Has been identified as a victim of trafficking by someone else | 20.6 (N=20) | 14.7 (N=5) |
| Entered the sex industry younger than 18 | 8.1% (N=8) | 17.9% (N=7) |
| Identify as a victim or survivor in some way | 28.1% (N=27) | Not asked |
| Has experienced violence before FOSTA-SESTA/April 2018 | 36% (N=35) | 22.8% (N=8) |
| Has experienced violence after FOSTA-SESTA/April 2018* | 33.8% (N=32) | 13.9 (N=5) |

\* It is important to note that statistics of experiencing violence after FOSTA-SESTA/April 2018 only represent a period of two years, while the previous numbers reflect violence experienced anytime before 2018.

Only 10% of the online respondents report experiences having been trafficked by their own definitions. These experiences primarily related to having a pimp. However, 20% say they have been identified as a victim of trafficking by someone else, and 4% say they have identified as a victim of trafficking in order to receive services from supportive services from the state or nonprofit. 8% of online respondents report having started working in the sex industry before the age of 18, which under the federal definition does not require explicit external force in order to be considered trafficking.

Of the WCIIA group, 18% reported entering the sex trades before the age of 18, and 20% self identifty as victims of sex trafficking. Twentytwo percent of WCIIA respondents report that at some point they were either held against their will by someone, someone had sex with them against their will, or had someone controlling money earned through their sex work.

Forty percent of online workers report identifying as a victim or survivor in some way, the majority of which was unrelated to their experiences in sex work: mostly from sexual assaults (some while working, but most specify that their assults were not related to sex work), domestic abuse, and childhood abuse.

# Barriers to Other Forms of Labor

**60.4%** of online respondents said they face barriers to accessing other forms of labor.

Those working within the sex trades do so for a variety of reasons that can usually be simplified into two factors: the need for income, and barriers that prevent them from earning enough through traditional means. We asked survey participants to describe barriers they face to other forms of employment.

In an open-ended question, the most common responses were mental illness, chronic illness, and disability, along with time constraints, such as single-parenthood and full time school enrollment. For some, systematic barriers such as previous criminal records, lack of education, and large gaps in resumes also prevented participants from getting other work. For many, sex work is seen as preferable labor due to signifigantly higher hourly rates. This reflected a need for flexibility and an inability or discomfort around sacrificing large amounts of their time for substandard wages.

Participation in formalized economies is often inaccessible to people living with disabilities. The flare-up periods that accompany many chronic illnesses, mental health issues, C-PTSD, PTSD, fibromyalgia, and other forms of non-specified somatized pain disorders create a barrier in an individual's ability to maintain stable employment within the rigid structure of traditional work.[35] Mental health diagnoses and invisible disabilities[36] are often more difficult to claim disability benefits for, especially when in order to claim those benefits you have to show up physically for appointments. Sex work is often one of the only ways that disabled people can support themselves and their families financially, especially when the state fails to provide adequate support and resources.

35  (Tastrom 2019)

36  **Invisible Disability** is an umbrella term that captures a spectrum of hidden disabilities. Invisible disabilities are disabilities that are not immediately apparent, they are often neurological in nature, difficult to diagnose and chronic. (definition taken from DisabledWorld.com)

While the majority of online participants reported that their experiences in sex work were positive and provided them with necessacry financial resources, many did report that they are survivors of violence and live with PTSD and somatic pain disorders. Many report that sex work was the only form of labor that they were able to maintain while dealing with the aftermath of a traumtic event or PTSD due to the flexible schedule, higher hourly rate, and the ability to take time off when needed.

**50%**
of online respondents reported having chronic health issues of disabilities (most common were chronic pain, autoimmune disorders, endometriosis, mental health disorders).

**8.16%**
of online respondents defined themselves as financially secure with an overwhelming majority saying that they had income coming in but were generally stressed about their financial security. 23% identified as insecure and didn't know where their next money was coming from.

**68.4%**
of online respondents have received a mental health diagnosis (depression, anxiety, ADHD, PTSD were most common).

**73.5%**
of online respondents say that their financial situation has changed since April 2018.

**78.57%**
of online respondents report that the majority of income was from sex work.

**72.5%**
of online respondents are facing increased economic instability after April 2018.

**46.94%**
of online respondents had no other form of income.

**45.74%**
of online respondents could not afford to place an ad for their services.

These barriers to traditional forms of labor and subsequent poverty are exacerbated by lack of access to traditional banking and financial technology tools, many citing that with the closure of their financial technology accounts such as PayPal or Venmo came the seizure of the funds, some losing as much as $500 in the process. Sex workers reported that their accounts were lost due to clients referencing 'suspicious' activity in the memo, clients trying to retroactively reverse payments or telling their bank it was a fradulent charge, and being reported by an abusive partner or potential client.

Of the WCIIA respondents, 86% of WCIIA respondents reported having a mental health diagnosis. 19% of WCIIA reported increased economic instability after Backpage was removed and FOSTA-SESTA was signed into law. Our research suggests that this number is lower than the online group because WCIIA did not have the same reliance on online spaces before FOSTA-SESTA. None of WCIIA members defined themselves as financially secure, with 38.2% saying that they didn't know when they'd be getting money next.

# Effects of FOSTA-SESTA

While FOSTA-SESTA's purported purpose is to aid in the reduction of human trafficking, what we've witnessed within the scope of this study is that this law is contributing to the poverty that makes an individual more succeptible to labor exploitation and trafficking.[37] By censoring the way that sex workers communicate with each other online, this law is also responsible for the dissolution of harm reduction tactics that allow workers to educate each other by sharing experiences with violent clients, exploitative mangement, and labor exploitation. This dismantling of an online-based sex work environment has played a role in the increased economic instability for **72.45%** of the online participants of this survey, with **33.8%** reporting an increase of violence from clients. **23.71%** of online workers reported that their housing situation has changed since April 2018.

37  (Chuang 2006)

While FOSTA-SESTA was presented as a law that increases the safety of those at risk of human trafficking, **99%** of online respondents reported that this law does not make them feel safer. The ability to work independently online has reduced the need for sex workers in dire financial situations to work on the streets or through an exploitative agency or third party. Working

online has given sex workers more autonomy over their labor and reduced the need to work under pimps and exploitative management. It has also provided more choices in client selection, by increasing the range of potential income sources as well as more possibilities to vet a client. **80.61%** of participants who took the online survey say they are now facing difficulties advertising their services.

Out of our online respondents with chronic illness, **26%** reported an increase in the exacerbation of their symptoms after April 2018. For people with chronic health issues an exacerbation of symptoms or flare up can make it more difficult to work and increase financial and housing insecurity.

FOSTA-SESTA has reduced the number of sites that sex workers use to find clients, community and share harm reduction working tips. The free and the niche websites used by sex workers were some of the first to be removed after FOSTA-SESTA or in anticipation of the law being signed. Post FOSTA-SESTA, sex workers are reliant on fewer platforms to advertise. These platforms now have monopolized the market, and have the ability to raise their prices for advertising as well as the cut they take for potential sales. Sites like Eros.com have increased their scrutiny for new members, requiring more forms of identification and higher advertising prices. Community trust in Eros.com has simultaneously dwindled, with many believing that that information is being handed over to law enforcement and beng used to restrict immigration, after one of their call centers was raided.[38]

38  (Brown 2017)

Sex workers reported that after the removal of Backpage and post FOSTA-SESTA, they are having difficulties connecting with clients, and are reluctantly returning to working conditions where they have less autonomy (e.g., returning to work under a pimp or to a 9–5 that does not accommodate for their needs or disability). **40%** of online respondents reported that over half of their clients came from Backpage. The fact that it was free to advertise on Backpage was particularly important to low income workers who either did not have the financial means to establish and host a private URL or those who use sex work as suplemUntary income and were uninterested or unable to invest in a more costly internet presence.

## Online sex sorkers describe their experiences post-FOSTA-SESTA

> **Was bringing in plenty of income pre-FOSTA. When BP went down I didn't have a single client for 2 months. My savings dwindled and are now completely gone.**

> **I lost all my income, lost my clients and was forced to go back to working a 9 to 5 job that is ableist and doesn't accommodate my disabilities/health issues. Sex work gave me freedom and flexibility before I lost it all.**

> **I'm homeless and can't pay the bills.**

> **My income decreased by 58% in the year following FOSTA-SESTA.**

> **I used to make enough to be comfortable now I'm always barely scraping by.**

> **I feel totally erased.**

## Digital Security and Harm Reduction

Sex workers are concerned with their health and safety. Digital security practices can be thought of as harm reduction, just as a worker might take PEP or PREP to mitigate harm, a worker might adopt online digital security methods to stay safer. That being said, tools such as "bad date" lists and digital security methods and techniques are not equally accessible to everyone. People who are working on the streets are often sharing phones, or do not have consistent access to technology or to these tools that many online workers do.

Of those who utilized web-based harm reduction techniques, the most common tools used were sites dedicated to reviewing clients in an effort to flag those that with a history of violence, non-payment, or potential connections to law enforcement. Commonly known as "bad-date lists," sites such as these can fall within the vague parameters of what FOSTA-SESTA criminalizes. Another tool used by sex workers is a system of verification in which a new client gives the contact information of past providers to vouch for themselves. VerifyHim is just one example of the harm reduction tools that have been taken down after FOSTA-SESTA.[39] In general, when sex work is criminalized, new clients are often hesistant to provide personal information used to verifiy their identities.

39 survivorsagainstsesta. org/documentation/ (visit this site to see a more complete list of websites that have been removed post-FOSTA-SESTA)

Sex workers also utilize several strategies to protect their anonymity from clients and law enforcement.

| | |
|---|---|
| **41%**<br>of online respondents used a separate phone for sex work. | **21%**<br>of online respondents said they are not able to access harm reduction online that they were in the past. |
| **91%**<br>of online respondents used some sort of digital security technology. The most common were encrypted email accounts (55%), seperate Internet browsers (45%), VPN (33%), multi-factor authentication (41.5%) or encrypted messaging (39.33%) | **94%**<br>of online respondents said they advertise sex work related services using online public platforms and social media. |

FOSTA-SESTA has reduced access to online spaces for sex workers, this data illustrates how this increases financial insecurity among already vulnerable populations. This has pushed sex workers into more dangerous working conditions with less financial agency to turn down work.

An internet-based work model has been adpopted by sex workers primarily due to the increased potential to create a safer work space. This work model has given sex workers the opppourtunity to utilize e-verification and create larger and more consise databases for black-listing of violent clients and potential undercover police. It also differs from street based work in terms of how meetings between clients and providers take place. Street based workers must identify clients and discuss logistics quickly to avoid the appearance of soliciting. This leaves little time for workers to assess their safety, discuss what will occur, and agree upon a price. A meeting made online can provide more time to negotiate terms, despite explicit communicationg about selling sex acts still being illegal.

The loss of income is the most immediate repercussion reported by online workers who now face barriers to working online. Of the online respondents surveyed **78.5%** said that sex work made of the majority of their income, while **47%** said it was their *only* form of income. Of this group **72.5%** reported that they are facing increased financial insecurity after the removal of Backpage and the passage of FOSTA-SESTA. The use of free advertising sites like Backpage, are especially important to those who are already financially insecure, as almost 46% of this group say that they cannot afford to place an ad on sites that charge for advertising.

Barriers that disrupt an online-based work model create an environment where harm reduction techniques that were previously in place become less accessible. Internet based workers still need the income that was lost due to the removal of their online platforms. Working with increased financial insecurity and increased criminalization leads to workers taking greater risks with clients that they previously were able to avoid.[40, 41]

It is worth noting that many clients of sex workers are also aware of the changes in how sex workers operate and may feel emboldened to act more violently knowing that fewer precautions are in place that would prevent their ability to harm or exploit sex work providers. The removal of bad-date lists and the inability for sex workers to communicate negative experiences with one another benefits those who intend to harm those who have little recourse in reporting violence against them.[42] An overwhelming **99%** of online respondents reported that they do not feel safer since FOSTA-SESTA was signed into law.

40  (Reed et al. 2010)

41  (Mantsios et al. 2018)

42  (Thukral and Ditmore 2001)

Of the WCIIA members who were surveyed, **40%** reported seeing an increase in the number of street based sex workers since the removal of Backpage and post FOSTA-SESTA. Since this change in the online landscape of the sex trades, **36%** of online respondents reported facing increased violence, with around **20%** of WCIIA reporting the same. Only **5.25%** of WCIIA respondents reported having consistent access to a personal cell phone over the past year.

Our research suggests that individuals who work online experienced a greater *increase* of violence than those who were already working on the streets after the removal of Backpage and the passage of FOSTA-SESTA. An online-based work model creates distance from the impact of criminalization and the violence of traditional policing. Now, many individuals who utilized the web as a harm reduction working tool no longer benefit from that buffer to violence.

## Police Interactions

**❝ All of my worst experiences happened because of the police. [Sex work] is the highest paying job I've ever had and it allowed me to raise my children in a safe, middle-class neighborhood.**
**— Online respondent**

The reductive, binary discourse surrounding sex work and sex trafficking has created an environment in which the punitive treatment and surveillance of sex workers by the state is normalized and lauded. The lack of a nuanced conversation on labor has led to environment where the complexities of the lives of those who trade sex are erased. As poverty is one of the most prominent factors that makes an individual vulnerable to trafficking, laws that criminalize sex work increase sex worker's exposure to violence and exploitative working conditions.

The inherent danger in police interaction has been reported on before. A recent study by the Center for Court Innovation (N=304) showed that **30%** of participants were threatened with violence from a police officer, **27%** were harassed for their gender presentation by police and **15%** were raped by a

police officer (the police did not arrest them in exchange for sex).[43] As the criminalization of sex work is one of the main sources of violence that sex workers encounter, legislative infrastructure that pushes sex workers into more dangerous and more heavily policed working environments is a significant public health risk. An online respondent describes their experience with arrest as,

43  (White et al. 2017).

**" Severely traumatizing. I have had vice pull guns on me & have had sexual contact with me! I suffer from PTSD from excessive force & arrest.**

Another online respondent said,

**" The hatred [the police] had for me was inexplicable, they seemed to really enjoy degrading me."**

7% of online respondents reported having been arrested for sex work related offenses. This is considerably less that the 29% WCCIA respondents who reported having been arrested for sex work related offenses. The WCCIA group were arrested over three times as often while working on the streets. Having this level of increased surveillance greatly impacts how this demographic conducts themselves with customers, as well as increases their risk of violence from police and clients alike. A member of WCIIA describes her experiences of constant interactions with the police, "I've gotten into a car with an undercover officer. I've been arrested for Compton night walking. I've been pulled over after getting into a car. I've been arrested walking with a friend when they could not find another reason and was falsely accused." Another member of WCIIA says, "I wasn't even getting in a car. I was just walking and detectives walked up behind me and cuffed me. Another time I got in a car with a cop."

**18.5%** of online respondents have had interactions with police that did not lead to their arrest. An online respondent says that the police "used to 'verify' that I wasn't underage by pretending to be a client, showing up, going through my things and checking everywhere in the hotel room. Sometimes would tell the hotel staff what I did. I'd get kicked out. But would always 'warn' me." Another respondent said, "I've provided oral service to a cop that said, 'not to worry,' they were not looking for girls like me. They were looking for

drugs, traffickers, pimps. Bittersweet." A common theme of respondents who have had interactions with the police are fear, anxiety, panic attacks, violence, and PTSD.

Street-based workers and those who have lost access to online spaces are exposed to increased violence as they navigate more heavily policed econ-omies. Our research suggests that an online model of sex work acts as a protective barrier to police violence. Legislation that reduces an individual's ability to utilize online working tools and increases financial insecurity puts vulnerable workers in closer proximity with police and state violence.

## Community

**" Access to support groups and safety groups which are essential for my screening and networking with others. I like to also keep up to date with what's hap-pening in the sex workers rights movement across the globe and Twitter has been great for that. I fol-low a lot of outreach organizations and activists.
—Online respondent**

Access to the Internet has been shown to increase mental health outcomes in marginalized and criminalized communities.[44, 45] The Internet provided a space for sex workers to share resources, build community, and advertise their services. Sex workers who use social media to connect with communi-ty or share harm-reduction working tools may now find themselves isolated from their trusted networks and unable to find community members through regular searches. Access to community spaces (both online and offline) have been shown to reduce negative mental health outcomes, stigma, and rates of HIV transmission in sex workers.[46] **97%** of online respondents said that they use the Internet to access the sex worker community. **70%** of this group said that they've noticed a difference in how they can access the community online, the vast majority of which noted a decrease in access to sex worker community after FOSTA-SESTA. Those who noted a decrease in their ability to access online sex worker community talked about sex work-er and activist organization accounts being shutdown and shadowbanning. Those who noted an increase in their ability to access sex worker community

44  (Lucassen et al. 2018)

45  (Cserni 2015)

46  (Platt et al. 2018); (Shannon et al. 2015; Deering et al. 2014)

talked about the increased visibility of the sex worker rights movement online.

Many workers describe their relationship with online sex worker community as vital to their safety and a way to stay connected to and financially support the sex worker rights movement.

> **When I first started FSSW [full-service sex work] if it was not for Tumblr & other sites I would have had absolutely no idea how to screen & stay safe.**

The ability to access harm reduction resources online was a common theme from online respondents on their relationship to sex worker community. One worker summarizes this relationship concisely when they say,

> **Everything I know about being safe in sex work is because I was able to speak to other sex workers online.**

Other workers mentioned the ability to connect with workers from similar backgrounds. One worker talks about their experience with finding and joining a collective for Indigenous 2 spirit trans sex workers and dancers. They say,

> **I never knew others existed.**

**70%** of online respondents reported a noticeable difference in how they access sex worker communities online. Many describe the experience of losing access to their communities as chilling, depressing, and erasing. One online respondent says,

> **Sex workers are disappearing from the Internet. Workers' sites have been taken down, ad sites are hard to comply with and are always changing their rules, Twitter and Instagram are deleting accounts just for being a sex worker.**

JA0206

Another worker describes their experience after a Facebook support group for sex workers was shut down as depressing. They say,

**" I was so down since I have zero friends in RL [real life] who do this type of work.**

A few workers talk about how they are noticing a lot of websites getting stricter, with more accounts being shut down, deplatformed, and banned.

One worker describes why they said that their contact with the sex worker community has increased post FOSTA-SESTA and explains that while,

**" the accessibility might not be there, my need to take the initiative and make those connections sure has [increased].**

Many reported having their accounts deleted or disappeared or being unable to find and connect with their friends after their accounts were deleted. Despite this, **50.5%** of online workers surveyed say that their involvement in sex worker community has increased in some since the law was passed, with some stating that they're more determined then ever to seek out people with simliar expiereinces in order to protect themselves, engage in activism, and look out for their fellow workers. This law has caused irreparable harm, but it has also galvanized online sex workers—many of whom are showing up in the streets to protest despite the risk of these laws. As a community that is in the process of being disappeared online, sex workers are shifting the narrative of sex work and continuing to organize.

Unsure over what is safe to post, many sex workers report a general sense of fear and paranoia around the consequences of their internet presence. The vagueness of this law, and what qualifies as the facilitation of human trafficking has left sex workers unable to assess the severity of the legal action that could be taken against them.

What we witnessed with the surveyed group from WCIIA is that the passing of this law has had very little effect on the lives of street-based sex workers. Even without a formal understanding of what the law does to online platforms, it was evident that for sex workers who don't use the internet there

is nothing within the legal reach of FOSTA-SESTA being done to decrease the vulnerablity of street-based and survival sex workers. While this group does employ harm reduction techniques, like bad-date lists and safety calls, these are mostly done on paper, through word of mouth, and with other street workers. This model lacks the permanency and reach of internet based techniques, but has not been affected by FOSTA-SESTA.

**❝ [The Internet] allows me to interact and network with other sex workers, to be a part of ugly mug lists, to get a better understanding of the difficulties faced by workers who work in different capacities to me and how I can help them and support them, how I can work to help dismantle whorephobia experienced at different levels in the industry."**

**❝ Whole entire sites have disappeared! Or been changed, or deleted! Forums for sex workers providing safety info, info for screening clients, escort ad sites, etc.**

**❝ Less options to connect/access the community and a lot of censorship and accounts being wrongfully deleted from their platforms.**

**❝ I'm too afraid to access community online now.**

**❝ The Internet is barren of sex workers. Trying to search [for] any information or communities for sex workers results in just articles about busting prostitution.**

**" I feel like more and more sex workers' accounts are being deleted on Instagram, plus shadowbanning on Twitter has made it harder to search for those who do sex work. They don't show up directly in the query even if you type in their exact handle.**

**" Paranoia about how to do things online is THROUGH THE ROOF and nobody seems to know what is and is not permissible online.**

## Financial Technology



**72%**
of online respondents reported using financial technologies in their sex work.

**33%**
of online respondents said they had been kicked off of a payment processor.

**78%**
of WCIIA respondents reported not having access to a bank account.

**10%**
of WCIIA respondents reported ever receiving payment from sex work through an online payment processor.

Built into technological advances and financial infrastructure is legal liability. This creates a barrier to accessing technologies for people in heavily policed economies. The inaccessibility of financial technologies acts to further the income gap of folks who are pushed off of the platforms for vague violations of terms of service, for people who lack financial or technological literacy, and for people who may never have had access to these technologies to begin with.

Those who are not able to access common financial technologies or mainstream banking are left to using predatory financial services and payment processors that take between a 30-40% cut of earnings in order to sell their work. This process mirrors the practice of redlining,[47] which was outlawed in 1968.[48] This inequity also creates barriers to financial independence which is crucial to an individual's physical safety. Bardot Smith, a technologist, analyst, and dominatrix describes the impact of online discrimnation as a loss of opportunity. She shows how this discrimination "disproportionately affects people at the margins: queer people, people of color, sex workers. It comes down to people they (the platforms) have determined do not deserve access to money."[49]

When an online sex worker is kicked off of a financial or social platform, they are at risk of losing their means of making money and risk losing acccess to community. The lack of access to these technologies also creates a barrier between sex workers and civilians when the most recent technological innovations are not equitably accessible.[50]

Sex workers aren't just at risk of losing accounts related to their sex work. Many sex workers report losing access to non-sex work related accounts and platforms, as they are often linked or share a credit card. Stigma, criminalization and the labeling of sex workers as 'high risk' mean that sex workers can't advertise on mainstream advertising platforms, like using Google Ads. This stigma can also mean that sex workers are blocked from using financial technologies for things unrelated to their sex work just because they have at one time been seen as having sold sex.

Community research found over 29 payment processors and pay apps that explicitly discriminate against sex workers using their platforms in their Terms of Service agreements.[51] **72.%** of online respondents reported using an online payment processor. **33%** of online sex workers reported have been kicked off of a payment processor, many of whom said that the platform seized the funds in their account during the closure of their account. Many sex workers suggested that the reasons for their account closure were because of irresponsible memos in the payment app suh as "nudes", the use of a public facing work e-mail that may be on a list, a client reporting an account or a chargeback after rendering services.

47  **Redlining** is an unethical practice that puts services (financial and otherwise) out of roach for residents of certain areas based on race or ethnicity. It can be seen in the systematic denial of mortgages, insurance, loans, and other financial services based on location, rather than an individual's qualifications. (definition taken from Investopedia)

48  (Blue 2015)

49  (Smith 2019)

50  (Lake & Roux 2018)

51  (Lake & Roux 2018)

❝ **[I was kicked off of] PayPal, years ago around 2015. A client put my work email in the memo! Idiot 🤦🏼‍♀️ I was kicked off and could never retrieve the $500 balance. I'm lucky, they've stolen thousands from other women.**

❝ **[ I was kicked off of] Venmo, they said I was using it to 'sell services or gambling' but I was using it to accept donations when I was homeless the first time... It happened about December 2017.**

❝ **PayPal booted me about 10 years ago, I was unable to recover ~$400 from my account.**

## Shadowbanning

While our research was not explicitly about shadowbanning, many online respondents brought up shadowbanning in their answers to qualitative questions. Many platforms explicitly ban adult content and sex worker use, some utilize what they refer to as algorithmic curation in a way that causes harm through more opaque practices. When this algorithmic curation is applied in a way that invisibilizes a community, this practice is colloquially referred to by users as "shadowbanning."[52] Many people, sex workers included, use social media to build a brand and to create an income. Hashtags and viral posts have the power to shift discourse in the public,[53] but in many instances, these tools do not work the same for sex workers. The architecture of digital spaces dictates who can find whom, and shadowbanning ensures that sex workers are unable to find each other: If you are unable to find someone, you are unable to build community with them,[54] and if you are unable to build community, you are unable to organize and fight back against harmful laws. It is important to note here that shadowbanning was occuring before FOSTA-SESTA, while many online respondents reported increased shadowbanning, shadowbanning cannot not be directly attributed to FOSTA-SESTA, but rather should be seen as a part of an increasing and overarching whorephobic online landscape.

52 **Shadowbanning** is an obfuscated, internal process that prevents certain accounts from showing up in a feed, or prevents their handle from being searchable, and is routinely used on sex worker accounts, or those thought to be sex workers, while simultaneously being denied by tech companies.

53 (Lake & Roux 2018)

54 (Tufekci 2017)

Shadowbanning can prevent sex workers from participating meaningfully on social media. The obfuscated nature of shadowbanning and the fact that the platforms deny that it is happening, though they do admit they do that they prioritize the visibility of certain content. This leads to an environment where sex workers are simultaneously being erased from public spaces and their experiences of erasure are being ignored. The invisibilized practice of shadowbanning allows for the active silencing of a community without the platform having to lose valuable ad revenue. Due to the denial and obfuscation of these practices, it is difficult to hold platforms responsible for the violence of erasing marginalized voices, whereas the outright banning of sex worker accounts creates a space for a more visible protest.

Sex workers who use social media to connect with community or share harm reduction working tools, may find themselves isolated from their trusted networks and unable to find community through regular searches. Sex workers at a porn conference reported an interruption in their ability to network and make connections as 90% of their colleagues were unsearchable due to shadowbanning.[55]

55 (Fitzgerald & Sage 2019)

## Quotes on Shadowbanning

**❝ I feel like more and more sex workers' accounts are being deleted on Instagram, plus shadowbanning on Twitter has made it harder to search for those who do sex work. They don't show up directly in the query even if you type in their exact handle.**

**❝ Accounts are being deleted so quickly and without warning that sometimes a friend just \*poof\* and I never hear from them again, sometimes the one place I know how to reach them goes silent and I am only left to assume what happened.**

**❝ With people getting shadowbanned or deleted, a lot of who I followed are just GONE. Resources that were typed or infographic? GONE.**

# Discussion & Recommendations

FOSTA-SESTA led to a chilling effect in the community. This chilling effect acts as another form of violence. In a research study conducted by the Internet Policy Review, it was found that **75%** of respondents were "much less likely" to post after receiving a personal legal threat from a third party in regards to online activity. It is notable that female Internet users were significantly more likely to have their speech chilled online in response to legal notices being issued.[56] This indicates that those experiencing one or multiple intersecting forms of oppression are more likely to have their speech chilled online and be wary of sharing their experiences, connecting with community and sharing and receiving harm reduction tips. This means that the resources sex workers use to stay safe are not only disappearing from the Internet, but sex workers are deciding that sharing them may be too dangerous; and their speech is chilled. This is the work of the authoritarian state.

56  (Penney 2017)

**Chilling effect** is a term in law and communication that describes a situation where speech or conduct is suppressed by fear of penalization at the interests of an individual or group. It can affect one's free speech.

—USLegal.com

This chilling effect parallels the ways in which sex work is policed on the streets and the violence that ensues, and the communities that are most affected by this criminalization. In some cities, condoms have been used as evidence of prostitution in transphobic and racist policing tactics that selectively use this strategy to arrest people.[57] This has led to sex workers choosing not to carry condoms because having less access to safer sex tools was less risky than increased exposure to the police. Many individuals and harm reduction organizations feel a similar chilling effect when it comes to sharing harm-reduction working tips or providing safety and check-ins with fellow workers.[58] Sex workers and allies have faced jail time for assisting a sex worker under trafficking laws;[59] when 47% of black trans women have traded sex,[60] this punitive sentencing of queer survival creates unnecessary fear and self-censorship in community. Self-policing creates a barrier from harm reduction working tools and serves as another form of violence that sex workers face.

57  (Wurth et al. 2013)
58  (Siouxsie 2018)
59  (Romano 2018)
60  (Romano, et al. 2015)

The criminalization of sex work remains a main catalyst of harm incurred against people in the sex trades. Repressive policing practices make sex workers more vulnerable to violence from the state, clients, and partners. There is no evidence that FOSTA-SESTA has curbed trafficking. Instead, our research suggests the opposite; that FOSTA-SESTA has created an env-iornment where vulnerable populations are pushed into increased financial insecurity, making them more vulnerable to labor exploitation, and labor trafficking in the sex industry is pushed further underground. Just as sex workers warned, our research suggests that FOSTA-SESTA has increased sex workers exposure to violence while doing nothing to combat trafficking.

# Limitations

The primary survey consisted of largely open ended questions, and was disseminated online through sites frequented by sex workers. It was com-pleted by predominantly white, female, LGBTQIA identifying people, with the central age group being between 24 and 35. This is a limitation of the con-venience sampling strategy employed, given that this doesn't necessarily reflect the racial, ethnic, or gendered breakdown of the full range of people who trade sex. Participants were mainly located in the United States, though some travelled internationally for work. Those outside of the US reported still feeling the effects of FOSTA-SESTA, as many websites they used were hosted within the United States. In order to complete the survey or to find it via the web, individuals who wound up taking the survey had to have some sort of access to Internet infrastructure.

In order to fill some of the demographic gaps in the initial survey, we also employed a secondary survey to a group of street based sex workers at a meeting of WCIIA, a Holyoke, MA based outreach group. The data from these surveys is largely inconclusive due to smaller sample size, a lack of completed surveys, and a demonstrated lack of understanding on the part of many participants on what FOSTA-SESTA is. The questionnaire distrib-uted to the WCIIA participants was similar to the one taken by the online participants, but with input from WCIIA organizers many questions were added or reworded to gain greater understanding of issues more relevant to this group. As suggested by WCIIA organizers who reviewed this data, it is highly possible that police and system interactions were under-reported and

usage of certain apps and internet based techniques may be exaggerated or misunderstood. It is for these reasons that this survey was not the subject of our primary analysis, but supplementary data used to illustrate gaps in the reach of FOSTA-SESTA.

One of the difficulties that we faced while analyzing this data was that it was difficult to distinguish what is a direct effect of FOSTA-SESTA and what is a response to a greater, overarching whorephobic landscape. While online sex workers show a decent understanding of FOSTA-SESTA, we also saw an over attribution of effects in the online landscape to this law. For example, many people, sex workers and policy makers included, believed that the take down of Backpage was related to FOSTA-SESTA, when it was in fact taken down days before FOSTA-SESTA was signed into law. Another example of this is the shadowbanning and deplatforming of sex workers which seems to be increasing post FOSTA-SESTA, but has been happening for years.[61]

We suggest that future research focuses on access to the internet from a holistic sense, as it becomes difficult to differentiate the harm caused by specific laws or the removal of websites when they are happening as part of a larger whorephobic online ecosystem.

61  (Beres 2016)

# Recommendations and Relevancy

Our research suggests that many sex workers use online platforms and technologies to work safer and build community. Any legislation or policy that hinders an individual's use of a certain technology they use to reduce harm will only exacerbate harm. There is no evidence that FOSTA-SESTA has done anything to prevent sexual labor exploitation. Our research shows that this law has actually put people in more precarious financial situations that actually make individuals more vulnerable to trafficking, as well as decreasing access to previously established channels of communication used to protect sex workers against violence.

# Platform Suggestions

Barring sex workers from financial technologies and social media is a form of structural violence. When a private company owns what operates like a public space that is larger than the largest country in the world, relying on content moderation alone is an insurmountable task, one that often relies on the exploited, underpaid, and incredible traumatizing labor of workers.[62]

The restricted access to certain technologies and particular websites occurs alongside enhanced monitoring, surveillance, and dubious human trafficking trainings by corporations from Uber to PayPal. This restriction, surveillance, and inequitable access to technology contributes to sex worker harm and marginalization. Legislation like FOSTA-SESTA should be seen in context, in an ongoing history of laws and regulations that utilize technology to give rise to new kinds of public-private partnerships and police women. The collaboration between the state, private tech companies, and the use of community as the eyes and the ears of police fuels surveillance capitalism.[63] This is most apparent with the policing of migrant communities and sex workers.[64, 65]

Algorithmic curation is now largely an automated process based on image and content analysis as well as flagged and reported content.[66] Oftentimes, this curation means that the misogyny of the user is reflected back by the authority of the platform and it's moderators. Hashtags like #woman, #curvy, and #breastfeeding have been shadowbanned, indicating that that which is perceived as the feminine form is inextricable from *sexual content*, therefore problematized and removed from visibility on the platform.[67] These practices harm an individual's ability to take up public space, advertise their services, and connect with community; in these instances woman becomes a proxy for *whore*. Shadowbanning also silences workers and contributes to an echo chamber of anti-trafficking propaganda when sex workers are disabled from sharing their experiences widely on public platforms.

Shadowbanning and content curation can drown out the visibility of activist messages in favor of advertiser-friendly content.[68] This creates echo chambers, increasing polarization, and the erasure of voices of the people who are harmed by the platform and by the state.

62  (Newton 2019)

63  **Surveillance capitalism**, a term popularized by Shoshana Zuboff, is used to describe the surveillance surrounding the capitalization of personal information.

64  (Khan, n.d.)

65  (Cyril, 2015)

66  (Gillespie 2018)

67  (Piper 2018)

68  (Tufekci 2017)

Similar to how sex workers face myriad barriers if they decide to report violence to police,[69] social media and financial platform moderators are equally unresponsive to reports of violence against sex workers online and when sex workers lose their accounts.[70] Platforms are more responsive to banning sex workers than they are to responding to Nazis. [71] Typically, platforms only respond to, or do not ban, financially stable white women with large followings, oftentimes celebrities who can have a representative from the platform. [72,] [73] Often, a male photographer posting a suggestive photo of a woman won't be taken down, but if the subject posts the same image of herself, she may be banned or have her photo removed. [74] This is also how the Internet stays gentrified: sexuality is allowed if it's supported by privilege, mediated by a man, or directly making a platform money. [75]

Sex worker exclusive technologies, platform policing, and anti-sex work legislation push people into circumstances that make them more vulnerable to labor exploitation and labor trafficking. The silencing of sex worker opposition and the fearmongering surrounding trafficking push legislation that actually exacerbates the harms.

## More User Choice

Users should be able to curate their feed and be offered more choice in the process. Platforms shouldn't be the ones dictating what is indecent. The current rules and processes of content moderation are easily weaponized by trolls to harass marginalized communities. If Instagram can lock you out of a device, why can't a user block an IP Address or device that someone is using to make new accounts with to harass, stalk, or send death threats? Why are we leaving the decision of what people see up to the platform rather than the user? If an individual reports someone's post, the reported person should have the option to block that person (and their IP address) to avoid potential future harassment or viewing of unwanted materials. Likewise, if someone is harassing a user they should have the option to block a device, not just a handle.

69 (Young Women's Empowerment Project 2012)

70 (Gil n.d.)

71 (Farokhmanesh 2018)

72 (Cole 2019)

73 (Fitzsimmons 2019)

74 (@RienzoKennedy  2 May 2019. 2:52 PM)

75 (@RienzoKennedy)

## Sex Worker Inclusion

The inclusion of sex workers in the development of technology needs to be thought of as a diversity issue. Academics, journalists, legislators, and people who create technology should not build it without consulting the communities that are most affected by their creations. Sex workers often live at the intersection of multiple marginalized identities and are the most immediately harmed by insecure and censored technology; if we create technology that is safe for sex workers, we've likely created technology that is safe for everyone. By listening to these communities, we will be able to learn first-hand how they are impacted by emerging technologies and involve them in putting precautions in place to avoid negative social and health outcomes. The only way to ensure that new and emerging technologies don't harm vulnerable communities is by listening to the communities who are most impacted by poorly designed technology, legislation, and infrastructure.

**If we create technology that is safe for sex workers, we've likely created technology that is safe for everyone.**

# Policy Recommendations

The decriminalization of sex work and repeal of FOSTA-SESTA are our foremost recomendations. Without fear of prosecution, those who enter the sex trades within any part of the spectrum between choice and force, are more likely to report violence and exploitation. Currently seeking any legal recourse or aid after experiencing trafficking puts victims at risk of police violence, deportation, and incarceration, regardless of their choice to participate in the sex industry.[76] In order to identify and eradicate these complex and clandestine forms of exploitation we must first ensure that victims are willing and able to speak openly about their experiences without fear of punishment. Legislation pushing the sex industry further underground has not made sex trafficking any easier to stop, and has done nothing to even attempt to address the various forms of trafficking that do not happen on the internet.

76  (Marsh 2019)

Trafficking is more complex then the simplified narratives popular in our culture, and it has been estimated by some to happen more frequently outside

the sex industry than within it.[77, 78, 79] In order to responsibly and equitably address the loss of autonomy and exposure to various forms of violence that makes human trafficking so abhorant, we must include labor trafficking in the discussion around human trafficking as whole. This discussion should include that those being trafficked for their labor are also vulnerable to sexual and structural violence, and support policies that strengthen the agency of exploited people. The voices and experiences of those who have experienced violence and labor exploitation should be the ones dictating what protections should be in place to prevent trafficking.

Furthermore, additional and more easily accessible aid is needed for those living in poverty, domestic violence situations, and those with undocumented citizenship and chronic health issues.

77   (Lee 2019)

78   (Albright and D'Adamo 2017)

79   (Lind 2014)

## Decriminalize. Decarcerate. Destigmatize.

**Decriminalize** sex trade related offenses in New York that harm people who do sexual labor by choice, circumstance, or coercion, including sex workers and people profiled as sex workers, as well as people who purchase sexual services. Pass legislation and implement administrative policies that protect people in the sex trades from economic exploitation as well as interpersonal violence.

**Decarcerate** people who have been arrested on sex trade-related offenses so that people can move forward with their lives without lingering ties to the criminal legal system. Vacate criminal records related to prostitution and end the ongoing entanglement with the court system that the rescue industry produces.

**Destigmatize** the sex trade so that workers have access to housing, education, employment, health care, and other basic needs without restriction. Not everyone trading sex wants to continue doing so and we support evidence-based, harm reduction-rooted policies and funding that supports people's safety and empowers those seeking different work.

—*Taken from DecrimNY.com*

# Further Research

We encourage further research to explore the ways that sex work is me-
diated by technology and how technology is used both as a facilitator and
disruptor of sex work. Tech alters the way that people work and organize in
all labor sectors, yet in most research on how tech shapes labor, sex work-
ers are left out of the conversation. In Data & Society's recent anthropolog-
ical report, *Disruption: How Tech Shapes Labor Across Domestic Work &
Ridehailing*, despite sex workers being some of the first to theorize about
how tech shapes domestic labor,[80] they are very conspicuously left out of         80  (Smith 2015)
the report. Further research on the gig-economy needs to include and cen-
ter sex worker voices.

In December of 2019 Representative Ro Khanna introduced a bill along with
Senator Elizabeth Warren to study the effects of FOSTA-SESTA, specifically
on the sex working community. This bill was created with the input of the sex
working community, including over 70 grassroots and non-profit LGBTQAI
organizations. Kate D'Adamo, a sex worker rights activist and partner at
Reframe Health and Justice says, "The bill was written intentionally to not
just replicate what was happening on the ground, but to use a lens of public
health and harm reduction to contribute and re-affirm the valuable, robust
community knowledge which already exists." This work will undoubtedly be
impactful if researchers take this expertise seriously, and incorporate peo-
ple with lived experience in the design, research, analysis and advisory of
this work. While more expansive information will be helpful moving forward,
policy makers should not wait to include sex workers' voices and expertise
in the development of policies and conversations on internet and surveil-
lance technology regulation. Research on health and safety often confirms
that communities know first, and listening sooner rather than waiting on
everyone else to catch up will save lives.

Further research into the complexities of human trafficking should also be
directed toward better understanding and codifying how trafficking hap-
pens, without the notion that all sex work is inherently trafficking. The attri-
bution of explicit force on those who do not claim to experience that type of
exploitation has wasted resources, enangered sex workers and trafficking
victims alike, and only created confusion about how trafficking is happening
and how frequently. The perception of trafficking should also be informed by

the knowledge that exploitation happens more frequently to those who live within complex situations of immigration, intimate partner violence, poverty, disability, and various other axes of oppression. Without providing recourse specific to these situations, those who face exploitation may find it safer to remain quiet about the various other abuses they suffer.

Those who have worked in the sex trades are the experts of their own experiences. Research into these communities should have a participatory approach, or at least employ a community advisory board of people with a variety of expieriences in the sex trades. The simplest and most successful approach to understanding the complexities and nuances of these communities is to employ sex workers to do reasearch on the sex industry, or as the long-standing advocacy slogan says; Nothing about us without us.

### Employ sex workers to do research.

# Conclusion

Lawmakers said that this bill was about "protecting" those vulnerable to sex trafficking. But our research suggests just what sex workers warned; FOSTA-SESTA actually makes individuals more vulnerable to human trafficking

and exploitation. This research has just begun to highlight the devastating impact of FOSTA-SESTA. These bills directly harm individuals engaging in sex work, many who live at the intersection of marginalized identities and may have limited access to other sources of income, while providing no concrete form of help to those already in exploitative or violent

**Denying access to technologies should be understood not only as censorship, but as a form of structural violence.**

situations. FOSTA-SESTA has exacerbated poverty and increased exposure to violence in the already marginalized communities who use the internet as a tool to gain financial independence in a safer way.

The current legal changes of FOSTA-SESTA alter the structure of the web, disproportionately harming the physical safety and mental health of already vulnerable communities who have most benefited from using an internet based work model. The Internet is now being policed with tactics akin to those used for 'cleaning up' sex workers from public view. Creating barriers for sex workers to access resources is not something that is new; FOSTA-SESTA has just created an infrastructural precedent to expedite the process.

Comparing our initial data of online workers with that of WCIIA, shows that those who are already being heavily policed on the streets do not feel the same immediate effects of FOSTA-SESTA. The street-based respondents from WCIIA already exist in a more heavily criminalized and policed economy. What FOSTA-SESTA did was push workers who had access to harm reduction working tools into less safe work environments, increasing their financial insecurity and exposure to violence.

Denying access to technologies should be understood not only as censorship, but as a form of structural violence. FOSTA-SESTA's fallout illustrates what happens when a fragile network meets the blunt force of the law. The result is stigma, isolation, poverty, and further entrenching inequality.

Technology has permitted some groups, particularly early adopters like sex workers, to move faster than the law; what we are seeing now is the violent backlash. Access to technology, Internet infrastructure, and social media platforms have allowed sex work to come out of more dangerous and exploitative labor enviornments. Sex workers use the Internet as a harm reduction working tool by negotiating and screening for potentially violent clients on their own terms. FOSTA-SESTA, the removal of Backpage's adult services sections, and an environment of Internet censorship threaten the protective elements offered by a model of sex work mediated by the Internet.

We are living in a society that is systematically silencing marginalized voices. Legislation like FOSTA-SESTA encourages platforms to contribute to this silencing through erasing sex worker existence from the Internet. There is tremendous fear in the community as sex workers try to comply with and work around rules that aren't always apparent, and rules that are often enforced differently for different people. People are losing access to work and are less able to support themselves and their families. Increased financial insecurity, increased exposure to violence, lack of access to community resources, inability to find work, and increased feelings of fear and anxiety are a few very visible effects of FOSTA-SESTA.

# For more information visit HackingHustling.org



JA0224

# Endnotes

Albright, Erin, and Kate D'Adamo. 2017. "Decreasing Human Trafficking through Sex Work Decriminalization." *AMA Journal of Ethics* 19 (1): 122–26.

AshleyF. 2015. "Faces of Labor Trafficking in the United States • Human Trafficking Search." Human Trafficking Search. August 18, 2015. https://humantraffickingsearch.org/faces-of-labor-trafficking-in-the-united-states/.

Beres, Damon. 2016. "Don't Even Try Using These Banned Instagram Hashtags." HuffPost. HuffPost. May 17, 2016. https://www.huffpost.com/entry/banned-instagram-hashtags_n_57347d6ae4b077d4d6f23122.

Blue, Violet. 2015. "Paypal, Square, and Big Banking's War on the Sex Industry.'." *L Engadget. Accessed December.* https://www.engadget.com/2015/12/02/paypal-square-and-big-bankings-war-on-the-sex-industry/.

Brown, Elizabeth Nolan. 2017. "Eros.com Still Lives, But Homeland Security Raid Has Sex Workers Worried." Reason.com. Reason. November 13, 2017. https://reason.com/2017/11/13/eroscom-still-lives-but-homeland-securit/.

Campbell, Rosie and Sanders, Teela. Beyond the Gaze: Safety and Privacy for Online Workers. 2018.

Chapman-Schmidt, Ben. 2019. "'Sex Trafficking' as Epistemic Violence." *Anti-Trafficking Review.* https://doi.org/10.14197/atr.2012191211.

Child Welfare Information Gateway. (2016). Definitions of human trafficking. Washington, DC: U.S. Department of Health and Human Services, Children's Bureau.

Chuang, Janie. 2006. "Beyond a Snapshot: Preventing Human Trafficking in the Global Economy." *Indiana Journal of Global Legal Studies* 13 (1): 137–63.

Cyril, Malkia. 2015 "Targeted Surveillance, Civil Rights, and the Fight for Democracy." MediaJustice. https://mediajustice.org/news/targeted-surveillance-civil-rights-and-the-fight-for-democracy/

Cole, Samantha. 2019. "A Sex Workers Union Is Organizing Against Instagram Discrimination." Vice. VICE. May 6, 2019. https://www.vice.com/en_us/article/3k3d45/apag-union-sex-workers-account-deleted-from-instagram.

Cserni, Robert T. 2015. "To Know That You Are Not Alone: The Effect of Internet Usage on LGBT Youth's Social Capital." In *Communication and Information Technologies Annual*, edited by Ilan Talmud, 9:161–82. Studies in Media and Communications. Emerald Group Publishing Limited.

Cunningham, Scott, Gregory DeAngelo, and John Tripp. 2017. "Craigslist's Effect on Violence Against Women." *URL http://scunning.com/craigslist50.Pdf.*

Dank, Meredith. 2015. "Surviving the Streets of New York: Experiences of LGBTQ Youth, YMSM, and YWSW Engaged in Survival Sex." http://webarchive.urban.org/url.cfm?ID=2000119.

Deering, Kathleen N., Avni Amin, Jean Shoveller, Ariel Nesbitt, Claudia Garcia-Moreno, Putu Duff, Elena Argento, and Kate Shannon. 2014. "A Systematic Review of the Correlates of Violence against Sex Workers." *American Journal of Public Health* 104 (5): e42–54.

Farokhmanesh, Megan. 2018. "Switter, One of the Last Online Spaces Friendly to Sex Workers, Was Just Banned by Its Network." *The Verge*. https://www.theverge.com/2018/4/19/17256370/switter-cloudflare-sex-workers-banned.

Fitzgerald, Juniper and Sage, Jessie. 2019. "Shadowbans: Secret Policies Depriving Sex Workers of Income and Community." Tits and Sass. June 12, 2019. http://titsandsass.com/shadowbans-secret-policies-depriving-sex-workers-of-income-and-community/.

Fitzsimmons, Claire. 2019. "Exclusive: Victoria's Secret Influence on Instagram's Censorship Policies." Salty. November 23, 2019. https://saltyworld.net/exclusive-victorias-secret-influence-on-instagrams-censorship-policies/.

Gillespie, Tarleton. 2018. *Custodians of the Internet: Platforms, Content Moderation, and the Hidden Decisions That Shape Social Media*. Yale University Press.

Gil, Natalie. n.d. "How Instagram's New Rules About Sex Are Penalising Women Online." Accessed May 13, 2019. https://www.refinery29.com/en-gb/2019/04/230263/instagram-sexual-content.

Grant, Melissa Gira. 2014. "How D.C. Finally Stopped Punishing Sex Workers for Carrying Condoms." CityLab. June 19, 2014. https://www.citylab.com/equity/2014/06/how-dc-finally-stopped-punishing-sex-workers-for-carrying-condoms/371582/.

Grant, Melissa Gira. 2012. "Loitering With Intent." Accessed December 30, 2019. http://melissagiragrant.com/loitering-with-intent/.

Gullapalli, Vaidya "Spotlight: The Dangers of Gang Databases and Gang Policing." n.d. The Appeal. Accessed December 30, 2019. https://theappeal.org/spotlight-the-dangers-of-gang-databases-and-gang-policing/.

James, S. E., Herman, J. L., Rankin, S., Keisling, M., Mottet, L., & Anafi, M. (2016). The Report of the 2015 U.S. Transgender Survey. Washington, DC: National Center for Transgender Equality

Khan, Ummni. n.d. "Antiprostitution Feminism and the Surveillance of
    Sex Industry Clients." *Feminist Surveillance Studies*. https://doi.
    org/10.1215/9780822375463-011.

Krüsi, Andrea, Jill Chettiar, Amelia Ridgway, Janice Abbott, Steffanie A.
    Strathdee, and Kate Shannon. 2012. "Negotiating Safety and Sexual
    Risk Reduction with Clients in Unsanctioned Safer Indoor Sex Work
    Environments: A Qualitative Study." *American Journal of Public Health* 102
    (6): 1154–59.

Lake & Roux . 2018. "Platforms Which Discriminate Against Sex Workers."
    *LiarasList.org*

Lee, Lorelei. 2019. "Cash/Consent." n+1. September 24, 2019. https://npluso-
    nemag.com/issue-35/essays/cashconsent/.

Lind, Dara. 2014. "Forced Labor in America: Thousands of Workers Are
    Being Held against Their Will." Vox. Vox. October 22, 2014. https://www.
    vox.com/2014/10/22/7024483/labor-trafficking-immigrants-exploita-
    tion-forced-us-agriculture-domestic-servants-hotel-workers.

Lucassen, Mathijs, Rajvinder Samra, Ioanna Iacovides, Theresa Fleming,
    Matthew Shepherd, Karolina Stasiak, and Louise Wallace. 2018. "How
    LGBT+ Young People Use the Internet in Relation to Their Mental Health
    and Envisage the Use of E-Therapy: Exploratory Study." *JMIR Serious
    Games* 6 (4): e11249.

Mantsios, Andrea, Catherine Shembilu, Jessie Mbwambo, Samuel Likindikoki,
    Susan Sherman, Caitlin Kennedy, and Deanna Kerrigan. 2018. "'That's
    How We Help Each Other': Community Savings Groups, Economic
    Empowerment and HIV Risk among Female Sex Workers in Iringa,
    Tanzania." *PLOS ONE*. https://doi.org/10.1371/journal.pone.0199583.

Marsh, Sarah. 2019. "Decriminalise Sex Work to Protect Us
    from Crime, Prostitutes Say." *The Guardian*, February 28,
    2019. http://www.theguardian.com/society/2019/feb/28/
    decriminalise-sex-work-to-protect-us-from-prostitutes-say.

Mayhem, Maggie, et al. Sex Work, Drug Use, Harm Reduction
    and the Internet, Internet Governenece Forum, 2019.
    https://www.intgovforum.org/multilingual/content/
    igf-2019-ws-389-sex-work-drug-use-harm-reduction-and-the-internet

Newton, Casey. 2019. "The Trauma Floor." The Verge. The Verge. February 25,
    2019. https://www.theverge.com/2019/2/25/18229714/cognizant-face-
    book-content-moderator-interviews-trauma-working-conditions-arizona.

"#NoLoiteringJustLiving." n.d. Twitter. Accessed December 30, 2019. https://
    twitter.com/hashtag/notloiteringjustliving.

Penney, Jon. 2017. "Internet Surveillance, Regulation, and Chilling Effects
    Online: A Comparative Case Study." https://papers.ssrn.com/sol3/papers.
    cfm?abstract_id=3191638.

Piper, Reese. 2018. "How Censoring Strippers Affects All Women." Vice.
    VICE. May 31, 2018. https://www.vice.com/en_us/article/nek3gg/
    instagram-censoring-stripper-hashtags-reese-piper.

Platt, Lucy, Pippa Grenfell, Rebecca Meiksin, Jocelyn Elmes, Susan G.
    Sherman, Teela Sanders, Peninah Mwangi, and Anna-Louise Crago.
    2018. "Associations between Sex Work Laws and Sex Workers' Health:
    A Systematic Review and Meta-Analysis of Quantitative and Qualitative
    Studies." *PLoS Medicine* 15 (12): e1002680.

Reed, Elizabeth, Jhumka Gupta, Monica Biradavolu, Vasavi Devireddy, and
    Kim M. Blankenship. 2010. "The Context of Economic Insecurity and Its
    Relation to Violence and Risk Factors for HIV among Female Sex Workers
    in Andhra Pradesh, India." *Public Health Reports* 125 Suppl 4 (July): 81–89.

Ritchie, Andrea J. n.d. "Anti-Prostitution Ordinance Promotes Racial Profiling
    in Chicago." Truthout. Accessed December 30, 2019. https://truthout.org/
    articles/anti-prostitution-ordinance-promotes-racial-profiling-in-chicago/.

Romano, Aja. 2018. "A New Law Intended to Curb Sex Trafficking Threatens
    the Future of the Internet as We Know It." *Vox. Retrieved from Https://
    www.Vox.Com*. https://www.vox.com/culture/2018/4/13/17172762/
    fosta-sesta-backpage-230-internet-freedom.

Sei Young Pyo, Director of Immigrant Justice Project. 2016. "Walking While
    Trans – Effects of the Loitering Law on Trans-Feminine Immigrants."
    SRLP (Sylvia Rivera Law Project). October 7, 2016. https://srlp.org/
    effects-of-the-loitering-law-on-trans-feminine-immigrants/.

Shannon, Kate, Steffanie A. Strathdee, Shira M. Goldenberg, Putu Duff,
    Peninah Mwangi, Maia Rusakova, Sushena Reza-Paul, et al. 2015. "Global
    Epidemiology of HIV among Female Sex Workers: Influence of Structural
    Determinants." *The Lancet* 385 (9962): 55–71.

Siouxsie, Q. 2018. "Anti-Sex-Trafficking Advocates Say New Law Cripples
    Efforts to Save Victims." Rolling Stone. May 25, 2018. https://www.rolling-
    stone.com/culture/culture-features/anti-sex-trafficking-advocates-say-
    new-law-cripples-efforts-to-save-victims-629081/.

Smith, Bardot. n.d. "Sex, Money, and the Trillion Dollar Shadow." Model View
    Culture. Accessed July 22, 2019. https://modelviewculture.com/pieces/
    sex-money-and-the-trillion-dollar-shadow.

Smith, Molly. 2018. "If Sex Workers Can't Advertise Online, It
    Forces Them on to the Street." *The Guardian*, March 6, 2018.
    http://www.theguardian.com/commentisfree/2018/mar/06/
    sex-workers-advertise-online-pop-up-brothels-criminalised.

Smith, Molly, and Juno Mac. 2018. *Revolting Prostitutes: The Fight for Sex
    Workers' Rights*. Verso Books.

Stop, Lapd. 2013. "Spying Coalition, A People's Audit of the Los Angeles Police
    Department's Special Order 1." Los Angeles: Stop LAPD Spying Coalition.

"Targeted Surveillance, Civil Rights, and the Fight for Democracy." n.d.
    MediaJustice. Accessed December 30, 2019. https://mediajustice.org/
    news/targeted-surveillance-civil-rights-and-the-fight-for-democracy/.

Tastrom, Katie. 2019. "Sex Work Is a Disability Issue. So Why Doesn't the
    Disability Community Recognize That? - Rooted in Rights." Rooted in
    Rights. January 4, 2019. https://rootedinrights.org/sex-work-is-a-disability-
    issue-so-why-doesnt-the-disability-community-recognize-that/.

Thukral, Juhu, and Melissa Ditmore. 2001. *Revolving Door: An Analysis of
    Street-Based Prostitution in New York City*. Urban Justice Center.

Tufekci, Zeynep. 2017. *Twitter and Tear Gas: The Power and Fragility of
    Networked Protest*. Yale University Press.

"US Federal and State Prostitution Laws and Related Punishments - Legal
    Prostitution - ProCon.org." n.d. Accessed December 30, 2019. https://pros-
    titution.procon.org/view.resource.php?resourceID=000119.

White, Elise, Rachel Swaner, Emily Genetta, Suvi Hynynen Lambson, Janell
    Johnson Dash, Isaac Sederbaum, and Ariel Wolf. 2017. *Navigating Force
    and Choice: Experiences in the New York City Sex Trade and the Criminal
    Justice System's Response*. Center for Court Innovation.

White Hughto, Jaclyn M., Sari L. Reisner, and John E. Pachankis. 2015.
    "Transgender Stigma and Health: A Critical Review of Stigma Determinants,
    Mechanisms, and Interventions." *Social Science & Medicine* 147
    (December): 222–31.

*Wired*. 2018. "Craigslist Shuts Personal Ads for Fear of New
    Internet Law," March 23, 2018. https://www.wired.com/story/
    craigslist-shuts-personal-ads-for-fear-of-new-internet-law/.

Wolf, Ariel. 2019. "Stigma in the Sex Trades." *Sexual and Relationship Therapy:
    Journal of the British Association for Sexual and Relationship Therapy* 34
    (3): 290–308.

Wurth, Margaret H., Rebecca Schleifer, Megan McLemore, Katherine W. Todrys, and Joseph J. Amon.
      2013. "Condoms as Evidence of Prostitution in the United States and the Criminalization of Sex Work."
      *Journal of the International AIDS Society* 16 (May): 18626.

Young Women's Empowerment Project. Denied Help! How Youth in the Sex Trade & Street Economy are
      Turned Away From Systems Meant to Help Us & What We Are Doing to Fight Back. Bad Encounter
      Line 2012: A Participatory Action Research Project. Chicago, 2012.

Exhibit 10

coyoteri.org

# After Fosta, It's like Hunger Games on Sex Workers

3 minutes

**The passing of Fosta (Fight Online Sex Trafficking Act) is a hate crime. Congress is trying to kill Sex Workers!**



Emerging Data: The Impact of SESTA of Sex Worker Safety

**After FOSTA Slideshow**

Following the passage of SESTA, a sex worker-led organization COYOTE-RI conducted an impact survey and documented 260 responses (and growing). The data is still being collected and analyzed, but we have some clear takeaways that must be shared:



JA0232

**Results - 2018**

**Analyzed by**
**SWOP-SEATTLE**

## Of the 260 sex workers who responded to the survey…

– 77% (201 people) reported sex work as their sole income

– 75% (197 people) are supporting between 1-3 dependents

## Within 2 Weeks of Backpage Shutting Down…

– Over 65% of participants report earning less income

– 25% (65 people) reported being unable to support themselves or their dependant's because their source of income was gone.

– 30% of participants report having stopped screening clients or having lowered their safety standards.

– 60% (156 people) report having taken sessions with less safe clients, out of financial desperation

– Between 6-10% of participants were evicted

We are still processing the data to illustrate how many sex workers are being approached by pimps, who see this new environment as ripe for taking control. With online advertising, sex workers have been able to work independently, but now that this tool is gone, the pimps are starting to harass newly vulnerable sex workers.

We are aware of one death linked to a young woman going out

JA0233

USCA Case #22-5105      Document #1962386          Filed: 09/06/2022      Page 172 of 173

onto the streets to work, as a result of having nowhere online to advertise. We are aware of one suicide linked to the overwhelming stress SESTA has caused. These are only the incidents we know of.

CRIMINALIZATION KILLS.

## It's like HUNGER GAMES on sex workers



**Internet sites allow sex workers to screen potential clients, stay informed & to be safer. Why don't you actually listen to the data or to the sex workers themselves? Who do you think will step in if sex workers can't independently use the internet to find clients?**

Since Backpage closed (due to the passing of SESTA), sex workers have seen a huge uptick in the amount of pimps trying to take over their business. This is NOT an improvement, this is NOT safe.
#RepealSESTA #LetUsSurvive #SexWork



JA0234

USCA Case #22-5105    Document #1962386    Filed: 09/06/2022    Page 173 of 173

Thank You to SWOP Seattle for helping to analyze the data and creating the images.

There is a solution, Backpage RI is gone. Try Crockor.nz

**Other important articles**

Policing Modern Day Slavery 2014-2016

Sex Trafficking and the Sex Industry in the United

**The Deadly Consequences of the Anti-Sex Trafficking Law"**

JA0235