**ORAL ARGUMENT NOT YET SCHEDULED**

---

**No. 22-5105**

---

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

WOODHULL FREEDOM FOUNDATION, HUMAN RIGHTS WATCH, ERIC
KOSZYK, JESSE MALEY a/k/a ALEX ANDREWS and THE INTERNET
ARCHIVE,
*Appellants,*

v.

THE UNITED STATES OF AMERICA
AND MERRICK B. GARLAND, IN HIS OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF THE UNITED STATES,
*Appellees.*

---

Appeal from U.S. District Court for the District of Columbia
The Honorable Richard J. Leon, Judge Presiding (Case No. 1:18-cv-1552-RJL)

---

**BRIEF OF *AMICUS CURIAE*
TRANSGENDER LAW CENTER IN SUPPORT OF APPELLANTS**

---

Dated: September 13th, 2022

Christopher T. Bavitz
Mason A. Kortz
Kendra K. Albert
Cyberlaw Clinic
Harvard Law School
1557 Massachusetts Avenue
Cambridge, MA 02138
(617) 384-9125
cbavitz@law.harvard.edu

Counsel for *Amicus Curiae*
Transgender Law Center

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amicus curiae* Transgender Law Center states that it does not have a parent corporation and there is no corporation that owns 10% or more of its stock.

Dated: September 13th, 2022                    /s/ Christopher T. Bavitz

Christopher T. Bavitz
Cyberlaw Clinic
Harvard Law School
1557 Massachusetts Avenue
Cambridge, MA 02138
(617) 384-9125
cbavitz@law.harvard.edu

Counsel for *Amicus Curiae*
Transgender Law Center

## CERTIFICATE AS TO PARTIES, RULINGS
## UNDER REVIEW, AND RELATED CASES

Pursuant to D.C. Circuit Rules 26.1 and 28(a)(1), and Fed. R. App. P. 26.1, the undersigned counsel certifies as follows:

**A.**     **Parties and *Amici***

All parties, intervenors, and amici appearing before the district court and in this court are listed in the Brief for Appellants.

**B.**     **Rulings Under Review**

References to the rulings at issue appear in the Brief for Appellants.

**C.**     **Related Cases**

The ruling under review has not been, and is not, the subject of any other petition for review, aside from those actions that have been consolidated in this proceeding.

Dated: September 13th, 2022              /s/ Christopher T. Bavitz

                                        Christopher T. Bavitz
                                        Cyberlaw Clinic
                                        Harvard Law School
                                        1557 Massachusetts Avenue
                                        Cambridge, MA 02138
                                        (617) 384-9125
                                        cbavitz@law.harvard.edu

                                        Counsel for *Amicus Curiae*
                                        Transgender Law Center

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES ................................................................................... ii

TABLE OF CONTENTS................................................................................ iii

TABLE OF AUTHORITIES .......................................................................... iv

GLOSSARY OF ABBREVIATIONS ................................................................ ix

STATUTES AND REGULATIONS...................................................................x

STATEMENT OF IDENTITY, INTEREST IN CASE, AND SOURCE OF AUTHORITY TO FILE ............................................................................ xi

STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS ..... xiii

INTRODUCTION AND SUMMARY OF THE ARGUMENT ...............................1

ARGUMENT .............................................................................................1

    I.    Facially neutral laws regulating morality have often been used to target LGBTQ people. .................................................................1

    II.    Content policing caused by FOSTA disproportionately targets and harms LGBTQ people. ................................................................4

        a. FOSTA increases Internet censorship. ...................................6

        b. Internet censorship targets and harms LGBTQ people. ...................10

    III.   FOSTA Exacerbates Abusive Over-Policing and Profiling of LGBTQ People.......................................................................................16

    IV.  FOSTA increases vulnerability to trafficking, disproportionately impacting LGBTQ people. ................................................................21

CONCLUSION .........................................................................................28

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002) ...........................................6

*Bennett v. Google, LLC*, 882 F.3d 1163 (D.C. Cir. 2018).........................................7

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973) ............................................................4

*Herbert v. Lando*, 441 U.S. 153 (1979) .....................................................................7

*Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789 (1984)................5

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964)..............................................7

*Smith v. California,* 361 U.S. 147 (1959) ...................................................................7

*United States v. Stevens*, 559 U.S. 460 (2010) ...........................................................5

*Woodhull Freedom Foundation v. United States*, 948 F.3d 363 (D.C. Cir. 2020)....7

*Woodhull Freedom Foundation v. United States*, No. 1:18-cv-1552-RJL, 2022 WL 910600 (D.D.C. Mar. 29, 2022) .............................................................................4

**Statutes**

18 U.S.C. § 1591 .........................................................................................................7

18 U.S.C. § 2421A ......................................................................................................7

**Other Authorities**

2014 TRAFFICKING IN PERSONS REPORT, UNITED STATES DEPT. OF STATE (2014)..34

2016 TRAFFICKING IN PERSONS REPORT, UNITED STATES DEPT. OF STATE (2016)..35

2021 TRAFFICKING IN PERSONS REPORT, UNITED STATES DEPT. OF STATE (2021)..28

2022 TRAFFICKING IN PERSONS REPORT, UNITED STATES DEPT. OF STATE (2022)..28

*About FOSTA*, CRAIGSLIST ......................................................................................11

Alex Dalbey, *Sex Workers Called It: 'Anti-Sex Trafficking' Law Causes More Sex Trafficking*, DAILY DOT (May 20, 2021).............................................................35

Amnesty International, *Stonewalled: Police Abuse and Misconduct Against Lesbian, Gay, Bisexual and Transgender People in the U.S.* (Sept. 21, 2005)..................22

Amy Gonzales & Niki Fritz, *Prioritizing Flexibility and Intangibles: Medical Crowdfunding for Stigmatized Individuals*, PROCEEDINGS OF THE 2017 CHI CONFERENCE ON HUMAN FACTORS IN COMPUTING SYSTEMS 2371 (2018)..........19

Andrea Marks, *How Are Trans Bodies Monitored on Instagram? Meta's Oversight Board Takes Up Its First Gender Identity Case*, ROLLING STONE (July 26, 2022) ......................................................................................................................19

ANNA LVOVSKY, VICE PATROL: COPS, COURTS, AND THE STRUGGLE OVER URBAN GAY LIFE BEFORE STONEWALL (2021) .............................................................2, 3

Ari Ezra Waldman, *Disorderly Content* (forthcoming 2022)........................ 4, 5, 17

BILL ESKRIDGE, JR., GAYLAW (1999)....................................................................2, 3

Caroline Medina et al., Center for American Progress, *Protecting and Advancing Health Care for Transgender Adult Communities* (2021)...................................18

Chinyere Ezie & Richard Saenz, *Abuse and Neglect of Transgender People in Prisons and Jails: A Lawyer's Perspective*, LAMBDA LEGAL (2020)........... 24, 28

Chris Barcelos, *The Affective Politics of Care in Trans Crowdfunding*, 9 TSQ: TRANSGENDER STUDIES QUARTERLY 28–43 (2022).............................................18

CHRISTINA DINAR, THE STATE OF CONTENT MODERATION FOR THE LGBTIQA+ COMMUNITY AND THE ROLE OF THE EU DIGITAL SERVICES ACT (Heinrich-Böll-Stiftung 2021) ........................................................................................7, 15

Danielle Blunt & Ariel Wolf, *Erased: The Impact of FOSTA-SESTA and the Removal of Backpage on Sex Workers*, 14 ANTI-TRAFFICKING REVIEW 117, 119 (2020) ...........................................................................................................20

Danielle Blunt & Kate D'Adamo, *A Good Woman is Hard to Confine: Criminalization Creep in Digital Space*, YOUTUBE (May 24, 2022).................27

Danielle Blunt & Zahra Stardust, *Automating Whorephobia: Sex, Technology, and the Violence of Deplatforming*, 8 PORN STUDIES 350 (2021) .............................26

Dawn Ennis, *American Medical Association Responds To 'Epidemic' Of Violence Against Transgender Community*, FORBES (June 15, 2019)................................22

Dilara Yarbrough, *The Carceral Production of Transgender Poverty: How Racialized Gender Policing Deprives Transgender Women of Housing and Safety*, PUNISHMENT & SOCIETY (May 24, 2021) ...........................................................24

*Documenting Tech Actions*, SURVIVORS AGAINST SESTA ....................................12

ELIZABETH KENNEDY & MADELINE DAVIS, BOOTS OF LEATHER, SLIPPERS OF GOLD (2003) ....................................................................................................................2

*Facebook Community Standards: Sexual Solicitation,* FACEBOOK: TRANSPARENCY CTR. ......................................................................................................................10

Freedom Network USA, *Freedom Network Urges Caution in Reforming the CDA* (2017) ..................................................................................................................34

*Gender Identity and Nudity (2022-009-IG-UA 2022-010-IG-UA)*, OVERSIGHT BOARD  (July 2022) ..................................................................................... 13, 14

GEORGE CHAUNCEY, GAY NEW YORK (1994).......................................................2, 3

Gillian Abel & Catherine Healy, *Sex Worker-Led Provision of Services in New Zealand*, *in* SEX WORK, HEALTH AND HUMAN RIGHTS (Shira M. Goldberg, et al., 2021).....................................................................................................................33

Global Network of Sex Work Projects, *Policy Brief: The Decriminalization of Third Parties* (2016)......................................................................................................32

*Google Play Console: Restricted Content*, GOOGLE: POLICY CTR. ........................11

Jaclyn Diaz, *New York Repeals 'Walking While Trans' Law*, NPR (Feb. 3, 2021) ................................................................................................................... 25, 26

JOHN D'EMILIO, SEXUAL POLITICS, SEXUAL COMMUNITIES (1983)..........................2

Jordan Blair Woods et al., *Latina Transgender Women's Interactions with Law Enforcement in Los Angeles County*, 7 POLICING: A JOURNAL OF POLICY & PRACTICE 379 (Nov. 2013) ...............................................................................23

Kaniya Walker, *To Protect Black Trans Lives, Decriminalize Sex Work*, ACLU (Nov. 20, 2020) ....................................................................................................30

Kate Klonick, *Inside the Making of Facebook's Supreme Court*, THE NEW YORKER (Feb. 12, 2021) ..................................................................................................13

Kendra Albert & Oliver L. Haimson, *Comments in Oversight Board Gender Identity and Nudity Case* (Sept. 12, 2022) ................................................................ 16, 17

Kristen DiAngelo & Rachel Anderson, Sex Workers Outreach Project/Safer Alternatives Through Networking and Education, *Sex Work and Human Trafficking in the Sacramento Valley: A Needs Assessment* (May 2015) ...........29

Leonore F. Carpenter & R. Barrett Marshall, *Walking While Trans: Profiling of Transgender Women by Law Enforcement, and the Problem of Proof*, 24 WM. & MARY J. WOMEN & L. 5 (2017) .................................................................. 21, 23

LILIAN FADERMAN & STUART TIMMONS, GAY L.A.: A HISTORY OF OUTLAWS, POWER POLITICS, AND LIPSTICK LESBIANS (2006)..............................................................2

Lynly S. Egyes, *Borders and Intersections: The Unique Vulnerabilities of LGBTQ Immigrants to Trafficking*, *in* BROADENING THE SCOPE OF HUMAN TRAFFICKING RESEARCH: A READER (Erin C. Heil & Andrea J. Nichols, eds., 2d ed. 2019) ...27

Lynly S. Egyes, *The Hidden Truth: How Our Policies and Practices Can Both Help and Harm Victims of Human Trafficking*, *in* SOCIAL WORK PRACTICE WITH SURVIVORS OF SEX TRAFFICKING AND COMMERCIAL SEXUAL EXPLOITATION (Andrea Nichols, Tonya Edmond & Erin Heil eds., 2018) ......................... 32, 33

Megan Farnel, *Kickstarting Trans\*: The Crowdfunding of Gender/Sexual Reassignment Surgeries*, 17 NEW MEDIA & SOCIETY 215–230 (2014)...............18

NAN BOYD, WIDE OPEN TOWN (2003).......................................................................2

New York City Bar, *Report on An Act to Repeal Section 240.37 of the Penal Code* (2020) ....................................................................................................................25

Niki Fritz & Amy Gonzales, *Not the Normal Trans Story: Negotiating Trans Narratives While Crowdfunding at the Margins*, 12 INTERNATIONAL JOURNAL OF COMMUNICATION 1189-1208 (2018)....................................................................18

Oliver Haimson & Anna Lauren Hoffmann, *Constructing and Enforcing "Authentic" Identity Online: Facebook, Real Names, and Non-Normative Identities*, 21 FIRST MONDAY (2016) ..................................................................15

Oliver Haimson et al., *Disproportionate Removals and Differing Content Moderation Experiences for Conservative, Transgender, and Black Social Media Users: Marginalization and Moderation Gray Areas*, 5 PROCEEDINGS OF THE ACM ON HUMAN-COMPUTER INTERACTION 1 (2021) ......................... 6, 7, 15, 16

*R/Announcements: New addition to site-wide rules regarding the use of Reddit to conduct transactions,* REDDIT ...........................................................................12

Sam Levin, *Abused Then Arrested: Inside California's Crackdown on Sex Work*, THE GUARDIAN (Nov. 28, 2018) .......................................................30

Sandy E. James et al., National Center for Transgender Equality, *The Report of the 2015 U.S. Transgender Survey* (2016)................................................17

Scott Cunningham, Gregory DeAngelo, & John Tripp, *Craigslist's Effect on Violence Against Women*, in AMERICAN ECONOMIC ASSOCIATION CONFERENCE, CHICAGO, IL (Nov. 2017)................................................................31

Scott W. Stern, *Sex Workers Are an Important Part of the Stonewall Story, But Their Role Has Been Forgotten*, TIME MAGAZINE (June 27, 2019) ...........................21

Shakira Smith et al., Salty, *Censorship of Marginalized Communities on Instagram* (Sept. 27, 2021) ........................................................... 15, 16

The Legal Aid Society, *Legal Aid Lauds Passage of Legislation to Repeal New York's "Walking While Trans" Law* (Feb. 2, 2021)...........................................25

The Samaritan Women, *Research Brief: After FOSTA-SESTA* (2018)...................35

Thiago D. Oliva et al., *Fighting Hate Speech, Silencing Drag Queens? Artificial Intelligence in Content Moderation and Risks to LGBTQ Voices Online*, 25 SEXUALITY & CULTURE 700 (2021) .................................................16

U.S. GOV'T ACCOUNTABILITY OFF., GAO-21-385, SEX TRAFFICKING: ONLINE PLATFORMS AND FEDERAL PROSECUTIONS (2021) ....................................... 10, 34

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| BIPOC | Black, Indigenous, People of Color |
| FOSTA | Allow States and Victims to Fight Online Trafficking Act of 2017 |
| LGBTQ | Lesbian, Gay, Bisexual, Transgender, Queer |
| TGNC | Transgender and Gender Non-Conforming |
| TLC | Transgender Law Center |

## STATUTES AND REGULATIONS

Relevant statutes and regulations are reproduced in the Addendum that accompanies the Appellants' Opening Brief (Doc. #1962378).

## STATEMENT OF IDENTITY, INTEREST IN CASE, AND SOURCE OF AUTHORITY TO FILE

Transgender Law Center (TLC) is a national trans-led organization advocating for a world in which all people are free to define themselves and their futures. Founded in 2002, TLC has grown into the largest trans-specific, trans-led organization in the United States. TLC believes that Transgender and Gender Non-Conforming (TGNC)[1] people hold the resilience, brilliance, and power to transform society at its root, and that the people most impacted by the systems TLC fights must lead this work. TLC builds power within TGNC communities, particularly communities of color and those most marginalized, and lays the groundwork for a society in which all people can live safely, freely, and authentically regardless of gender identity or expression. TLC works to achieve this goal through leadership development and by connecting TGNC people to legal resources. TLC's advocacy and litigation—in areas including employment, prison conditions, education, immigration, and healthcare—protect and advance the rights of transgender and gender nonconforming people across the country. Grounded in legal expertise and committed to racial justice, TLC employs a variety of community-driven strategies to keep transgender and gender nonconforming people alive, thriving, and fighting for liberation.

---

[1] This brief uses the term TGNC to refer to people who do not identify with the sex or gender they were assigned at birth.

*Amicus* submits this brief to explain how the Allow States and Victims to Fight Online Sex Trafficking Act of 2017 (FOSTA) has harmed lesbian, gay, bisexual, transgender and queer (LGBTQ) communities' First Amendment rights in real and substantial ways through its overbroad regulation of speech and to provide context on how FOSTA's impact continues a history of profiling and policing of LGBTQ people and makes LGBTQ people more vulnerable to becoming victims of human trafficking. TLC does so in furtherance of its mission to advocate for the rights and freedoms of transgender and gender nonconforming people.

Both Appellants and Appellees have consented to TLC filing this amicus brief.

## STATEMENT OF AUTHORSHIP AND
## FINANCIAL CONTRIBUTIONS

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amicus curiae* certifies that no party or party's counsel authored this brief in whole or in part, that no party or party's counsel provided any money that was intended to fund the preparation or submission of this brief, and no party or person—other than the *amicus curiae* or its counsel—contributed money that was intended to fund the preparation or submission of this brief.

**INTRODUCTION AND SUMMARY OF THE ARGUMENT**

FOSTA's real and substantial impact on lesbian, gay, bisexual, transgender and queer (LGBTQ) people, particularly transgender and gender non-conforming (TGNC) people, supports the Appellants' assertion that FOSTA violates the First Amendment. Although FOSTA's text may not name gender or sexual orientation, FOSTA's regulation of speech furthers the profiling and policing of LGBTQ people, particularly TGNC people, as the statute's censorial effect has resulted in the removal of speech created by LGBTQ people and discussions of sexuality and gender identity. This is the continuation of a long history of the silencing and oppression of LGBTQ people through vague and overbroad laws. The legacy and continuation of these laws harm LGBTQ individuals and communities. FOSTA also furthers the violence LGBTQ people are subjected to, including human trafficking victimization, by making it harder to report victimization and access support. Because of this, TLC urges the Court to vacate the District Court's order dismissing this action and denying Appellants a preliminary injunction, and declare that FOSTA violates constitutional protections, including the First Amendment.

**ARGUMENT**

**I.  Facially neutral laws regulating morality have often been used to target LGBTQ people.**

The United States has a long history of using facially neutral laws, especially those aimed at addressing sexual conduct, to target and police LGBTQ people.

1

Scholars have chronicled how anti-vice laws have been used to crackdown on LGBTQ communities in the United States, particularly from the 1930s to 1960s. *See* ANNA LVOVSKY, VICE PATROL: COPS, COURTS, AND THE STRUGGLE OVER URBAN GAY LIFE BEFORE STONEWALL (2021); GEORGE CHAUNCEY, GAY NEW YORK (1994); BILL ESKRIDGE, JR., GAYLAW (1999); JOHN D'EMILIO, SEXUAL POLITICS, SEXUAL COMMUNITIES (1983); NAN BOYD, WIDE OPEN TOWN (2003); LILIAN FADERMAN & STUART TIMMONS, GAY L.A.: A HISTORY OF OUTLAWS, POWER POLITICS, AND LIPSTICK LESBIANS (2006); ELIZABETH KENNEDY & MADELINE DAVIS, BOOTS OF LEATHER, SLIPPERS OF GOLD (2003). While queer intimacy was officially criminalized by sodomy laws, sodomy was often difficult to prove, and thus vague morality statutes against lewdness and disorderly conduct were more commonly used to criminalize LGBTQ people in the middle of the century. LVOVSKY, at 104, 195-97; CHAUNCEY, at 170-174, 185, 338 (explaining that most queer men arrested in New York during this time were arrested for "disorderly conduct").

Though vice laws said nothing about sexual orientation, they were the disciplinary mechanism used to silence and punish LGBTQ communities in the middle of the century. Centers for queer community, such as bars and cruising grounds, were considered a "blight on the orderly city," and morality statutes acted as the state's tool to clear them out without having to meet strict standards of evidence. LVOVSKY, *supra*, at 5; *see also* CHAUNCEY, *supra*, at 336-338. In addition

to being framed as sanitizing urban spaces, vice laws were justified as protecting the vulnerable, particularly children, from predatory sexual behavior, despite no evidence that LGBTQ people were especially likely to be engaged in such behavior. However, statutes criminalizing public lewdness, indecency, vagrancy, and disorderly conduct "aimed at preventing the corruption of children" by gay men. ESKRIDGE, *supra*, at 27.

What might seem like a relic of a homophobic and transphobic past is, in fact, the present. FOSTA, a law passed in the name of sanitizing collective spaces and protecting the vulnerable, has led to the suppression of LGBTQ expression and the oppression of LGBTQ people. Professor Ari Waldman has explored these parallels, arguing that, "content moderation for 'sexual activity' is an assemblage of social forces that resembles oppressive anti-vice campaigns from the middle of the last century in which 'disorderly conduct', 'vagrancy', 'lewdness', and other vague morality statutes were disproportionately enforced against queer behavior in public." Ari Ezra Waldman, *Disorderly Content*, at 1 (forthcoming 2022).[2] FOSTA, like former vice laws, is used to police LGBTQ people because of the breadth and vagueness of the statute, which allows a range of malicious use under the guise of legitimate enforcement. FOSTA, and these past laws, act to sanitize public spaces of sexualized content, physical or virtual. Finally, these laws justify their restrictions

---

[2] *Available at* https://ssrn.com/abstract=3906001 [https://perma.cc/Y4RL-SGSC]

as protecting the vulnerable from sexual predation, here in the form of traffickers however, FOSTA has only made young people more vulnerable to trafficking victimization. Much as vice laws relied on the specter of the predatory gay man to justify their repression, content that is judged to be sexual is purged from the Internet by FOSTA to allegedly protect users from predatory traffickers or the specter of sexual solicitation. "[L]ike anti-vice policing, sexual content moderation was rationalized as a means to protect vulnerable populations from exploitation." Waldman, *supra*, at 27.

## II. Content policing caused by FOSTA disproportionately targets and harms LGBTQ people.

FOSTA's real and substantial impact on LGBTQ people, particularly TGNC people, calls into questions the district court's assertion that FOSTA's impact is "limited to legitimate criminal activity," *Woodhull Freedom Foundation v. United States*, No. 1:18-cv-1552-RJL, 2022 WL 910600, *6 (D.D.C. Mar. 29, 2022), and supports the Appellants' assertion that FOSTA is overbroad. As Appellants lay out in their briefing, Appellants' Opening Br. 33, the overbreadth doctrine weighs the chilling effect of government regulation on speech, both spoken words and expressive or communicative conduct. *See Broadrick v. Oklahoma*, 413 U.S. 601, 612-13 (1973). When the impacts of such regulation on protected speech are "real and substantial" in relation to the challenged statute's "legitimate sweep", as they are here, the law should be invalidated. *Id.* at 615; *see also United States v. Stevens*,

559 U.S. 460, 473 (2010) (citation omitted). FOSTA's regulation of speech furthers the profiling and policing of LGBTQ people, particularly TGNC people. FOSTA's censorial effect throughout the Internet has resulted in censorship of LGBTQ content and creators. *See* Oliver Haimson et al., *Disproportionate Removals and Differing Content Moderation Experiences for Conservative, Transgender, and Black Social Media Users: Marginalization and Moderation Gray Areas*, 5 PROCEEDINGS OF THE ACM ON HUMAN-COMPUTER INTERACTION 1 (2021).

Striking down a statute as overbroad is appropriate when there is a "likelihood that the statute's very existence will inhibit free expression." *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 799-800 (1984). This Court need not use a crystal ball to determine whether such an outcome is likely, because FOSTA's impact is already clear. Even a constrained reading of the statute will continue to have real and substantial impact on protected speech as FOSTA's chilling effects have caused major platforms to widely flag and punish content that could, correctly or incorrectly, be deemed sexual in nature.

FOSTA's powerful chilling effect on speech across the Internet has had a particular impact on LGBTQ content and creators, with TGNC people facing some of the worst profiling and policing online. As platforms increase censorship to comply with FOSTA, speech related to gender and sexuality is consistently flagged and punished. *See* CHRISTINA DINAR, THE STATE OF CONTENT MODERATION FOR

THE LGBTIQA+ COMMUNITY AND THE ROLE OF THE EU DIGITAL SERVICES ACT (Heinrich-Böll-Stiftung 2021);[3] Haimson et al., *supra*. This overbroad regulation harms LGBTQ people economically, hindering fundraising and business opportunities, and curtails First Amendment rights in real and substantial ways.

### a. FOSTA increases Internet censorship.

To comply with FOSTA, internet content providers have been forced to suppress protected online speech going far beyond an anti-trafficking law's legitimate sweep. The resulting unconstitutional chilling effect has been particularly damaging to the protected speech of transgender, non-binary, and other LGBTQ internet users.

"The overbreadth doctrine prohibits the Government from banning unprotected speech if a substantial amount of protected speech is prohibited or chilled in the process." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 237 (2002) (citing *Broadrick*, 413 U.S. at 612). The fact that FOSTA's suppression of protected speech has been carried out by private companies does not remedy this fatal flaw. The constitutional danger of an overbroad law is not only the prospect of self-censorship by speakers, but also of private censorship by intermediaries worried they may be held liable for third parties' speech. *See Herbert v. Lando*, 441 U.S. 153, 171

---

[3] *Available at* https://eu.boell.org/sites/default/files/2021-06/HBS-e-paper-state-platform-moderation-for-LGBTQI-200621_FINAL.pdf [https://perma.cc/DMG9-DS7B]

(1979) (discussing the potential chilling effect resulting from publisher liability for third-party speech); *cf. Smith v. California,* 361 U.S. 147, 154–55 (1959) (involving censorship by booksellers in response to a criminal obscenity law); *New York Times Co. v. Sullivan*, 376 U.S. 254, 279 (1964) (contemplating editorial and advertising censorship by newspapers in response to civil liability).

Moreover, this Court and others have specifically recognized that exposure to civil liability incentivizes internet companies to over-police online speech. *See Bennett v. Google, LLC*, 882 F.3d 1163, 1166 (D.C. Cir. 2018) (acknowledging, in the internet context, that "[t]he imposition of tort liability on service providers for the communications of others represented, for Congress, simply another form of intrusive government regulation of speech.") *(quoting Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997)).

As this Court acknowledged, FOSTA's terminology is "susceptible of multiple and wide-ranging meanings," and its scope is not limited to the "bad-actor websites" that motivated Congress to pass it. *Woodhull Freedom Foundation v. United States*, 948 F.3d 363, 372-73 (D.C. Cir. 2020) (internal quotations omitted). Consequently, internet services must be especially careful when moderating user-generated content that might be interpreted as somehow facilitating or making commercial sex easier, or as constituting "participation in a venture" with a user who posts trafficking-related content. 18 U.S.C. § 2421A; *Id.* § 1591. Under FOSTA, the

cost of getting these content moderation decisions wrong may be expensive civil litigation and/or severe criminal penalties.

Internet companies have responded proportionally to this liability risk. In the years since FOSTA's enactment, internet services have restricted a range of protected online speech that presents some risk of falling within the broadest potential read of FOSTA. *See* JA0080-0882. Given the dearth of prosecutions under FOSTA, private companies have served as the law's primary interpreters and have erred on the side of caution at the expense of users' protected speech. *See* U.S. GOV'T ACCOUNTABILITY OFF., GAO-21-385, SEX TRAFFICKING: ONLINE PLATFORMS AND FEDERAL PROSECUTIONS (2021)[4] (reporting only two prosecutions and one civil case brought under FOSTA's § 2421A, between July 2018 and June 2021).

These restrictions have taken two forms. First, services have stepped up targeted online content policing, disproportionately harming LGBTQ user speech in the process. For example, within months of FOSTA's passage, Facebook updated its community standards to prohibit an extensive range of speech including "sexualized slang," discussion of sexual preferences, and "vague suggestive statements." *Facebook Community Standards: Sexual Solicitation,* FACEBOOK: TRANSPARENCY

---

[4] *Available at* https://www.gao.gov/assets/gao-21-385.pdf [https://perma.cc/987H-V27R]

CTR.[5] Likewise, Google updated its Google Play policy to forbid publishing of "sexually explicit or pornographic images or videos." *Google Play Console: Restricted Content*, GOOGLE: POLICY CTR.[6] As described in this brief, such policy changes have resulted in content over-policing that targets transgender, non-binary, and other LGBTQ users. This limits their ability to post legitimate content and engage in protected online discourse about their lives and experiences.

While multi-billion-user platforms may be able to reduce their liability risk through large-scale policing of individual content, most smaller services have responded with the second, more cost-effective approach: shutting down forums that risk running afoul of FOSTA. The effects of this draconian response on online speech were immediate. The day after FOSTA's enactment, Craigslist eliminated all personal ads from its site, sweeping up non-sexual categories of content in the process. *See About FOSTA*, CRAIGSLIST.[7] Similarly, Reddit eliminated all forms of marketplace transactions from its platform. *R/Announcements: New addition to site-wide rules regarding the use of Reddit to conduct transactions,* REDDIT.[8] Numerous smaller adult websites also shut down in the wake of FOSTA's passage. *See*

---

[5] https://transparency.fb.com/policies/community-standards/sexual-solicitation [https://perma.cc/9RDE-JUAH]
[6] https://support.google.com/googleplay/android-developer/topic/9877466 [https://perma.cc/F5QK-RYW2]
[7] https://www.craigslist.org/about/FOSTA [https://perma.cc/2UPM-XSQB]
[8] https://www.reddit.com/r/announcements/comments/863xcj/new_addition_to_sitewide_rules_regarding_the_use/ [https://perma.cc/Z6BR-7DCV].

*Documenting Tech Actions*, SURVIVORS AGAINST SESTA.[9] In short, the inevitable response to FOSTA's overbreadth has been a crackdown on any protected online speech that could be viewed as tangentially related to prostitution.

This is an outcome the First Amendment exists to prevent. As discussed below, FOSTA's overbroad exposure of internet content providers to civil and criminal liability has resulted in particularly severe impacts on the protected speech of LGBTQ, and particularly transgender, internet users. Ultimately, LGBTQ users represent just one of the many communities whose protected online First Amendment activity has been a casualty of FOSTA's overbreadth. The cumulative effect has been real and substantial harm to online speech that goes far beyond FOSTA's legitimate aims related to human trafficking.

**b. Internet censorship targets and harms LGBTQ people.**

The overbroad censorship resulting from FOSTA has resulted in real and substantial harm to LGBTQ people's First Amendment rights as well as economic harm to LGBTQ people and communities. A recent example from Instagram illustrates the extent to which sexual solicitation policies, tightened as a direct response to FOSTA, harm LGBTQ speech online. Meta, the company that owns both Facebook and Instagram, has set up an "Oversight Board," a court-like system to provide review of content moderation decisions. See Kate Klonick, *Inside the*

---

[9] https://survivorsagainstsesta.org/documentation/ [https://perma.cc/979U-H9XL]

*Making of Facebook's Supreme Court*, THE NEW YORKER (Feb. 12, 2021)[10]. In August, the Oversight Board announced it would review a case involving Instagram's removal of the posts of two transgender people under the sexual solicitation policy. See *Gender Identity and Nudity (2022-009-IG-UA 2022-010-IG-UA)*, OVERSIGHT BOARD  (July 2022).[11] The two users, both transgender and non-binary, posted images and accompanying text to  "discuss trans healthcare issues" and announce a fundraiser to pay for one person's gender-affirming surgery. In the relevant pictures, the trans masculine people are shirtless, with their nipples covered either by tape or their hands, and the captions explain that they are transgender and one of them will soon have a gender-affirming chest surgery, which the post asks for help funding. *See id.*

Showing the extent to which FOSTA has chilled legitimate online speech, Meta removed both posts under the Sexual Solicitation Community Standard. *See id.* The pictures were both repeatedly flagged by automated systems and removed after review by a human. *See id.* The users appealed their decision to Meta, which maintained its decision to remove the posts. *See id.* As this case demonstrates, Meta's officially neutral policies, developed as a result of FOSTA, limit transgender

---

[10] https://www.newyorker.com/tech/annals-of-technology/inside-the-making-of-facebooks-supreme-court [https://perma.cc/22UZ-2KZX]
[11] https://oversightboard.com/news/385467560358270-oversight-board-announces-new-cases-and-review-of-meta-s-covid-19-misinformation-policies/ [https://perma.cc/ZD9A-4N8E]

people's ability to share information related to their marginalized identities, silencing their participation in the public sphere, and denies them financial opportunities, such as the chance to fundraise for healthcare costs. Simply posting pictures of themselves was deemed sexual solicitation, demonstrating the sexualization of TGNC bodies in non-sexual contexts and accordingly how transgender people are profiled as engaging in sex work when this is not the case.

These removals are far from isolated incidents. Research has shown that restrictive social media moderation policies disproportionately harm transgender people. *See* DINAR, *supra*; Haimson et al., *supra*; Oliver Haimson & Anna Lauren Hoffmann, *Constructing and Enforcing "Authentic" Identity Online: Facebook, Real Names, and Non-Normative Identities*, 21 FIRST MONDAY (2016); Shakira Smith et al., Salty, *Censorship of Marginalized Communities on Instagram* (Sept. 27, 2021).[12] A recent study found that transgender people using social media were significantly more likely to have their content removed and their accounts shut down on social media sites such as Instagram and Facebook, even in instances when they did not violate the site's policies or guidelines. *See* Haimson et al., *supra*. Notably, 21.2% of transgender participants in the study had content removed as "adult"

---

[12] *Available at* https://www.saltyworld.net/wp-content/uploads/woocommerce_uploads/2021/09/Salty-AlgorithmicBiasReport2021_FINAL-ehe6xj.pdf [https://perma.cc/XSM7-CDP7]

despite following site guidelines, a rate roughly five times higher than cisgender[13] participants in the study. *See id*. When transgender people appeal such removal decisions, they are unlikely to have the decision overturned. One study on content removal found that over 90% of people who appealed a content removal decision either received no response or received a response but not have their content reinstated. *See* Smith et al., *supra*.

    In a comment to the Oversight Board regarding the case of the transgender people who had content removed, two transgender content moderation experts explained that "[d]isproportionate removals of 'adult' content does not mean that trans people are posting nude content more often than other users—it means that their content, whether or not it does actually depict nudity or sexual content, is flagged as such by social media site's algorithms or human moderators." Kendra Albert & Oliver L. Haimson, *Comments in Oversight Board Gender Identity and Nudity Case* (Sept. 12, 2022).[14] Whether it is drag queen social media accounts being deemed more "toxic" than white supremacist ones, Thiago D. Oliva et al., *Fighting Hate Speech, Silencing Drag Queens? Artificial Intelligence in Content Moderation and Risks to LGBTQ Voices Online*, 25 SEXUALITY & CULTURE 700, 703 (2021); or

---

[13] The term cisgender refers to people whose gender identity matches the one assigned at birth.

[14] *Available at* https://kendraalbert.com/2022/09/12/comments-in-oversight-board.html [https://perma.cc/AE87-YL6B]

an LGBTQ art museum's Instagram account having posts of artwork repeatedly removed, Waldman, *supra*, content moderation policies developed in the aftermath of FOSTA's expansion of criminal and civil liability have limited free speech and expression for LGBTQ people. These policies also alienate TGNC users, reminding them these spaces are not meant for them to exist in. *See* Albert & Haimson, *supra*, at 4 (discussing how anti-transgender moderation practices "consistently remind transgender people that they are not welcome in public").

Beyond the substantial impacts on LGBTQ expression and dignity, the imposition of restrictive policies with the goal of FOSTA compliance has created specific economic harms to TGNC users. Transgender people make significantly less money than cisgender people, Sandy E. James et al., National Center for Transgender Equality, *The Report of the 2015 U.S. Transgender Survey* (2016),[15] and often have gender affirmation medical expenses that are not covered by insurance, Caroline Medina et al., Center for American Progress, *Protecting and Advancing Health Care for Transgender Adult Communities* (2021).[16] Crowdfunding to cover the costs of this care is a common practice in TGNC communities and often essential to accessing health care. *See* Chris Barcelos, *The*

---

[15]  *Available at* https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf [https://perma.cc/RHX7-WRSK]

[16]  *Available at* https://www.americanprogress.org/article/protecting-advancing-health-care-transgender-adult-communities/ [https://perma.cc/5TSE-C5SU]

*Affective Politics of Care in Trans Crowdfunding*, 9 TSQ: TRANSGENDER STUDIES QUARTERLY 28–43 (2022); Megan Farnel, *Kickstarting Trans\*: The Crowdfunding of Gender/Sexual Reassignment Surgeries*, 17 NEW MEDIA & SOCIETY 215–230 (2014); Niki Fritz & Amy Gonzales, *Not the Normal Trans Story: Negotiating Trans Narratives While Crowdfunding at the Margins*, 12 INTERNATIONAL JOURNAL OF COMMUNICATION 1189-1208 (2018); Amy Gonzales & Niki Fritz, *Prioritizing Flexibility and Intangibles: Medical Crowdfunding for Stigmatized Individuals*, PROCEEDINGS OF THE 2017 CHI CONFERENCE ON HUMAN FACTORS IN COMPUTING SYSTEMS 2371 (2018). TGNC users who need social media to crowdfund face risks from censorship on multiple levels – as articulated above, their fundraising posts themselves may be flagged, and the consistent over-policing of their content may make it harder for them to build the kinds of social media following necessary to successfully raise money.

TGNC people who work in the legal sex trades, such as people who receive money from OnlyFans or other porn sites, are also economically damaged by these policies, as the content they post within the guidelines of the social media sites to build a following is removed and their accounts blocked. Andrea Marks, *How Are Trans Bodies Monitored on Instagram? Meta's Oversight Board Takes Up Its First*

*Gender Identity Case*, ROLLING STONE (July 26, 2022);[17] *see also* Danielle Blunt & Ariel Wolf, *Erased: The Impact of FOSTA-SESTA and the Removal of Backpage on Sex Workers*, 14 ANTI-TRAFFICKING REVIEW 117, 119 (2020) (reporting that 72.5% of surveyed sex workers were facing increased economic instability since the passage of FOSTA and noting that almost a third of the surveyed sex workers were trans, nonbinary, and/or gender fluid).

## III.   FOSTA Exacerbates Abusive Over-Policing and Profiling of LGBTQ People.

Though often overlooked, the modern history of the LGBTQ rights movement is inseparable from the criminalization, over-policing and policing of sex work. The storied mid-century LGBTQ riots—at Coopers Doughnuts in Los Angeles, 1959; at Compton's Cafeteria in San Francisco, 1966; and most famously, at the Stonewall Inn in New York City, 1969—were all LGBTQ communities' reactions to biased over-policing. The police raids that had become routine at these places of business targeted them not just because their clientele was transgender or gay, but also because their patrons were sex workers or presumed to be sex workers because of stereotypes about LGBTQ people. *See*, *e.g.*, Scott W. Stern, *Sex Workers Are an Important Part of the Stonewall Story, But Their Role Has Been Forgotten*, TIME

---

[17] https://www.rollingstone.com/culture/culture-news/meta-oversight-board-trans-body-gender-identity-case-1388117/ [https://perma.cc/8WT3-AVRS]

MAGAZINE (June 27, 2019).[18] Today, the uprising at Stonewall is commemorated every year at LGBTQ Pride festivals around the United States and around the world.

And, today, LGBTQ people, most especially transgender people who are Black, indigenous, or otherwise people of color (BIPOC), continue to be harassed, arrested, and over-policed because they are sex workers or presumed to be sex workers. This experience is so common that LGBTQ communities have a name for it: "walking while trans." *See*, *e.g.*, Leonore F. Carpenter & R. Barrett Marshall, *Walking While Trans: Profiling of Transgender Women by Law Enforcement, and the Problem of Proof*, 24 WM. & MARY J. WOMEN & L. 5, 6 (2017). A report by Amnesty International found that "[t]ransgender individuals are often the subject of intense police scrutiny" and noted "many reports of transgender women being stopped by police and questioned about their reason for being on the street and where they were going, often under the pretext of policing sex work, even when those stopped were engaging in routine daily activities such as walking a dog or going to a local shop." Amnesty International, *Stonewalled: Police Abuse and Misconduct Against Lesbian, Gay, Bisexual and Transgender People in the U.S.* 21 (Sept. 21, 2005)[19] (finding "a strong pattern of police unfairly profiling transgender women as

---

[18] https://time.com/5604224/stonewall-lgbt-sex-worker-history/
[https://perma.cc/P7L7-DPBP]
[19] https://www.amnesty.org/en/documents/AMR51/122/2005/en/
[https://perma.cc/8VYD-KUFM]

sex workers" in nine major American cities).

This problem is compounding because BIPOC transgender women also experience extremely high rates of violence, including murder, yet the violence they experience is often ignored or downplayed by law enforcement or law enforcement are the perpetrators. Dawn Ennis, *American Medical Association Responds To 'Epidemic' Of Violence Against Transgender Community*, FORBES (June 15, 2019).[20] Police profiling of transgender women therefore represents "not just a serious disconnect between this incredibly vulnerable population and law enforcement, but an enhanced vulnerability in the presence of those charged with maintaining order and safety." Carpenter & Marshall, *supra* at 13; *also see* Jordan Blair Woods et al., *Latina Transgender Women's Interactions with Law Enforcement in Los Angeles County*, 7 POLICING: A JOURNAL OF POLICY & PRACTICE 379 (Nov. 2013) ("Transgender women, and especially transgender women of colour, are common victims of verbal harassment, physical assault, and sexual assault perpetrated by law enforcement officers. The findings also lend support to the propositions that many transgender women perceive their personal interactions with law enforcement officers negatively, and view reports of crime against them as mishandled or ignored.")

---

[20] https://www.forbes.com/sites/dawnstaceyennis/2019/06/15/american-medical-association-responds-to-epidemic-of-violence-against-transgender-community/ [https://perma.cc/Z2AW-HPL3]

Further, transgender women experience especially dire consequences once arrested and incarcerated. Transgender women are overwhelmingly incarcerated in men's prisons and jails, where sexual violence and hate violence against them are rampant and their healthcare needs are denied, belittled, and mocked. *See*, *e.g.*, Chinyere Ezie & Richard Saenz, *Abuse and Neglect of Transgender People in Prisons and Jails: A Lawyer's Perspective*, LAMBDA LEGAL (2020).[21] And police profiling that leads to arrests or conviction records only further entrenches poverty, employment discrimination, targeting by traffickers and homelessness in transgender communities. *Id.*; Dilara Yarbrough, *The Carceral Production of Transgender Poverty: How Racialized Gender Policing Deprives Transgender Women of Housing and Safety*, PUNISHMENT & SOCIETY (May 24, 2021).

In recognition of police abuse and profiling of transgender women, and after a long campaign by TGNC and allied activists, in 2021 New York State went so far as to entirely repeal the statute which prohibited "loitering for the purpose of prostitution," a statute that was so commonly used to prosecute transgender women of color it was known as criminalizing "walking while trans." Jaclyn Diaz, *New York Repeals 'Walking While Trans' Law*, NPR (Feb. 3, 2021).[22] Advocates for the repeal

---

[21] https://www.lambdalegal.org/blog/20201125_transgender-people-prisons-jails [https://perma.cc/UQ5L-3WGR]

[22] https://www.npr.org/2021/02/03/963513022/new-york-repeals-walking-while-trans-law [https://perma.cc/QDZ5-453B]

argued that the statute violated the First Amendment as an overboard criminalization of constitutionally protected expressive conduct, with transgender women afraid to express their gender identity for fear of criminalization. New York City Bar, *Report on An Act to Repeal Section 240.37 of the Penal Code* (2020).[23] New York's Legal Aid Society, which advocated for the repeal, had previously represented transgender and cisgender women "assumed to be loitering for prostitution because they were wearing a 'short dress,' 'a skirt and high heels,' 'tight black pants,' or 'a black dress.' Women were also targeted for standing outside, speaking to one another, or walking from a subway or grocery store back to their residence." The Legal Aid Society, *Legal Aid Lauds Passage of Legislation to Repeal New York's "Walking While Trans" Law* (Feb. 2, 2021).[24] After signing the repeal, New York's then-governor explained, "[r]epealing the archaic 'walking while trans' ban is a critical step toward reforming our policing system and reducing the harassment and criminalization transgender people face simply for being themselves." Diaz, *supra*.

FOSTA continues this violence in three ways. First, by shutting down online outlets and increasing the prevalence of street-based sex work, FOSTA increases the risks of police profiling, harassment, and arrest not only for sex workers, but also for

---

[23] *Available at* https://s3.amazonaws.com/documents.nycbar.org/files/2020630-RepealWalkingWhileTrans_FINAL_2.3.20.pdf [https://perma.cc/M858-6B2F]
[24] *Available at* https://legalaidnyc.org/wp-content/uploads/2021/02/02-02-21-LAS-Lauds-Passage-of-Legislation-to-Repeal-New-Yorks-Walking-While-Trans-Law.pdf [https://perma.cc/7X3J-2EWU]

BIPOC transgender women going about their daily lives. Second, it effectively recreates similar dynamics in online spaces, as discussed in Section I, *supra*, leading to the moderation of transgender people's expression on the assumption that it must be sexual solicitation. *See* Danielle Blunt & Zahra Stardust, *Automating Whorephobia: Sex, Technology, and the Violence of Deplatforming*, 8 PORN STUDIES 350, 362 (2021). Likewise, certain users may get profiled as sex workers, whether they are or not, or whether they are engaged in sexual solicitation or not. *See* Danielle Blunt & Kate D'Adamo, *A Good Woman is Hard to Confine: Criminalization Creep in Digital Space*, YOUTUBE (May 24, 2022).[25] Third, it increases criminalization of transgender people, making TGNC people more vulnerable to human traffickers.

## IV.  FOSTA increases vulnerability to trafficking, disproportionately impacting LGBTQ people.

TLC recognizes the legitimate hopes FOSTA's drafters had to address the horror of trafficking, especially as TLC has represented and worked with many survivors of human trafficking trying to find safety. Transgender people, in particular BIPOC and immigrant transgender women, are disproportionately and uniquely vulnerable to human trafficking victimization because of social stigmatization including family rejection, discrimination in education, housing, employment, and social services, intimate partner violence, and police profiling. *See*

---

[25]  https://www.youtube.com/watch?v=hXOHW9b6se0  [https://perma.cc/N2QH-YXSV]

*generally* Lynly S. Egyes, *Borders and Intersections: The Unique Vulnerabilities of LGBTQ Immigrants to Trafficking*, *in* BROADENING THE SCOPE OF HUMAN TRAFFICKING RESEARCH: A READER (Erin C. Heil & Andrea J. Nichols, eds., 2d ed. 2019); Ezie & Saenz, *supra* (discussing the "discrimination-to-incarceration pipeline" and its consequences for transgender people). The United States Department of State has reported that LGBTQ communities "are extremely vulnerable to exploitation due to social, legal, and cultural marginalization," 2022 TRAFFICKING IN PERSONS REPORT, UNITED STATES DEPT. OF STATE 43 (2022),[26] and explained that "circumstances of LGBTQI+ individuals, including threats of public disclosure of their sexual orientation or gender identity, are not isolated to foreign countries," and make LGBTQI+ people vulnerable to trafficking victimization, 2021 TRAFFICKING IN PERSONS REPORT, UNITED STATES DEPT. OF STATE 43 (2021).[27] Although transgender people are vulnerable to all forms of trafficking victimization, trafficking into commercial sex is an area where they are particularly vulnerable.

Unfortunately, FOSTA only exacerbates these problems for all sex workers, and LGBTQ sex workers are disproportionally impacted. FOSTA's harms are not just devastating for survivors of trafficking, they are also relevant to its

---

[26] *Available at* https://www.state.gov/wp-content/uploads/2022/08/22-00757-TIP-REPORT_072822-inaccessible.pdf [https://perma.cc/J3S5-L5TB]
[27] *Available at* https://www.state.gov/wp-content/uploads/2021/09/TIPR-GPA-upload-07222021.pdf [https://perma.cc/9L9W-3PWX]

constitutionality. First Amendment analysis involves assessing whether FOSTA was the least restrictive alternative to accomplish its drafters' goals, Appellant briefing at 46, and this Act's wide-ranging negative impact weighs against its constitutionality. By shutting down online platforms, FOSTA drives trafficking victims and sex workers further underground, into more dangerous conditions. *See generally* Kristen DiAngelo & Rachel Anderson, Sex Workers Outreach Project/Safer Alternatives Through Networking and Education, *Sex Work and Human Trafficking in the Sacramento Valley: A Needs Assessment* (May 2015).[28] The use of online platforms enabled trafficking victims and sex workers to "screen" clients from afar and to negotiate safer terms ahead of time, including condom use, locations, and pay rates. *Id* at 6 ("On the internet, [sex workers] have a barrier between them and the client. They have time to evaluate the risks and decide if the work is in their best interest.").

Conversely, "[b]anning online sex work platforms pushes sex workers out onto the street, which is more dangerous." Kaniya Walker, *To Protect Black Trans Lives, Decriminalize Sex Work*, ACLU (Nov. 20, 2020).[29] In 2014, the FBI shutdown of MyRedBook.com

---

[28] https://survivorsagainstsesta.files.wordpress.com/2018/03/sex-worker-need-analysis-sacramento-valley.pdf [https://perma.cc/QX73-CUX3]
[29] https://www.aclu.org/news/lgbtq-rights/to-protect-black-trans-lives-decriminalize-sex-work [https://perma.cc/EWF4-JNRP]

> immediately wiped away a main source of income for sex workers
> while eliminating a platform that enabled them to screen clients,
> negotiate rates, and find work they felt was safe. Some immediately
> rushed outside, desperate for work. 'I was out on the streets that same
> night,' said Monroe, 26, who previously did sex work in northern
> California and had relied on Redbook. 'All of us girls were out walking
> the streets, and we didn't make nothing.'

Sam Levin, *Abused Then Arrested: Inside California's Crackdown on Sex Work*, THE GUARDIAN (Nov. 28, 2018)[30] On the street, "[c]lient interactions are quick because we don't want to be caught. I know some girls who feel the need to get a gun license to protect themselves. Others will carry knives or mace." Walker, *supra*. The difference between online and street-based sex work can be literally life or death: a 2017 study found that the advent of Craigslist's "erotic services" section "reduced the female homicide rate by 17.4 percent," concluding that, "this reduction in female violence was the result of street prostitutes moving indoors and matching more efficiently with safer clients." Scott Cunningham, Gregory DeAngelo, & John Tripp, *Craigslist's Effect on Violence Against Women*, in AMERICAN ECONOMIC ASSOCIATION CONFERENCE, CHICAGO, IL (Nov. 2017).[31]

Although the intended impact of FOSTA may have been to curb human trafficking or reduce sex work as a whole, the result has been FOSTA increases the

---

[30] https://www.theguardian.com/us-news/2018/nov/28/california-sex-workers-crackdown [https://perma.cc/5WCY-RB6D]
[31] https://www.aeaweb.org/conference/2018/preliminary/paper/QZNF9dHi [https://perma.cc/8A52-QD54]

possibility of a sex worker becoming a victim of exploitation. Having lost online tools to make their work safer, some sex workers now more heavily rely on third parties, such as a driver or bodyguard, a booker or madam, to keep them safe. And while many third parties in the commercial sex industry "provide safer working environments for sex workers, recruit and screen clients, provide security, and mediate disputes," others "can be manipulative, violent, and abusive[.]" Global Network of Sex Work Projects, *Policy Brief: The Decriminalization of Third Parties* (2016)[32] (internal quotations and citations omitted). This increased reliance on third parties comes with the risk that someone who is a helper one day may become a trafficker the next. Lynly S. Egyes, *The Hidden Truth: How Our Policies and Practices Can Both Help and Harm Victims of Human Trafficking*, *in* SOCIAL WORK PRACTICE WITH SURVIVORS OF SEX TRAFFICKING AND COMMERCIAL SEXUAL EXPLOITATION, 128 (Andrea Nichols, Tonya Edmond & Erin Heil eds., 2018) ("more dependence on another person for basic necessities opens up sex workers to exploitation.").

FOSTA makes it more difficult for trafficking survivors to escape. When the goal is ending trafficking into commercial sex, it is important to identify the people who interact most frequently with survivors of human trafficking: sex workers and

---

[32] https://www.nswp.org/sites/default/files/Policy%20Brief%20The%20Decriminalisation%20of%20Third%20Parties%2C%20NSWP%20-%202016.pdf [https://perma.cc/5VXU-TTAZ]

clients of sex workers. Egyes, *The Hidden Truth*, *supra*, at 127, 129. FOSTA's alleged purpose is contradicted by its methods. Increased criminalization, like FOSTA, creates more distrust and fear by sex workers and clients. Decriminalization creates a safe place for all people to work together to fight exploitation. For example, in New Zealand, after prostitution was decriminalized, law enforcement worked directly with sex workers to create safer work conditions and create positive relationships so that sex workers are able to report trafficking victimization. *See* Gillian Abel & Catherine Healy, *Sex Worker-Led Provision of Services in New Zealand*, *in* SEX WORK, HEALTH AND HUMAN RIGHTS 175-187 (Shira M. Goldberg, et al., 2021). Criminalization through laws like FOSTA makes it less likely for sex workers or clients in the U.S. will work with law enforcement and report possible victimization.

Finally, in shutting down online platforms, FOSTA has made it harder for law enforcement and advocates to locate trafficking victims, offer assistance, and identify traffickers. Prior to FOSTA, law enforcement could rely on advertisements to help identify trafficking victims. "There are many cases of victims being identified online—and little doubt that without this platform, they would have not been identified. Internet sites provide a digital footprint that law enforcement can use to investigate trafficking into the sex trade, and to locate trafficking victims." Freedom Network USA, *Freedom Network Urges Caution in Reforming the CDA*

(2017).[33] Even the federal Government Accountability Office acknowledges that the loss of online platforms has made law enforcement's job more difficult: "According to a 2019 FBI document, the FBI's ability to identify and locate sex trafficking victims and perpetrators was significantly decreased following the takedown of backpage.com." GAO-21-385, *supra*. These barriers impact LGBTQ people more severely because authorities already face difficulties supporting LGBTQ survivors, as "[b]iases and discrimination severely complicate proper identification of, and provision of care to, LGBT victims of human trafficking." 2014 TRAFFICKING IN PERSONS REPORT, UNITED STATES DEPT. OF STATE 10 (2014).[34]

Rather than curb human trafficking, FOSTA's effect has been to drive trafficking victims and sex workers further underground, increase sex workers' vulnerability to trafficking, and makes attempts to identify trafficking victims more difficult. A study, conducted by the Samaritan Women and published by the Institute for Shelter Care in the months following FOSTA, revealed an increase in trafficking referrals since FOSTA was passed.  It also showed that sex workers and survivors of trafficking reported increased risks from their clients, including street-based violence, assault, and exploitation. The Samaritan Women, *Research Brief: After*

---

[33] https://www.eff.org/files/2017/09/18/sestahearing-freedomnetwork.pdf [https://perma.cc/J54K-WGRG]
[34] https://2009-2017.state.gov/documents/organization/226844.pdf [https://perma.cc/VHR9-V9SD]

*FOSTA-SESTA* (2018).[35] It is unsurprising to find out that sex trafficking in San Francisco shot up 170% following the passage of the law. Alex Dalbey, *Sex Workers Called It: 'Anti-Sex Trafficking' Law Causes More Sex Trafficking*, DAILY DOT (May 20, 2021).[36] As LGBTQ people are already less likely to report exploitation to local authorities or access needed services, 2016 TRAFFICKING IN PERSONS REPORT, UNITED STATES DEPT. OF STATE 20 (2016),[37] this has hit LGBTQ communities particularly hard.

Rather than end human trafficking, FOSTA's impact has actually created more victims of human trafficking throughout the country, including more LGBTQ victims of human trafficking. When a First Amendment analysis involves assessing whether FOSTA was the least restrictive alternative to accomplish its drafters' goals, Appellants' Opening Br. 46, the law's failure to deliver on its promises is not just tragic for survivors of trafficking, but also relevant to its constitutionality.

## CONCLUSION

FOSTA's harms to LGBTQ people and communities continues the legacy of overbroad and vague laws being used to criminalize LGBTQ people. The statute's

---

[35] https://instituteforsheltercare.org/wp-content/uploads/2018/09/After-SESTA-FOSTA.pdf [https://perma.cc/WEZ5-FSRJ]
[36] https://www.dailydot.com/irl/increase-sex-trafficking-sesta-fosta/ [https://perma.cc/AW72-BLVZ]
[37] https://2009-2017.state.gov/documents/organization/258876.pdf [https://perma.cc/VK26-3M9X

real and substantial impact on LGBTQ people, particularly TGNC people, supports the Appellants' assertion that FOSTA is overbroad. And FOSTA's failure to deliver on its aims, despite the breadth of speech repression that it has caused, suggests that it cannot pass constitutional muster. Therefore, we support the Appellants request that the Court vacate the District Court's order dismissing this action and denying Appellants a preliminary injunction, and declare that FOSTA violates constitutional protections, including the First Amendment.

Dated: September 13th, 2022                Respectfully submitted,

/s/ Christopher T. Bavitz

Christopher T. Bavitz
Mason A. Kortz
Kendra K. Albert
Cyberlaw Clinic[38]
Harvard Law School
1557 Massachusetts Avenue
Cambridge, MA 02138
(617) 384-9125
cbavitz@law.harvard.edu

Counsel for *Amicus Curiae*
Transgender Law Center

---

[38] *Amicus curiae* thanks Cyberlaw Clinic students Wyatt Larkin and Danny Belgrad for their valuable contributions to this brief.

# CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of the Federal Rules of Appellate Procedure and the Circuit Rules. The document contains 6,332 words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f).

This document complies with the typeface and type style requirements of the Federal Rules. The document has been prepared in a proportionally spaced typeface using Microsoft Word, in the font Times New Roman.

Dated: September 13th, 2022          /s/ Christopher T. Bavitz

Christopher T. Bavitz
Cyberlaw Clinic
Harvard Law School
1557 Massachusetts Avenue
Cambridge, MA 02138
(617) 384-9125
cbavitz@law.harvard.edu

Counsel for *Amicus Curiae*
Transgender Law Center

## CERTIFICATE OF SERVICE

I hereby certify that on September 13th, 2022, I caused the foregoing Brief of *Amicus Curiae* Transgender Law Center in Support of Appellants to be electronically filed with the Clerk of the Court using CM/ECF, which will automatically send email notification of such filing to all counsel of record.

Dated: September 13th, 2022                    /s/ Christopher T. Bavitz

Christopher T. Bavitz
Cyberlaw Clinic
Harvard Law School
1557 Massachusetts Avenue
Cambridge, MA 02138
(617) 384-9125
cbavitz@law.harvard.edu

Counsel for *Amicus Curiae*
Transgender Law Center