ORAL ARGUMENT NOT YET SCHEDULED
**No. 22-5105**

_____

IN THE

# United States Court of Appeals
# for the District of Columbia Circuit

_____

WOODHULL FREEDOM FOUNDATION, ET AL.,
*Plaintiffs-Appellants*,

v.

UNITED STATES OF AMERICA, ET AL.,
*Defendants-Appellees*.

_____

On Appeal from the
United States District Court for the District of Columbia
No. 1:18-cv-1552-RJL (Hon. Richard J. Leon)

_____

**BRIEF OF AMICUS CURIAE
CENTER FOR DEMOCRACY & TECHNOLOGY
IN SUPPORT OF PLAINTIFFS-APPELLANTS AND REVERSAL**

_____

LAUREN GALLO WHITE
ARIEL C. GREEN ANABA
CARMEN SOBCZAK
WILSON SONSINI
GOODRICH & ROSATI, P.C.
One Market Plaza, Spear Tower,
Suite 3300
San Francisco, CA 94105
(415) 947-2000
LWhite@wsgr.com
AAnaba@wsgr.com
CSobczak@wsgr.com

BRIAN M. WILLEN
*Counsel of Record*
BENJAMIN D. MARGO
WILSON SONSINI
GOODRICH & ROSATI, P.C.
1301 Avenue of the Americas
40th Floor
New York, New York 10019
(212) 999-5800
BWillen@wsgr.com
BMargo@wsgr.com

*Attorneys for Amicus Curiae Center for Democracy & Technology*

## CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES

Counsel for Center for Democracy & Technology certifies the following:

A. **Parties and Amici.** All parties and amici appearing before this Court are listed in the Opening Brief of Appellants Woodhull Freedom Foundation, Human Rights Watch, Eric Koszyk, Jesse Maley a/k/a Alex Andrews, and the Internet Archive ("Appellants"). *See* USCA Case No. 22-5105, Doc. No. 1962378 (Sep. 6, 2022).

B. **Ruling under Review.** The ruling under review is *Woodhull Freedom Foundation v. United States*, No. 18-1552 (RJL), 2022 U.S. Dist. LEXIS 57747 (D.D.C. Mar. 29, 2022) (JA0717-45), in which the District Court denied Appellants' motion for summary judgment and dismissed their Complaint challenging the constitutionality of the Allow States and Victims to Fight Online Sex Trafficking Act of 2017, Pub. L. No. 115-164, 132 Stat. 1253 (2018).

C. **Related Cases.** There are no related cases.

i

D. **Corporate Disclosure.** Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A), amicus curiae Center for Democracy & Technology states that it has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES................................................................................i

TABLE OF CONTENTS ...................................................... iii

TABLE OF AUTHORITIES...................................................v

GLOSSARY OF ABBREVIATIONS ......................................xi

INTRODUCTION................................................................1

STATUTES AND REGULATIONS ......................................3

STATEMENT OF IDENTITY, INTEREST IN CASE, AND SOURCE OF AUTHORITY TO FILE ................................................3

STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS................................................................5

ARGUMENT .......................................................................6

I.   THE INTERNET OFFERS AN UNPARALLELED MEDIUM FOR FREE EXPRESSION WHERE THE CONSEQUENCES OF CENSORSHIP ARE GRAVE AND SPEAKERS DESERVE THE HIGHEST LEGAL PROTECTIONS...............................................6

   A.   The Internet Is Vital to the Exercise of Fundamental Constitutional Rights. .................................................6

   B.   Internet Speech Is Entitled to the Highest Protection From Government Censorship..........................................11

   C.   Unlawful Speech Cannot Be Surgically Removed From the Internet. .........................................................14

   D.   Legal Protections For Publishing Speech are Essential to Facilitating Open Discourse.....................................17

E.    Courts Have Routinely Rejected Blunt Attempts to Target Offensive Speech on the Internet. ............................................. 22

II.  FOSTA IS NO DIFFERENT THAN OTHER FAILED EFFORTS TO CENSOR INTERNET SPEECH. ............................................. 26

A.    The District Court Was Wrong to Conclude That FOSTA Is Not Unconstitutional. ....................................................... 26

B.    The District Court's Narrowing Construction Does Not Cure FOSTA's Chilling Effects ............................................. 31

CONCLUSION ................................................................. 35

CERTIFICATE OF COMPLIANCE ........................................ 36

CERTIFICATE OF SERVICE ............................................... 37

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU v. Mukasey*,
 534 F.3d 181 (3d Cir. 2008) ............................................................. 25

*ACLU v. Reno*,
 929 F. Supp. 824 (E.D. Pa. 1996) ...................................................... 12

*Ashcroft v. ACLU*,
 542 U.S. 656 (2004) ................................................................... 24, 32

*Ashcroft v. Free Speech Coal.*,
 535 U.S. 234 (2002) ........................................................................ 12

*Backpage.com, LLC v. Cooper*,
 939 F. Supp. 2d 805 (M.D. Tenn. 2013) ...................................... 20, 25

*Backpage.com, LLC v. Dart*,
 807 F.3d 229 (7th Cir. 2015) ............................................................. 4

*Backpage.com, LLC v. Hoffman*,
 No. 13-cv-03952 (DMC) (JAD),
 2013 U.S. Dist. LEXIS 119811 (D.N.J. Aug. 20, 2013) ..................... 25

*Backpage.com, LLC v. Lynch*,
 216 F. Supp. 3d 96 (D.D.C. 2016) ..................................................... 27

*Backpage.com, LLC v. McKenna*,
 881 F. Supp. 2d 1262 (W.D. Wash. 2012) .................................... 20, 30

*Batzel v. Smith*,
 333 F.3d 1018 (9th Cir. 2003) .......................................................... 20

*Ctr. for Democracy & Tech. v. Pappert*,
 337 F. Supp. 2d 606 (E.D. Pa. 2004) ....................................... 4, 12, 25

*Dart v. Craigslist, Inc.*,
 665 F. Supp. 2d 961 (N.D. Ill. 2009) ................................................. 30

*Doe v. Mindgeek USA Inc.*,
    558 F. Supp. 3d 828 (C.D. Cal. 2021) ................................................ 28

*Doe v. Twitter, Inc.*,
    555 F. Supp. 3d 889 (N.D. Cal. 2021) ........................................... 28-29

*Does #1-5 v. Snyder*,
    834 F.3d 696 (6th Cir. 2016) ............................................................ 4

*Dombrowski v. Pfister*,
    380 U.S. 479 (1965) ......................................................................... 33

*Google, Inc. v. Hood*,
    822 F.3d 212 (5th Cir. 2016) ........................................................... 20

*Hurley v. Irish-Am.Gay, Lesbian & Bisexual Group*,
    515 U.S. 557 (1995) ......................................................................... 19

*J.B. v. G6 Hosp., LLC*,
    No. 19-CV-07848-HSG,
    2020 U.S. Dist. LEXIS 151213 (N.D. Cal. Aug. 20, 2020) ........... 28, 29

*Klayman v. Zuckerberg*,
    753 F.3d 1354 (D.C. Cir. 2014) ........................................................ 19

*Kleindienst v. Mandel*,
    408 U.S. 753 (1972) ......................................................................... 18

*Knight First Am. Inst. at Columbia Univ. v. Trump*,
    928 F.3d 226 (2d Cir. 2019), vacated on other grounds,
    *Biden v. Knight First Am. Inst. at Columbia Univ.*,
    141 S. Ct. 1220 (2021) ...................................................................... 18

*La'Tiejira v. Facebook, Inc.*,
    272 F. Supp. 3d 981 (S.D. Tex. 2017) .............................................. 20

*Mahanoy Area Sch. Dist. v. B.L.*,
    141 S. Ct. 2038 (2021) ....................................................................... 9

*Miami Herald Publ'g Co. v. Tornillo*,
    418 U.S. 241 (1974) ......................................................................... 19

*NetChoice, LLC v. AG, Fla.*,
   34 F.4th 1196 (11th Cir. 2022) .................................................. 4, 9, 21

*NetChoice, LLC v. Paxton*,
   573 F. Supp. 3d 1092 (W.D. Tex. 2021),
   *appeal docketed*, No. 21-51178 (5th Cir. Dec. 7, 2021)........................ 21

*NetChoice, LLC v. Paxton*,
   No. 21-51178,
   2022 U.S. App. LEXIS 13434 (5th Cir. May 11, 2022) ........................ 4

*Packingham v. N. Carolina*,
   137 S. Ct. 1730 (2017).................................................................. 4, 7, 11

*People v. Ferrer*,
   No. 16FE024013, slip op. 11
   (Cal. Super. Ct. Aug. 23, 2017).......................................................... 20

*Reno v. ACLU*,
   521 U.S. 844 (1997)................................. 1, 6-7, 11, 13, 23, 28

*Sable Commc'ns of Cal. v. FCC*,
   492 U.S. 115 (1989)............................................................................ 9

*Stanley v. Ga.*,
   394 U.S. 557 (1969).......................................................................... 18

*Smith v. Cal.*,
   361 U.S. 147 (1959).......................................................................... 17

*United States v. Williams*,
   553 U.S. 285 (2008).......................................................................... 31

*Universal Commc'n Sys v. Lycos, Inc.*,
   478 F.3d 413 (1st Cir. 2007) ........................................................30-31

*Woodhull Freedom Found. v. United States*,
   948 F.3d 363 (D.C. Cir. 2020) .................................................. 4, 31, 33

*Zeran v. Am. Online, Inc.*,
   129 F.3d 327 (4th Cir. 1997)............................................................ 31

## Constitutional Provisions

U.S. Const., amend. I ................................................................. 1

## Statutes

18 U.S.C. § 1591 ........................................................27-28, 30

18 U.S.C. § 1595 ............................................................28-29

18 U.S.C. § 2421A................................................ 3, 26-27, 29-31, 33

47 U.S.C. § 223 ...................................................................... 22

47 U.S.C. § 230 ............................................................. 3, 9, 33

Allow States and Victims to Fight Online Sex Trafficking Act
    of 2017, Pub. L. No. 115-164, 132 Stat. 1253 (2018)............................ 1

## Other Authorities

Abigail Moss, *'Such a Backwards Step': Instagram Is Now
    Censoring Sex Education Accounts*, VICE (Jan. 8, 2021),
    https://bit.ly/3aQ2L5e ................................................... 34-35

Adam Grundy, *Service Annual Survey Shows Continuing
    Decline in Print Publishing Revenue*, U.S. Census Bureau
    (June 7, 2022), https://www.census.gov/library/
    stories/2022/06/Internet-crushes-traditional-media.html ................. 10

Adi Robertson, *Social Justice Groups Warn Biden Against
    Throwing Out Section 230*, THE VERGE (Jan. 27, 2021,
    6:00 AM),
    https://www.theverge.com/2021/1/27/22251093/section-
    230-civil-rights-groups-letter-biden-harris-congress-
    defense ......................................................................... 10-11

Adrian Shahbaz and Allie Funk, *The Global Drive to Control
    Big Tech,* Freedom House: Freedom on the Net 2021, at 2-
    3 (2021), https://freedomhouse.org/report/freedom-
    net/2021/global-drive-control-big-tech................................. 14

Center for Democracy and Technology, *Mixed Messages? The Limits of Automated Social Media Content Analysis*, at 8 (Nov. 2017), https://cdt.org/wp-content/uploads/2017/11/Mixed-Messages-Paper.pdf ........................ 15

Dhanaraj Thakur and Emma Llansó, *Do You See What I See? Capabilities and Limits of Automated Multimedia Content Analysis*, Ctr. for Democracy & Tech. (May 20, 2021), https://cdt.org/insights/do-you-see-what-i- see-capabilities-and-limits-of-automated-multimedia-content-analysis ........................................................................ 15-16

*Freedom of Expression for the Next 5 Billion Internet Users*, Ctr. for Democracy & Tech. (Apr. 22, 2011) (hereinafter "CDT: Freedom of Expression"), https://cdt.org/insights/freedom-of-expression-for-the-next-5-billion-Internet-users/ .................................................. 6-7

Gita Jackson, *Tumblr Is Trying To Win Back the Queer Audience It Drove Off*, VICE (May 11, 2021), https://www.vice.com/en/article/93yyp8/tumblr-is-trying-to-win-back-the-queer-audience-it-drove-off ..................................... 34

Heather Caygle, *Lawmakers Ditch Town Halls: "They Want to Avoid Those Gotcha Moments"*, POLITICO (Aug 21, 2018, 5:08 AM), https://www.politico.com/story/2018/08/21/congress-town-halls-gotcha-public-meetings-789430 ................................................. 10

Helen Holmes, *"First They Come for Sex Workers, Then They Come for Everyone," Including Artists*, OBSERVER (Jan. 27, 2021), https://bit.ly/3xDqCOd ............................................. 34

Kate Ruane, *Dear Congress: Platform Accountability Should Not Threaten Online Expression*, ACLU (Oct. 27, 2020), https://www.aclu.org/news/free-speech/dear-congress-platform- accountability-should-not-threaten-online-expression ............................................................ 10

Philip Elmer-Dewitt & Hannah Bloch, *On a screen near you: Cyberporn*, TIME, July 3, 1995 ........................................................ 22

Shannon Liao, *Tumblr Will Ban All Adult Content on December 17th*, THE VERGE (Dec. 3, 2018), https://bit.ly/2SmoC5A ................................................................. 34

*Shielding the Messengers: Protecting Platforms for Expression and Innovation,* Ctr. For Democracy & Tech. (Dec. 2012), https://cdt.org/files/pdfs/CDT-Intermediary-Liability-2012.pdf ............................................................... 8-9

Statista Research Department, *Worldwide digital population April 2022* (Jul. 26, 2022), https://www.statista.com/statistics/617136/digital-population-worldwide/ (last visited Sept. 7, 2022) ............................... 6

x

## GLOSSARY OF ABBREVIATIONS

CDT                                    Amicus Curiae Center for
                                       Democracy & Technology

FOSTA                                  Allow States and Victims to Fight
                                       Online Sex Trafficking Act of
                                       2017, Pub. L. No. 115-164, 132
                                       Stat. 1253 (2018)

## INTRODUCTION

The First Amendment forbids Congress from passing any law that "abridg[es] the freedom of speech, or of the press; or the right of the people peaceably to assemble." U.S. Const. amend. I. Yet the Allow States and Victims to Fight Online Sex Trafficking Act of 2017, Pub. L. No. 115-164, 132 Stat. 1253 (2018) ("FOSTA") does just that. Although Congress may have only intended the laudable goal of halting sex trafficking, it went too far: chilling constitutionally protected speech and prompting online platforms to shut down users' political advocacy and suppress communications having nothing to do with sex trafficking for fear of liability.

Because the Internet is such an important medium for expression, the Supreme Court has held that Internet speech receives the "highest protection from governmental intrusion." *Reno v. ACLU*, 521 U.S. 844, 865 (1997). The size and openness of communication on the Internet underscore the need for these protections and render it especially vulnerable to censorship. Given the scale of user-generated content uploaded to the Internet, many online platforms depend upon automated (and inherently blunt) tools to moderate undesirable speech. But those

tools cannot be deployed with surgical precision and cannot reliably distinguish between unlawful and borderline speech. When laws penalize operating websites and publishing online speech, they necessarily risk wide-reaching chilling effects on constitutionally protected and beneficial speech, as intermediaries, fearing their own liability, crack down on user speech broadly in service of removing what is unlawful.

Because of concerns about overbroad removals of speech, courts consistently have upheld the First Amendment rights of intermediaries, including online platforms, to decide what speech to allow. And courts have not hesitated to strike down previous laws that chill constitutionally protected online speech in the name of purging harmful or offensive material from the Internet.

Congress has also recognized the importance of protecting online intermediaries from potentially staggering liability for hosting the speech of their users. In enacting Section 230 to protect online service providers from liability for hosting, publishing, and making available other people's speech, Congress reinforced the First Amendment rights of platforms to curate and present third-party material and safeguarded the rights of individuals who use the Internet to express themselves.

FOSTA upsets this balance. The statute reaches too broadly and with imprecise terms, sweeping in vast swaths of constitutionally protected and beneficial speech. Moreover, even under the District Court's narrowing interpretation, FOSTA acts as a content-based censorship law that criminalizes the operation of websites and abrogates Section 230 protections for broad categories of speech, causing platforms to block or remove content even more broadly, and inevitably sweeping in speech that otherwise would be constitutionally protected. *See* 18 U.S.C. § 2421A; 47 U.S.C. § 230(e)(5).

FOSTA goes too far and threatens too much. This Court should strike it down.

## STATUTES AND REGULATIONS

All applicable statutes, etc., are contained in the Opening Brief of the Woodhull Freedom Foundation.

## STATEMENT OF IDENTITY, INTEREST IN CASE, AND SOURCE OF AUTHORITY TO FILE

Center for Democracy & Technology ("CDT") is a non-profit public interest organization that advocates for Internet users' free expression and other human rights. Integral to this work is CDT's representation of the public interest in the creation of an open and innovative Internet that

promotes the constitutional and democratic values of free expression and privacy. For more than 25 years, CDT has advocated in support of protections for online speech, including limits on intermediary liability for user-generated content. CDT has participated in several cases addressing First Amendment rights on the Internet, both as party and amicus curiae, including: *Ctr. for Democracy & Tech. v. Pappert*, 337 F. Supp. 2d 606 (E.D. Pa. 2004); *Backpage.com, LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015); *Does #1-5 v. Snyder*, 834 F.3d 696 (6th Cir. 2016); *Packingham v. N. Carolina*, 137 S. Ct. 1730 (2017); *Woodhull Freedom Found. v. United States*, 948 F.3d 363 (D.C. Cir. 2020); *NetChoice, LLC v. AG, Fla.*, 34 F.4th 1196 (11th Cir. 2022); and *NetChoice, LLC v. Paxton*, No. 21-51178, 2022 U.S. App. LEXIS 13434 (5th Cir. May 11, 2022). Like those cases, this appeal has profound ramifications for Internet users, reaching far beyond the named parties. CDT respectfully submits this brief on behalf of those whose speech rights are threatened by FOSTA and the District Court's interpretation below.

Pursuant to District of Columbia Circuit Rule 29(b), Center for Democracy & Technology ("CDT") certifies that all parties have consented to the filing of this amicus brief.

Pursuant to District of Columbia Circuit Rule 29(d), CDT certifies that this separate amicus brief is necessary because it reflects a perspective on this case not found in either the parties' briefs or any of the other amicus briefs. CDT is a nonprofit public interest organization that advocates for Internet users' free expression and other human rights. Integral to this work is CDT's representation of the public interest in the creation of an open and innovative Internet that promotes the constitutional and democratic values of free expression and privacy. Through its deep experience researching and litigating some of the same issues presented by this case, CDT brings dedicated interest and unique expertise in the First Amendment, content moderation, and the impact of FOSTA on Internet users to the Court's consideration of this appeal.

## STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), CDT states that no counsel for a party authored this brief in whole or in part, and no party or entity other than CDT and its counsel made a monetary contribution intended to fund the preparation or submission of this brief.

## ARGUMENT

I. **THE INTERNET OFFERS AN UNPARALLELED MEDIUM FOR FREE EXPRESSION WHERE THE CONSEQUENCES OF CENSORSHIP ARE GRAVE AND SPEAKERS DESERVE THE HIGHEST LEGAL PROTECTIONS.**

### A. The Internet Is Vital to the Exercise of Fundamental Constitutional Rights.

"The Internet is an international network of interconnected computers" that enables users to "communicate with one another and to access vast amounts of information from around the world." *Reno*, 521 U.S. at 849-50. Its adoption is ubiquitous: over five billion people, or approximately 63% of the global population, use the Internet. *See* Statista Research Department, *Worldwide digital population April 2022* (Jul. 26, 2022), https://www.statista.com/statistics/617136/digital-population-worldwide/ (last visited Sept. 7, 2022). "From the publishers' point of view, [the Internet] constitutes a vast platform from which to address and hear from a world-wide audience of millions [(now, billions)] of readers, viewers, researchers, and buyers." *Reno*, 521 U.S. at 853.

Since its inception, the Internet has been recognized and celebrated as a foundational platform for free expression—facilitating social, cultural, and political speech across the globe. "Like no medium before it, the Internet can empower citizens to communicate instantaneously with

6

others in their own communities and worldwide, at low cost relative to traditional forms of media." *Freedom of Expression for the Next 5 Billion Internet Users*, Ctr. for Democracy & Tech. (Apr. 22, 2011) (hereinafter "CDT: Freedom of Expression"), https://cdt.org/insights/freedom-of-expression-for-the-next-5-billion-Internet-users/. "Producers of traditional forms of media also can use the Internet to greatly expand their audiences at nominal cost." *Id.*

Given the Internet's size and the fact that online intermediary providers, like social media services and blogging platforms, have arisen to allow individual Internet users to post their speech, "[i]t is no exaggeration to conclude that the content on the Internet is as diverse as human thought." *Reno*, 521 U.S. at 852 (internal quotation marks omitted). In particular, online intermediaries provide "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard. They allow a person with an Internet connection to 'become a town crier with a voice that resonates farther than it could from any soapbox.'" *Packingham v. N. Carolina*, 137 S. Ct. 1730, 1737 (2017) (quoting *Reno*, 521 U.S. at 870).

A wide-ranging group of intermediaries facilitate the speech of billions of individual Internet users—including search engines like Google and DuckDuckGo; social media sites like Facebook, Reddit, and Pinterest; video-hosting websites like YouTube and Vimeo; web-hosting services like Amazon Web Services; remote storage services such as Dropbox; consumer-review sites like Yelp and Tripadvisor; online classified ad services like Craigslist; collaborative encyclopedias such as Wikipedia and Ballotpedia; and many others. These intermediaries publish or distribute other people's speech, making it possible for individuals to broadcast their messages to audiences around the world.

These vast capabilities are not the product of chance. "Rather, today's Internet is possible because of very specific choices made in technology, policy, and law that encourage innovation and preserve the openness of the platform." CDT: Freedom of Expression, *supra*. Different decisions could transform the Internet from a medium of expression into a tool of oppression. *See id.* Online intermediaries function best, and are more likely to allow user speech to flourish, when their editorial or curatorial choices are protected from legal liability. *See, e.g.*, *Shielding the Messengers: Protecting Platforms for Expression and Innovation,* Ctr.

For Democracy & Tech. (Dec. 2012), https://cdt.org/files/pdfs/CDT-Intermediary-Liability-2012.pdf. Congress understood this when it passed Section 230 to protect the Internet as a "forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity," which "ha[s] flourished . . . with a minimum of government regulation." 47 U.S.C. § 230(a)(3)-(4). This protection is necessary because an uncensored Internet is a practical prerequisite to the exercise of many constitutional rights.

From a user's perspective, nearly everything on the Internet is speech—text, images, and videos displayed in various formats and combinations. *See, e.g.*, *Mahanoy Area Sch. Dist. v. B.L.*, 141 S. Ct. 2038, 2042-43 (2021) (image posted on Snapchat was protected speech). This includes non-obscene "[s]exual expression," *Sable Commc'ns of Cal. v. FCC*, 492 U.S. 115, 126, (1989), but goes far beyond it to include even the selection and arrangement of words and images on a given webpage. *See NetChoice, LLC v. AG, Fla.*, 34 F.4th at *1210-14. Especially considering the rapid disappearance of traditional speech platforms like print newspapers and physical town halls in which people could share ideas, the consequences of censoring Internet speech may be felt even more

heavily. *See* Adam Grundy, *Service Annual Survey Shows Continuing Decline in Print Publishing Revenue*, U.S. CENSUS BUREAU (June 7, 2022), https://www.census.gov/library/stories/2022/06/Internet-crushes-traditional-media.html; Heather Caygle, *Lawmakers Ditch Town Halls: "They Want to Avoid Those Gotcha Moments"*, POLITICO (Aug 21, 2018, 5:08 AM), https://www.politico.com/story/2018/08/21/congress-town-halls-gotcha-public-meetings-789430.

But the Internet's importance extends beyond free speech. It is vital to the exercise of other constitutional rights too, like the right to travel and the right to assemble, among others. Activists of all political stripes might find it difficult to assemble peaceably if social media platforms shut down in a world without Section 230. Kate Ruane, *Dear Congress: Platform Accountability Should Not Threaten Online Expression*, ACLU (Oct. 27, 2020), https://www.aclu.org/news/free-speech/dear-congress-platform-accountability-should-not-threaten-online-expression.    And those wishing to garner support for a petition to change existing law might struggle to identify like-minded individuals if interactive computer services refuse to host controversial ideas for fear of liability. *See id.*; *see also* Adi Robertson, *Social Justice Groups Warn Biden Against Throwing*

10

*Out Section 230*, THE VERGE (Jan. 27, 2021, 6:00 AM), https://www.theverge.com/2021/1/27/22251093/section-230-civil-rights-groups-letter-biden-harris-congress-defense.

### B. Internet Speech Is Entitled to the Highest Protection from Government Censorship.

Given the vital importance of the Internet to the exercise of constitutional rights, it is no surprise that the Supreme Court has held Internet speech requires "the highest protection from governmental intrusion." *Reno*, 521 U.S. at 863. The "fundamental" First Amendment principle that "all persons have access to places where they can speak and listen" applies with special force online. *Packingham*, 137 S. Ct. at 1735. "[T]he Court must exercise extreme caution" and review with special scrutiny any law that purports to regulate speech on the "vast democratic forums of the Internet." *Id.* at 1735-36 (internal quotation marks removed).

In particular, the "special attributes of Internet communication" require robust application of the First Amendment doctrines of overbreadth and vagueness. *Reno*, 521 U.S. at 863 (citation omitted). Any law that purports to regulate speech across "the entire universe of cyberspace" risks suppressing not merely a large amount of speech, but

speech that is unfathomably diverse, constantly expanding, and globally interconnected. *Id.* at 868. For that reason, the principle that the "[g]overnment may not suppress lawful speech as the means to suppress unlawful speech," *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002), is heightened on the Internet.

For example, in *Center for Democracy & Technology v. Pappert*, 337 F. Supp. 2d 606, 655 (E.D. Pa. 2004), a Pennsylvania statute that imposed liability on Internet service providers for hosting obscene material was, in effect, found unconstitutional based on technical features of the Internet. Because Internet service providers could not target a specific webpage or a specific item of obscene material, the law would have compelled them to silence far more protected speech than necessary. *Id.* ("More than 1,190,000 innocent web sites were blocked in an effort to block less than 400 child pornography web sites."). The statute was struck down on vagueness grounds because it "fail[ed] to specify any means of compliance, let alone provide guidance as to which method will minimize or avoid suppression of protected speech." *Id.* at 655-56; *accord ACLU v. Reno*, 929 F. Supp. 824, 863 (E.D. Pa. 1996) (Buckwalter, J., concurring) (concluding that the "unique nature" of the

Internet aggravated the vagueness of the statute), *aff'd*, 521 U.S. 844 (1997). These examples elucidate courts' willingness in the Internet context to "presume that governmental regulation of the content of speech is more likely to interfere with the free exchange of ideas than to encourage it." *Reno*, 521 U.S. at 885.

The scale and openness of communications on the Internet likewise mean that *mens rea* requirements are particularly ill-suited to addressing overbreadth concerns. "Requiring . . . evidence of mens rea" does not "vastly reduc[e] the risk of prosecution for guiltless behavior," as the District Court in this case believed. *See* JA0737. In *Reno*, for example, the Court rejected as "untenable" the government's argument that the "knowledge" requirement in the Communications Decency Act "save[d] the [Communications Decency Act] from overbreadth." *See* 521 U.S. at 880.

This principle applies equally to other situations, such as an interactive computer service's awareness that a particular speaker is reputed to be engaged in prostitution. After all, "[a]ny person or organization with a computer connected to the Internet can 'publish' information," *id.* at 853, including people who have or may in the future

engage in sex work (lawfully or unlawfully), and public health campaigners who make life easier for sex workers. Liability regimes that require website operators to remove content upon obtaining (or suspecting) knowledge of it are dangerous because Internet intermediaries often respond to complaints by removing content rather than undertaking a burdensome investigation into its legality and risking both litigation and ultimate liability. *See id.* at 880. This "confer[s] broad powers of censorship, in the form of a 'heckler's veto,' upon any opponent of indecent speech." *Id.*

Put simply, courts consistently have recognized that the Internet facilitates free expression for most people on the planet and special care must be taken not to break it.

### C. Unlawful Speech Cannot Be Surgically Removed from the Internet.

Despite (and, perhaps, because of) the Internet's importance to the dissemination of ideas, governments across the globe have wrestled to control it. Adrian Shahbaz and Allie Funk, *The Global Drive to Control Big Tech*, FREEDOM HOUSE: FREEDOM ON THE NET 2021, at 2-3 (2021), https://freedomhouse.org/report/freedom-net/2021/global-drive-control-big-tech. In the United States, the Internet's widespread adoption

14

prompted a moral panic primarily focused on the ability for children to access material that many regard as inappropriate. Over the years, lawmakers repeatedly tried to keep offensive or harmful material offline. But, even if such efforts were lawful (and, in many cases, they were not), the nature and scale of the Internet made surgical removal of unlawful content impossible.

Today, automated content moderation tools are employed in a significant amount of online content moderation decisions because humans cannot feasibly review the vast amount of content that is posted to online platforms every millisecond. *See* Center for Democracy & Technology, *Mixed Messages? The Limits of Automated Social Media Content Analysis*, at 8 (Nov. 2017), https://cdt.org/wp-content/uploads/2017/11/Mixed-Messages-Paper.pdf. When these automated tools analyze users' speech, they typically apply broad and generalized rules, such as scanning for particular prohibited keywords, rather than an individualized and contextual analysis. *See id.* at 5.

Unfortunately, these automated tools have significant limitations that often lead to broad censorship of speech. *See* Dhanaraj Thakur and Emma Llansó, *Do You See What I See? Capabilities and Limits of*

*Automated Multimedia Content Analysis*, Ctr. for Democracy & Tech. (May 20, 2021), https://cdt.org/insights/do-you-see-what-i-see-capabilities-and-limits-of-automated-multimedia-content-analysis. For example, automated systems are not good at recognizing the context of speech, such as whether a particular depiction of violence violates a platform's terms of service because it is gratuitous, or is a permissible artistic representation, commentary, or testimonial. *Id.* This "can lead to overbroad limits on speech and inaccurate labeling of speakers as violent, criminal, and abusive." *Id.*

In short, to censor "offensive" content, websites and other interactive computer services must cull lots of constitutionally protected speech along with the targeted material. This cannot be avoided. When coupled with potential liability, the impossibility of perfect or precise moderation at scale means that intermediaries choose to over-censor as opposed to under-censor. If intermediaries censor too little, they risk expensive lawsuits and crippling liability. To ensure they block and remove speech that might expose them to liability, they rely on automation and, in turn, over-removal. But over-censoring of speech by

intermediaries chills the rights of individual end users to engage in free expression and to receive information.

### D. Legal Protections for Publishing Speech are Essential to Facilitating Open Discourse.

Both courts and Congress have long recognized the necessity of protecting the rights of publishers to decide what content to publish without government interference, even before the Internet's widespread adoption.

In *Smith v. California*, 361 U.S. 147 (1959), the Supreme Court struck down a statute making it illegal for booksellers to possess "any obscene or indecent writing, [or] book," recognizing that the statute would have the effect of "restrict[ing] the dissemination of books which are not obscene." *Id.* at 148, 152, 155. "The bookseller's burden," the Court wrote, "would become the public's burden, for by restricting him the public's access to reading matter would be restricted." *Id.* at 153. Ultimately, "[t]he bookseller's self-censorship, compelled by the State, would be a censorship affecting the whole public. [ . . . ] Through it, the distribution of all books, both obscene and not obscene, would be impeded." *Id.* at 154.

17

The same principles are true in the Internet context. If online intermediaries over-censor protected speech for fear of facing criminal liability or expensive civil lawsuits, then "the public's access to [that content] would be restricted." *See id.* at 153. This infringes upon the speech rights of users whose content is removed and who are accordingly unable to engage in protected expression on the Internet.

It also infringes upon the rights of Internet users to read and receive that protected expression. "It is now well established that the Constitution protects the right to receive information and ideas. This freedom of speech and press necessarily protects the right to receive[.]" *Kleindienst v. Mandel*, 408 U.S. 753, 762-63 (1972) (quoting *Stanley v. Ga.*, 394 U.S. 557, 564 (1969)) (cleaned up); *accord Knight First Am. Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 233 (2d Cir. 2019) (affirming holding that "the blocking of the Individual Plaintiffs violated the Knight Institute's right to read the replies of the Individual Plaintiffs which they cannot post because they are blocked"), vacated on other grounds, *Biden v. Knight First Am. Inst. at Columbia Univ.*, 141 S. Ct. 1220 (2021).

First Amendment protections for the editorial judgments of publishers and other entities who arrange, present, or disseminate other

people's speech are also essential to open discourse, because they preserve a multitude of fora for different perspectives. The Supreme Court has long held that the First Amendment protects the exercise of editorial discretion in a variety of contexts, including newspapers and parades. *See, e.g.*, *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974) (striking down a law that required newspapers to publish messages from political candidates); *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Group*, 515 U.S. 557, 559 (1995) (holding that the state could not compel parade organizers "to include among the marchers a group imparting a message the organizers do not wish to convey").

What is true for booksellers, newspapers, and parades is equally true, if not more, for online intermediaries. Indeed, these principles animated the passage of Section 230(c)(1) of the Communications Decency Act, which affords protection to online platforms and other interactive computer service providers to formulate and enforce their own editorial standards, giving statutory expression to bedrock First Amendment principles. *See Klayman v. Zuckerberg*, 753 F.3d 1354, 1359 (D.C. Cir. 2014) (Section 230 "protects against liability for the exercise of a publisher's traditional editorial functions—such as deciding whether to

publish, withdraw, postpone, or alter content" (internal quotation marks omitted)); *Google, Inc. v. Hood*, 822 F.3d 212, 220 (5th Cir. 2016) ("First Amendment values . . . drive the [Communications Decency Act]" (citation omitted)); *Batzel v. Smith*, 333 F.3d 1018, 1028-29 (9th Cir. 2003) (explaining that Section 230 was added "to further First Amendment and e-commerce interests on the Internet"); *People v. Ferrer*, No. 16FE024013, slip op. 11 (Cal. Super. Ct. Aug. 23, 2017) ("[T]he protections afforded by the First Amendment were the motivating factors behind . . . the [Communications Decency Act]."). That is why courts sometimes invoke both the First Amendment and Section 230 when invalidating efforts to control content on online platforms. *See, e.g.*, *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1275-84 (W.D. Wash. 2012); *Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805, 828-40 (M.D. Tenn. 2013).

Courts have consistently held that "online publishers have a First Amendment right to distribute others' speech and exercise editorial control on their platforms." *La'Tiejira v. Facebook, Inc.*, 272 F. Supp. 3d 981, 991-92 (S.D. Tex. 2017). Just this year, the Eleventh Circuit struck down a Florida law that sought to make it illegal for online services to

remove particular types of content. *NetChoice, LLC v. AG, Fla.*, 34 F.4th 1196 (11th Cir. 2022). The court recognized that platforms' content moderation activities constitute protected speech under the First Amendment: "When a platform selectively removes what it perceives to be incendiary political rhetoric, pornographic content, or public-health misinformation, it conveys a message and thereby engages in 'speech' within the meaning of the First Amendment. Laws that restrict platforms' ability to speak through content moderation therefore trigger First Amendment scrutiny." *Id.* at 1210; *accord NetChoice, LLC v. Paxton*, 573 F. Supp. 3d 1092, 1106 (W.D. Tex. 2021) ("Social media platforms have a First Amendment right to moderate content disseminated on their platforms."), *appeal docketed*, No. 21-51178 (5th Cir. Dec. 7, 2021). The recognition of an online platform's First Amendment right to exercise editorial discretion benefits Internet users, because it forbids the government from compelling a singular editorial viewpoint on the Internet and, in turn, makes room for a variety of online fora where users can express themselves.

While the right to make these editorial judgments is generally also secured by Section 230, the First Amendment provides an inalienable

protection against government efforts to compel or forbid the display of speech by online service providers. Even where Section 230 is not available, the First Amendment stands ready to fill the gap. Contrary to what the District Court concluded, *see* JA0717-45, Congress may not legislate away online intermediaries' rights to select and present third-party speech.

### E. Courts Have Routinely Rejected Blunt Attempts to Target Offensive Speech on the Internet.

FOSTA is not the first attempt to censor offensive speech on the Internet and likely will not be the last. History shows few, if any, of these efforts ultimately succeed.

In 1995, following a series of reports about the surge in online pornography (*see, e.g.*, Philip Elmer-Dewitt & Hannah Bloch, *On a screen near you: Cyberporn*, Time, July 3, 1995), Senator J. James Exon proposed the first major federal regulation of the Internet: what became the Communications Decency Act. Its goal was to prevent minors from exposure to "indecent" and "patently offensive" content online. 47 U.S.C. § 223(a)(1), (d). But the statute did not define either "indecent" or "patently offensive," much less in clear terms. And despite imposing liability only for "knowing" violations, the Communications Decency Act

applied too broadly in a medium "open to all comers" where intermediaries could not be expected to know the behavior of their users. *Reno*, 521 U.S. at 880.

In *Reno v. ACLU*, the Supreme Court invalidated the law as an impermissible speech restriction in violation of the First Amendment. At the outset, the Court held that there was "no basis for qualifying the level of First Amendment scrutiny that should be applied to this medium." 521 U.S. at 870 (citation omitted). The Court then proceeded to hold that the Communications Decency Act did not satisfy strict scrutiny, as it was wildly overbroad: "[t]he general, undefined terms 'indecent' and 'patently offensive' cover large amounts of nonpornographic material with serious educational or other value," *id.* at 877, and the statute therefore "unquestionably silence[d] some speakers whose messages would be entitled to constitutional protection," *id.* at 874. Nor was the Court persuaded that the Communications Decency Act's focus on protecting minors rendered it narrowly tailored, given that "most Internet fora . . . are open to all comers," not limited by age group or any other demographic. *Id.* at 880. Warning that "governmental regulation of the content of speech is more likely to interfere with the free exchange of

23

ideas than to encourage it," the Court held that "[t]he interest in encouraging freedom of expression in a democratic society outweighs any theoretical but unproven benefit of censorship." *Id.* at 885.

When, two years later, Congress again tried to pass a statute ostensibly designed to protect children on the Internet, the Supreme Court again struck it down. The Child Online Protection Act of 1998 imposed "criminal penalties . . . for the knowing posting, for 'commercial purposes,' of World Wide Web content that is 'harmful to minors.'" *Ashcroft v. ACLU*, 542 U.S. 656, 661 (2004). Although Congress attempted to define the term "harmful to minors," it was not enough. The Court affirmed a preliminary injunction against the Child Online Protection Act's enforcement, explaining that "[c]ontent-based prohibitions, enforced by severe criminal penalties, have the constant potential to be a repressive force in the lives and thoughts of a free people. To guard against that threat the Constitution demands that content-based restrictions on speech be presumed invalid." *Id.* at 660.

Four years later, the Third Circuit put the final nail in the statute's coffin. The court held that the statute was unconstitutionally overbroad, as its "definition of 'material harmful to minors' 'impermissibly places at

24

risk a wide spectrum of speech that is constitutionally protected.'" *ACLU v. Mukasey*, 534 F.3d 181, 206 (3d Cir. 2008) (citation omitted). As a result, "[w]eb publishers that are not commercial pornographers will be uncertain as to whether they will face prosecution under the statute, chilling their speech." *Id*. at 205.

State efforts to censor Internet speech have also consistently been held unconstitutional.

For example, in *Pappert*, a district court struck down Pennsylvania's Internet Child Pornography Act, which imposed potential liability on Internet service providers that enabled access to "child pornography" on the Internet, even if the providers neither hosted nor had any relationship whatsoever with the publishers of the content. 337 F. Supp. 2d at 610; *see also Cooper*, 939 F. Supp. 2d at 805, 830 (striking down law banning ads for commercial sex and recognizing "the hazards of self-censorship" posed by the law as applied to online services); *Backpage.com, LLC v. Hoffman*, No. 13-cv-03952 (DMC) (JAD), 2013 U.S. Dist. LEXIS 119811, at *34 (D.N.J. Aug. 20, 2013) (striking down similar law, observing that "speakers may self-censor rather than risk the perils of trial").

25

In short, courts have for decades consistently struck down legislative efforts to regulate how Internet platforms host and disseminate user speech.

## II. FOSTA IS NO DIFFERENT THAN OTHER FAILED EFFORTS TO CENSOR INTERNET SPEECH.

Just like previous efforts to regulate the content of speech on the Internet, FOSTA does not pass constitutional muster.

### A. The District Court Was Wrong to Conclude That FOSTA Is Not Unconstitutional.

The District Court remarkably concluded that FOSTA did what earlier statutes had not: managed to target such a narrow range of speech that it does not "possibly prohibit *any* such protected speech, much less a sufficient amount so as to render the Act overbroad." JA0734. The District Court further determined that FOSTA is not unconstitutionally vague, wrongly concluding that the *mens rea* requirement of "intent to promote or facilitate the prostitution of another person" (§ 2421A(a)) was sufficient to save a statute intended to threaten Internet intermediaries based on the content of speech hosted on their platforms. *See id.* at JA0735-37. Neither conclusion is correct.

26

As a preliminary matter, FOSTA is clearly a content-based speech regulation subject to strict scrutiny. FOSTA directly limits what online speakers can say—restricting potentially broad swaths of speech relating to sex work—by threatening liability against online service providers that host or make available certain types of content. Thus, FOSTA interferes with both the constitutionally protected speech of individual users and the editorial judgment of intermediaries in regard to such speech. More specifically, FOSTA imposes two new speech restrictions. To begin, it creates a new federal crime (and a related civil cause of action), 18 U.S.C. § 2421A, the vague terms of which directly burden protected online speech. At the same time, FOSTA expands the existing criminal provisions codified in 18 U.S.C. § 1591(a). Whereas this statute had previously been held to apply only to unprotected speech— "advertisements concerning illegal sex trafficking," *Backpage.com, LLC v. Lynch*, 216 F. Supp. 3d 96, 106 (D.D.C. 2016)—FOSTA broadened it by redefining the term "participation in a venture" to mean "knowingly assisting, supporting, or facilitating" a violation of § 1591(a)(1). 18 U.S.C. § 1591(e)(4).

27

The text of these provisions is hopelessly vague. Numerous terms remain undefined, such as "promote," "facilitate," "prostitution," and "contributes." *See Reno*, 521 U.S. at 871-72 (observing that the "absence of a definition" of key terms in the Communications Decency Act "will provoke uncertainty among speakers" and "may well cause speakers to remain silent rather than communicate even arguably unlawful words, ideas, and images"). And, as to the scienter required to deprive service providers of Section 230 immunity, even district courts disagree as to how Section 230(e)(5)(A) is to be interpreted. *Compare* JA0736 ("Each restriction contained in FOSTA requires proof of at least knowledge . . . ."), *with J.B. v. G6 Hosp., LLC*, No. 19-CV-07848-HSG, 2020 U.S. Dist. LEXIS 151213, at *25 (N.D. Cal. Aug. 20, 2020) (holding that the knowledge requirement of Section 1591 does not carry over to Section 1595, as the latter has only a "constructive knowledge requirement"), *Doe v. Mindgeek USA Inc.*, 558 F. Supp. 3d 828, 836 (C.D. Cal. 2021) ("[W]hen a 'plaintiff seeks to impose civil liability under Section 1595 based on a violation of Section 1591(a)(2) . . . [,] the "known or should have known" language of Section 1595 (rather than the actual knowledge standard of Section 1591) applies.") (quoting *Doe v. Twitter,*

*Inc.*, 555 F. Supp. 3d 889, 918 (N.D. Cal. 2021)), *and G6 Hospitality,* 2020 U.S. Dist. LEXIS 151213, at *12-34 (reconsidering and reversing earlier opinion regarding the requisite *mens rea* and noting the "tension" between competing district court constructions).

As these decisions reflect and as the Woodhull Freedom Foundation has explained, the District Court's narrowing construction of FOSTA is untenable. Opening Br. of Woodhull Freedom Foundation at 28-33 (filed Sept. 6, 2022). The District Court provides no explanation for its importation of the term "aiding and abetting" into FOSTA beyond its presence in the "criminal law context." JA0741. *But see* 47 § 230(e)(5)(A) (providing civil liability); 18 U.S.C. § 2421A(c) (same); *id.* § 1595 (same).

Misunderstanding these vague provisions could have grave consequences. Given the potential 10-year sentence, let alone a ***25-year sentence*** for an "aggravated violation" triggered by "promot[ion] or facilitat[ion] [of] the prostitution of 5 or more persons," 18 U.S.C. § 2421A(b), the risk to "operat[ors] [of] interactive computer service[s]" is dire. *Id.*

Beyond expanding the substantive criminal (and civil) law in ways that directly burden protected speech, FOSTA also targets online

29

platforms by abrogating Section 230 protections for several categories of claims. This change threatens all manner of lawful speech. The line between material that discusses sex work in favorable or value-neutral terms and that which "promotes" is hazy, as is the distinction between ads or posts that relate to legal adult services and those that might be deemed to "facilitate" unlawful prostitution. Thus, although offering adult services is not itself unlawful, "nor does it necessarily call for unlawful content," *Dart v. Craigslist, Inc.*, 665 F. Supp. 2d 961, 968 (N.D. Ill. 2009), a platform with an adult-services section may generally be aware that its users have posted or may post material that violates (or arguably might violate) Section 1591 or 2421A. *Cf. McKenna*, 881 F. Supp. 2d at 1279 (if the Internet Archive crawls an unlawful ad on another platform "and publishes it through its Wayback Machine, knowing that [the platform] has an 'adult services' ad section . . . , is [the Internet Archive] liable?").

These concerns are not abstract, especially "given the volume of material communicated through such intermediaries, the difficulty of separating lawful from unlawful speech, and the relative lack of incentives to protect lawful speech." *Universal Commc'n Sys v. Lycos,*

*Inc.*, 478 F.3d 413, 419 (1st Cir. 2007) (citing *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330-31 (4th Cir. 1997)). The chilling effect here stems from the statute's plain targeting of protected speech that favors prostitution, where the very "intent to promote . . . prostitution" becomes a crime when that intent is held by an interactive computer service provider. 18 U.S.C. § 2421A(a); *see also Woodhull*, 948 F.3d at 372 ("[T]he verbs 'promote' and 'facilitate' are disjunctive," and "when considered in isolation [they] 'are susceptible of multiple and wide-ranging meanings.'") (citing *United States v. Williams*, 553 U.S. 285, 294 (2008)). And it also flows from the "difficulty of separating lawful from unlawful speech" on the scale at which interactive computer service providers routinely operate, and from "the relative lack of incentives to protect lawful speech." *Lycos*, 478 F.3d at 419. Indeed, FOSTA *encourages* platforms to censor speech, selectively removing immunity under Section 230(c)(1) for hosting content while leaving undisturbed Section 230(c)(2)'s protections for taking borderline content down.

## B. The District Court's Narrowing Construction Does Not Cure FOSTA's Chilling Effects.

The District Court's narrowing construction, even if accepted, cannot prevent this chilling effect. The District Court's Order suggests

that intermediaries will not remove protected content if FOSTA is construed narrowly, reasoning that those intermediaries would only be criminally liable under the statute if they had the intent to aid and abet "*specific instances* of prostitution." JA0729 (emphasis in original). But Internet intermediaries cannot be expected to gamble that the District Court's narrowing construction will be applied universally, and they risk crippling liability if they are wrong. In addition, given the lack of precision in automated content moderation technologies, even intermediaries that accept the District Court's narrowing construction will likely over-remove constitutionally protected speech related to sex work, as they attempt to ensure they detect and remove all content that actually aids and abets specific instances of prostitution. Further, a narrowing construction is unlikely to save an overbroad statute where, as here, the statute threatens criminal penalties. *See, e.g.*, *Ashcroft*, 542 U.S. at 660. Because aiding and abetting specific acts of prostitution was already illegal before FOSTA was enacted, companies reasonably might conclude that the statute was intended to prohibit a broader range of conduct and over-censor speech accordingly.

Even if interactive computer service providers believe the District Court's narrowing construction will ultimately be adopted more widely, that is not enough to cure the law's chilling effects. It is well-established that an unconstitutional chilling effect may flow from the threat of litigation—even unsuccessful litigation. *See Dombrowski v. Pfister*, 380 U.S. 479, 487 (1965) ("The chilling effect upon the exercise of First Amendment rights may derive from the fact of the prosecution, unaffected by the prospects of its success or failure."). The previous panel of this Court already suggested that FOSTA could cover protected speech. *See Woodhull*, 948 F.3d at 372. That is more than enough to incentivize state prosecutors and civil litigants. Now free to sue Internet intermediaries after FOSTA selectively withdrew Section 230(c)(1) immunity, *see* 47 U.S.C. § 230(e)(5), state prosecutors and civil litigants need little more reason to bring lawsuits based on any perceived evidence that an Internet intermediary intends to "promote . . . prostitution," 18 U.S.C. § 2421A(a), even in the constitutionally-protected sense of informational reporting or political advocacy.

Indeed, this risk has already resulted in Internet intermediaries taking down content or portions of their platforms addressed to sex,

33

romance, and adult relationships, and with them the speech of innumerable citizens. Just after FOSTA's passage, for example, the social media service Tumblr banned "explicit sexual content and nudity," a change that resulted in the disproportionate removal of speech by members of the LGBTQ community. Shannon Liao, *Tumblr Will Ban All Adult Content on December 17th*, THE VERGE (Dec. 3, 2018), https://bit.ly/2SmoC5A; *see also* Gita Jackson, *Tumblr Is Trying To Win Back the Queer Audience It Drove Off*, VICE (May 11, 2021), https://www.vice.com/en/article/93yyp8/tumblr-is-trying-

to-win-back-the-queer-audience-it-drove-off. And Instagram has reportedly removed the accounts of writers and artists discussing sex work, in the wake of a change to its policies forbidding "content that is implicitly or indirectly offering or asking for sexual solicitation," which may include "mentions or depictions of sexual activity (including hand drawn, digital, or real world art)." Helen Holmes, *"First They Come for Sex Workers, Then They Come for Everyone," Including Artists*, OBSERVER (Jan. 27, 2021), https://bit.ly/3xDqCOd (reporting that, in the wake of FOSTA, Instagram has removed accounts belonging to, as well as posts by, poets, writers, and artists discussing sex work); *see also* Abigail Moss,

*'Such a Backwards Step': Instagram Is Now Censoring Sex Education Accounts*, VICE (Jan. 8, 2021), https://bit.ly/3aQ2L5e (reporting that, following an update to its content policy "aimed at stopping 'sexual solicitation'", Instagram began banning accounts of sex educators). In sum, despite the District Court's intentions, FOSTA remains constitutionally infirm and will continue to chill lawful speech.

## CONCLUSION

For all these reasons, the decision of the District Court should be reversed.

Dated: September 13, 2022

Respectfully submitted,

| | |
|---|---|
| LAUREN GALLO WHITE | */s/ Brian M. Willen* |
| ARIEL C. GREEN ANABA | BRIAN M. WILLEN |
| CARMEN SOBCZAK | *Counsel of Record* |
| WILSON SONSINI | BENJAMIN D. MARGO |
| GOODRICH & ROSATI, P.C. | WILSON SONSINI |
| One Market Plaza, Spear Tower, | GOODRICH & ROSATI, P.C. |
| Suite 3300 | 1301 Avenue of the Americas, |
| San Francisco, CA 94105 | 40th Floor |
| (415) 947-2000 | New York, New York 10019 |
| LWhite@wsgr.com | (212) 999-5800 |
| AAnaba@wsgr.com | BWillen@wsgr.com |
| CSobczak@wsgr.com | BMargo@wsgr.com |
| | *Attorneys for Amicus Curiae* |
| | *Center for Democracy &* |
| | *Technology* |

35

## CERTIFICATE OF COMPLIANCE

The undersigned certifies under Rule 32(g)(1) that this brief complies with the type-volume limitation of Rules 29(a)(5) and 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 6,453 words, excluding the parts of the brief exempted by Rule 32(f).

This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font.

Dated: September 13, 2022          Respectfully submitted,

*/s/ Brian M. Willen*
BRIAN M. WILLEN
*Counsel of Record*
WILSON SONSINI GOODRICH
  & ROSATI, P.C.
1301 Avenue of the Americas,
40th Floor
New York, New York 10019
(212) 999-5800
BWillen@wsgr.com
*Attorneys for Amicus Curiae
Center for Democracy &
Technology*

## CERTIFICATE OF SERVICE

I hereby certify that on September 13, 2022, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. The participants in this case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

Dated: September 13, 2022

Respectfully submitted,

*/s/ Brian M. Willen*
BRIAN M. WILLEN
*Counsel of Record*
WILSON SONSINI GOODRICH
  & ROSATI, P.C.
1301 Avenue of the Americas,
40th Floor
New York, New York 10019
(212) 999-5800
BWillen@wsgr.com

*Attorneys for Amicus Curiae
Center for Democracy &
Technology*