ORAL ARGUMENT NOT YET SCHEDULED

## No. 22-5105
_____

# United States Court of Appeals
# for the District of Columbia Circuit

**WOODHULL FREEDOM FOUNDATION, HUMAN RIGHTS WATCH,
ERIC KOSZYK, JESSE MALEY a/k/a ALEX ANDREWS and
THE INTERNET ARCHIVE,**

*Appellants,*

v.

**THE UNITED STATES OF AMERICA
AND MERRICK B. GARLAND, IN HIS OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF THE UNITED STATES,**

*Appellees.*
_____

From an Order by the U.S. District Court for the District of Columbia
The Honorable Richard J. Leon, Judge Presiding (Case No. 1:18-cv-1552-RJL)

_____

## APPELLANTS' OPENING BRIEF
**(Joint Appendix Filed Separately)**

_____

Lawrence G. Walters
WALTERS LAW GROUP
195 W. Pine Ave.
Longwood, FL 32750-4104
Phone: 407-975-9150

Robert Corn-Revere
Adam S. Sieff
Caesar Kalinowski IV
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, DC 20005
Phone: 202-973-4200

*Attorneys for Appellants*

*additional counsel inside cover*

David Greene
Aaron Mackey
Corynne McSherry
ELECTRONIC FRONTIER
FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Phone:  415-436-9333

Daphne Keller
STANFORD CYBER POLICY
CENTER
Encina Hall
616 Jane Stanford Way #E016
Stanford, CA 94305
Phone:  650-725-0325

### CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

Pursuant to D.C. Circuit R. 28(a)(1), Appellants certify that:

**A.     Parties and *Amici***

Woodhull Freedom Foundation, Human Rights Watch, Eric Koszyk, Jesse Maley, a/k/a Alex Andrews, and The Internet Archive, Plaintiffs below, Appellants here, filed suit challenging the constitutionality of the Allow States and Victims to Fight Online Sex Trafficking Act of 2017, Pub. L. No. 115-164, 132 Stat. 1253 (2018) ("FOSTA"), naming as Defendants, Appellees here, the United States and the Attorney General of the United States in his official capacity.  Appellants anticipate that *amici* in support of this appeal will include (1) the Center for Democracy and Technology; (2) Coyote–Rhode Island; (3) Decriminalize Sex Work, and other entities aligned with its position; (4) Foundation for Individual Rights and Expression, and other entities aligned with its position; and (5) the Transgender Law Center.

**B.     Rulings Under Review**

The ruling under review is *Woodhull Freedom Foundation, et al. v. United States*, 2022 WL 910600 (D.D.C. Mar. 29, 2022), and its accompanying Order, by which the District Court granted Appellees' motion for summary judgment and denied Appellants' motion for summary judgment, dismissing Appellants' Complaint challenging the constitutionality of FOSTA.

i

## C.    Related Cases

There are no related cases.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and D.C. Circuit Rule 26.1, Appellant states as follows:

Appellants Eric Koszyk and Jesse Maley a/k/a Alex Andrews are individuals not required to submit a corporate disclosure statement, and Woodhull Freedom Foundation, Human Rights Watch, and The Internet Archive are incorporated as nonprofit organizations, with no parent corporations, and no stock or other interest owned by a publicly held company.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES ..............i

CORPORATE DISCLOSURE STATEMENT ........................................ iii

TABLE OF AUTHORITIES ...................................................................vi

JURISDICTIONAL STATEMENT ..........................................................1

ISSUES PRESENTED...............................................................................2

INTRODUCTION .....................................................................................3

STATEMENT OF THE CASE...................................................................5

      A.     FOSTA's Specific Provisions ....................................................5

      B.     FOSTA's Immediate Impact .....................................................8

            1.    Generally ........................................................................8

            2.    Impact on Appellants .................................................11

      C.     Prior Proceedings ...................................................................13

STANDARD OF REVIEW .....................................................................14

STATUTES AND REGULATIONS.........................................................15

SUMMARY OF ARGUMENT ...............................................................15

ARGUMENT ..........................................................................................22

I.     FOSTA VIOLATES THE FIRST AMENDMENT........................................22

      A.     FOSTA is an Overbroad Prohibition of Online Speech.....................22

            1.    FOSTA Inherently Regulates Speech .......................................23

                 a.     Regulating a Medium of Communication
                      Targets Speech................................................................23

          b.      Sections 2421A and 1591 Target Speech.......................25

     2.     The Conclusion That FOSTA Reaches Only Unprotected
          Speech is Incorrect ................................................28

     3.     FOSTA's Impact on Protected Speech ....................................33

  B.    FOSTA is Unconstitutionally Vague and Lacks Clear Scienter
       Requirements................................................................37

  C.    FOSTA Fails Strict Scrutiny .............................................43

     1.     FOSTA is a Content-Based Regulation ...................................44

     2.     FOSTA Does Not Employ the Least Restrictive Means .........46

II.   FOSTA VIOLATES THE FIRST AMENDMENT BY
     ESTABLISHING PUBLICATION LIABILITY FOR ONLINE
     INTERMEDIARIES .......................................................48

  A.    The First Amendment Protects Speech by Intermediaries.................48

  B.    Congress Codified First Amendment Protections in Section 230
       to Address the Problem of Intermediary Liability Online .................50

  C.    FOSTA's Amendments to Section 230, Combined With Its
       Other Provisions, Violate the First Amendment. ...............................52

III.  FOSTA IS AN UNCONSTITUTIONAL *EX POST FACTO* LAW.................55

CONCLUSION ..................................................................57

ADDENDUM
CERTIFICATE OF COMPLIANCE
CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU of Ill. v. Alvarez*,
  679 F.3d 583 (7th Cir. 2012) ............................................................24

*Al Bahlul v. United States*,
  767 F.3d 1 (D.C. Cir. 2014) ............................................................56

*Anderson v. City of Hermosa Beach*,
  621 F.3d 1051 (9th Cir. 2010) ........................................................23

*Ashcroft v. ACLU*,
  542 U.S. 656 (2004) ........................................................................47

*Ashcroft v. Free Speech Coal.*,
  535 U.S. 234 (2002) ............................................................22, 28, 47

*Baggett v. Bullitt*,
  377 U.S. 360 (1964) ..................................................................38, 41

*Bantam Books v. Sullivan*,
  372 U.S. 58 (1963) ....................................................................49, 54

*Barnes v. Yahoo!, Inc.*,
  570 F.3d 1096 (9th Cir. 2009) ........................................................51

*Bartnicki v. Vopper*,
  532 U.S. 514 (2001) ........................................................................24

*Bennett v. Google, LLC*,
  882 F.3d 1163 (D.C. Cir. 2018) ..........................................20, 50, 53

*Bose Corp. v. Consumers Union of U.S., Inc.*,
  466 U.S. 485 (1984) ........................................................................14

*Broadrick v. Oklahoma*,
  413 U.S. 601 (1973) ........................................................................57

*Brown v. Entm't Merchs. Ass'n*,
  564 U.S. 786 (2011) ............................................................24, 38, 46

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*,
142 S. Ct. 1464 (2022) ........................................................45

*City of Houston v. Hill*,
482 U.S. 451 (1987) ...........................................................33

*City of Ladue v. Gilleo*,
512 U.S. 43 (1994) .............................................................48

*City of Los Angeles v. Patel*,
576 U.S. 409 (2015) ...........................................................56

*Denver Area Educ. Telecomms. Consortium v. FCC*,
518 U.S. 727 (1996) .....................................................49, 54

*Doe v. Kik Interactive, Inc.*,
482 F. Supp. 3d 1242 (S.D. Fla. 2020) ..............................42

*Doe v. Mindgeek USA Inc.*,
558 F. Supp. 3d 828 (C.D. Cal. 2021) ...............................42

*Doe v. Twitter, Inc.*,
555 F. Supp. 3d 889 (N.D. Cal. 2021),
*appeal filed*, No. 22-15104 (9th Cir. 2022) ......................42

*Elonis v. United States*,
575 U.S. 723 (2015) ...........................................................42

*Ex parte Garland*,
71 U.S. 333 (1866) .............................................................56

*Fyk v. Facebook, Inc.*,
808 F. App'x 597 (9th Cir. 2020),
*cert. denied*, 141 S. Ct. 1067 (2021) .................................51

*Grayned v. City of Rockford*,
408 U.S. 104 (1972) ...........................................................38

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010) ...............................................................45

*J.B. v.G6 Hosp., LLC*,
    2021 WL 4079207 (N.D. Cal. 2021),
    *appeal pending*, No. 22-15290 (9th Cir. 2022) ...................................................42

*Jones v. Dirty World Entm't Recordings LLC*,
    755 F.3d 398 (6th Cir. 2014) ...........................................................................50

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*,
    385 U.S. 589 (1967)..........................................................................................36

*Klayman v. Zuckerberg*,
    753 F.3d 1354 (D.C. Cir. 2014) ......................................................................51

*Liberty Lobby, Inc. v. Rees*,
    852 F.2d 595 (D.C. Cir. 1988)..........................................................................14

*Marbury v. Madison*,
    5 U.S. 137 (1803)..............................................................................................56

*Marquez-Reyes v. Garland*,
    36 F.4th 1195 (9th Cir. 2022) .............................................................17, 30, 37

*McCullen v. Coakley*,
    573 U.S. 464 (2014)..........................................................................................46

*Members of City Council v. Taxpayers for Vincent*,
    466 U.S. 789 (1984)....................................................................................22, 57

*Menkes v. U.S. Dep't of Homeland Sec.*,
    637 F.3d 319 (D.C. Cir. 2011)..........................................................................14

*Midwest Video Corp. v. FCC*,
    571 F.2d 1025 (8th Cir. 1978), *aff'd*, 440 U.S. 689 (1979)..............................49

*Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*,
    460 U.S. 575 (1983)..........................................................................................23

*Mishkin v. New York*,
    383 U.S. 502 (1966)..........................................................................................43

*Miss. Band of Choctaw Indians v. Holyfield*,
    490 U.S. 30 (1989)............................................................................................30

*NAACP v. Button,
   371 U.S. 415 (1963)...............................................................19, 34, 39

Near v. Minnesota,
   283 U.S. 697 (1931)......................................................................23

NetChoice, LLC v. Att'y Gen., Fla.,
   34 F.4th 1196 (11th Cir. 2022) ..................................................25, 50

New York Times v. Sullivan,
   376 U.S. 254 (1964).................................................................49, 53, 54

*Packingham v. N. Carolina,
   137 S. Ct. 1730 (2017)...............................................................15, 43

*Reed v. Town of Gilbert,
   576 U.S. 155 (2015)...............................................................44, 45, 46

*Reno v. ACLU,
   521 U.S. 844 (1997)............................................... 15, 22, 25, 28, 38, 39, 48, 50

Rosenberger v. Rector & Visitors of Univ. of Va.,
   515 U.S. 819 (1995)......................................................................45

Sandvig v. Sessions,
   315 F. Supp. 3d (D.D.C. 2018).........................................................25

Shelton v. Tucker,
   364 U.S. 479 (1960)......................................................................37

Simon & Schuster, Inc. v. N.Y. State Crime Victims Bd.,
   502 U.S. 105 (1991)......................................................................44

*Smith v. California,
   361 U.S. 147 (1959)...............................................................20, 48, 49, 54

Sorrell v. IMS Health, Inc.,
   564 U.S. 552 (2011)......................................................................24

Speiser v. Randall,
   357 U.S. 513 (1958)......................................................................43

*Stogner v. California*,
    539 U.S. 609 (2003) ...........................................................................56

*Telescope Media Grp. v. Lucero*,
    936 F.3d 740 (8th Cir. 2019) ..............................................................24

*TRW Inc. v. Andrews*,
    534 U.S. 19 (2001) .......................................................................17, 31

\*United States v. Hansen*,
    25 F.4th 1103 (9th Cir. 2022),
    *reh'g denied*, 40 F.4th 1049 (9th Cir. 2022),
    *pet. for cert. docketed*, No. 22-179 (Aug. 29, 2022) ............................32, 35, 37

\*United States v. Hernandez-Calvillo*,
    39 F.4th 1297 (10th Cir. 2022) .................................... 17, 29, 30, 32, 33, 36, 37

\*United States v. Miselis*,
    972 F.3d 518 (4th Cir. 2020),
    *cert. denied*, 141 S. Ct. 2756 (2021) .........................................27, 31, 36, 40, 41

\*United States v. Playboy Entm't Grp., Inc.*,
    529 U.S. 803 (2000) ............................................... 19, 20, 37, 44, 46, 47

\*United States v. Rundo*,
    990 F.3d 709 (9th Cir. 2021),
    *cert. denied*, 142 S. Ct. 865 (2022) ...........................................................31, 36

\*United States v. Sineneng-Smith*,
    910 F.3d 461 (9th Cir. 2018),
    *vacated on other grounds*, 140 S. Ct. 1575 (2020) ........ 27, 28, 29, 30, 32, 33, 35

\*United States v. Stevens*,
    559 U.S. 460 (2010) ............................................................................22, 28

\*United States v. Williams*,
    553 U.S. 285 (2008) .............................................................22, 29, 31, 32, 33

*United States v. Yung*,
    37 F.4th 70 (3d Cir. 2022) ...................................................................25

*Universal Commc'n Sys., Inc. v. Lycos, Inc.*,
    478 F.3d 413 (1st Cir. 2007) ...............................................................51

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989)...........................................................................45

*Wash. Post v. McManus*,
    944 F.3d 506 (4th Cir. 2019) .......................................25, 35, 44, 48

*Whole Women's Health v. Jackson*,
    142 S. Ct. 522 (2021).......................................................................56

*Winter v. G.P. Putnam's Sons*,
    938 F.2d 1033 (9th Cir. 1991) ........................................................50

*Woodhull Freedom Found. v. United States*,
    334 F. Supp. 3d 185 (D.D.C. 2018)................................................13

*\*Woodhull Freedom Found. v. United States*,
    948 F.3d 363 (D.C. Cir. 2020)..... 4, 13, 14, 16, 17, 18, 26, 27, 29, 30, 31, 34, 37

*\*Zeran v. Am. Online, Inc.*,
    129 F.3d 327 (4th Cir. 1997) ....................................................51, 52

## Constitutional Provisions

U.S. Const.,
    amend. I............................................ 2, 3, 4, 5, 13, 14, 15, 16, 20, 21, 22, 23, 24,
    .................................... 25, 33, 38, 39, 41, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 57
    amend. V ...........................................................................................57
    amend. XIV.......................................................................................13

## Statutes

7 U.S.C.
    § 13c.................................................................................................39

12 U.S.C.
    § 1786(k)(2)(K)...............................................................................39
    § 1786(m).........................................................................................39
    § 1847..............................................................................................39

15 U.S.C.
    § 78t.................................................................................................39
    § 80b-9(f) .........................................................................................39

**18 U.S.C.**
1595(a) ...............................................................................42
§ 1591 ............................... 6, 7, 8, 15, 25, 26, 42, 43, 52, 55
§ 1591(a) ............................................................6, 15, 36
§ 1591(a)(1) ..............................................................6, 47
§ 1591(a)(2) .......................................................6, 7, 26, 47
§ 1591(e)(4) .................................................6, 15, 18, 26, 38
§ 1595 ........................................... 6, 7, 8, 19, 42, 52, 55
§ 1595(d) ...................................................................7
§ 2421A ..................... 5, 7, 8, 15, 17, 19, 25, 26, 40, 43, 44, 45, 52, 55
§ 2421A(a) ...........................................................5, 25
§ 2421A(a)-(b) ...............................................................5
§ 2421A(b) ................................................................5, 6
§ 2421A(b)(2) .......................................................19, 38, 41
§ 2421A(c) ...................................................................5
§ 2421A(d) ...................................................................5

**21 U.S.C.**
§ 841(h) ...................................................................39

**26 U.S.C.**
§ 7206(2)-(3) .............................................................39

**28 U.S.C.**
§ 1291 .......................................................................1
§ 1331 .......................................................................1
§ 2201 .......................................................................1
§ 2202 .......................................................................1

**47 U.S.C.**
§ 223 .......................................................................3
§ 230 ................. 5, 8, 15, 19, 20, 21, 25, 42, 45, 50, 51, 52, 53, 54, 55
§ 230(a)(3) ................................................................52
§ 230(c)(1) ...................................................20, 51, 52, 53
§ 230(c)(2) ...................................................20, 51, 52, 53
§ 230(c)(2)(A) ..............................................................53
§ 230(e) ....................................................................8
§ 230(e)(5) ...........................................................8, 15, 55
§ 230(e)(5)(A) .............................................................42

## Rules

Federal Rules of Civil Procedure
    Rule 57 ..................................................................................................1
    Rule 65 ..................................................................................................1

## Other Authorities

Antonin Scalia & Bryan A. Garner,
    READING LAW: THE INTERPRETATION OF LEGAL TEXTS (2012) .............17, 30, 31

BLACK'S LAW DICTIONARY (11th ed. 2019) ...........................................................26

CRAIGSLIST, About FOSTA
    (https://www.craigslist.org/about/FOSTA) ........................................10

Eric Goldman, *The Complicated Story of FOSTA and Section 230*,
    17 FIRST AMENDMENT L. REV. 279 (2019) ........................................................53

Eric Goldman, *'Worst of Both Worlds' FOSTA Signed Into Law,
Completing Section 230's Evisceration*, Tech. & Mktg. Law Blog,
    April 11, 2018
    (https://blog.ericgoldman.org/archives/2018/04/worst-of-both-
    worlds-fosta-signed-into-law-completing-section-230s-
    evisceration.htm) ...................................................................................9

Government Accountability Office,
    *Sex Trafficking—Online Platforms and Federal Prosecutions*,
    GAO-21-385 (June 2021) ..............................................................36

Jeff Kosseff,
    THE TWENTY-SIX WORDS THAT CREATED THE INTERNET (2019) .....................54

    \*  Authorities chiefly relied upon marked with an asterisk.

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction of this action arising under FOSTA, and the United States Constitution pursuant to 28 U.S.C. §§ 1331, 2201, and 2202, and Federal Rules of Civil Procedure 57 and 65.  Plaintiffs-Appellants filed a timely notice of appeal of the District Court's March 29, 2022 final Memorandum Opinion and Order, JA0717-0745, on April 25, 2022.  JA0746.  This Court has jurisdiction over both appeals under 28 U.S.C. § 1291.

## ISSUES PRESENTED

1.      Whether FOSTA violates the First Amendment because (A) it is an overbroad restriction on protected speech; (B) its operative terms are unconstitutionally vague; (C) it lacks adequate scienter requirements; and (D) it is a content-based speech restriction that fails strict scrutiny.

2.      Whether FOSTA violates the First Amendment because its broad and poorly defined restrictions on Internet speech and selective removal of immunity for online intermediaries imposes an unconstitutional chilling effect on protected expression.

3.      Whether FOSTA violates the *Ex Post Facto* and Due Process Clauses of the Constitution by allowing states to prosecute pre-FOSTA conduct that they could not have prosecuted at the time it occurred, and exposing defendants to increased penalties unavailable prior to FOSTA for conduct predating its enactment.

## INTRODUCTION

FOSTA is the furthest-reaching attempt to censor online speech since Congress first attempted to regulate the Internet through anti-indecency provisions in the Communications Decency Act, 47 U.S.C. § 223 ("CDA").  FOSTA makes it easier for federal prosecutors, state law enforcement officials, and civil litigants to impose crushing liability on Internet speech using expansive but undefined terms regarding the "promotion" or "facilitation" of prostitution and/or the "reckless disregard" of conduct that "contributes to sex trafficking."  FOSTA's new, content-based criminal penalties and heavy civil liability for online publishers have already led to substantial diminution of online speech on these subjects, and on issues peripheral to them.

Appellants Woodhull Freedom Foundation ("Woodhull"), Human Rights Watch ("HRW"), Eric Koszyk, Jesse Maley a/k/a Alex Andrews ("Andrews"), and the Internet Archive ("the Archive") brought a pre-enforcement facial challenge to FOSTA on several grounds:  The law's provisions are unconstitutionally overbroad, vague, and fail to require adequate scienter; it imposes content-based speech restrictions that fail strict First Amendment scrutiny; it imposes a heckler's veto on speech transmitted by online intermediaries; and it constitutes a forbidden *ex post facto* law.  Appellants showed FOSTA has a substantial chilling effect on protected

3

speech, causing numerous online platforms to completely shut down or censor material protected by the First Amendment.

The District Court initially dismissed the challenge based on a lack of standing, but this Court reversed, rejecting the lower court's narrow reading of the law. *Woodhull Freedom Found. v. United States*, 948 F.3d 363 (D.C. Cir. 2020). The panel majority found the law's operative terms were undefined and "not limited by a string of adjacent verbs … that would convey 'a transactional connotation,'" and that "FOSTA's text does not limit its scope to 'bad actor websites,' or even to classified advertising." *Id.* at 372-73. In a partial concurrence, Judge Katsas wrote the law should be interpreted more narrowly, applicable only to speech that constitutes or aids and abets criminal activity. *Id.* at 374-76. On remand, Judge Richard Leon embraced the concurrence, citing it no fewer than 15 times in a 28-page opinion, and concluded it is "consistent with that endorsed in my earlier opinion." JA0724; *see also* JA0728-0729. As if the majority opinion did not exist, the District Court concluded that FOSTA is narrowly tailored to reach only illegal conduct, and that "FOSTA, on its face, is not a direct regulation of speech." JA0738.

The decision under review ignores the majority's analysis that applied basic canons of statutory interpretation to find that FOSTA's text reaches beyond "bad actor websites" to reach constitutionally protected speech. Accordingly, this Court should affirm that FOSTA is a direct regulation of speech that employs undefined,

overbroad, and vague terms that have had a substantially chilling impact on Internet platforms and their users. It also should find that FOSTA manipulated immunities for online intermediaries that were designed to preserve First Amendment protections, and that these changes have had widespread chilling effects. The decision below should be reversed and FOSTA should be enjoined.

## STATEMENT OF THE CASE

### A.     FOSTA's Specific Provisions

FOSTA effects three major changes in the law:

First, newly added 18 U.S.C. § 2421A makes it a felony for anyone to own, manage, or operate an interactive computer service—as defined in 47 U.S.C. § 230—using any facility or means of interstate commerce "with the intent to promote or facilitate the prostitution of another person." 18 U.S.C. § 2421A(a). It also creates an "aggravated violation" when the underlying conduct "promotes or facilitates the prostitution of 5 or more persons" or the person "acts in reckless disregard" of the fact that their conduct "contributed to sex trafficking." *Id*. § 2421A(b).[1] Anyone convicted of violating Section 2421A(a) can be fined, imprisoned for up to 10 years, or both; for "aggravated violations" under Section 2421A(b) imprisonment may be for up to 25 years. *Id*. § 2421A(a)-(b). The statute

---

[1] Sections 2421A(c) and (d) allow for, respectively, civil recovery damages and attorneys' fees, and mandatory restitution for victims of the crime.

does not define the terms "promotes," "facilitates," or "prostitution." Nor are "promote," "facilitate," or "contribute to sex trafficking" defined for purposes of Section 2421A(b).

Second, FOSTA expanded the existing federal criminal trafficking law in 18 U.S.C. § 1591 and related civil claims under 18 U.S.C. § 1595.[2] The law not only prohibits specific acts of traffickers, but reaches anyone who "participates in a venture," which requires only "reckless disregard" to make out a violation. Section 1591 has a particularly confusing hodgepodge of *mens rea* and *actus reus* language. In relevant part, though, Section 1591(a)(2) creates liability for anyone who knowingly benefits from "participation in a venture" with knowledge or, except in the case of advertising, *reckless disregard* of the facts most critical to liability—such as the fact that any commercial sex acts have taken place, or that a third party has used force, fraud or coercion against a person who participated in those acts. The term "participation in a venture" is defined, at 1591(e)(4), to mean "knowingly assisting, supporting, or facilitating a violation" of the law's prohibition on acts such as recruiting, transporting, advertising, under subsection (a)(1).

---

[2] Section 1591(a) imposes criminal penalties (and, through Section 1595, civil liability) for anyone who knowingly recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits a person, *or* who "benefits financially or by receiving anything of value from participation in a venture" involving those enumerated acts. 18 U.S.C. § 1591(a).

FOSTA's amendments to Section 1591 significantly muddied the waters for anyone trying to understand what actions, and what mental states, would lead to liability.  The House Report explained that the law needed to reach defendants who did not know key facts about the actions of third parties because the "knowledge standard [was] difficult to prove beyond a reasonable doubt."  H.R. Rep. No. 115-572, pt. 1, at 5 (2018).  FOSTA thus broadens the law's coverage  through use of the verbs "assisting or supporting, or facilitating" trafficking, and confusingly ties back into the "reckless disregard" standard of *mens rea*.  18 U.S.C. § 1591(a)(2).

As a result, speakers or Internet platforms seeking to avoid liability now must navigate overlapping and impenetrable *mens rea* standards.  FOSTA appears to create liability whether or not the platform realized or suspected that a crime occurred or might occur, and online intermediaries must anticipate how law enforcement officials in every state might interpret these standards.  This is because FOSTA amends the law to permit state attorneys general to bring state criminal actions against conduct that violates Sections 1591 or 2421A, or to bring civil actions *parens patriae* if there is reason to believe "an interest of the residents of that State has been or is threatened or adversely affected by any person who violates section 1591." *See id*. § 1595(d).  Putative defendants must also anticipate how countless civil litigants might construe the law under Section 1595.

7

Third, FOSTA diminished Section 230 immunity in two significant ways. Primarily, it expanded the risk of enforcement by amending Section 230(e) to allow for both state criminal prosecutions and private civil actions, eliminating immunity for: (A) any claim in a civil action under Section 1595 if the conduct underlying the claim constitutes a violation of Section 1591; (B) any charge in a criminal prosecution under state law if the underlying conduct would constitute a violation of Section 1591; or (C) any charge in a criminal prosecution under state law if the underlying conduct would constitute a violation of section 2421A. *See* 47 U.S.C. § 230(e)(5). Further, by adding new offenses under federal law and expanding existing ones, FOSTA broadened potential liability for Internet intermediaries, who are not shielded by Section 230 from federal criminal claims. *Id.* § 230(e).

The amendments to Section 230, like all of FOSTA, became effective on the date of enactment. However, the changes to Section 230's statutory immunities are *retroactive*, applying to conduct that occurred "before, on, or after … enactment." *See* FOSTA, Pub. L. No. 115-164 § 4(b).

## B.  FOSTA's Immediate Impact

### 1.  Generally

FOSTA profoundly altered the ecosystem for online speech in at least two critical ways: (1) it chilled numerous would-be online speakers into self-censoring because of the risk of criminal and civil liability; and (2) it exposed numerous online

platforms and service providers to liability under an unclear standard, causing many that had previously hosted such speech and otherwise provided services to cease doing so. These were precisely the censorial effect many predicted before FOSTA was enacted.[3]

Online service providers that enable interpersonal contact by users—including many lacking a connection to sexual content—immediately removed content, eliminated entire sections of websites, or were shuttered altogether out of fear of state or federal prosecution, or ruinous civil liability. *See* JA0129-0133, ¶ 16. These included websites that hosted personals ads, community forums devoted to discussions of sexuality and lawful adult sexual relationships, speech about non-sexual massage therapy and other non-sexual services, as well as dating sites. *Id.* ¶ 16. Some online service providers took these actions simply because they could not afford to monitor the activities of third parties on their sites in order to avoid liability under the new law. *Id.* (discussing how the volunteer-led personals ad website www.pounced.org shut down).

Just two days after the Senate passed H.R. 1865, the online classified ad service Craigslist eliminated all personals ads, including non-sexual categories such

---

[3] *See, e.g*., Eric Goldman, *'Worst of Both Worlds' FOSTA Signed Into Law, Completing Section 230's Evisceration*, Tech. & Mktg. Law Blog, April 11, 2018 (https://blog.ericgoldman.org/archives/2018/04/worst-of-both-worlds-fosta-signed-into-law-completing-section-230s-evisceration.htm).

as "Missed Connections" and "Strictly Platonic." In a public statement, it explained that it censored these sections due to FOSTA:

> US Congress recently passed HR 1865, "FOSTA," seeking to subject websites to criminal and civil liability when third parties (users) misuse online personals unlawfully.
>
> Any tool or service can be misused. We can't take such risk without jeopardizing all our other services, so we have regretfully taken craigslist personals offline. Hopefully we can bring them back some day.

JA0129 ¶ 12.[4]

Reddit, a site where users post content, including news articles, photos, or links, and participate in comment threads discussing the posts, began removing "subreddits" that relate to sex. JA0129-0130 ¶¶ 13-14. It also warned the moderator of the r/sexworkers subreddit, which is a "community forum for sex workers, clients, and even those unaffiliated with the industry to … ask questions and share resources," that the forum could be shut down if administrators felt it infringed Reddit's post-FOSTA policy. *Id*. Google changed enforcement of its Google Play policy to forbid publishing of "sexually explicit or pornographic images or videos." JA0130-0131 ¶ 16.

The Desiree Alliance, a national coalition of current and former sex workers, health professionals, social scientists, sex educators, and their supporting networks,

---

[4]  *See* About FOSTA, CRAIGSLIST, https://www.craigslist.org/about/FOSTA (last visited Sept. 6, 2022).  Users now receive "404 Errors" if they try to access URLs where Craigslist's personals formerly appeared.

cancelled its July 2019 conference, scuttling what would have been the largest U.S. gathering to address human, labor, and civil rights for sex workers.  In an online post, its director announced that because of FOSTA, "our leadership made the decision that we cannot put our organization and our attendees at risk."  *See* http://desireealliance.org/conference.

### 2.  Impact on Appellants

Appellants are individuals and organizations engaged in constitutionally protected speech on the Internet—including a national human rights organization dedicated to sexual freedom, an international human rights organization, a massage therapist, an activist dedicated to assisting and advocating for the rights of sex workers, and a digital library of Internet sites and other cultural artifacts in digital form.  The Complaint alleged that FOSTA had adversely affected each Appellant, and they submitted detailed supporting declarations in subsequent briefing.

**Woodhull Freedom Foundation**, a tax-exempt education, advocacy and lobbying organization dedicated to protecting the fundamental human right to sexual freedom, focuses on supporting the health, safety, and protection of those under the broad umbrella of "sex workers," including adult film performers, live webcam models, sexual wellness instructors, escorts, and prostitutes.  JA0436-0437 ¶¶ 2-3, 5-6.  FOSTA caused it to censor its publication of information on its website that could assist sex workers negatively affected by the law, and to cease posting other

resources for sex workers. Examples included limiting Woodhull from expressing on its blog and in social media opposition to FOSTA's enforcement against marginalized sex workers, from allowing third parties to post similar material on Woodhull's *Sex and Politics* blog, and restricting the online speech associated with Woodhull's annual multi-day Sexual Freedom Summit. JA0439-0441 ¶¶ 13, 16, 21-24, 27.

**Alex Andrews** is a long-time advocate for sex worker rights and co-founder and organizer of a number of advocacy groups for sex worker health, safety, and human rights, and of the website Rate That Rescue (www.ratethatrescue.org), a free sex worker-led, community effort to share information. JA0418-0421 ¶¶ 1-4, 8-9, 13-14. Because of FOSTA, Andrews canceled her acquisition and development of an electronic tool for sex workers to report violence, harassment, and other harmful behavior. JA0425-0427 ¶¶ 34-36, 40-42.

FOSTA endangers **Human Rights Watch**'s human rights advocacy because HRW seeks to make sex work safer. HRW advocates on behalf of sex workers' rights and safety in the U.S. and internationally, and by documenting abuses against sex workers with a goal of making sex work less dangerous. JA0454 ¶¶ 2-3. For example, HRW has warned sex workers about methods police use to discover and shut down sex work. *See* JA0455 ¶ 5.

12

**The Internet Archive** stores and displays a vast amount of historical website data and third-party content, including content related to prostitution and trafficking, and has "no practical ability to evaluate the legality of" such third-party material. JA0431-0432 ¶¶ 6-10, 14.  The Archive reasonably fears prosecution for both its preservation of web pages that may later be found to violate FOSTA, and for third-party material it hosts.  JA0433 ¶ 21.  FOSTA has inhibited the Archive's mission of preserving access to information for the public by driving a significant amount of content off the web.

**Eric Koszyk** is a licensed massage therapist and proprietor of Soothing Spirit Massage, who, before FOSTA, used the online classified ad platform Craigslist.org to reach approximately 90 percent of his clientele.  JA0447 ¶¶ 7-8.  When Craigslist eliminated its Therapeutic Services section in response to FOSTA, he lost this channel, and the business and revenues associated with it.  JA0450-0451 ¶¶ 20-23.

## C.    Prior Proceedings

Appellants filed a Complaint seeking declaratory and injunctive relief, challenging FOSTA's constitutionality under the First and Fourteenth Amendments, both on its face and as applied.  Appellants simultaneously sought a preliminary injunction pending resolution of the constitutional challenge.  On September 24, 2018, the District Court dismissed the case and the motion for preliminary injunction, holding that Appellants lacked standing.  *Woodhull Freedom Found. v.*

13

*United States*, 334 F. Supp. 3d 185 (D.D.C. 2018). Appellants appealed, and this Court reversed dismissal of the Complaint for lack of subject-matter jurisdiction and remanded the case to the District Court. *Woodhull*, 948 F.3d at 363. Judge Katsas filed an opinion concurring in part and concurring in the judgment based on a narrower construction of FOSTA than in the majority opinion. *Id.* at 375-76.

On remand, the parties filed cross-motions for summary judgment, and the District Court again dismissed the Complaint. Adopting the construction of FOSTA set forth in Judge Katsas' partial concurrence, it held that FOSTA did not regulate speech directly and that its terms are not unconstitutionally overbroad or vague. JA0735-0741. It also rejected the claim that FOSTA violates the *Ex Post Facto* Clause. JA0741-0743. Appellants timely appealed. JA0746.

## STANDARD OF REVIEW

This Court exercises *de novo* review over the District Court's conclusions of law, *Menkes v. U.S. Dep't of Homeland Sec.*, 637 F.3d 319, 329 (D.C. Cir. 2011), and conducts an independent examination of the whole record to ensure that "the judgment does not constitute a forbidden intrusion" on First Amendment rights. *E.g.*, *Liberty Lobby, Inc. v. Rees*, 852 F.2d 595, 598 (D.C. Cir. 1988) (quoting *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 499 (1984)).

## STATUTES AND REGULATIONS

The text of 18 U.S.C. §§ 1591 and 2421A, as amended and added by FOSTA, respectively, and the text of 47 U.S.C. § 230, as amended by FOSTA, appear in the Addendum.

## SUMMARY OF ARGUMENT

FOSTA is a direct regulation of speech that violates well-established First Amendment principles pertaining to the constitutional rights to publish, post to, and access websites.  It criminalizes undefined acts of "promoting" or "facilitating" prostitution via interactive computer service, 18 U.S.C. § 2421A; expands federal trafficking offenses for "participating in a venture" by "assisting," "supporting," or "facilitating" violations, all of which are undefined, *id*. § 1591(a), (e)(4); and eliminates statutory immunity from state prosecution and civil liability for interactive computer services in these areas, 47 U.S.C. § 230(e)(5).  This runs contrary to the Supreme Court's warning that courts "must exercise extreme caution" and review with special scrutiny any law that purports to regulate speech on the "vast democratic forums of the Internet." *Packingham v. N. Carolina*, 137 S. Ct. 1730, 1735-36 (2017) (quoting *Reno v. ACLU*, 521 U.S. 844, 868 (1997)).

The District Court denied Appellants' claims that FOSTA violates the First Amendment based on two overarching fallacies:  (1) that FOSTA does not directly regulate speech, and (2) that FOSTA's language narrowly targets "aiding and

15

abetting" activities and only affects speech integral to criminal activity.  Take out those two props, and the decision below collapses.

The District Court's central premise that "FOSTA, on its face, is not a direct regulation of speech," JA0738, runs contrary to a primary tenet of First Amendment jurisprudence:  regulating a communications medium inherently regulates expression.  FOSTA targets speech every bit as much as would a law penalizing one who "owns, manages, or operates [a printing press] … with the intent to promote or facilitate the prostitution of another."  The District Court reasoned from the false premise that FOSTA is merely a criminal law with only indirect implications for protected expression, and consequently reached the wrong conclusion that the law can reach only criminal behavior.

But FOSTA's broad and undefined terms do not support that conclusion.  As the panel majority previously found, the statute does not focus just on the so-called "bad actor" or "classified advertising" websites that motivated its passage, and its operative terms are "susceptible of multiple and wide-ranging meanings" that lack qualifying language that would convey "a transactional connotation."  *Woodhull*, 948 F.3d at 372.  The District Court stakes its all on Judge Katsas' concurring opinion that reimagines FOSTA as reaching only speech that constitutes aiding and abetting crime.  However, neither FOSTA's plain language, nor basic concepts of statutory construction permit such a reading.

16

The District Court's approach violates "the most fundamental semantic rule of interpretation," the "ordinary-meaning rule." Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 69 (2012) ("Scalia and Garner"). A court may deviate from the ordinary meaning of words in interpreting a statute to apply the "narrower, criminal-law sense of solicitation or aiding and abetting" when that interpretation "is supported by the *noscitur a sociis* canon." *Marquez-Reyes v. Garland*, 36 F.4th 1195, 1202-03 (9th Cir. 2022). But as the majority here found, FOSTA's operative terms are not "limited by a string of adjacent verbs" so as to permit such a reading. *Woodhull*, 948 F.3d at 372.

The District Court's attempt to limit FOSTA's plain language by applying specialized criminal law definitions is inapt because the statute's various provisions provide both criminal and civil remedies. *United States v. Hernandez-Calvillo*, 39 F.4th 1297, 1306 (10th Cir. 2022). And by interpreting FOSTA's disjunctive terms "promote or facilitate" to mean the same thing (aiding and abetting), the District Court violated the canon against superfluity. *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001). Section 2421A's reference to "the prostitution of another person" does not limit FOSTA's reach only to criminal transactions, as the District Court concluded. JA0734. Even for communication specifically about illegal prostitution (or directed toward a particular prostitute), much speech intended to "facilitate" the activity (*e.g.*,

promoting health, safety, providing legal and political support) falls within the broad language of FOSTA but is not part of a criminal transaction.

FOSTA's incursions into protected speech are significant both in absolute terms and by comparison to any "legitimate sweep" of the law. According to the government, FOSTA's "legitimate sweep" is to allow civil claims and prosecution against so-called "bad-actor" websites, identified primarily as those hosting classified ads. JA0489. But as the panel majority found, FOSTA's terms are not so limited, *Woodhull*, 948 F.3d at 373, and the censorial impact of the law has been widespread. JA0080-0083. FOSTA's overbreadth is underscored by the fact that pre-existing laws that do not specifically target online speech already serve its purpose.

FOSTA's operative terms are also unconstitutionally vague. As the panel majority observed, "FOSTA does not define 'promote' or 'facilitate,' nor does it specify what constitutes 'prostitution,' a term undefined by federal law." *Woodhull*, 948 F.3d at 372. Likewise, the operative verbs in Section 1591(e)(4)—assisting, supporting, and facilitating—are ambiguous, leaving owners and operators of interactive computer services to guess about what speech might run afoul of the law. The district court discounts vagueness concerns, relying entirely on the same faulty assumption as its conclusions on overbreadth—that the terms must be read in "the criminal law context in which they appear." JA0736. But references to criminal law

"synonyms" do not change the fact that Congress did not write an aiding and abetting statute.  FOSTA violates the principle that "[p]recision of regulation must be the touchstone in an area so closely touching our most precious freedoms."  *NAACP v. Button*, 371 U.S. 415, 438 (1963).

FOSTA's vagueness is not saved by its scienter requirements, which only make matters worse.  Section 2421A lacks any specific knowledge element, and although it includes an "intent" requirement, it is not limited to speech that is integrally related to, or supportive of, criminal activity.  FOSTA's "aggravated" offense likewise imposes liability based on "reckless disregard" that speech "contributed to sex trafficking" without defining that concept.  18 U.S.C. § 2421A(b)(2).  And FOSTA's confusing modification of Section 230 immunity to permit civil suits under 18 U.S.C. § 1595 has led to conflicting decisions about the applicable *mens rea* standard.  The absence of clear statutory prohibitions combined with opaque *mens rea* requirements has proven to be particularly chilling for online intermediaries.

FOSTA is a content-and viewpoint-related speech regulation that fails to satisfy strict scrutiny.  The district court sidestepped this issue and erroneously concluded that FOSTA "is not a direct regulation of speech" at all.  JA0738.  Properly construed, however, FOSTA "focuses only on the content of the speech" it regulates.  *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 811 (2000)

(citation omitted). It thus constitutes "the essence of [a] content-based regulation" that is "presumptively invalid." *Id.* at 812, 817 (citation omitted). Here, however, the government has not attempted to show FOSTA employs the least restrictive means of serving its asserted interests. To the contrary, it has acknowledged preexisting laws that address the same problem but that do so without targeting speech. Enforcement of these laws (subject to First Amendment limits, including constitutionally required *mens rea* requirements) provides obvious less restrictive means to obtain the same end.

FOSTA's modification of Section 230 immunities to impose these vague new standards on intermediaries also violates the First Amendment. Courts have long recognized protections for speech intermediaries in cases like *Smith v. California*, 361 U.S. 147 (1959), and Congress adopted Section 230 precisely to preserve First Amendment protections for online platforms in light of the unique challenges of the medium. *Bennett v. Google, LLC*, 882 F.3d 1163, 1166 (D.C. Cir. 2018). But FOSTA strips away immunities provided by subsection 230(c)(1), reviving the collateral censorship risks the First Amendment prohibits, to make online intermediaries liable for a raft of civil claims and state criminal charges. At the same time, FOSTA leaves subsection 230(c)(2) undisturbed, which immunizes actions taken to *restrict* speech—including speech protected by the First Amendment. FOSTA tilted the table sharply toward censorship through a combination of broad

speech prohibitions, multiplying the ranks of public and private enforcers, and selective withdrawal of Section 230 immunity. As a result, most large platforms over-censored to avoid potential liability, while many smaller sites simply closed.

The District Court agreed this is the logical consequence of FOSTA, but concluded the statutory changes violated no First Amendment principles. JA0737-0738. This is erroneous, because it ignores the background of First Amendment law that informed the adoption of Section 230 in the first place. Section 230 recognized and implemented well-established First Amendment principles—it did not create them—and Congress cannot now ignore them.

Finally, FOSTA is an invalid *ex post facto* law because its effective date enables enforcement "regardless of whether the conduct alleged occurred, or is alleged to have occurred, before, on, or after such date of enactment." FOSTA § 4(b). On its face, this provision violates the Constitution's command that "[n]o … *ex post facto* Law shall be passed." U.S. Const. art. I, § 9. The District Court did not disagree with this point, JA0742, but dismissed Appellants' claim by concluding that there was no party in the case against which an injunction could be directed, JA0743. This was clear error because it overlooked that Appellants are seeking not just equitable relief, but also declaratory relief, and ignored that the case arises in the First Amendment context.

## ARGUMENT

## I.   FOSTA VIOLATES THE FIRST AMENDMENT

### A.   FOSTA is an Overbroad Prohibition of Online Speech

The Constitution "gives significant protection from overbroad laws that chill speech within the First Amendment's vast and privileged sphere," *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 244 (2002), and the overbreadth doctrine is particularly vital when laws target online speech, *Reno*, 521 U.S. at 863.  A law "may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *United States v. Stevens*, 559 U.S. 460, 473 (2010) (citation omitted).  Likewise, a law that targets speech is facially unconstitutional if there is a "likelihood that the statute's very existence will inhibit free expression."  *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 799-800 (1984).

Analysis of whether a law is an overbroad regulation of speech starts and often ends with examination of the statutory language.  *United States v. Williams*, 553 U.S. 285 (2008).  The District Court's conclusion here that the range of FOSTA's hypothetical applications "covering only unprotected activity—comprises all, or at worst the vast majority, of potential applications of the statute," JA0728, misreads FOSTA's language and misapplies basic canons of statutory construction.

22

## 1.    FOSTA Inherently Regulates Speech

The government defended FOSTA by claiming it does not regulate speech at all, JA0488 ("no facial First Amendment analysis of FOSTA's provisions is appropriate where none of [its] provisions necessarily regulate speech at all"); s*ee also* JA0465, JA0484-0487, JA0498, and the District Court agreed that "FOSTA, on its face, is not a direct regulation of speech."  It noted that "FOSTA's provisions at most *implicate* speech by imposing restrictions on internet services, which, among other things, may provide a forum or serve as a medium for speech."  JA0738.  This foundational premise underlies all the District Court's conclusions and is incorrect for two reasons.

### a.    Regulating a Medium of Communication Targets Speech.

Laws that target a particular medium regulate speech, regardless of how those regulations may be "[c]haracterize[ed]."  *Near v. Minnesota*, 283 U.S. 697, 720 (1931) ("Characterizing the publication as a business, and the business as a nuisance does not permit an invasion of the constitutional immunity against restraint.").  This is true even for measures that do not overtly call out "speech" *per se*.  *See, e.g.*, *Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 582 (1983) (tax on ink and paper "burdens rights protected by the First Amendment"); *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1061-62 (9th Cir. 2010) (First Amendment protects the "process of expression through a medium" as well as "the

expression itself"). These cases stand for the principle that "[s]peech is not conduct just because the government says it is." *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 752 (8th Cir. 2019). The government cannot avoid the First Amendment simply by recasting essential speech processes as "conduct." Otherwise, it could claim "publishing a newspaper is conduct because it depends on the mechanical operation of a printing press." *Id*.

"[T]he creation and dissemination of information are speech within the meaning of the First Amendment," *Sorrell v. IMS Health*, Inc., 564 U.S. 552, 570 (2011), and "if the acts of 'disclosing' and 'publishing' information do not constitute speech, it is hard to imagine what does fall within that category, as distinct from the category of expressive conduct," *Bartnicki v. Vopper*, 532 U.S. 514, 526-27 (2001) (citation omitted) (regulating the disclosure of information "a regulation of pure speech … not a regulation of conduct"); *see also Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 792 n.1 (2011) ("Whether government regulation applies to creating, distributing, or consuming speech makes no difference."); *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 601 n.10 (7th Cir. 2012) (a statute that targets a communication technology and imposes potential criminal liability "burdens First Amendment rights directly, not incidentally").

It has been obvious from the beginning of Internet regulation that laws targeting this medium inherently present serious First Amendment concerns. *See*

*Reno*, 521 U.S. at 868-70. This is true even for regulations that do not specifically mention "speech" (just as for the print medium). *E.g.*, *Sandvig v. Sessions*, 315 F. Supp. 3d at 1, 12-13 (D.D.C. 2018) (applying First Amendment analysis to unauthorized access prohibitions in Computer Fraud and Abuse Act); *United States v. Yung*, 37 F.4th 70, 77 (3d Cir. 2022) (rejecting argument that the Anti-Cyberstalking Act targets conduct and not speech). In addition to extending First Amendment protections to Internet *users*, courts have also uniformly recognized the rights of *intermediaries* such as Facebook or Twitter to "disseminate third-party created" speech and exercise editorial control on their platforms. *NetChoice, LLC v. Att'y Gen.*, *Fla.*, 34 F.4th 1196, 1212 (11th Cir. 2022) (citing cases and explaining that "whether, to what extent, and in what manner to disseminate third-party created content to the public are editorial judgments protected by the First Amendment"); *Wash. Post v. McManus*, 944 F.3d 506, 515 (4th Cir. 2019) (a "platform-oriented structure poses First Amendment problems of its own").

### b.    Sections 2421A and 1591 Target Speech

FOSTA's broad language necessarily implicates speech. There would be little reason to suspend immunity under Section 230—which protects platforms from claims treating them as the "publisher or speaker" of content posted by users—if FOSTA were not about punishing acts of publication and speech. Section 2421A(a) prohibits "own[ing], manag[ing], or operat[ing] an interactive computer service

… with the intent to promote or facilitate the prostitution of another person." 18 U.S.C. § 2421A.  And Section 1591's prohibition on "participation in a venture" involving sex trafficking likewise includes any action "knowingly assisting, supporting, *or facilitating*" a venture while recklessly disregarding its violation of the law.  18 U.S.C. § 1591(a)(2), (e)(4) (emphasis added).

As the panel majority observed, "[t]he terms 'promote' and 'facilitate,' when viewed in isolation, are susceptible of multiple and wide-ranging meanings." *Woodhull*, 948 F.3d at 372 (cleaned up).  And in FOSTA, those terms appear "in isolation," as they are not "limited by a string of adjacent verbs" and are disjunctive. *Id*.  While "promote" and "facilitate" on their face, could apply either to conduct or to speech, here, they target speech in almost all their applications because they apply specifically to the operation of an online computer service.  This is equally true of FOSTA's amendment to 18 U.S.C. § 1591, which defined "participation in a venture" as "knowingly assisting, supporting, or facilitating a violation."

The panel explained that these statutory terms are commonly understood as "to make easier or less difficult, or to assist or aid."  *Woodhull*, 948 F.3d at 372 (cleaned up); *see also* "Facilitate," BLACK'S LAW DICTIONARY (11th ed. 2019) ("To make the occurrence of (something) easier; to render less difficult.").  The broad reach of these terms necessarily touches on constitutionally protected expression, including that of Appellants.  Websites that provide health and safety information to

26

sex workers, such as Rate that Rescue, certainly fall within the wide range of things that could be said to "assist or aid" prostitution. Websites that enable sex workers to report violence or harassment, or to circulate "bad date" lists, no doubt makes their jobs "easier" or "less difficult." This Court recognized as much in its prior opinion, holding that "there is ample reason to conclude that the threat of future enforcement against Andrews is substantial" because of posts, such as information about payment processing services, that might be made by third parties on Rate That Rescue. *Woodhull*, 948 F.3d at 373.

Although the District Court concluded the law only reaches speech integral to criminal conduct, it is plain—as the panel majority found—that "FOSTA's text does not limit its scope to 'bad actor websites,' or even to classified advertising." *Id.* at 372 (citation omitted). Accordingly, "the central overbreadth question becomes whether any of the purposes included in the statute's specific-intent element implicate protected advocacy. If so, *those purposes can't form the basis of an attempt to engage in unlawful speech*." *United States v. Miselis*, 972 F.3d 518, 535 (4th Cir. 2020) (emphasis added), *cert. denied*, 141 S. Ct. 2756 (2021); *see also United States v. Sineneng-Smith*, 910 F.3d 461, 475 (9th Cir. 2018) ("Although the 'encourage or induce' prong [of the law] may capture some conduct, there is no way to get around the fact that the terms also plainly refer to First Amendment-protected expression."), *vacated on other grounds*, 140 S. Ct. 1575 (2020).

Ultimately, the government's argument is not that FOSTA does not regulate speech; it is that the speech FOSTA regulates is constitutionally unprotected. That is wrong, for reasons set forth below. Whatever else may be said about FOSTA and its scope, its entire purpose is to restrict the transmission of information.

### 2. The Conclusion That FOSTA Reaches Only Unprotected Speech is Incorrect

The District Court erroneously concluded that FOSTA does not "prohibit *any* such protected speech" by interpreting it to apply only to "conduct or unprotected speech integral to criminal activity." JA0734. This was based entirely on Judge Katsas' partial concurrence, suggesting that the terms "promote" or "facilitate" must be read as synonyms for aiding and abetting, limited by the relevant background of criminal law. *Id*. Judge Leon discounted the panel's reading of the statute by saying "the majority did not decide how FOSTA *should* be construed, but only how it *could* be construed." JA0733. But looking at the ways a law *could* be interpreted is how overbreadth analysis works. *See, e.g*., *Free Speech Coal*., 535 U.S. at 244; *Stevens*, 559 U.S. at 473. The question is whether the statutory language on its face applies to protected speech, and whether the law is "readily susceptible" to the proposed narrowing construction. *Reno*, 521 U.S. at 884-85.

The panel's opinion made clear FOSTA is not susceptible to such a narrow reading, and its construction of the law cannot be so easily shrugged off. While the Court was focused on standing (the only issue before it), the majority's decision was

28

rooted in disagreement with Judge Leon's narrow reading of FOSTA—the very interpretation the District Court believes was vindicated by Judge Katsas' concurrence. The majority observed that "the common meaning of facilitate is 'to make easier,'" that the terms are not defined and "are susceptible of multiple and wide-ranging meanings," and are not "limited by a string of adjacent verbs." *Woodhull*, 948 F.3d at 372.

This observation means FOSTA is not susceptible to a narrowing construction by application of the *noscitur a sociis* canon, because the law's operative terms contain *no* adjacent verbs. *See generally Williams*, 553 U.S. at 294 (explaining "the commonsense canon of *noscitur a sociis*"). For statutes like FOSTA, "'a list of two words' is 'too short for application of the canon *noscitur a sociis*.'" *Hernandez-Calvillo*, 39 F.4th at 1306 (citation omitted); *see also, e.g.*, *Sineneng-Smith*, 910 F.3d at 474 (canon did not apply where the law did "not have a string of five verbs" but "only two" that "can be applied to speech, conduct, or both"). It also means the district court's narrowed construction of FOSTA makes sense *only* if the terms "promote" and "facilitate" can be interpreted as aiding and abetting in the criminal law sense and no other way. This is implausible for several reasons.

*First*, it puts the cart before the horse. The interpretation of statutory terms "begins with their ordinary meaning, not their specialized meaning in criminal law." *Hernandez-Calvillo*, 39 F.4th at 1304. The Supreme Court has explained that "we

start with the assumption that the legislative purpose is expressed by the ordinary meaning of the words used." *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 47 (1989) (citation omitted); *see also* Scalia and Garner at 69 ("The ordinary-meaning rule is the most fundamental semantic rule of interpretation.").[5] And here, the ordinary understanding or the two verbs Congress chose "are susceptible of multiple and wide-ranging meanings." *Woodhull*, 948 F.3d at 372 (citation omitted).

**Second**, FOSTA is not susceptible to interpretation solely through criminal law concepts because *all* of its various provisions provide both criminal and civil remedies, as the majority noted. *Id.* at 373; *see also Hernandez-Calvillo*, 39 F.4th at 1306 (explaining that "facilitating or soliciting *civilly* unlawful activity is not enough" since "facilitation and solicitation generally require some underlying *criminal* conduct"); *Sineneng-Smith*, 910 F.3d at 482 ("we are not aware of any case that upholds a statute restricting such speech" in the civil context under an aiding and abetting theory). Thus, it is not possible to narrow the law as the District Court did without ignoring FOSTA's overall structure and purpose.

---

[5] A court may deviate from the ordinary meaning rule to apply the "narrower, criminal-law sense of solicitation or aiding and abetting," when that interpretation "is supported by the *noscitur a sociis* canon." *Marquez-Reyes*, 36 F.4th at 1202-03. But, of course, that statutory canon does not apply here. *Hernandez-Calvillo*, 39 F.4th at 1306 (*noscitur a sociis* "doesn't apply here because there are no neighboring verbs").

*Third*, the District Court's construction of FOSTA violates the canon against superfluity because "the verbs 'promote' and 'facilitate' are disjunctive." *Woodhull*, 948 F.3d at 372.  A "cardinal principle" governing statutory interpretation is that "if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant."  *Andrews*, 534 U.S. at 31 (citation omitted); *see also* Scalia and Garner at 174 (statutory interpretations that create redundancies "may be presumed improbable").  And if "facilitation" means "aiding and abetting," as the District Court concluded, what does "promote" mean?[6]  The District Court's construction of FOSTA leaves an extra puzzle piece that doesn't fit the overall picture.  The word "promotes" either is surplusage in violation of the superfluity canon, or it means something more than "aiding and abetting."  *See Miselis*, 972 F.3d at 536 (verbs "encourage" or "promote" in Anti-Riot Act "fail to bear the requisite relation between speech and lawlessness"); *United States v. Rundo*, 990 F.3d 709 (9th Cir. 2021) (same), *cert. denied*, 142 S. Ct. 865 (2022).

*Fourth*, nothing in FOSTA limits its applications to "transactions," as the District Court concluded.  JA0729-0732.  Again, the Supreme Court in *Williams* explained that a verb like "promotes" takes on "a transactional connotation" only

---

[6]  In *Williams*, the Supreme Court observed that the word "promote" in a criminal statute is "susceptible of multiple and wide-ranging meanings" unless it can be narrowed by other surrounding verbs using the *noscitur a sociis* canon.  553 U.S. at 294.  But as noted, that interpretive option is not available for FOSTA.

when the word "is given more precise content by the neighboring words with which it is associated."  553 U.S. at 294; *see also Hernandez-Calvillo*, 39 F.4th at 1305-06. But in FOSTA, "promotes" has no neighbors except "facilitates," its redundant evil twin.  The District Court focuses on FOSTA's language regarding the facilitation or promotion or the "prostitution of another person," but that language does not suggest the statutory terms encompass only criminal transactions.  Even for communication specifically about illegal prostitution (as distinguished from sex work generally), much speech intended to "facilitate" the activity (*e.g.*, promoting health, safety, providing legal and political support) falls within the broad language of FOSTA but is not part of a criminal transaction.

The Ninth Circuit specifically rejected the District Court's reasoning in cases striking down provisions of the Immigration and Nationality Act ("INA").  In *Sineneng-Smith*, 910 F.3d 461, the court held a prohibition on "encouraging" or "inducing" an alien to come to, enter, or reside in the U.S., knowing, or in reckless disregard that doing so is illegal, is an overbroad restriction of protected speech.[7]

---

[7] The Supreme Court vacated the decision in *United States v. Sineneng-Smith*, 140 S. Ct. 1575 (2020), for addressing constitutional issues not raised by the parties. Afterward, two other courts found the same INA provisions to be unconstitutional, observing "that much of [*Sineneng-Smith*'s] thorough analysis is persuasive on the overbreadth issue."  *United States v. Hansen*, 25 F.4th 1103, 1107 (9th Cir. 2022), *rehearing denied*, 40 F.4th 1049 (9th Cir. 2022), *pet. for cert. docketed*, No. 22-179 (Aug. 29, 2022); *Hernandez-Calvillo*, 39 F.4th at 1303 n.8 ("[W]e may consider [*Sineneng-Smith*'s] initial overbreadth analysis to the extent we find it persuasive.").

The court accepted the government's construction that the law "is limited to encouraging 'a particular alien or aliens,'" but nevertheless found "implying a *mens rea* requirement into the statute and applying it only to speech to a particular person does not cure the statute's impermissible scope." *Id*. at 478, 484.

The same is true here: the clause "prostitution of another person" does nothing to narrow FOSTA's excessive reach. An online Q&A that answers specific health questions from a particular individual (even if a prostitute) or an online service that logs reports of "bad dates" may be said to "facilitate" or "promote" prostitution under the statute's plain terms, but cannot be said to be "aiding or abetting" the crime of prostitution. *Cf. id*. at 484 ("Just because the grandmother wanted her words to encourage her grandson [to violate the law] and said them directly to him does not render those words less protected under the First Amendment."). Contrary to the reasoning below, not all speech relating to the "prostitution of another person" is transactional or illegal.

### 3.    FOSTA's Impact on Protected Speech

FOSTA's incursions into protected speech are significant both in absolute terms and in comparison to any "legitimate sweep" of the law. *Williams*, 553 U.S. at 292; *Hernandez-Calvillo*, 39 F.4th at 1309. Experience under the law has shown it "susceptible of regular application to protected expression." *City of Houston v. Hill*, 482 U.S. 451, 467 (1987). Where a law can reach protected speech, as here,

33

the government does not get the benefit of doubt.  *Button*, 371 U.S. at 432 ("If the line drawn … between the permitted and prohibited activities … is an ambiguous one, we will not presume that the statute curtails constitutionally protected activity as little as possible.").

According to the government, FOSTA's "legitimate sweep" is to allow civil claims and prosecution against so-called "bad-actor" websites, JA0489, identified primarily as those hosting classified ads, *see* JA0468 ("More than 80% of federal sex trafficking prosecutions between 2015 and 2020 involved online advertising."), with Backpage.com cited as the biggest source of the problem, *id*. (claiming Backpage "reportedly net more than 80% of all revenue from online commercial sex ad[s] in the United States").  But this Court previously found, "FOSTA's text does not limit its scope to 'bad actor websites,' or even to classified advertising." *Woodhull*, 948 F.3d at 372 (citation omitted).

Under its plain terms, FOSTA affects a far broader range of online speech. Anything on an online platform, commercial or non-commercial alike, that can be said to "promote" or "facilitate" prostitution or trafficking creates a risk of criminal prosecution or ruinous civil liability.  *See id*. at 373 (holding that Alex Andrews' operation of a website designed to make sex workers' lives and work easier creates a substantial threat of future enforcement under FOSTA).  Websites that support sex workers by providing health-related information or safety tips could be liable for

34

promoting or facilitating prostitution, while those that assist or make prostitution easier—*i.e.*, "facilitate" it—by advocating for decriminalization are now uncertain of their own legality.  Additionally, websites that enable interpersonal or intimate connections, such as "personals" or "dating" information, face obvious risks.  This overbreadth is not hypothetical.  The response from intermediaries not before this Court has been predictably, inevitably, and understandably to censor wide swaths of protected speech:  an unprecedented array of sites closed down or severely restricted access to constitutionally-protected material immediately after FOSTA passed. JA0080-0083.  *Cf. McManus*, 944 F.3d at 516-17 ("[T]he short history of Maryland's law shows that these chilling effects are not theoretical.").

Cases invalidating provisions of the INA and the Anti-Riot Act illustrate the overbreadth problem.  Although the "INA was intended to restrict the facilitation of illegal immigration" and parts of the law target specific illegal acts, "there is no way to get around the fact that the terms ['encourage' or 'induce'] also plainly refer to First Amendment-protected expression." *Sineneng-Smith*, 910 F.3d at 475; *see also Hansen*, 25 F.4th at 1110 ("Many commonplace statements and actions could be construed as encouraging or inducing an undocumented immigrant to come to or reside in the United States.").  The INA was overbroad because the statute's plain language could reach such things as providing certain legal advice, advising a noncitizen about available social services, or encouraging an undocumented

immigrant to take shelter during a natural disaster.  *Id.*; *Hernandez-Calvillo*, 39 F.4th at 1311.  Similarly, the decisions in *Miselis* and *Rundo* held that language of the Anti-Riot Act prohibiting speech that tend to "encourage" or "promote" a riot, as well as speech "urging" others to riot "fail to bear the requisite relation between speech and lawlessness," and "sweeps up a substantial amount of speech that retains the status of protected advocacy."  *Miselis*, 972 F.3d at 530, 536; *Rundo*, 990 F.3d at 720 (same).

And so it is with FOSTA.  Not only does FOSTA's reach exceed its legitimate scope, it is questionable whether FOSTA was necessary to serve *any* of its stated objectives.  FOSTA's overbreadth is underscored by the fact that other laws that do not target online speech serve the same purposes.[8]  The government admits that "FOSTA does not criminalize any conduct that was not already prohibited under existing federal law," JA0464, such as 18 U.S.C. § 1591(a) and the Travel Act, the later of which the government used in the prosecution of Backpage.com, forcing it to cease operating.  JA0469, JA0483, JA0487-0490 & n.7.  The availability of "alternative prosecutorial tools dilutes the force of [a law's] legitimate applications." *Hernandez-Calvillo*, 39 F.4th at 1310; *see also Keyishian v. Bd. of Regents of Univ.*

---

[8] *See Government Accountability Office, Sex Trafficking—Online Platforms and Federal Prosecutions*, GAO-21-385, at 30 (June 2021) ("GAO Report") (finding that FOSTA has not been used much by prosecutors since its passage because they have proceeded under pre-existing laws).

*of State of N.Y.*, 385 U.S. 589, 609 (1967) ("The breadth of legislative abridgment must be viewed in the light of less drastic action for achieving the same purpose." (quoting *Shelton v. Tucker*, 364 U.S. 479, 488 (1960)); *Playboy*, 529 U.S. at 823-24.

Where, as here, the government's objective of prosecuting "bad actor websites" can be pursued without targeting speech directly, the law's "plainly legitimate sweep [has] little independent work to do." *Hansen*, 25 F.4th at 1109; *Hernandez-Calvillo*, 39 F.4th at 1309-10 ("[F]or each of the government's examples [of legitimate applications] other statutes independently—and more narrowly— proscribe these activities.").    By contrast, because FOSTA focuses on communication via the Internet, it has no applications that do *not* involve speech. *Cf. Marquez-Reyes*, 36 F.4th at 1205.  In practice, FOSTA has had little effect within the ambit of its "legitimate sweep," while its very existence has had widespread censorial effects across the Internet.  That is the very definition of an overbroad law.

## B.    FOSTA is Unconstitutionally Vague and Lacks Clear Scienter Requirements

FOSTA is not merely overbroad; it is also vague.  While questions involving overbreadth and vagueness necessarily are related, the chilling effect is most pronounced when a law contains both defects, as here.  FOSTA amended existing statutes and added new crimes expressly to broaden the law's prohibition.  But as the majority observed, "FOSTA does not define 'promote' or 'facilitate,' nor does it specify what constitutes 'prostitution,' a term undefined by federal law." *Woodhull*,

948 F.3d at 372.  Likewise, the operative verbs in Section 1591(e)(4)—assisting, supporting, and facilitating—are ambiguous, leaving owners and operators of interactive services to guess about what speech might run afoul of the law.

FOSTA's aggravated offense creates further ambiguity by increasing punishment for those who act "in reckless disregard … that … conduct contributed to sex trafficking," without indicating how one "contributes to sex trafficking."  18 U.S.C. § 2421A(b)(2).  The vagueness of these terms is compounded by Congress's belief that sex trafficking and consensual sex work are "inextricably linked," thus raising the probability that it considers anything that "contributes to" sex work, whatever that means, to also inherently "contribute to sex trafficking."  H.R. Rep. No. 115-572, pt. 1, at 5.

A vague law regulating expression "raises special First Amendment concerns because of its obvious chilling effect on free speech."  *Brown*, 564 U.S. at 807 (quoting *Reno*, 521 U.S. at 871-72).  Such laws are unconstitutional because they "inevitably lead citizens to 'steer far wider of the unlawful zone' … than if the boundaries of the forbidden areas were clearly marked."  *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) (quoting *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964)).  Experience under FOSTA exemplifies this concern.

The District Court discounts the problem, relying on the same assumption as its conclusions on overbreadth—that FOSTA's terms must be read in "the criminal

38

law context in which they appear" and that they acquire clarity from "established synonyms in the criminal law."  JA0736 & n.9.  This holding is wrong for the same reasons the District Court erred in its analysis of overbreadth, *supra* Part I.A, and an offhand allusion to criminal law "synonyms" does not solve FOSTA's vagueness problem.  Congress knows how to write aiding and abetting statutes, and if that was what it intended, it would have used specific language.[9]  When penal statutes are involved, "[p]recision of regulation must be the touchstone in an area so closely touching our most precious freedoms."  *Button*, 371 U.S. at 438.

A lack of precision led the Supreme Court to strike down the CDA's vague prohibition of online indecency.  In doing so, the Court asked "[c]ould a speaker confidently assume that a serious discussion about birth control[], homosexuality, the First Amendment issues raised by the Appendix to our *Pacifica* opinion, or … prison rape would not violate the CDA?"  *Reno*, 521 U.S. at 871.  Under FOSTA, speakers cannot "confidently assume" they will not be threatened by criminal or civil

---

[9] Generally speaking, Congress uses many more verbs and gerunds to describe aiding and abetting liability, as a variety of statutes attest.  *See, e.g.*, 26 U.S.C. § 7206(2)-(3) (fraud and false statements under internal revenue laws); 21 U.S.C. § 841(h) (dispensing controlled substances online); 15 U.S.C. § 80b-9(f) (SEC regulation of investment advisors); 15 U.S.C. § 78t (regulation of securities trading); 7 U.S.C. § 13c (regulation of commodity exchanges); 12 U.S.C. § 1847 (penalties for violating bank holding company regulations); 12 U.S.C. § 1786(k)(2)(K), (m) (regulation of insured credit unions).  Significantly, *none* of these statutes use "facilitate" to define aiding and abetting.

liability for any online speech that may be said to "promote" or "facilitate" prostitution, or "contribute to" sex trafficking, because the law lacks clear language separating legal from unprotected speech.

The threats that ordinarily accompany vagueness are exponentially greater here than for the CDA, because FOSTA vastly multiplies the number of people who can enforce the law. Even if a party were confident that DOJ would not find that its speech "facilitates" prostitution, it would ignore reality—as well as the history of Internet censorship—to disregard how FOSTA's vague mandate will be used by prosecutors and private litigants in all 50 states to censor speech and threaten lifestyle choices with which they disagree.

The District Court disregarded Appellants' concerns about vagueness by pointing to what it called "the presence of heightened scienter requirements throughout FOSTA's prohibitions." JA0736. But the opposite is true: FOSTA's vagueness and overbreadth are further underscored by its failure to prescribe constitutionally sufficient *mens rea* requirements.

Section 2421A lacks any specific knowledge element, and although it includes an "intent" requirement, it is not limited to speech that is integrally related to, or supportive of, criminal activity. The Fourth Circuit recently addressed this issue in *Miselis*, noting that where a statute's *mens rea* element implicates protected expression, it "can't form the basis of an attempt to engage in unlawful speech."

40

972 F.3d at 535. Accordingly, a statute violates the First Amendment when it criminalizes the intent to engage in speech without specific knowledge that it relates to unprotected activity. FOSTA violates that rule, as a person may intend to "facilitate" prostitution through entirely legal means, such as political advocacy, education, or harm reduction, yet would still be subject to criminal and civil liability.

Where a statute fails to provide fair warning of the prohibited conduct in the first instance, mandating that such indifinite acts be done with "intent" does not cure vagueness. Particularly where the prohibited speech is protected by the First Amendment, inclusion of a *mens rea* element does not make the prohibition clear. *E.g.*, *Baggett*, 377 U.S. at 366-68 (Constitution does not permit statutory language that can be interpreted "to require foreswearing of an undefined variety of 'guiltless knowing behavior'").

FOSTA's "aggravated" offense likewise imposes liability based on "reckless disregard" of the fact that speech "contributed to sex trafficking." 18 U.S.C. § 2421A(b)(2). This provision does not require specific knowledge, and instead imposes heightened liability based on a generalized notion that online speech may be construed to "promote or facilitate" prostitution or to "contribute to sex trafficking." This violates the constitutional requirement that a defendant "must 'know the facts that make his conduct fit the definition of the offense, even if he

does not know that those facts give rise to a crime.'" *Elonis v. United States*, 575 U.S. 723, 734-35 (2015) (citation omitted).

Additionally, lack of precision in FOSTA's amendment of Section 230 has caused significant confusion among courts about whether civil litigants may bring claims against online intermediaries based on constructive versus actual knowledge of wrongdoing.  FOSTA removed immunity for civil actions "brought under section 1595 … if the conduct underlying the claim constitutes a violation of section 1591 of that title."  47 U.S.C. § 230(e)(5)(A).  This carveout from Section 230's civil immunity has confounded courts.  Some have held that this change allows civil claims against online services only where the intermediary had actual knowledge of criminal acts in violation of Section 1591,[10] while others have held that liability may be imposed based on constructive knowledge.[11]  As one court noted, the "confusion arises from the phrase 'participation in a venture' in both § 1591 … and § 1595(a))."  *Kik Interactive*, 482 F. Supp. 3d at 1249.

---

[10] *E.g.*, *J.B. v.G6 Hosp., LLC*, 2021 WL 4079207 (N.D. Cal. 2021), *appeal pending*, No. 22-15290 (9th Cir. 2022); *Doe v. Kik Interactive, Inc.*, 482 F. Supp. 3d 1242, 1249-51 (S.D. Fla. 2020).

[11] *E.g.*, *Doe v. Mindgeek USA Inc.*, 558 F. Supp. 3d 828, 836 (C.D. Cal. 2021); *Doe v. Twitter, Inc.*, 555 F. Supp. 3d 889, 920 (N.D. Cal. 2021), *appeal filed*, No. 22-15104 (9th Cir. 2022).

The District Court lumped its analysis of the scienter issue with its conclusions on overbreadth and vagueness, and focused almost exclusively on scienter under Section 2421A, not Section 1591. Its abbreviated discussion of the scienter issue rises or falls almost entirely on its conclusions that the verbs "promote" or "facilitate" in Section 2421A and FOSTA's changes to Section 1591 relate solely to aiding and abetting in the criminal law context. JA0736-0737. For reasons already set forth, that analysis is incorrect. *See supra* Part I.A.2.

The absence of clear statutory prohibitions combined with opaque *mens rea* requirements has proven to be particularly chilling for online intermediaries and people who depend on them for communication. Such platforms have no clear way to avoid liability without monitoring and over-censoring users' posts. FOSTA created a predictable speech-suppressing ratchet leading to "self-censorship of constitutionally protected material" on a massive scale, *Mishkin v. New York*, 383 U.S. 502, 511 (1966), such as where Craigslist eliminated its entire personals section and Reddit banned certain subreddits. The Supreme Court viewed such mainstream, general-purpose websites as indispensable in *Packingham*, 137 S. Ct. at 1735-36, yet they have restricted themselves in an effort to "steer far wide[] of the unlawful zone." *Speiser v. Randall*, 357 U.S. 513, 526 (1958).

## C.    FOSTA Fails Strict Scrutiny

FOSTA regulates speech based on the content of its message. Because

FOSTA does not satisfy the strict scrutiny applicable to such "presumptively invalid" regulations, *Playboy*, 529 U.S. at 817, it must be enjoined.

### 1.     FOSTA is a Content-Based Regulation

"Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Laws that facially target the "message" of "particular subject matter," regulate speech "by its function or purpose," or "discriminate among viewpoints," are content based. *Id.* at 163-64, 168-69. So are facially neutral laws "that cannot be' justified without reference to the content of the regulated speech.'" *Id.* at 164 (quotation omitted). FOSTA qualifies by every measure.

***First***, FOSTA does not restrict all online speech, but only that which "promote[s] or facilitate[s] prostitution of another person." 18 U.S.C. § 2421A. By "singl[ing] out" only "specified content" for regulation—*i.e.*, publication of speech that promotes or facilitates prostitution, whatever that means—FOSTA fits the archetype of regulations the Supreme Court has classified as content based. *Simon & Schuster, Inc. v. N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991) (statute regulating income derived "only on speech of a particular content" was "plainly" content based); *McManus*, 944 F.3d at 513 ("a content-based regulation on speech … singles out one particular topic of speech … for regulatory attention").

44

*Second*, FOSTA is content based because it expressly targets speech based on its "function or purpose." *Reed*, 576 U.S. at 163-64. Any contention that FOSTA merely regulates the promotion of proscribed conduct is irrelevant: FOSTA "cannot escape classification as facially content based simply by swapping an obvious subject-matter distinction for a 'function or purpose' proxy that achieves the same result." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1474 (2022) (discussing *Reed*, 576 U.S. at 163-64).

*Third*, FOSTA also discriminates "among viewpoints," *Reed*, 576 U.S. at 168-69, creating liability through Section 2421A and its amendments to Section 230 for speech that supports sex work—such as harm-reduction education and advocacy for decriminalization—while exempting speech that condemns it and immunizing platforms that remove at-risk speech from publication. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) (holding that such a regulation is an "egregious form of content discrimination"). FOSTA operates much like the "material support" statute at issue in *Holder v. Humanitarian Law Project*, 561 U.S. 1, 27 (2010), which the Supreme Court classified as content-based since "whether" persons could lawfully "speak to" designated organizations "depend[ed] on what they say."

The District Court ignored most of this, focusing only on whether FOSTA discriminated among viewpoints, and concluding under *Ward v. Rock Against*

45

*Racism*, 491 U.S. 781 (1989)—without even engaging in a viewpoint analysis—that it ultimately made no difference because FOSTA "is not a direct regulation of speech" at all.  JA0738.  This was error.  The District Court's order "conflates two distinct but related limitations that the First Amendment places on government regulation of speech," and fails to recognize that "a speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter."  *Reed*, 576 U.S. at 168-69.  Properly construed, FOSTA "focuses *only* on the content of the speech" it regulates.  *Playboy*, 529 U.S. at 811.  It thus constitutes "the essence of [a] content-based regulation" that is "presumptively invalid."  *Id.* at 812, 817 (citation omitted).

## 2.    FOSTA Does Not Employ the Least Restrictive Means

To overcome the presumption of invalidity, the government must come forward with evidence that FOSTA provides "the least restrictive means of achieving a compelling state interest."  *McCullen v. Coakley*, 573 U.S. 464, 478 (2014).  "If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative."  *Playboy*, 529 U.S. at 813 (citation omitted).

The government has not satisfied that "demanding standard."  *Brown*, 564 U.S. at 799.  In fact, the government has never argued, and the District Court never held, that FOSTA could survive strict scrutiny.  Even granting the government's claim of a compelling interest, "[t]he prospect of crime … by itself does not justify

laws suppressing protected speech." *Free Speech Coal.*, 535 U.S. at 244-45 (citing cases). The means FOSTA employs to prevent sex trafficking must not restrict speech "further than necessary." *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004).

Instead of deploying the *least* restrictive means to achieve its ends, by targeting online intermediaries with tens of millions of lawful users, FOSTA adopts the *most* restrictive option. Nothing like this was necessary. Prior to FOSTA's enactment, it was already a crime to "advertise[]" sex trafficking (on the Internet or elsewhere) and to "benefit[] financially" from a venture involving such ads. 18 U.S.C. § 1591(a)(1), (2). The enforcement of these laws (subject to First Amendment limits, including constitutionally required *mens rea* requirements) provide obvious less restrictive means to obtain the same end. Their existence is fatal. "When a plausible, less restrictive alternative is offered to a content-based speech restriction, it is the Government's obligation to prove that the alternative will be ineffective to achieve its goals." *Playboy*, 529 U.S. at 816. The government makes no such showing here. As in *Playboy*, the government's failure to rebut the existence of effective, established, and less restrictive federal prohibitions besides FOSTA is dispositive. *Id.* at 825-26; *see also Ashcroft*, 542 U.S. at 666-70 (upholding injunction under *Playboy* where government did not even attempt to show that its means were less effective than the identified alternative).

47

## II.   FOSTA VIOLATES THE FIRST AMENDMENT BY ESTABLISHING PUBLICATION LIABILITY FOR ONLINE INTERMEDIARIES

Regulations on speech raise "particular concern" when they target an "entire medium of expression" and restrict "a common means of speaking." *City of Ladue v. Gilleo*, 512 U.S. 43, 55-56 (1994).  This is especially true with the Internet, which hosts a "worldwide audience" of billions of publishers, speakers, and readers. *Reno*, 521 U.S. at 853.  Regulations designed to chill Internet communications thus pose a unique danger since they foreclose the most "dynamic, multifaceted category of communication" ever created. *Id.* at 870.  As the Fourth Circuit explained, "when the onus is placed on platforms, we hazard giving government the ability to accomplish indirectly via market manipulation what it cannot do through direct regulation." *McManus*, 944 F.3d at 517.  FOSTA's First Amendment problems must be evaluated within this context.

### A.   The First Amendment Protects Speech by Intermediaries

Well before the Internet, the Supreme Court recognized that laws threatening to impose liability on those who provide a forum for the speech of others pose special threats to the rights of speakers and readers who depend on those services.

In *Smith*, 361 U.S. at 153-54, the Court struck down a law holding booksellers strictly liable for obscene books on their shelves because the law would in effect compel self-censorship.  The problem, the Court noted, was "[t]he bookseller's limitation in the amount of reading material with which he could familiarize himself,

48

and his timidity in the face of his absolute criminal liability, thus would tend to restrict the public's access to forms of the printed word which the State could not constitutionally suppress directly."  For similar reasons, the Court rejected Rhode Island's bookseller liability laws in *Bantam Books v. Sullivan*, 372 U.S. 58 (1963), and later upheld cable programmers' First Amendment challenge to laws requiring cable operators to segregate and block patently offensive sexual content, *Denver Area Educ. Telecomms. Consortium v. FCC*, 518 U.S. 727 (1996); *see also Midwest Video Corp. v. FCC*, 571 F.2d 1025, 1056 (8th Cir. 1978), *aff'd*, 440 U.S. 689 (1979) (requiring cable operators to block programmers' unlawful speech impermissibly created "a corps of involuntary government surrogates" to violate intermediary First Amendment rights).

As the Court recognized in *New York Times v. Sullivan*, 376 U.S. 254, 266 (1964), holding an intermediary liable for publishing third-party content "would discourage" those intermediaries "from carrying" content and "shut off an important outlet for the promulgation of information and ideas by persons who do not themselves have access to publishing facilities."  Such "self-censorship, compelled by the State" is thus "a censorship affecting the whole public."  *Id.* at 279 (quoting *Smith*, 361 U.S. at 154).  Laws affixing liability for publishing third-party content must therefore precisely define the unprotected speech, avoid overbreadth, operate only through robust *mens rea* requirements, and not incentivize intermediaries to

49

suppress third parties' protected speech.  *See, e.g.*, *Winter v. G.P. Putnam's Sons*, 938 F.2d 1033, 1037 & n.8 (9th Cir. 1991) (holding "the First Amendment and the values embodied therein" precluded making a publisher "independently investigate" third-party content).

The laws invalidated in these cases had enabled audiences to collaterally "censor[]" speech through complaints to intermediaries—what is known as a "heckler's veto." *Reno*, 521 U.S. at 880.  The heckler's veto is dangerous because intermediaries often respond to complaints by deleting speech, or eliminating the forum, since it would be unduly burdensome to investigate the merits of every complaint.  *Id.*

### B.     Congress Codified First Amendment Protections in Section 230 to Address the Problem of Intermediary Liability Online

Concern over the "heckler's veto" is magnified with online intermediaries, which process "millions of posts per day." *NetChoice*, 34 F.4th at 1230.  Congress responded to this liability threat by enacting Section 230 of the CDA "to promote rather than chill internet speech." *Bennett*, 882 F.3d at 1166.

Section 230 "protects against the 'heckler's veto' that would chill free speech" online by enacting a prophylactic statutory "immunity" that "shield[s]" online intermediaries from having to either "remove the content" complained about "or face litigation costs and potential liability." *Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 407-08, 417 (6th Cir. 2014).  As Judge Wilkinson explained in

*Zeran v. America Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997), the seminal case interpreting Section 230, "Congress considered the weight of the speech interests implicated and chose to immunize service providers to avoid any such restrictive effect." Section 230 thus ensures the continued viability of preexisting First Amendment principles online by establishing "incentives to protect lawful speech" from the unique vulnerability online intermediaries face. *Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 418-19 (1st Cir. 2007).

Section 230(c)(1) is key to this objective. Subsection (c)(1) immunizes online intermediaries from liability for "making the decision whether to print or retract a given piece of content." *Klayman v. Zuckerberg*, 753 F.3d 1354, 1359 (D.C. Cir. 2014). Taking a maximalist approach coextensive with the First Amendment, "nothing in § 230(c)(1) turns on the alleged motives underlying the editorial decisions" at issue. *Fyk v. Facebook, Inc.*, 808 F. App'x 597, 598 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 1067 (2021). "Subsection (c)(1), by itself, shields from liability *all publication decisions*, whether to edit, to remove, or to post, with respect to content generated entirely by third parties." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1105 (9th Cir. 2009) (emphasis added).

Subsection (c)(2) "provides an *additional shield* from liability, *but only for* 'any action voluntarily taken in good faith to restrict'" dissemination of "obscene" or "otherwise objectionable" content. *Id.* (emphasis added) (quoting 47 U.S.C.

§ 230(c)(2)).  Though it does reinforce an online intermediary's protected editorial discretion, subsection (c)(2) *does not* address the "heckler's veto" and First Amendment concern for collateral censorship that animates Section 230's primary intermediary protections in subsection (c)(1).  Section 230 without subsection (c)(1) would "subject" online intermediaries to "*liability only for the publication of information, and not for its removal*," and thus do nothing to eliminate the pernicious but "natural incentive simply to remove messages upon notification, whether the contents [are] defamatory or not."  *Zeran*, 129 F.3d at 333 (emphasis added).

## C.    FOSTA's Amendments to Section 230, Combined With Its Other Provisions, Violate the First Amendment

FOSTA revives the perverse incentive to over-censor that Congress sought to avoid in passing Section 230.  It strips away immunities provided by subsection (c)(1), reviving the collateral censorship risks the First Amendment prohibits, in what Congress called "a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity." 47 U.S.C. § 230(a)(3).

FOSTA amended Section 230(c)(1) to make online intermediaries liable for civil claims under 18 U.S.C. § 1595, state criminal charges where the underlying conduct would violate 18 U.S.C. § 1591, as well as parallel 18 U.S.C. § 2421A charges in jurisdictions where prostitution is illegal.  At the same time, FOSTA

leaves subsection (c)(2) undisturbed, which immunizes actions taken to *restrict* speech—even speech protected by the First Amendment.[12]

This selective modification, combined with new and heightened penalties and an expanded range of potential enforcers, restores the "specter" of "liability" that leads online platforms to "severely restrict" and censor the content they publish. *Bennett*, 882 F.3d at 1166 (citation omitted).  This results in far-reaching censorship: FOSTA restricts the speech of intermediaries themselves—like Facebook and Reddit, as well as smaller operators like Appellants Andrews and the Internet Archive—and promotes the collateral censorship of their users, speakers who *rely* on those intermediaries, like Appellants Koszyk, Woodhull, and HRW.  *Sullivan*, 376 U.S. at 266.

FOSTA had its intended and predictable effect of resurrecting the "dilemma Section 230 had been designed to eliminate."  Eric Goldman, *The Complicated Story of FOSTA and Section 230*, 17 First Amendment L. Rev. 279, 288 (2019).  Since FOSTA took effect, many large platforms have over-censored to avoid potential

---

[13]  While the grants of immunity under subsections (c)(1) and (c)(2) address separate issues, FOSTA's sponsors, and those who are advocating its enforcement, conflated the two, suggesting that Section 230 immunity under FOSTA only applies to intermediaries' editorial judgements made in "good faith."  *See* S. Rep. No. 115-199, at 4 (2018) (ignoring the distinct protections of subsection (c)(1), and claiming that online intermediaries "would not have their good faith efforts to restrict access to objectionable content used against them" because the legislation "would not abrogate section 230(c)(2)(A)").

liability, while smaller sites simply shut down. *Id*. at 288-89. Confronted "with the choice of censoring legitimate speech or risking lawsuits and criminal prosecution," most "well-intentioned platforms" elected to "err on the side of caution" and censor. Jeff Kosseff, *The Twenty-Six Words That Created The Internet* 270-72 (2019). Users, including several Appellants, have suffered the consequences. JA0080-0882.

The District Court agreed this broad chilling effect was a logical consequence, acknowledging that Appellants' claims "encapsulate the incentives created by this section of FOSTA." JA0737. But it erroneously concluded that no First Amendment principle constrained Congress's ability to "re-balance the provision of an immunity it conferred in the first place," and failed to consider the intersection of FOSTA's amendments to Section 230 and its sweeping new liability provisions. JA0738.[13]

Contrary to the District Court's terse conclusion, Section 230 *itself* provided prophylaxis to underlying First Amendment principles established and applied in cases like *Smith*, 361 U.S. at 153-54, *Bantam Books*, 372 U.S. at 66-67, *Sullivan*, 376 U.S. at 266, 279, and *Denver Area*, 518 U.S. at 747-48, to protect intermediaries

---

[13] The District Court also based its conclusion regarding the selective removal of immunity on its overall misreading of the statute. JA0738 ("These broader claims fail for the reasons discussed above."). Because the District Court erred in that analysis of overbreadth, vagueness, scienter, and the application of strict scrutiny, *see supra* Part I, the District Court's conclusions regarding modifications to Section 230 collapse for this reason, as well.

and those who rely upon them from the pernicious and unconstitutional collateral censorship effects of the heckler's veto. *See supra* Part II.A-B. Modifying Section 230 and exposing online intermediaries to heightened penalties and a global army of censors violates *those* principles that limit Congress's ability to create new forms of intermediary liability. FOSTA was designed to, and did, encourage intermediaries to self-censor.

## III.    FOSTA IS AN UNCONSTITUTIONAL *EX POST FACTO* LAW

FOSTA is a quintessential *ex post facto* law because its effective date enables enforcement of the updated crimes and claims under 18 U.S.C. §§ 1591, 1595, and 2421A—"regardless of whether the conduct alleged occurred, or is alleged to have occurred, ***before***, on, or after such date of enactment." FOSTA § 4(b) (emphasis added). This provision therefore implements radical changes to 47 U.S.C. § 230(e)(5), retroactively authorizing (1) civil claims predicated on violations of criminal law in 18 U.S.C. § 1591; (2) criminal prosecutions under state law where the underlying conduct violates Section 1591; and (3) criminal prosecutions under state law where the underlying conduct violates newly adopted prohibitions in 18 U.S.C. § 2421A.

On its face, this provision violates the Constitution's command that "[n]o … *ex post facto* Law shall be passed." U.S. Const. art. I, § 9. Tellingly, the District Court did not disagree and even commended the government for not

disputing the point. JA0742. The District Court nonetheless dismissed the claim, concluding that "plaintiffs seek injunctive relief only against defendants comprising the federal law enforcement community" and that there was no party in the case against which an injunction could be directed. JA0743.

This ignores the fact that Appellants seek both declaratory and equitable relief. JA0012, JA0020, JA0062, JA0113. The court undoubtedly has the authority to declare an Act of Congress unconstitutional, whether or not a party is entitled to equitable relief, *Marbury v. Madison*, 5 U.S. 137 (1803); *City of Los Angeles v. Patel*, 576 U.S. 409, 415 (2015), and the district court should have done so here. *Stogner v. California*, 539 U.S. 609, 610 (2003) ("The Constitution's two *Ex Post Facto* Clauses prohibit the Federal Government and the States from *enacting* laws with … retroactive effects.") (emphasis added). *See also Ex parte Garland*, 71 U.S. 333, 381 (1866) (declaring that *ex post facto* law "must be rescinded" regardless of pardon nullifying its effect on petitioner); *Al Bahlul v. United States*, 767 F.3d 1, 30-31 (D.C. Cir. 2014) (en banc) (declaring solicitation law "a plain *ex post facto* violation" even without deciding its applicability to defendant).

The District Court's reliance on *Whole Women's Health v. Jackson*, 142 S. Ct. 522 (2021), for the proposition that "no court may lawfully enjoin the world at large," JA0743 (cleaned up), is misplaced. It ignores the claim for declaratory relief as well as the fact that that this case—unlike *Jackson*—is challenging an *ex post*

56

*facto* law in the First Amendment context. Thus, its conclusion that the case lacks "a named defendant … who could even hypothetically undertake enforcement of FOSTA in a manner that would violate the Ex Post Facto Clause," *id.*, is irrelevant. When a law restricts speech, litigants "are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973). A declaratory ruling is essential in this context, even when dealing with hypothetical parties, because a "statute's very existence" may "inhibit[] the speech of third parties who are not before the Court." *Taxpayers for Vincent*, 466 U.S. at 799-800.

## CONCLUSION

For the foregoing reasons, this Court should vacate the District Court's order dismissing this action and denying Appellants a preliminary injunction, and order that it a declare that FOSTA violates the First and Fifth Amendments, as well as the *Ex Post Facto* Clause, and enter a preliminary injunction against *pendente lite* enforcement of FOSTA, and take such other steps as are consistent with this Court's determination.

*/s/ Robert Corn-Revere*

Robert Corn-Revere
bobcornrevere@dwt.com
Adam S. Sieff
adamsieff@dwt.com
Caesar Kalinowski IV
caesarkalinowski@dwt.com
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500
Washington, D.C. 20005
Telephone: 202-973-4200

David Greene
Aaron Mackey
Corynne McSherry
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Telephone: 415-436-9333

Lawrence G. Walters
WALTERS LAW GROUP
195 W. Pine Ave.
Longwood, FL 32750-4104
Telephone: 407-975-9150

Daphne Keller
STANFORD CYBER POLICY CENTER
Encina Hall
616 Jane Stanford Way #E016
Stanford, CA 94305
Phone: 650-725-0325

*Attorneys for Appellants*

# TABLE OF CONTENTS TO ADDENDUM

18 U.S.C. § 1591, as amended and added by FOSTA.........................................A-1

18 U.S.C. § 2421A, as amended and added by FOSTA.....................................A-3

47 U.S.C. § 230, as amended by FOSTA ..........................................................A-4

**ADDENDUM**

United States Code Annotated
  Title 18. Crimes and Criminal Procedure
    Part I. Crimes
      Chapter 77. Peonage, Slavery, and Trafficking in Persons

18 U.S.C. § 1591

§ 1591. Sex trafficking of children or by force, fraud, or coercion

**(a)** Whoever knowingly--

  **(1)** in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or

  **(2)** benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),

knowing, or, except where the act constituting the violation of paragraph (1) is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b).

**(b)** The punishment for an offense under subsection (a) is--

  **(1)** if the offense was effected by means of force, threats of force, fraud, or coercion described in subsection (e)(2), or by any combination of such means, or if the person recruited, enticed, harbored, transported, provided, obtained, advertised, patronized, or solicited had not attained the age of 14 years at the time of such offense, by a fine under this title and imprisonment for any term of years not less than 15 or for life; or

  **(2)** if the offense was not so effected, and the person recruited, enticed, harbored, transported, provided, obtained, advertised, patronized, or solicited had attained the age of 14 years but had not attained the age of 18 years at the time of such

A-1

offense, by a fine under this title and imprisonment for not less than 10 years or for life.

**(c)** In a prosecution under subsection (a)(1) in which the defendant had a reasonable opportunity to observe the person so recruited, enticed, harbored, transported, provided, obtained, maintained, patronized, or solicited, the Government need not prove that the defendant knew, or recklessly disregarded the fact, that the person had not attained the age of 18 years.

**(d)** Whoever obstructs, attempts to obstruct, or in any way interferes with or prevents the enforcement of this section, shall be fined under this title, imprisoned for a term not to exceed 20 years, or both.

**(e)** In this section:

**(1)** The term "abuse or threatened abuse of law or legal process" means the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action.

**(2)** The term "coercion" means--

**(A)** threats of serious harm to or physical restraint against any person;

**(B)** any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or

**(C)** the abuse or threatened abuse of law or the legal process.

**(3)** The term "commercial sex act" means any sex act, on account of which anything of value is given to or received by any person.

**(4)** The term "participation in a venture" means knowingly assisting, supporting, or facilitating a violation of subsection (a)(1).

**(5)** The term "serious harm" means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm.

A-2

(**6**) The term "venture" means any group of two or more individuals associated in fact, whether or not a legal entity.

| United States Code Annotated |
| Title 18. Crimes and Criminal Procedure |
| Part I. Crimes |
| Chapter 117. Transportation for Illegal Sexual Activity and Related Crimes |

18 U.S.C. § 2421A

§ 2421A. Promotion or facilitation of prostitution and reckless disregard of sex trafficking
Effective: April 11, 2018

(**a**) **In general.**--Whoever, using a facility or means of interstate or foreign commerce or in or affecting interstate or foreign commerce, owns, manages, or operates an interactive computer service (as such term is defined in defined in[1] section 230(f) the Communications Act of 1934 (47 U.S.C. 230(f))), or conspires or attempts to do so, with the intent to promote or facilitate the prostitution of another person shall be fined under this title, imprisoned for not more than 10 years, or both.

(**b**) **Aggravated violation.**--Whoever, using a facility or means of interstate or foreign commerce or in or affecting interstate or foreign commerce, owns, manages, or operates an interactive computer service (as such term is defined in defined in[1] section 230(f) the Communications Act of 1934 (47 U.S.C. 230(f))), or conspires or attempts to do so, with the intent to promote or facilitate the prostitution of another person and--

(**1**) promotes or facilitates the prostitution of 5 or more persons; or

(**2**) acts in reckless disregard of the fact that such conduct contributed to sex trafficking, in violation of 1591(a),[2]

shall be fined under this title, imprisoned for not more than 25 years, or both.

(**c**) **Civil recovery.**--Any person injured by reason of a violation of section 2421A(b) may recover damages and reasonable attorneys' fees in an action before any appropriate United States district court.

(**d**) **Mandatory restitution.**--Notwithstanding sections 3663 or 3663A[3] and in addition to any other civil or criminal penalties authorized by law, the court shall

order restitution for any violation of subsection (b)(2). The scope and nature of such restitution shall be consistent with <u>section 2327(b)</u>.

**(e) Affirmative defense.**--It shall be an affirmative defense to a charge of violating subsection (a), or subsection (b)(1) where the defendant proves, by a preponderance of the evidence, that the promotion or facilitation of prostitution is legal in the jurisdiction where the promotion or facilitation was targeted.

Footnotes

[1]  So in original.

[2]  So in original. Should be "<u>section 1591(a)</u>".

[3]  So in original. Should be "<u>section 3663</u> or <u>3663A</u>".

| United States Code Annotated |
| Title 47. Telecommunications |
| Chapter 5. Wire or Radio Communication |
| Subchapter II. Common Carriers |
| Part I. Common Carrier Regulation |

47 U.S.C. § 230

§ 230. Protection for private blocking and screening of offensive material
Effective: April 11, 2018

**(a) Findings**

The Congress finds the following:

 **(1)** The rapidly developing array of Internet and other interactive computer services available to individual Americans represent an extraordinary advance in the availability of educational and informational resources to our citizens.

**(2)** These services offer users a great degree of control over the information that they receive, as well as the potential for even greater control in the future as technology develops.

A-4

**(3)** The Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity.

**(4)** The Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation.

**(5)** Increasingly Americans are relying on interactive media for a variety of political, educational, cultural, and entertainment services.

**(b) Policy**

It is the policy of the United States--

**(1)** to promote the continued development of the Internet and other interactive computer services and other interactive media;

**(2)** to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation;

**(3)** to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services;

**(4)** to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material; and

**(5)** to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer.

**(c) Protection for "Good Samaritan" blocking and screening of offensive material**

**(1) Treatment of publisher or speaker**

No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

A-5

**(2) Civil liability**

No provider or user of an interactive computer service shall be held liable on account of--

>  **(A)** any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

>  **(B)** any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).[1]

**(d) Obligations of interactive computer service**

A provider of interactive computer service shall, at the time of entering an agreement with a customer for the provision of interactive computer service and in a manner deemed appropriate by the provider, notify such customer that parental control protections (such as computer hardware, software, or filtering services) are commercially available that may assist the customer in limiting access to material that is harmful to minors. Such notice shall identify, or provide the customer with access to information identifying, current providers of such protections.

**(e) Effect on other laws**

**(1) No effect on criminal law**

Nothing in this section shall be construed to impair the enforcement of section 223 or 231 of this title, chapter 71 (relating to obscenity) or 110 (relating to sexual exploitation of children) of Title 18, or any other Federal criminal statute.

**(2) No effect on intellectual property law**

Nothing in this section shall be construed to limit or expand any law pertaining to intellectual property.

**(3) State law**

Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. No cause of action may be brought

and no liability may be imposed under any State or local law that is inconsistent with this section.

**(4) No effect on communications privacy law**

Nothing in this section shall be construed to limit the application of the Electronic Communications Privacy Act of 1986 or any of the amendments made by such Act, or any similar State law.

**(5) No effect on sex trafficking law**

Nothing in this section (other than subsection (c)(2)(A)) shall be construed to impair or limit--

**(A)** any claim in a civil action brought under <u>section 1595 of Title 18</u>, if the conduct underlying the claim constitutes a violation of section 1591 of that title;

**(B)** any charge in a criminal prosecution brought under State law if the conduct underlying the charge would constitute a violation of <u>section 1591 of Title 18</u>; or

**(C)** any charge in a criminal prosecution brought under State law if the conduct underlying the charge would constitute a violation of <u>section 2421A of Title 18</u>, and promotion or facilitation of prostitution is illegal in the jurisdiction where the defendant's promotion or facilitation of prostitution was targeted.

**(f) Definitions**

As used in this section:

**(1) Internet**

The term "Internet" means the international computer network of both Federal and non-Federal interoperable packet switched data networks.

**(2) Interactive computer service**

The term "interactive computer service" means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions.

A-7

**(3) Information content provider**

The term "information content provider" means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service.

**(4) Access software provider**

The term "access software provider" means a provider of software (including client or server software), or enabling tools that do any one or more of the following:

   **(A)** filter, screen, allow, or disallow content;

   **(B)** pick, choose, analyze, or digest content; or

   **(C)** transmit, receive, display, forward, cache, search, subset, organize, reorganize, or translate content.

Footnotes

[1]

    So in original. Should be "subparagraph (A)".

## CERTIFICATE OF COMPLIANCE

I certify that pursuant to Fed. R. App. P. 32(a)(7)(C) and Circuit Rule 32-1, the attached brief is proportionately spaced, has a typeface of 14 points or more and contains 12,957 words.

Counsel relies on the computer program used to create this brief for the word count.


By:   */s/ Robert Corn-Revere*
      Robert Corn-Revere

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system on September 6, 2022.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


By:   */s/ Robert Corn-Revere*
           Robert Corn-Revere